Matthew A. Feldman
Paul V. Shalhoub
Robin Spigel
Debra C. McElligott
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                              :        Chapter 11
                                                    :
SquareTwo Financial Services                        :        Case No. 17-_____ (      )
Corporation, et al.,[1]                             :
                                                    :        (Joint Administration Pending)
                               Debtors.             :
--------------------------------------------------------x

### DECLARATION OF J.B. RICHARDSON, JR. IN
### SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, J.B. Richardson, Jr., declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that:

1.        I am the Chief Operating Officer of SquareTwo Financial Corporation,

and a director, officer, and/or manager of certain of the other above-captioned debtors and

debtors in possession (collectively, the "**Debtors**").  I have acted as Chief Operating Officer

---

[1]        The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer
identification number or Canadian equivalent are as follows:  Astrum Financial, LLC (2265); Autus, LLC
(2736); CA Internet Marketing, LLC (7434); CACH, LLC d/b/a Fresh View Funding (6162); CACV of
Colorado, LLC (3409); CACV of New Jersey, LLC (3499); Candeo, LLC (2809); CCL Financial Inc.
(7548); Collect Air, LLC (7987); Collect America of Canada, LLC (7137); Healthcare Funding Solutions,
LLC (2985); Metropolitan Legal Administration Services, Inc. (6811); Orsa, LLC (2864); Preferred Credit
Resources Limited (0637); ReFinance America, Ltd. (4359); SquareTwo Financial Canada Corporation
(1034); SquareTwo Financial Corporation (1849); and SquareTwo Financial Services Corporation d/b/a
Fresh View Solutions (5554).  The Debtors' executive headquarters are located at 6300 South Syracuse
Way, Suite 300, Centennial, CO 80111.

since March 1, 2016.  As part of my employment and service in such capacities, I have become

familiar with the history, day-to-day operations, businesses and financial affairs of the Debtors.[2]

2.      On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**").[3]  Shortly after the Petition Date, SquareTwo Financial Corporation, the proposed

foreign representative of the Debtors, intends to file an application with the Ontario Superior

Court of Justice under the *Companies' Creditors Arrangement Act* ("**CCAA**") for recognition of

these chapter 11 cases as foreign main proceedings under Part IV of the CCAA (the

"**Recognition Proceeding**").  The Debtors intend to continue in the possession of their

respective properties and the management of their respective businesses as debtors in possession.

3.      Beginning in early 2015, in response to their financial results and concerns

about long-term liquidity, the Debtors began considering options to recapitalize their balance

sheet.  As a result, the Debtors entered into a series of transactions in May 2016 (together, the

"**Recapitalization**") that resulted in their current capital structure.  Pursuant to the

Recapitalization, as described further in Section I.E, the Debtors sought to improve their capital

---

[2]     The Debtors' corporate structure is set forth in the chart annexed hereto as Schedule I.  In addition to the entities listed on Schedule I, the Debtors have one non-Debtor subsidiary incorporated in Canada that is not a guarantor of any of the Debtors' outstanding prepetition debt.  Through an intercompany services agreement, the non-Debtor subsidiary provides certain third-party management and advisory services to the Debtors.

[3]     The Debtors chose to file their petitions for relief in this Court on the basis that Debtors SquareTwo Financial Services Corporation, CACH, LLC and CACV of Colorado, LLC each separately hold debt collection licenses, issued by the New York City Department of Consumer Affairs, which allows the Debtors to perform collections services in New York City and which are required to generate a significant portion of the Debtors' revenues.  In addition, each of the Debtors' three secured credit facilities as well as the second lien indenture are governed by New York law, with the applicable Debtors' having granted exclusive jurisdiction of any New York State court or federal court sitting in Manhattan under each such credit facility and indenture. The largest secured creditors of the Debtors are located in Manhattan, and the Debtors' have funded retainers for certain professionals that are held in bank accounts located in New York City.

structure by (a) repaying amounts outstanding under their then-existing secured credit facilities

and (b) making an exchange offer for their then-outstanding second lien notes.

4.     The Debtors entered into the Recapitalization as an initial step to improve

their capital structure.  Thereafter, in early June 2016, the Debtors engaged professionals to,

among other things, analyze their business model and organizational structure with the goal of,

among other things, understanding the future potential of the Debtors' processes and capabilities.

In particular, of concern was a January 1, 2017 springing maturity under each of their secured

prepetition credit facilities, which required the outstanding secured second lien notes to be paid

down to no more than $1 million by January 1, 2017.

5.     In or around July 2016, the Debtors received a pre-diligence, unsolicited,

nonbinding offer from a third party to purchase substantially all of their business at an attractive

price.  This inquiry led the Debtors to believe that a sale or new investment may be their best

option to maximize value for all stakeholders.  Accordingly, in order to explore the viability of a

sale or other restructuring, in August 2016, the Debtors engaged Keefe, Bruyette & Woods, Inc.

as their financial advisor and began a prepetition marketing process, reaching out to over 30

potential acquiring parties and distributing a confidential information memorandum to 27 parties

who expressed an interest in acquiring all or a portion of the Debtors' business.  After due

diligence was conducted, including meetings with management, five bidders submitted bids and

the Debtors ultimately invited two such bidders to participate in a final round of bidding.  Based

on the bids received, the Debtors entered into an exclusivity agreement with one such bidder.

However, after months of negotiations and multiple exchanges of draft key definitive

documentation, the Debtors were unable to resolve to their satisfaction open business and legal

issues during the period of exclusivity.  Thus, in February 2017, the Debtors reopened

non-exclusive negotiations with other bidders.

6.      Ultimately, the Debtors determined that the most value-maximizing approach was to proceed with a restructuring involving a new money investment from Resurgent Holdings LLC (the "**Plan Investor**") through a chapter 11 restructuring, and the Canadian Recognition Proceeding, in exchange for which the Plan Investor would receive all of the equity in CACH, LLC, CACV of Colorado, LLC, and SquareTwo Financial Canada Corporation (together with their subsidiaries other than CACV of New Jersey, LLC, the "**Acquired Debtors**"), with (a) the Plan Investor (and/or any permitted assignee) to own the Acquired Debtors, and (b) Wind Down Co (i.e., SquareTwo on and after the Effective Date) to continue to own the remaining other Debtors (together with SquareTwo, the "**Dissolving Debtors**") and, among other things, effectuate substantially all distributions under the Prepackaged Plan (collectively, the "**Proposed Restructuring Transaction**").

7.      To effectuate the Proposed Restructuring Transaction, the Debtors, the Plan Investor, and the secured lenders under the Debtors' prepetition secured credit facilities representing (i) 100% in principal amount and number of holders of their First Lien Financing Facility (as defined below), (ii) 100% in principal amount and number of holders of their 1.25 Lien Credit Facility (as defined below), and (iii) approximately 83.2% in principal amount of their 1.5 Lien Credit Facility (together, the "**Consenting Lenders**") extensively negotiated the *Joint Prepackaged Chapter 11 Plan for SquareTwo Financial Services Corporation and Its Affiliated Debtors* (as amended, modified and/or supplemented from time to time, the "**Prepackaged Plan**"),[4] which is being filed concurrently herewith, and a plan funding agreement (the "**Plan Funding Agreement**").  The Prepackaged Plan and the Plan Funding Agreement contemplate obtaining a new money investment by the Plan Investor of $405.1

---

[4]      Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Prepackaged Plan or the corresponding First Day Motion, as applicable.

million, subject to purchase price adjustments, which the Debtors estimate will result in a final purchase price of approximately $264 million (the "**New Money Investment**"), in exchange for 100% of the equity of those Debtor entities that are to be reorganized.  The parties also executed a restructuring support agreement (the "**RSA**"), pursuant to which each party agreed to support the Prepackaged Plan, subject to certain terms and conditions.  Thereafter, the Debtors solicited votes in respect of the proposed restructuring transaction.  The Prepackaged Plan, the material terms of which are described herein, was overwhelmingly accepted by the creditors entitled to vote thereon.  The Debtors then commenced these chapter 11 cases to obtain confirmation and consummation of the Prepackaged Plan.

8.      To enable the Debtors to operate effectively postpetition and to avoid adverse effects with respect to these chapter 11 cases, the Debtors have requested various types of relief in "first day" motions and applications (collectively, the "**First Day Motions**") filed with the Court, including a motion seeking to have the Debtors' chapter 11 cases consolidated for procedural purposes and jointly administered.

9.      I submit this declaration pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"):  (a) in support of the relief requested in the First Day Motions; (b) to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code; and (c) to provide certain information that I understand is required by Local Rule 1007-2.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, consultation with other officers of the Debtors, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  If called

upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this declaration.

10.     Part I of this declaration provides background with respect to the Debtors' businesses, capital structure and restructuring efforts.  Part II sets forth the relevant facts in support of the Debtors' First Day Motions.  Part III provides the information that I understand is required by Local Rule 1007-2.

## I.     BACKGROUND

### A.     General.

11.     SquareTwo Financial Corporation, founded in 1994, is a privately held corporation headquartered in Centennial, Colorado.  The Debtors' primary business is to acquire, manage, and collect charged-off consumer and commercial accounts receivable ("**Charged-Off Accounts**"), which are accounts that credit issuers have charged off as uncollectible, but that remain owed by the borrower and subject to collection.

12.     Charging off an account is an accounting action that merely removes the obligation from the institution's books.  It does not release the obligor on the account from his or her responsibility to pay amounts due.  Credit issuers facing collection difficulties with respect to Charged-Off Accounts can alleviate the cost these accounts create by selling them, potentially reducing the cost of credit for all of the issuer's customers and increasing the overall efficiency of the credit market.  The market price of Charged-Off Accounts in a sale transaction is substantially lower than their face value.

13.     The Debtors first started purchasing debt in 1998.  Since then, they have invested approximately $2.7 billion in acquiring Charged-Off Accounts, representing over $39 billion in face value of accounts.  The Debtors' annual cash proceeds have steadily increased

over this period, from $8.7 million in 1999, their first full year of operations, to $310.5 million in 2016.

14.     The Debtors operate their business through a series of subsidiaries of their parent company, SquareTwo Financial Corporation.  Debtors CACH, LLC d/b/a Fresh View Funding, CACV of Colorado, LLC, and Preferred Credit Resources Limited (the "**Purchasing Entities**") purchase Charged-Off Accounts from financial institutions, finance and leasing companies, and other credit issuers in the United States and Canada.  Debtors SquareTwo Financial Services Corporation d/b/a Fresh View Solutions and CCL Financial Inc. are licensed collection agencies that collect amounts owed on Charged-Off Accounts (the "**Collecting Entities**").  There are twelve additional subsidiaries with no or nominal operations.

15.     The Purchasing Entities are prominent participants in the purchase market for "fresh" Charged-Off Accounts, which are generally 180-210 days past due at the time of the sale and typically have not been subject to previous collection attempts by a third-party collection agency.  In Canada, the Purchasing Entities also purchase "warehouse debt," "bulk debt" and "out of statute debt," each of which consists of Charged-Off Accounts that have been dormant for several years.

16.     Although the Debtors formerly engaged in the sale of Charged-Off Accounts, they have not regularly done so as part of their business practices since 2014, and have not done so with respect to their Canadian Charged-Off Accounts since 2009.

    (i)     *United States*

17.     In the United States, the Debtors collect amounts owed on Charged-Off Accounts both within and outside of the judicial system.  In the non-legal setting, the Debtors utilize company-owned call centers that operate under the name Fresh View Solutions (the "**Fresh View Call Centers**") to pursue collections, as well as the services of First Step Group,

LLC ("**First Step Group**"), a non-legal collections firm that is exclusively dedicated to collecting Charged-Off Accounts owned by the Debtors. To pursue collections through the court system, the Debtors utilize the services of either: (a) one of thirteen law firms that, until very recently, exclusively represented the Debtors and continue to rely on the Debtors as a material source of income (each, a "**Partner Law Firm**"), each of which is supported by a member of a network of operational support companies referred to as "advisory groups" (each, an "**Advisory Group**," and together with the Partner Law Firms, the "**Law Firm Network**") or (b) one of a group of additional law firms (each, an "**Additional Law Firm**" and, together with the Partner Law Firms, the "**Law Firms**") that historically have not exclusively represented the Debtors. Using the services of the Law Firms to collect on Charged-Off Accounts allows the Debtors to comply with laws in the United States requiring all collections efforts pursued through litigation to be conducted by attorneys.

18.     The Law Firms are responsible for commencing lawsuits, litigating actions and enforcing judgments. In the Law Firm Network, the role of each Advisory Group is to provide accounting, human resources, compliance, and other administrative support to its corresponding Law Firm.

19.     Together, the Fresh View Call Centers, First Step Group, the Law Firm Network, and the Additional Law Firms form a unique business model that the Debtors refer to as the "**Closed Loop Network**." All of the Debtors' newly purchased Charged-Off Accounts in the United States are placed into the Closed Loop Network for collections. Specifically, all newly acquired accounts are placed for collection with the Fresh View Call Centers, which are exclusively dedicated to collecting the Debtors' Charged-Off Accounts.

20.     If accounts cannot be collected through the Fresh View Call Centers, they are designated for legal recovery efforts and placed with a Law Firm for collection. The Debtors

also use the Law Firms to collect accounts purchased prior to the establishment of the Fresh

View Call Centers (specifically, accounts on which legal judgments were entered and for which

payment plans were established).

21.    Most accounts of the Debtors incorporated in the United States (the "**U.S.**

**Debtors**") are managed within a centralized, proprietary technology platform called eAGLE.

The U.S. Debtors use eAGLE to maintain customer account data accurately and securely and to

ensure that their collection efforts adhere to a standardized set of compliance policies and

operational procedures.  The Partner Law Firms, the majority of which, until very recently, were

exclusively dedicated to the Debtors, also utilize eAGLE in accordance with contractual

arrangements with the Debtors.  Accounts collected by the Additional Law Firms are managed

through those firms' respective software systems.  Regardless of where an account is managed,

the Debtors require the Law Firms to adhere to common policies and procedures to maintain

high levels of security and precision across their operations.

*(ii)    Canada*

22.    The Debtors also operate through several Canadian subsidiaries (the

"**Canadian Debtors**"), directly owned by U.S. Debtor Collect America of Canada LLC, that

exclusively purchase and collect Canadian Charged-Off Accounts (mainly consumer debt).[5]

23.    Like the U.S. Debtors, the Canadian Debtors pursue collections through

both judicial and non-judicial channels.  The Canadian Debtors initially attempt to collect on

Charged-Off Accounts in Canada through a call center (referred to as a "collection floor"), where

---

[5]    As noted above in paragraph 14, Debtor Preferred Credit Resources Limited acts as the Purchasing Entity
for Canadian Charged-Off Accounts, while Debtor CCL Financial Inc. is the Collecting Entity.

accounts are managed using a software platform named Collect.[6]  If those attempts are

unsuccessful, the Debtors engage the services of one of a network of collections firms, some of

which are law firms (collectively, the "**Alliance Partners**"), to continue their efforts.  The

Alliance Partners frequently engage law firms to pursue collections through legal channels when

non-legal collection efforts fail.  The Canadian Debtors also use in-house legal services provided

by Debtor Metropolitan Legal Administration Services, Inc.  As in the United States, the

Canadian Debtors have implemented common policies and procedures across their Canadian

operations, which are intended to promote accuracy and maximize the security of customer

account data.

24.    The Debtors' Canadian operations are an integral part of their business,

accounting for 22.0% of the Debtors' total adjusted EBITDA and 9.2% of their total revenues

from January 1, 2016 through September 30, 2016.  The Canadian business also represented

10.8% of the Debtors' assets for the period from January 1, 2016, through December 31, 2016.

**B.    Operations.**

25.    In both the United States and Canada, the Debtors have two primary

business processes: (a) underwriting and purchasing and (b) management of collections and other

cash proceeds on purchased debt.  In the United States, these processes are subject to oversight

by a number of federal regulators, including the Consumer Financial Protection Bureau.  The

Debtors also must comply with federal statutes such as the Fair Debt Collection Practices Act,

the Fair Credit Reporting Act, the Telephone Consumer Protection Act, and similar state and

local statutes and regulations.  Similarly, in Canada, the Debtors' collection efforts are subject to

---

[6]    Neither the Fresh View trade name nor the eAGLE platform is used in Canada.  In addition, from time to time, CCL Financial Inc. collects charged-off accounts on behalf of non-affiliated third parties.  Currently, the annual payments received on account of such activities are less than $1,000.

oversight by a number of provincial ministries, including the Ontario Ministry of Small Business and Consumer Services and the Quebec Office of Consumer Protection.  The Debtors also must comply with guidelines set forth by the Canadian Radio-Television and Telecommunications Commission, federal statutes such as the Personal Information Protection and Electronic Documents Act and the Canadian Anti-Terrorism Act, and federal and provincial statutes governing debt collection agencies.

      *(i)*      *Underwriting and Purchasing.*

26.      The success of the Debtors' business depends heavily on their ability to find Charged-Off Accounts for purchase, accurately evaluate those assets, and acquire them at the appropriate pricing.  In addition, the Debtors maintain relationships with marketplace lenders, financial technology companies, super-regional and regional banks, and other credit issuers.

27.      The Debtors also review all purchasing opportunities and create forecasted cash flows for each purchase using proprietary statistical models and the Debtors' experience with similar purchases.  These models and related assumptions are reviewed by the Debtors' investment committee, which includes members of their senior leadership team and representatives from each key business function, to determine the appropriate purchase price for the available portfolios.  The Debtors target purchases that meet return thresholds determined by the investment committee.

28.      The majority of the Debtors' purchasing opportunities are sourced through limited offerings or exclusive relationships with debt providers. The Debtors also evaluate one-off negotiated deals and broader auction sales depending on the type of receivable at issue and the type of process desired by the seller.  Finally, the Debtors spend substantial time forging new business relationships with debt providers that have not historically participated in debt sales.

29.     The price of Charged-Off Accounts is primarily dictated by the supply and quality of the accounts for sale.  The Charged-Off Accounts the Debtors purchase can vary dramatically in age, type, quality, and collectability, meaning the Debtors may pay significantly different prices from one purchase to another.  In addition, market forces can drive prices up or down.  Regardless of the price paid for Charged-Off Accounts, the Debtors target a required rate of return for each of their purchases based on the unique qualities of each portfolio.  The Debtors' purchasing strategy in a given period involves seeking a certain level of expected returns at pricing that appropriately accounts for collection risks.

(ii)     *Management of Collections and Other Cash Proceeds on Purchased Debt*

30.     A key driver of the Debtors' performance, and one of the primary metrics monitored by their management team, is cash proceeds received from purchased debt.  Included in cash proceeds are (x) non-legal collections (as defined below), (y) collections accomplished through the use of lawyers and the court system, and (z) returns of non-conforming accounts (also known as "recourse").  These incoming cash flow streams and their respective relationships to the collection life cycle are described further below.

(a)     <u>Non-Legal Collections</u>.

31.     Currently, once the Debtors acquire a Charged-Off Account, they pursue collections through one of the Collecting Entities or First Step Group (or, in Canada, through a collection floor), each of which engages in activities short of initiating lawsuits (typically, calls and letters to the account holder).  These activities are referred to as "non-legal collections." Non-legal collections are the most cost-effective means for the Debtors to realize cash proceeds. As of December 31, 2016, approximately $90 million, or 34.4%, of the Debtors' total year-to-date cash proceeds on Charged-Off Accounts in the United States, and approximately $14 million, or 24% of the Debtors' total year-to-date cash proceeds on Charged-Off Accounts in

Canada, was generated through telephone and letter campaigns initiated through non-legal collection channels.

    (b)    <u>Legal Collections</u>.

32.    The Debtors' strong preference is to assist customers in resolving their financial commitments without filing a lawsuit. In some cases, however, court processes are necessary to collect monies owed on the Charged-Off Accounts where non-legal collection methods fail (for example, where an obligor's apparent financial resources indicate that he or she has the ability, but not the willingness, to pay amounts owed on a Charged-Off Account).

33.    In cases where collections are commenced through legal channels, the U.S. Debtors allocate Charged-Off Accounts to the Law Firms for collection in accordance with applicable law and the Debtors' policies and procedures, and the Canadian Debtors allocate Charged-Off Accounts to the Alliance Partners in accordance with applicable law and the Debtors' policies and procedures.

34.    Although the U.S. Debtors' overall legal collections have decreased over the past three years, they have increased as a percentage of the U.S. Debtors' total cash proceeds because the Debtors have purchased less debt since 2014 than they did in years prior. As the U.S. Debtors' portfolio becomes weighted more heavily towards older Charged-Off Accounts, legal collections increase as a percentage of total domestic cash proceeds. As of December 31, 2016, approximately $163.7 million, or 62.7%, of the Debtors' total year-to-date cash proceeds on Charged-Off Accounts in the United States, was generated through legal collection efforts, which includes collections in the legal channel received prior to the initiation of legal action. In Canada, legal collections have increased over the past three years, but have remained approximately the same as a proportion of the Canadian Debtors' cash proceeds. As of December 31, 2016, approximately $45 million, or 76% of the Debtors' total year-to-date cash

proceeds on Charged-Off Accounts in Canada, was generated through legal collection efforts, which includes collections in the legal channel received prior to the initiation of legal action.  In addition, the Debtors advance court costs and related fees through the Law Firms, and from time to time recoup these costs in the form of attorneys' fees awarded to them through litigation.

    (c)  <u>Recourse</u>.

    35.  The Debtors typically have recourse — or the right to return — certain Charged-Off Accounts to the seller under the relevant purchase contract within a designated time period after the purchase date if the account does not meet certain agreed-upon requirements. These include, for example, when an obligor on an account was deceased or in bankruptcy at the time the Debtors purchased the account, when an account was opened through fraud, and when an account had been previously resolved, but was sold in error.

**C.  Facilities and Employees.**

    36.  The Debtors maintain their headquarters in Centennial, Colorado, as well as offices in Overland Park, Kansas; Newmarket, Ontario; and Montreal, Quebec.[7]  The Debtors also maintain data centers in Centennial, Colorado and Lisle, Illinois, which provide key information technology services (including supporting the eAGLE platform).  Finally, the Debtors lease, but do not currently occupy, office space in Phoenix, Arizona.  As of March 6, 2017, the Debtors had approximately two hundred eighty-three (283) employees, none of whom are represented by a union or covered by a collective bargaining agreement.  Approximately one hundred ninety-eight (198) of these employees work in the Centennial office in executive, operations, business development, and corporate services functions.  All of the Debtors' remaining employees focus on recovery efforts, with approximately fifty-two (52) based in the

---

[7]  The Debtors also maintain a Fresh View Call Center in the same building as their headquarters.  To comply with applicable laws and regulations, the Fresh View Call Center is located on a separate floor.

Debtors' Fresh View Call Centers in Centennial and Overland Park and the other approximately thirty-three (33) in the Newmarket and Montreal offices.

**D.      Certain Material Prepetition Litigation.**

37.      In 2009 and thereafter, certain of the Debtors were named as defendants in several lawsuits, some of which have been filed as class actions. Specifically, a number of persons commenced class actions against certain of the Debtors and their Law Firms that, among other things, challenged the Debtors' debt collection practices. As of the Petition Date, several such class actions (or purported class actions) are pending against one or more of the Debtors in one or more jurisdictions.

**E.      The Debtors' Prepetition Capital Structure.**

38.      Pursuant to the Recapitalization, the Debtors repaid their then-existing revolving credit facility and entered into the First Lien Financing Agreement and the 1.25 Lien Credit Agreement (each as defined below). The Debtors also made an exchange offer for their then-outstanding 11.625% Senior Second Lien Notes due 2017 (the "**Second Lien Notes**"). The total consideration for each $1,000 in aggregate principal amount of exchanged Second Lien Notes (the "**Exchanged Notes**") validly tendered and accepted for purchase by the holders of such Exchanged Notes (collectively, the "**Supporting Noteholders**") was (i) $650 in aggregate principal amount of the 1.5 Lien Term Loan (as defined below) and (ii) $350 initial liquidation preference of SquareTwo Financial Corporation's preferred stock. Approximately 25% of the holders, representing approximately 93% of the dollar amount of the Second Lien Notes, participated in the exchange.

*(i)      First Lien Financing Agreement.*

39.      In connection with the Recapitalization, the Debtors entered into that certain Financing Agreement (the "**First Lien Financing Agreement**"), dated as of May 24,

2016, by and among SquareTwo Financial Corporation, as Borrower, the loan parties thereto, the lenders from time to time party thereto, and Cerberus Business Finance, LLC, as Collateral Agent and Administrative Agent.  Under the First Lien Financing Agreement, certain of the Debtors are borrowers under (a) a $60 million revolving credit facility (the "**First Lien Revolving Credit Facility**") and (b) a $105 million term loan facility (the "**First Lien Term Loan Facility**," and, together with the First Lien Revolving Credit Facility, the "**First Lien Financing Facility**").  The First Lien Revolving Credit Facility contains a sublimit of $17.5 million (the "**Canadian Revolving Loans**") that may be borrowed by two Debtors incorporated in Canada:  CCL Financial Inc. and Preferred Credit Resources Limited (the "**Canadian Borrowers**").  Any available commitments under the First Lien Revolving Credit Facility that are not borrowed by the Canadian Borrowers may be borrowed by three Debtors incorporated in the United States:  SquareTwo Financial Corporation, SquareTwo Financial Services Corporation, and CACH, LLC (the "**U.S. Borrowers**").  The U.S. Borrowers and Canadian Borrowers are co-debtors on their respective loans under the First Lien Financing Agreement. Each of the other Debtors is a guarantor under the First Lien Financing Facility.

40.     As of the Petition Date, there is approximately $41 million in aggregate principal amount plus accrued but unpaid interest and fees outstanding under the First Lien Revolving Credit Facility.  There also is approximately $105 million in aggregate principal amount outstanding plus accrued but unpaid interest and fees under the First Lien Term Loan Facility as of the Petition Date.  The First Lien Term Loan Facility is secured by a first priority lien on substantially all of the Debtors' assets.  As a result of the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016 being greater than $1 million, the maturity date under the First Lien Financing Agreement occurred on January 1, 2017.  In connection therewith, the Debtors and the lenders under the First Lien Financing Agreement

entered into a series of forbearance agreements whereby such lenders agreed, among other things, to forbear from exercising remedies against the Debtors until the Petition Date.

    *(ii)*       *1.25 Lien Credit Agreement.*

    41.     Pursuant to the Recapitalization, the Debtors also offered the Supporting Noteholders the opportunity to participate in a 1.25 lien term loan facility in the aggregate principal amount of $15 million under that certain 1.25 Lien Credit Agreement, dated as of May 24, 2016, by and among SquareTwo Financial Corporation, as Borrower, the loan parties thereto, the lenders party thereto, and Cortland Capital Market Services LLC, as the Administrative Agent (the "**1.25 Lien Credit Agreement**", and the delayed draw commitments thereunder, the "**1.25 Lien Term Loan Facility**").  Certain of the Supporting Noteholders provided the entire 1.25 Lien Term Loan Facility.

    42.     As of the Petition Date, there is $16.3 million in aggregate principal amount outstanding plus accrued but unpaid interest and fees outstanding under the 1.25 Lien Term Loan Facility.  The 1.25 Lien Term Loan Facility is secured by a lien (subordinated in priority to the lien held by the lenders under the First Lien Financing Agreement) on substantially all of the Debtors' assets.  As a result of the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016 being greater than $1 million, the maturity date of under the 1.25 Lien Credit Agreement occurred on January 1, 2017.  In connection therewith, the Debtors and the lenders under the 1.25 Lien Credit Agreement entered into a series of forbearance agreements whereby such lenders agreed, among other things, to forbear from exercising remedies against the Debtors until the Petition Date.

    *(iii)*      *1.5 Lien Term Loan Facility.*

    43.     In connection with the Recapitalization, the Debtors also entered into that certain 1.5 Lien Credit Agreement, dated as of May 24, 2016, by and among SquareTwo

Financial Corporation, as Borrower, the loan parties thereto, the lenders party thereto, and

Cortland Capital Market Services LLC, as administrative agent (the "**1.5 Lien Credit**

**Agreement**").  Under the 1.5 Lien Credit Agreement, SquareTwo Financial Corporation issued

approximately $176.1 million in aggregate original principal amount of senior secured term

loans (the "**1.5 Lien Term Loan Facility**") as partial consideration for the exchange of the

Second Lien Notes.

44.     As of the Petition Date, there is approximately $191.5 million in aggregate

principal amount outstanding plus accrued but unpaid interest and fees outstanding under the 1.5

Lien Term Loan Facility.  The 1.5 Lien Term Loan Facility is secured by a lien (subordinated in

priority to the lien held by the lenders under the First Lien Financing Agreement and the lenders

under the 1.25 Lien Credit Agreement) on substantially all of the Debtors' assets.  As a result of

the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016

being greater than $1 million, the maturity date of under the 1.5 Lien Credit Agreement occurred

on January 1, 2017.  In connection therewith, the Debtors and the requisite lenders under the 1.5

Lien Credit Agreement entered into a series of forbearance agreements whereby such lenders

agreed, among other things, to forbear from exercising remedies against the Debtors until the

Petition Date.

*(iv)     Second Lien Notes*.

45.     Pursuant to that certain Indenture, dated as of April 7, 2010 (the "**Second**

**Lien Indenture**"), by and between SquareTwo Financial Corporation, as Issuer, the guarantors

named therein, and U.S. Bank National Association, as Trustee (the "**Indenture Trustee**"),

SquareTwo Financial Corporation issued $290 million in aggregate principal amount of Second

Lien Notes.

46.     As of the Petition Date, $19.1 million in principal amount of Second Lien Notes remains outstanding plus accrued and unpaid interest.  The Second Lien Notes are held by those parties who did not exchange their notes in the exchange offer conducted in connection with the Recapitalization.  As of the Petition Date, there also is accrued but unpaid interest outstanding under the Second Lien Indenture.  The Second Lien Notes are secured by a lien (subordinated in priority to the lien held by the lenders under the First Lien Financing Agreement, the lenders under the 1.25 Lien Credit Agreement and the lenders under the 1.5 Lien Credit Agreement) on substantially all of the assets of the Debtors incorporated in the United States.[8]  Pursuant to the terms of the Second Lien Indenture, the Second Lien Notes mature on April 1, 2017.  Pursuant to the terms of the Second Lien Intercreditor Agreement (as defined below), holders of Second Lien Notes may not, among other things, object to the forbearance agreements agreed to by the Agents (as defined below) or lenders under the First Lien Financing Agreement, 1.25 Lien Credit Agreement, and 1.5 Lien Credit Agreement nor may they exercise or seek to exercise any rights or remedies with respect to the liens on the shared collateral or institute any action or proceeding with respect to such rights or remedies.

*(v)      Intercreditor Agreements.*

47.     The agents under each of the First Lien Financing Agreement, the 1.25 Lien Credit Agreement, and the 1.5 Lien Credit Agreement (each, an "**Agent**" and together, the "**Agents**"), along with Indenture Trustee, are party to several intercreditor agreements executed in connection with the Recapitalization, each dated as of May 24, 2016, which govern the relative rights of the lenders under the First Lien Financing Agreement, the 1.25 Lien Credit Agreement, and the 1.5 Lien Credit Agreement with respect their shared collateral.

---

[8]     The Debtors incorporated in Canada are not guarantors under the Second Lien Indenture.

48.     Additionally, the Agent under the 1.25 Lien Credit Agreement and the Agent under the 1.5 Lien Credit Agreement are parties to that certain 1.25 Lien Intercreditor Agreement, dated as of May 24, 2016, which governs the relative rights of the lenders under the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement with respect to their shared collateral.

49.     Finally, the Agents and the Indenture Trustee are each party to that certain Amended and Restated Second Lien Intercreditor Agreement, dated as of May 24, 2016, which governs the relative rights of all of the secured lenders with respect to their shared collateral.

*(vi)     Equity Ownership*

50.     The Supporting Noteholders received $350 of a new class of convertible preferred stock in consideration for every $1,000 in principal amount of Exchanged Notes. SquareTwo Financial Corporation's preferred stock interests represent 90% of its common stock on an as-converted basis.  The remaining 10% of its common stock on an as-converted basis is held by the former shareholders of its former parent entity, CA Holding, Inc.[9]

**F.     Events Leading to Chapter 11 Cases.**

51.     The commencement of these chapter 11 cases represents the culmination of the prepetition Recapitalization and subsequent marketing and auction process that took place in the months leading up to the Petition Date.

52.     As noted above, the Debtors entered into the Recapitalization as an initial step to improve their capital structure.  Thereafter, in early June 2016, the Debtors engaged professionals to, among other things, analyze their business model and organizational structure with the goal of understanding the future potential of the Debtors' processes and capabilities.

---

[9]     Equity interests in CA Holding, Inc. were converted into stock of SquareTwo Financial Corporation in connection with the Recapitalization.

Specifically, the Debtors' business plan was evaluated and next steps were considered in light of the Debtors' substantial debtload and maturities thereunder. In particular, of concern was the January 1, 2017 springing maturity under each of their secured prepetition credit facilities, which required the Second Lien Notes to be paid down to no more than $1 million by January 1, 2017.

53.    In or around July 2016, the Debtors received a pre-diligence, unsolicited, nonbinding offer from a third party to purchase substantially all of their business at an attractive price. This inquiry led the Debtors to believe that a sale or new investment may be their best option to maximize value for all stakeholders. Accordingly, in order to explore the viability of a sale or other restructuring, in August 2016, the Debtors engaged Keefe, Bruyette & Woods, Inc. as their financial advisor and began a prepetition marketing process, reaching out to over thirty potential acquiring parties and distributing confidential information memorandum to twenty-seven parties who expressed an interest in acquiring all or a portion of the Debtors' business. After due diligence was conducted, including meetings with management, five bidders submitted bids and the Debtors ultimately invited two such bidders to a final round.

54.    Based on the bids received, the Debtors entered into an exclusivity agreement with one such bidder. However, after months of negotiations and multiple exchanges of draft key definitive documentation, the Debtors were unable to resolve to their satisfaction open business and legal issues during the period of exclusivity. Thus, in February 2017, the Debtors reopened non-exclusive negotiations with other bidders.

55.    As set forth above, the Debtors ultimately determined that the most value-maximizing approach was to proceed with a restructuring involving a new money investment from the Plan Investor through a chapter 11 restructuring, and the Canadian Recognition Proceeding. The Prepackaged Plan, a related Disclosure Statement, the Plan Funding Agreement and the RSA, each are being filed simultaneously herewith. Among other things, the

Prepackaged Plan provides for:  (a) a new money investment in cash from the Plan Investor in exchange for 100% of the equity of CACH, LLC, CACV of Colorado, LLC, and SquareTwo Financial Canada Corporation; (b) holders of claims under the First Lien Financing Agreement and 1.25 Lien Credit Agreement to receive payment of their claims owed as of the Petition Date in full in cash (plus postpetition interest at a combination of the default and non-default rates as set forth in the Prepackaged Plan) in full and final satisfaction of their respective claims; (c) holders of claims under the 1.5 Lien Credit Agreement to receive their pro rata share of the Remaining Cash (i.e., the remainder of the cash proceeds from the Proposed Restructuring Transaction after payment of all other amounts required to be paid under the Prepackaged Plan) in full and final satisfaction of their claims; and (d) Wind Down Co to effectuate the Prepackaged Plan, including the winding down and dissolution of the Dissolving Debtors and the provision of transition services to the Plan Investor.

56.     In addition to distributions on account of the Prepetition Secured Lender Claims, the Prepackaged Plan provides for: (a) the payment in full in cash of Allowed (i) Administrative Expense Claims, (ii) Priority Tax Claims, and (iii) Fee Claims; and (b) reinstatement or payment in full, as applicable, of (x) Priority Non-Tax Claims, (y) Other Secured Claims, and (z) Canadian Claims and Assumed U.S. Liabilities.  Under the Prepackaged Plan, holders of (i) Claims under the Second Lien Indenture, (ii) General Unsecured Claims against the U.S. Debtors, and (iii) Existing U.S. Interests will not receive a recovery on account of their Claims and/or Interests.  The Dissolving Debtors will be liquidated and no distributions other than as set forth above are expected to be made.

57.     The U.S. Debtors either are borrowers or guarantors under the Second Lien Indenture.  The Canadian Debtors are neither borrowers nor guarantors thereunder. Accordingly, as part of the terms of the RSA, the Consenting Lenders have agreed to support and

vote in favor of the Prepackaged Plan (which proposes to compromise the First Lien Lender Claims, the 1.25 Lien Lender Claims and the 1.5 Lien Lender Claims) and have agreed that all undisputed unsecured claims against the Canadian Debtors either will be, subject to Bankruptcy Court approval, paid in the ordinary course during the pendency of these Chapter 11 Cases, or be unimpaired and reinstated under the Prepackaged Plan. In addition, as part of the Proposed Restructuring Transactions, on the Effective Date, Debtor SquareTwo Financial Canada Corporation shall repurchase for a lump sum cash payment all equity securities of Debtor CCL Financial Inc. held by Christopher D. Walker, Debtor SquareTwo Financial Canada Corporation's current President and Chief Executive Officer.

G.    **Notice and Solicitation Procedures.**

58.    On March 3, 2017, the Debtors began soliciting votes to accept or reject the Prepackaged Plan from the holders of claims in Class 3 (First Lien Lender Claims), Class 4 (1.25 Lien Lender Claims), and Class 5 (1.5 Lien Lender Claims), the only classes of claims entitled to vote on the Prepackaged Plan. The holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 7B (Canadian General Unsecured Claims), and Class 8B (Existing Canadian Interests) were deemed to accept the Prepackaged Plan and were not entitled to vote. Additionally, the holders of claims in Class 6 (Second Lien Lender Claims), Class 7A (U.S. General Unsecured Claims), and Class 8A (U.S. Existing Interests) were deemed to reject the Prepackaged Plan and were not entitled to vote.

59.    The Debtors, with the assistance of their solicitation agent, Prime Clerk LLC ("**Prime Clerk**"), prepared and mailed the ballots to the appropriate entities in each voting class and received and tabulated the votes. Prime Clerk has informed me that the Prepackaged Plan was accepted by all classes entitled to vote thereon. Specifically, 100% of Class 3 Claims (First Lien Lender Claims), 100% of Class 4 Claims (1.25 Lien Lender Claims) and over 99% in

amount and 93% in number of Class 5 Claims (1.5 Lien Lender Claims) voted to accept the

Prepackaged Plan.  After receipt of such votes, the Debtors commenced these chapter 11 cases.

60.     As the Prepackaged Plan contemplates a comprehensive financial

restructuring of the Debtors' existing capital structure that will allow the Debtors to de-lever

their balance sheet through consensual chapter 11 cases, which are anticipated to be brief, and

for the Acquired Debtors to emerge from chapter 11 under new ownership and poised for future

growth and stability, I believe the commencement of these chapter 11 cases is in the best

interests of the Debtors, their creditors, and all parties in interest.

## II.     SUMMARY OF FIRST DAY MOTIONS

61.     To enable the Debtors to operate effectively and to avoid the adverse

effects of the chapter 11 filings, the Debtors have filed, or will file in the near term, the motions

and applications described below.

62.     In connection with the preparation for these bankruptcy cases, I have

reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared

with my input and assistance, or the input and assistance of employees working under my

supervision.  I believe the information contained in the First Day Motions is accurate and correct.

As set forth more fully below, I believe that the entry of orders granting the relief requested in

these motions and applications is critical to the Debtors' ability to preserve the value of their

estates and will assist in their restructuring efforts.

### A.     Motions Related to Case Management.

*(i)     Joint Administration Motion.*

63.     The Debtors seek the joint administration of their eighteen chapter 11

cases for procedural purposes only.  I believe that it would be far more practical and expedient

for the administration of these chapter 11 cases if the Court were to authorize their joint

administration.  First, each of the Debtors is a co-obligor under the Debtors' prepetition credit

facilities, either as a borrower or a guarantor.  In addition, the treatment of certain contracts and

business relationships of a single Debtor may impact the assets and operations of other Debtors.

Further, many of the motions, hearings, and other matters involved in these chapter 11 cases will

affect all of the Debtors.  Hence, joint administration will reduce costs and facilitate the

administrative process by avoiding the need for duplicative hearings, notices, applications and

orders.  It is my understanding that no prejudice will befall any party by the joint administration

of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect

substantive rights.

       *(ii)*     *Motion to Approve Solicitation Procedures and Schedule Combined Hearing.*

     64.     The Debtors also have filed a motion seeking an order scheduling a

combined hearing with respect to the approval of their plan solicitation procedures, their

Disclosure Statement (which describes the proposed restructuring and its effects on holders of

claims against and interests in the Debtors), and confirmation of the Prepackaged Plan.

       *(iii)*     *Motion to Extend Deadline to File Schedules and Statements and Permanently*
               *Waive Requirements to File Same Upon Confirmation.*

     65.     Concurrently herewith, the Debtors filed a motion seeking an extension of

the deadline to file their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of

Financial Affairs (the "**Statements**") to the date which is sixty (60) days after the Petition Date

(i.e., through and including May 18, 2017) and, if the Prepackaged Plan is confirmed on or prior

to the sixtieth (60th) day after the Petition Date, a waiver of such requirement upon confirmation

of the Prepackaged Plan.

     66.     Due to the complexity of the Debtors' businesses, the number of Debtor

entities, the substantial burden already imposed on the Debtors' management by the

commencement of these chapter 11 cases, and the fact that the Debtors have a substantial number

of creditors, the Debtors will be unable to complete their Schedules and Statements by the deadline set forth in the Bankruptcy Code and the Bankruptcy Rules. The Debtors do not anticipate seeking to impose a bar date in these cases because all classes of claims either (a) are being paid in full, (b) have agreed to their treatment, or (c) are impaired and deemed to reject the Prepackaged Plan. Thus, completing the Schedules and Statements will be unnecessarily time-consuming and expensive if the Prepackaged Plan is confirmed. Therefore, I believe that good cause exists for extending the deadline by which the Debtors must file their Schedules and Statements. I understand that granting this motion is in the best interests of the Debtors' estates, as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely restructuring process.

**B.     Applications and Motions Related to the Retention of Professionals.**

*(i)     Application to Employ and Retain Prime Clerk as Claims and Noticing Agent.*

67.     Concurrently herewith, the Debtors filed an application to retain Prime Clerk as this Court's claims and noticing agent for the Debtors' chapter 11 cases and all materials related to the Recognition Proceeding. I believe that the retention of Prime Clerk is critical because of the large number of creditors identified in these cases.

68.     I understand that Prime Clerk is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases. The Debtors solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting Prime Clerk and believe Prime Clerk's rates are reasonable given the quality of Prime Clerk's services and prior bankruptcy experience. Given the need for the services described above and Prime Clerk's expertise in providing such services, I believe that retaining Prime Clerk will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their restructuring efforts.

69.    The Debtors also intend to file a separate application to retain Prime Clerk

as an administrative agent to provide, among other things, certain solicitation-related services.

*(ii)    Other Retention Applications.*

70.    The Debtors also intend to file certain applications, upon the scheduling of

a further hearing by the Court, to retain professionals who will assist in the administration of

these chapter 11 cases.  Among certain other professionals, the Debtors will seek to retain:

Willkie Farr & Gallagher LLP as bankruptcy counsel with regard to the filing and prosecution of

these chapter 11 cases; Thornton Grout Finnigan LLP as bankruptcy counsel with regard to the

filing and prosecution of the Recognition Proceeding; and Keefe, Bruyette & Woods, Inc. and

Miller Buckfire & Co. as co-investment bankers.  The Debtors also intend to file a motion

seeking authorization and establishing procedures for compensating and reimbursing

professionals on a monthly basis, on terms comparable to the procedures established in other

chapter 11 cases in this District.

71.    In addition, the Debtors intend to file a motion authorizing the Debtors to

(a) retain certain professionals utilized in the ordinary course of their business without the

submission of separate retention applications and the issuance of separate orders approving the

retention of each individual professional and (b) pay each professional in accordance with the

terms set forth in the motion without application to the Court by such professional.

72.    The Debtors also intend to file a motion seeking authorization to

(a) continue their existing contractual relationships with the Advisory Groups and (b) retain the

Partner Law Firms in the ordinary course of business as of the Petition Date.  As explained more

fully in the motion, the Debtors seek approval of this motion on an interim basis because the

Debtors' Charged-Off Accounts generate the only material source of revenue for the Advisory

Groups and Partner Law Firms.  Thus, any lapse in payment would materially harm each such

firm and jeopardize their ability to meet operating obligations as they come due (including

paying their personnel), which in turn, could have a material negative impact on the Debtors'

collection efforts.  A separate declaration is being filed in support of this motion.

**C.    Motion to Approve Debtor-in-Possession Financing and Use of Cash Collateral.**

73.    Concurrently herewith, the Debtors are seeking authority to enter into that

certain Senior Secured Super-Priority Debtor-in-Possession Financing Agreement, pursuant to

which the lenders thereunder (the "**DIP Lenders**") shall (a) provide postpetition debtor-in-

possession financing (the "**DIP Facility**") on a priming, superpriority basis, (b) consent to the

Debtors' use of cash collateral, (c) provide "adequate protection" to prepetition secured lenders,

and (d) schedule a final hearing with respect to the relief requested, all as more fully described in

the relevant motion (the "**DIP Motion**").

74.    As described in more detail in the DIP Motion, the Debtors reached out to

a number of potential sources of financing to obtain the best terms possible.   Ultimately, the

Debtors' determined that the DIP Lenders, who are comprised of the Debtors' first lien

prepetition lenders (or their affiliates), offered the most cost-effective and beneficial debtor-in-

possession financing.  In connection therewith, the Debtors' conducted several arm's length

discussions with the DIP Lenders and were able to improve the DIP Lenders proposed initial

offer.  In light of terms generally required in the market for loans of the size and nature of the

DIP Facility, as well as considering the expense, time, and risks associated with finding an

alternative lender, the Debtors determined that the DIP Lenders final proposed terms for the DIP

Facility were the best terms available to the Debtors for such financing.

75.    The DIP Facility is a revolving credit facility in an aggregate principal

amount not to exceed $58,500,000.  I understand that all of the Debtors' prepetition secured

lenders, who have liens that will be primed by liens granted to secure the DIP Facility, have

either (a) explicitly consented to the DIP Credit Agreement, (b) are deemed to have consented to the priming of their liens and to the Debtors' use of cash collateral under the applicable Intercreditor Agreement, and/or (c) if required under the CCAA, have received notice of the priming lien granted to the DIP Lenders.

76.    On an interim basis, the Debtors are requesting access to $10,000,000 of the $58,500,000 in availability under the DIP Facility.  Subject to Court approval, a portion of such amounts will be used to complete a "roll-up" of the Debtors' First Lien Revolving Credit Facility, pursuant to which all currently outstanding loans under the First Lien Revolving Credit Facility will be converted into obligations incurred under the DIP Facility.  The DIP Facility also will be used to fund fees under the DIP Facility, pay restructuring expenses, and provide working capital in connection with the Debtors' operations.

77.    The reasons supporting the Debtors' request for authority to enter into the DIP Facility are compelling.  As explained in greater detail in the motion, the DIP Facility, in combination with the use of cash collateral, will provide the necessary liquidity to fund the Debtors' operating, working capital and capital expenditure needs during the course of these chapter 11 cases.  I believe that access to cash collateral and the funds available under the DIP Facility is crucial to avoid immediate and irreparable harm to the Debtors' estates, employees, customers, and creditors.  Further, the terms of the DIP Facility are reasonable as they include favorable pricing terms, reasonable adequate protection measures for the prepetition secured creditors' interests and reasonable fees payable to the DIP Lenders.

78.    For the foregoing reasons, I believe that the DIP Facility embodies the best available financing under these circumstances and that entry into the DIP Credit Agreement is in the best interest of the Debtors and their estates.

**D.      Motion to Authorize Continued Use of the Debtors' Cash Management System and Bank Accounts.**

79.      In the ordinary course of their business prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtors maintained a centralized cash management system to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately.

80.      It is my understanding that the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts (which must be designated debtor in possession bank accounts) and obtain, establish and maintain separate debtor in possession accounts.  The Debtors are requesting a modification of such requirements to allow them to maintain their existing cash management system.  I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' business.  Creating a new cash management system could cause confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could diminish the prospects for a successful restructuring.  It would be especially inefficient in these cases because the Debtors recently completed a transition of their cash management system to a new bank, a process that spanned several months leading to the Petition Date.

81.      In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements.  The Debtors believe that the accounts in their current cash management system either meet those requirements or, to the extent that certain accounts do not, that such requirements should be modified as set forth in the motion given the security of the Debtors' deposits and the expedited nature of these chapter 11 cases.

82.     Finally, the Debtors request authority to continue performing, in their

discretion, their prepetition practices with respect to ordinary course intercompany transactions

and to grant superpriority administrative expenses status to obligations arising out of

intercompany claims.  These intercompany transactions, which are common among businesses of

the Debtors' size, promote efficiency and ensure that the Debtors operate in an orderly fashion.

83.     I believe that allowing the Debtors to maintain their cash management

system would be in the best interests of the Debtors' estates, creditors and other parties in

interest.  Thus, the Debtors seek authorization to continue the management of their cash receipts

and disbursements in the manner in which they were handled immediately prior to the Petition

Date and to continue intercompany transfers in the ordinary course of business.

**E.      Motion for Authorization to Pay Certain Prepetition Claims of Employees.**

84.     Concurrently herewith, the Debtors have filed a motion (the "**Wage**

**Motion**") seeking authority to, among other things, satisfy certain of their prepetition obligations

to their employees, pay prepetition payroll-related taxes and withholdings associated with the

Debtors' employee wage claims and employee benefit obligations, and other similar tax

obligations, continue any employee benefit programs in place as of the Petition Date (including

satisfying any prepetition obligations associated with such programs), and reimburse employees

for prepetition travel and other business expenses that were incurred on behalf of the Debtors.

Additionally, the Debtors are seeking to continue their annual spring incentive bonus program

for rank and file employees working on the collections floor, that will pay no more than $3,000

to each eligible employee (none of whom are insiders) on May 31, 2017.  These spring bonuses

are tied directly to the level of collections during the months when most Americans receive their

tax refunds, which is typically an active time for collections activities.  This relief in the Wage

Motion is critical to the Debtors' business and the success of the Proposed Restructuring Transaction.

85.     In order to achieve a successful restructuring, it is essential that the Debtors' employees work with the same or greater degree of commitment and diligence as they did prior to the Petition Date.  The requested authority to continue to pay their prepetition employee obligations and to maintain their current employee benefits programs is critical to ensure that:  (a) the Debtors can retain personnel knowledgeable about the Debtors' business; (b) the Debtors' employees continue to provide quality services to the Debtors at a time when they are needed most; and (c) the Debtors remain competitive with comparable employers.

86.     If this motion were not granted, I believe that it would result in a significant deterioration in morale among employees, which undoubtedly would have a devastating impact on the Debtors, interfere with the Debtors' ability to close the Plan Funding Agreement, and negatively impact the value of estate assets and the Debtors' ability to restructure.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the Employees to the restructuring effort.  Prepetition Employee Obligations paid pursuant to the Interim Order will not exceed $12,850 for any individual employee.  I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their estates, their creditors and other parties in interest, and will enable the Debtors to continue to operate their business without disruption, in an economic and efficient manner.

**F.     Motion to Approve Investor Protections.**

87.     The Debtors intend to effectuate the Proposed Restructuring Transaction through the Prepackaged Plan and the Plan Funding Agreement.  Among other things, the Plan

Funding Agreement (a) provides that the Debtors will pay the Plan Investor (i) a fee of

$12,000,000 (the "**Termination Fee**") when and if payable pursuant to the terms of the Plan

Funding Agreement and (ii) certain expenses of the Plan Investor (the "**PI Expenses**," as such

term is defined in the Plan Funding Agreement), and (b) pursuant to Section 6.7 therein, sets

forth restrictions with respect to negotiating alternative transactions and superior proposals

(together with the Termination Fee and the PI Expenses, the "**Investor Protections**").

88.     Concurrently herewith, the Debtors are seeking approval of the Investor

Protections.  The Investor Protections are necessary to induce and incentivize the Plan Investor

to undertake the time, expense, and risks involved with serving as the Plan Investor.  The

Investor Protections also reflect market terms for a transaction of this size and nature.  Further,

the Plan Investor advised the Debtors that it was unwilling to execute the Plan Funding

Agreement without the inclusion of the Investor Protections.  I believe that granting the Investor

Protections is a sound exercise of the Debtors' business judgment, and authorizing the Debtors to

honor the Investor Protections is in the best interests of the Debtors, their estates, and all other

parties in interest,.

## G.    Certain Other Motions.

   (i)    *Motion for Authority to Pay Certain Prepetition Sales, Use and Other Taxes and
          Regulatory Fees.*

89.     The Debtors seek entry of an order authorizing them to pay various

prepetition sales and use taxes (collectively, the "**Trust Fund Taxes**") and other taxes (the

"**Other Taxes**") to various federal, state, local and foreign authorities (collectively, the "**Taxing**

**Authorities**"), and certain licensing, permitting, bonding, regulatory, and certain other fees (the

"**Regulatory Fees**" and together with the Trust Fund Taxes and the Other Taxes, the "**Taxes**") to

certain federal, state, local and foreign government agencies (collectively, the "**Regulatory**

**Authorities**" and together with the Taxing Authorities, the "**Applicable Authorities**") on a

periodic basis, in each case, as and when such obligations become due.  In the ordinary course of

their business, the Debtors collect Trust Fund Taxes and hold them for a period of time before

remitting them to the appropriate Taxing Authorities.  The Debtors also pay certain Other Taxes,

including, but not limited to, property taxes and state and local income taxes, to certain

Applicable Authorities on a periodic basis.  The Debtors also are required to pay Regulatory

Fees, including, but not limited to, certain business licensing and permit fees.

90.    Payment of the prepetition Taxes is critical to the Debtors' continued,

uninterrupted operations.  The Debtors' failure to pay these obligations may cause the Applicable

Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic

stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt

the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors'

estates.  Failure to pay the prepetition Taxes also could have a negative impact on the Debtors'

existing permits and licenses.  In addition, the Debtors believe that most of the prepetition Taxes

are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect

only the timing of the payments, and not the amount of the ultimate recovery.

91.    As of the Petition Date, the Debtors estimate, based on a thorough review

of their books and records, that the total amount of prepetition Taxes is approximately $77,500.

The proposed interim and final orders, if entered, will grant the Debtors the authority to pay the

Taxes in accordance with the Debtors' prepetition practices.

92.    I believe that the authority to pay the Taxes in accordance with the

Debtors' prepetition business practices is in the best interest of the Debtors and their estates.

(ii)    *Motion for Interim and Final Orders Authorizing Payment of Local Court Costs and Recording and Garnishment Fees.*

93.    The Debtors are seeking authority to pay valid prepetition filing, service,

judgment, recording and similar fees, costs, and other expenses (the "**Collections Costs**") owed

to approximately one thousand state and local court systems, sheriffs' and clerks' offices,

recorders, deed registries, employers (in connection with garnishment of wages) and banks (in

connection with garnishment of accounts) in connection with the Debtors' collection of Charged-

Off Accounts through legal channels.

94.     Failure to pay the Collections Costs likely will result in a material

disruption to the Debtors' collections and revenues as, among other things, it would require the

Debtors to restart the applicable court, recording, or garnishment processes, leading to further

delay and expense without any corresponding benefit to the Debtors' estates.

95.     As of the Petition Date, the Debtors estimate, based on a thorough review

of their books and records, that the total amount of prepetition Collections Costs is

approximately $73,000.  The proposed interim and final orders, if entered, will grant the Debtors

the authority to pay the Collections Costs in accordance with the Debtors' prepetition practices.

   (iii)   *Motion for Interim and Final Orders Authorizing Debtors to Honor Prepetition*
           *Refund Checks.*

96.     The Debtors are seeking authority, but not direction, to honor and pay

certain prepetition refunds (the "**Obligor Refunds**") in the ordinary course of business issued by

the Debtors for overpayments made by such obligors on their Charged-Off Accounts.  From time

to time, borrowers on Charged-Off Accounts inadvertently remit payment to the Debtors in an

amount exceeding their debt owed or, in certain limited circumstances, a dispute arises with an

Obligor based on the Debtors' acceptance or crediting of a payment from an Obligor.  In the

ordinary course of business, the Debtors return the overpayments to the relevant Obligor.  The

Debtors' historical data indicates that, typically, if an Obligor Refund is not deposited by the

Obligor within thirty (30) days of receipt, it is not likely to be deposited by the Obligor.

97.   As of the Petition Date, the Debtors estimate, based on a thorough review

of their books and records, that there are approximately 12,000 prepetition Obligor Refunds

outstanding, representing approximately $1,575,000, the majority of which Obligor Refunds were sent to the applicable Obligor more than thirty (30) days prior to the Petition Date and have not been deposited. The Debtors are seeking to honor, in their discretion, the Obligor Refunds in an amount up to an aggregate cap of $200,000 (the "**Cap**"), which represents the Debtors' good faith estimate of Obligor Refunds already issued by check that likely will be deposited by Obligors based on the foregoing, plus an estimated amount for Obligor Refunds that may be owed in the weeks leading up to the Petition Date but for which the Debtors have not yet issued checks.

     *(iv)*    *Motion for Interim and Final Orders Providing Adequate Assurance to Utilities.*

     98.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telecommunications, waste disposal and other similar utility products and services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**"). The Debtors seek entry of interim and final orders of this Court prohibiting the Utility Companies from altering or discontinuing the Utility Services and deeming the Utility Companies adequately assured of future performance by virtue of the Debtors' proposed adequate assurance.

     99.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to provide a deposit equal to two (2) weeks of Utility Services, calculated as a historical average over the past twelve (12) months (the "**Adequate Assurance Deposit**"), to any Utility Company who requests such a deposit, subject to certain limitations, including if a Utility Company has a deposit. I believe that the Debtors' Adequate Assurance Deposit constitutes sufficient adequate assurance to the Utility Companies. However, in recognition of Utility Companies' right to evaluate the proposed adequate assurance on a case-by-case basis, if any Utility Company believes additional assurance is needed, the Debtors have

proposed procedures for the Utility Companies to request additional adequate assurance.  I

believe these procedures, as outlined in the motion, are not only fair and reasonable, but also

necessary for the Debtors' stability.  Furthermore, the Debtors fully intend to timely comply with

their postpetition obligations to Utility Companies.

100.    Based on the nature of the Debtors' business and their heavy reliance on

telecommunications, internet services, and similar utilities, the Debtors have requested relief on

an interim basis.  The Debtors require the assurance that the Utility Companies will not alter or

discontinue services.  Even a short disruption of service would severely impact the Debtors'

collection efforts and, in turn, revenues.  I believe that interim relief is necessary to avoid the

immediate and irreparable harm that would befall the Debtors' estates if the Debtors were unable

to pay the Utility Companies prior to the final hearing on this motion.  Additionally, I believe

that without the final relief requested in the motion, the Debtors could be harmed by having to

address numerous requests by Utility Companies in a disorganized manner at a critical period in

their restructuring efforts.

(v)    *Motion for Interim and Final Orders Authorizing Payment of Prepetition
        Canadian General Unsecured Claims in the Ordinary Course of Business.*

101.    The Canadian Debtors are seeking authorization to pay all general

unsecured claims (the "**Canadian General Unsecured Claims**") against them in the ordinary

course of business.  The Prepackaged Plan, which has been accepted by all classes entitled to

vote thereon in excess of the thresholds required by the Bankruptcy Code, provides that

Canadian General Unsecured Claims (as defined in the Prepackaged Plan) are unimpaired.

Assuming the Prepackaged Plan is confirmed, granting the relief requested in this motion will

only affect the timing of payment under the Prepackaged Plan, and will not affect the ultimate

recovery to any creditor in these cases.  Because Canadian General Unsecured Claims are

unimpaired under the Prepackaged Plan, the Debtors seek interim relief to continue paying such

Claims in the ordinary course of business to ensure that there is no disruption to the Debtors'

business in Canada and in an attempt to avoid the confusion that the filing of the Bankruptcy

Cases and Recognition Proceeding could create among such creditors despite that they are

proposed to be paid in full.  I believe that interim relief is also necessary to avoid the immediate

and irreparable harm that would befall the Debtors' estates, including a loss of confidence among

these creditors, which could affect the Debtors' reputation and goodwill, if the Canadian Debtors

were unable to pay the Canadian General Unsecured Claims prior to the final hearing on this

motion.  No party will be prejudiced by the relief requested in this motion.

> *(vi)*     *Motion for Order Authorizing SquareTwo Financial Corporation to Act as Foreign Representative on Behalf of the Debtors' Estates.*

102.     The Debtors are seeking authorization for SquareTwo Financial

Corporation, the ultimate parent company of the Debtors, to: (a) act as the foreign representative

(as such term is defined in the CCAA) for the Debtors; (b) seek recognition by the Canadian

Court of the chapter 11 cases and the orders entered by this Court; (c) requesting the Canadian

Court (or any other Canadian court, as applicable) to lend assistance to this Court in protecting

the property of the Debtors' estates; and (d) seek any other appropriate relief from the Canadian

Court or any other Canadian court, as applicable) that is just and proper in furtherance of the

protection of the Debtors' estates or the interest of a creditor or creditors.  Under the CCAA, a

recognition application must be accompanied by a "certified copy of the instrument, however

designated, authorizing the foreign representative to act in that capacity or a certificate from the

foreign court affirming the foreign representative's authority to act in that capacity."  CCAA,

R.S.C., Ch. C-36, § 46 (1985) (Can.).

103.     I believe it is in the best interests of the Debtors, their estates, and all

parties in interest that SquareTwo Financial Corporation be appointed to represent the Debtors'

estates in the Recognition Proceeding.  Because the Debtors have assets in Canada, it is critical

that a stay similar to the automatic stay imposed pursuant to section 362 of the Bankruptcy Code

be granted in Canada and that certain of this Court's orders also be recognized in Canada, which

would not be possible without the relief requested in this motion.

### III.   <u>INFORMATION REQUIRED BY LOCAL RULE 1007-2</u>

104.   It is my understanding that Local Rule 1007-2 requires certain information

related to the Debtors, which is set forth below.

105.   <u>Exhibit A</u> hereto provides the following information with respect to each

of the holders of the Debtors' thirty (30) largest unsecured claims (excluding insiders):  (i) each

creditor's name, address (including the number, street, apartment or suite number, and zip code,

if not included in the post office address) and telephone number; (ii) the nature and approximate

amount of such creditor's claim; and (iii) an indication of whether the claim is contingent,

unliquidated, disputed, or partially secured.

106.   <u>Exhibit B</u> hereto provides the following information with respect to the

holders of the five (5) largest secured claims against the Debtors:  (i) the creditor's name, address

(including the number, street, apartment or suite number, and zip code, if not included in the post

office address) and telephone number; (ii) the amount of the claim; (iii) a brief description of

such creditor's claim; (iv) if known, an estimate of the value of the collateral securing the claim;

and (v) whether the claim or lien is contingent, unliquidated or disputed.

107.   <u>Exhibit C</u> hereto provides a summary of the Debtors' assets and liabilities.

60.   <u>Exhibit D</u> hereto sets forth the number of holders of the Second Lien

Notes, which are publicly held.  <u>Exhibit D</u> further provides that the obligations under the First

Lien Financing Agreement, the 1.25 Lien Credit Agreement, and the 1.5 Lien Credit Agreement,

as well as the outstanding equity interests of the Debtors, are privately held, and that there is no

established public trading market for such securities.

- 39 -

61.    <u>Exhibit E</u> hereto provides that certain property of the Debtors is currently in the possession or custody of a custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

62.    <u>Exhibit F</u> hereto sets forth a list of the owned or leased premises from which the Debtors operate their business.

63.    <u>Exhibit G</u> hereto sets forth the location of the Debtors' substantial assets and the location of their books and records.

64.    <u>Exhibit H</u> hereto provides that there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

65.    <u>Exhibit I</u> hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

66.    <u>Exhibit J</u> hereto sets forth the estimated amount to be paid to: (a) employees; (b) officers, stockholders and directors; and (c) financial and business consultants retained by the Debtors, for the thirty (30) day period following the Petition Date.

67.    <u>Exhibit K</u> hereto sets forth a list of the Debtors' estimated cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the thirty (30) day period following the Petition Date.

## <u>CONCLUSION</u>

In furtherance of their restructuring efforts, the Debtors respectfully request that

orders granting the relief requested in the First Day Motions be entered.

Dated:  March 19, 2017
        New York, New York

> SquareTwo Financial Services Corporation, <u>et al</u>., on behalf of the Debtors and the Debtors in Possession
>
>
>
>  /s/ J.B. Richardson, Jr.
> _____
> J.B. Richardson, Jr.
> Chief Operating Officer and/or Authorized Signatory of Debtors and Debtors in Possession

**<u>Schedule 1</u>**[1]

**Organizational Chart**

---

[1]    Excludes 2566737 Ontario Inc., which is a wholly-owned non-Debtor Canadian subsidiary of Debtor SquareTwo Financial Corporation, and is incorporated under the laws of Ontario, Canada.



*Christopher Walker holds approximately a 14% equity position in CCL Financial Inc.

## **EXHIBIT A**

### **Committees Organized Prior to the Order for Relief**

To the best of the Debtors' knowledge and pursuant to Local Rule 1007-2(a)(3), no official committee or ad hoc group has been organized prior to the Petition Date.

# **EXHIBIT B**

**30 Largest Unsecured Claims**
**(on a consolidated basis)**

Official Form 204

**Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest**

| Fill in this information to identify the case: |
| --- |

Debtor name <u>SquareTwo Financial Services Corporation, et al.</u>

United States Bankruptcy Court for the: <u>Southern</u>          District of <u>New York</u>
                                                                                      (State)

Case number *(if known):* <u>17-</u>

☐ Check if this is an amended filing

**Unsecured Claims and Are Not Insiders**

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11. U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim[1] | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | **Oracle America, Inc.** Legal Department 500 Oracle Parkway Redwood Shores, CA 94065 | General Counsel T: 303-272-7602 kavitha.venkatesh@oracle.com | Trade Payable | | N/A | $ 0 | $745,074 |
| 2 | **NICE Systems, Inc.** Legal Department 461 From Road, 3rd Floor Paramus, NJ 07652 | General Counsel T: 201-964-2600 ieff.levenberg@nice.com | Trade Payable | | N/A | $ 0 | $339,450 |
| 3 | **Lowery, Arthur Todd** c/o Erma Lowery 24 Cherry Lane Drive Englewood, CO 80110 | Arthur Todd Lowery slowery@lowerylawgroup.com | Note | | N/A | $ 0 | $207,368 |
| 4 | **Microsoft Corporation** Legal and Corporate Affairs, Volume Licensing Group One Microsoft Way Redmond, WA 98052 | General Counsel T: 425-703-6512 dhoward@microsoft.com | Trade Payable | | N/A | $ 0 | $142,384 |
| 5 | **DMC Portfolio, LLC** c/o Buchanan Street Partners 88 San Clemente Drive, Suite 200 Newport Beach, CA 92660 | Brian Payne T: 949-721-1414 bpayne@buchananstreet.com | Trade Payable | | N/A | $ 0 | $100,093 |

---

[1]      Holders of unsecured deficiency claims as well as insiders, including, any claims of former directors and/or officers, have been excluded from this list.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim[1] | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 6 | **[REDACTED]** | [REDACTED] | Settlement | Contingent | N/A | $ 0 | $88,580 |
| 7 | **U.S. Bancorp**<br><br>c/o U.S. Bank Equipment Finance U.S. Bank National Association P.O. Box 230789 Portland, OR 97281 | Paul Lam T: 949-798-4756 paul.lam@usbank.com | Trade Payable | | N/A | $ 0 | $33,280 |
| 8 | **LexisNexis Risk Solutions**<br><br>1000 Alderman Drive Alpharetta, GA 30005 | Angela M. DiCenso T: 978-436-0827 angela.dicenso @lexisnexis.com | Trade Payable | | N/A | $ 0 | $25,006 |
| 9 | **Capital One**<br><br>15070 Capital One Drive, WC7 3rd Floor Richmond, VA 23238 | General Counsel john.finneran @capitalone.com | Refund | | N/A | $ 0 | $20,189 |
| 10 | **MBNA**<br><br>655 Papermill Road Newark, DE 19711-1322 | General Counsel | Refund | | N/A | $ 0 | $15,851 |
| 11 | **Diesel USA**<br><br>200 West 19th St. 3rd Floor New York, NY 10011 | General Counsel | Refund | | N/A | $ 0 | $14,134 |
| 12 | **Portfolio Recovery Associates**<br><br>120 Corporate Blvd., Suite 100 Norfolk, VA 23502 | General Counsel clagow @portfoliorecovery.com | Refund | | N/A | $ 0 | $14,113 |
| 13 | **Cambece, James A.**<br><br>J.A. Cambece Law Office, PC 200 Cummings Center, Suite 173-D Beverly, MA 01915 | James A. Cambece F: 866-200-9330 acambece @cambecelaw.com | Account Profit Participation | Unliquidated | N/A | $ 0 | $13,573 |
| 14 | **ViaWest, Inc.**<br><br>6400 S. Fiddler's Green Circle Suite 2000 Greenwood Village, CO 80111 | Bill Hueston T: 720-891-1081 bill.hueston@viawest.com | Trade Payable | | N/A | $ 0 | $12,700 |
| 15 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $11,345 |
| 16 | **[REDACTED]** | | Refund | | N/A | $ 0 | $10,260 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | **Arrow Financial Services, LLC** 5996 W. Touhy Ave. Niles, IL 60714 | General Counsel | Refund | | N/A | $ 0 | $9,621 |
| 18 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $9,526 |
| 19 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $8,855 |
| 20 | **[REDACTED]** | | Refund | | N/A | $ 0 | $7,660 |
| 21 | **CSGA** 2361 Wehrle Drive Williamsville, NY 12345 | General Counsel | Refund | | N/A | $ 0 | $7,017 |
| 22 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $6,921 |
| 23 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $6,836 |
| 24 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $6,560 |
| 25 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $6,372 |
| 26 | **[REDACTED]** | | Refund | | N/A | $ 0 | $6,000 |
| 27 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $5,400 |
| 28 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $5,353 |
| 29 | **Wells Fargo Card Services** 7000 Vista Dr West Des Moines, IA 50266 | Carla Hawkins T: 303-968-2201 | Trade Payable | | N/A | $ 0 | $5,275 |
| 30 | **[REDACTED]** | [REDACTED] | Refund | | N/A | $ 0 | $5,061 |

## EXHIBIT C

### Holders of Five Largest Secured Claims Against the Debtors[1]

| Creditor Name | Mailing Address | Phone Number | Approximate Amount of Claim ($USD) | Description of Claim | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|---|---|
| Cerberus Business Finance LLC | 875 Third Avenue, 12th Floor, New York, NY 10022 | 212-891-2100 | $146,000,000* | First Lien Financing Facility | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | |
| Cortland Capital Market Services LLC, as Trustee | 225 W Washington Street, #2100 Chicago, IL 60606 | 312-564-5100 | $16,304,130.10* | 1.25 Lien Financing Facility | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | |
| Cortland Capital Market Services LLC, as Trustee | 225 W Washington Street, #2100 Chicago, IL 60606 | 312-564-5100 | $191,523,223.79* | 1.5 Lien Financing Facility | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | |

---

[1]  The information presented on this Exhibit C shall not constitute an admission by, nor is it binding on, the Debtors.  The information presented herein, including, without limitation: (a) the failure of the Debtors to list any claim as contingent, unliquidated, disputed or subject to setoff; or (b) the listing of any claim as secured, does not constitute an admission by the Debtors or constitute a waiver of the Debtors rights to contest the validity, nature, characterization and/or amount of any claim.

*  Amount represents principal amount owed as of the Petition Date.

| | | | | | | |
|---|---|---|---|---|---|---|
| U.S. Bank National Association | 950 17th Street, 12th Floor Denver, CO 80202 Attn: Kathleen A Connelly - Global Corporate Trust Services | 303-585-7340 | $19,082,000* | Second Lien Indenture | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | |
| The Huntington National Bank | 105 East Fourth Street, Suite 200C Cincinnati, Ohio 45202 Attn: Shari A. Liening, Loan Administrator Equipment Finance Division OR 301 Grant Street, 20th Floor, Pittsburg, PA 15219 Attn: Christopher P. Schueller | 513-762-1803 | $181,518[2] | Aircraft Lease | Security Deposit | |

---

[2]    This amount assumes application of the security deposit held by The Huntington National Bank against monthly lease payments owed by Collect Air, LLC through the Petition Date.

## EXHIBIT D

### Summary of Debtors' Assets and Liabilities
### on a consolidated basis, as of January 31, 2017

**Assets**

| | |
|---|---:|
| Cash and Cash equivalent | 8,888 |
| Restricted Cash | 506 |
| Receivables | |
| Trade, net | 1636 |
| Notes Receivable, net | 168 |
| Taxes Receivable | 66 |
| Purchased Debt, net | 174,850 |
| Property and equipment, net | 27,535 |
| Goodwill and intangible assets | 85,712 |
| Other Assets | 11,666 |
| Total assets | $    311,213 |

| | |
|---|---:|
| **Liabilities and stockholder's deficiency** | $ |
| Liabilities: | |
| Accounts payable, trade | 1,300 |
| Payable from trust accounts | 1,545 |
| Unallocated Proceeds | 22,284 |
| Taxes Payable | 199 |
| Accrued interest and other liabilities | 19,978 |
| Deferred tax liability, net | 2,031 |
| 1.0L Line of credit | 36,250 |
| Notes payable: | |
| 1.0L Term loan | 105,000 |
| 1.25L Term loan | 16,161 |
| 1.5L Term loan | 239,796 |
| 2.0 Notes payable, net of discount | 19,073 |
| Other notes payable | 211 |
| 1.0L and 1.25L debt issuance costs and discount | (6,251) |
| Obligations under capital lease agreements | 3,090 |
| Total liabilities | 460,667 |

| | |
|---|---:|
| Stockholder's deficiency | |
| Common stock | – |
| Preferred stock | – |
| Additional paid-in capital | 201,354 |
| Accumulated deficit | (351,857) |
| Accumulated other comprehensive loss | (7,029) |
| Total deficiency before noncontrolling interest | (157,532) |
| Noncontrolling interest | 8,078 |
| Total deficiency | (149,454) |
| Total liabilities and deficiency | $    311,213 |

## **EXHIBIT E**

### **Publicly Held Securities**

Local Bankruptcy Rule 1007-2(a)(7) requires the Debtors to identify the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

The outstanding equity interests of the Debtors are privately held, and there is no established public trading market for such equity interests or the Debtors' debt securities.

| Description of Securities | Publicly Held or Privately Held | If Publicly Held, Number of Holders |
|---|---|---|
| First Lien Financing Agreement | Privately Held | N/A |
| 1.25 Lien Financing Agreement | Privately Held | N/A |
| 1.5 Lien Financing Agreement | Privately Held | N/A |
| 2nd Lien Indenture | Publically Held | 605 |
| Series A Preferred Equity | Privately Held | N/A |
| Common Equity | Privately Held | N/A |

## <u>EXHIBIT F</u>

**Debtors' Property Not in the Debtors' Possession**

Local Bankruptcy Rule 1007-2(a)(8) requires the Debtors to list property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee or rents, or secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession or control of various third parties, including landlords, lessors, and certain service providers, where the Debtors' ownership interest is not affected.

Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## **EXHIBIT G**

### **Debtors' Premises**

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| SquareTwo Financial Corporation | 6300 South Syracuse Way, Suite 300 Centennial, CO 80111 | Office Lease |
| SquareTwo Financial Corporation | 6300 South Syracuse Way, Suite 200 Centennial, CO 80111 | Office Lease |
| SquareTwo Financial Corporation | AT&T Data Center 4513 Western Avenue Lisle, IL 60532 | Space Leased for equipment stored at the Lisle Data Center |
| SquareTwo Financial Corporation | viaWest Compark Data Center 8363 S. Peoria Street, Englewood, CO 80112 | Space Leased for equipment stored at the Englewood Data Center |
| SquareTwo Financial Services Corporation d/b/a Fresh View Solutions | 10865 Grandview Drive Overland Park, KS 66210 | Office Lease |
| CCL Financial Inc. | 17345 Leslie Street, Suite 300 Newmarket, Ontario L3Y 0A4 | Office Lease |
| CCL Financial Inc. | 505 Boulevard Rene-Levesque Ouest #1504 Montreal, Quebec H2Z 1Y7 | Office Lease |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

## EXHIBIT H

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, books and records, and nature, location, and value of any assets held by the Debtors outside the United States.

### Location of Debtors' Substantial Assets

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 300
Centennial, CO 80111

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 200
Centennial, CO 80111

SquareTwo Financial Services Corporation
10865 Grandview Drive
Overland Park, KS 66210

AT&T Data Center
4513 Western Avenue
Lisle, IL 60532

viaWest Compark Data Center
8636 S. Peoria Street
Englewood, CO 80112

### Location of the Debtors' Books and Records

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 300
Centennial, CO 80111

FIJ Law
50 West Pearce Street, Suite 10
Richmond Hill, Ontario L4B 1C5
Canada

Stewart McKelvey
Purdy's Wharf Tower One
1959 Upper Water Street, Suite 900
Halifax, Nova Scotia B3J 3N2
Canada

## Debtors' Assets Outside of the United States

**Location of Assets:**
CCL Financial Inc.,
17345 Leslie Street, Suite 300
Newmarket, Ontario L3Y 0A4
Canada

**Nature of Assets:**
Miscellaneous furniture and fixtures,
postage equipment, computer equipment,
phone systems, and leaseholds;
bank accounts as detailed in the Cash Management Motion

**Estimated Value of Assets:**
Net Book Value estimated at approximately
$120,000 (CAD), excluding bank balances

**Location of Assets:**
CCL Financial Inc.,
505 Boulevard Rene Levesque Ouest #1504
Montreal, Quebec H2Z 1Y7
Canada

**Nature of Assets:**
Miscellaneous desks and computers;
bank accounts as detailed in the Cash Management Motion

**Estimated Value of Assets:**
Net Book Value estimated as approximately $0 (CAD), excluding bank balances

## **EXHIBIT I**

### **Summary of Actions or Proceedings Pending Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the Debtors state that they are involved in multiple pending or threatened actions or proceedings in various jurisdictions. However, to the best of the Debtors' knowledge, judgment against any of the Debtors or a seizure of any Debtor's property is not imminent in any such litigation.

## EXHIBIT J

### Senior Management of the Debtors

| Name | Tenure | Position | Experience/Responsibilities |
|---|---|---|---|
| Christopher D. Walker | January 2003 - Present | President and CEO of SquareTwo Financial Canada Corporation | Mr. Walker serves as the President and CEO of SquareTwo's Canadian operations responsible for business development and strategy.  He previously founded the Metropolitan Collection Services. |
| John Lowe | August 2009 - Present | CFO | Mr. Lowe serves as the CFO responsible for leading the corporate controller's office, decision sciences, internal audit, financial planning and analysis, and technical and financial accounting teams.  He previously served in multiple positions at SquareTwo Financial including Treasurer and VP of Finance.  He also previously served as a Manager at Deloitte and Touche LLP. |
| J.B. Richardson, Jr. | October 2009 - Present | COO[1] | Mr. Richardson serves as the COO responsible for managing SquareTwo's unique network of partners / agencies and all business development functions.  He previously served as an Investment Associate for KRG Capital Partners.  Prior to his time at KRG, Mr. Richardson served as an investment banking analyst for Wachovia Capital Markets. |
| Alan Singer | April 2001 - Present | General Counsel | Mr. Singer serves as General Counsel responsible for overseeing all of SquareTwo's legal efforts.  He previously served as Associate General Counsel for SquareTwo Financial and Vice President of Regulatory Compliance and Customer Relations for ING Security of Denver Insurance company. |

---

[1]     J.B. Richardson, Jr. has served as since March 2016.

| Name | Tenure | Position | Experience/Responsibilities |
|---|---|---|---|
| | | | |
| Kristin Thielking | March 2011 - Present | SVP HR & Organizational Development | Ms. Thielking serves as the SVP, Human Resources and Organizational Development where she leads all human capital initiatives for SquareTwo, along with leading the facilities and administration teams. Prior to joining SquareTwo, Ms. Thielking was Sr. Director, Human Resources at Orbitz Worldwide where she led all HR activities for the Americas region. |
| Mark Erickson | December 2010 - Present | SVP Acquisitions | Mark D. Erickson has served as the SVP of Acquisitions and Market Development since July 2016.  Prior to this role, Mr. Erickson served as SVP of Commercial Operations after joining the firm in December 2010.  Prior to joining SquareTwo Financial, Mr. Erickson held multiple executive level positions from 1994 to 2009 with Key Equipment Finance, Inc., a unit of KeyCorp, engaged in small and mid-ticket commercial equipment finance and leasing. His roles included management positions in credit underwriting, lease syndications, asset management, and sales and marketing. |
| Ralph Nowicki | April 2009 - Present | Chief Accounting Officer & VP of Investor Relations | Mr. Nowicki currently serves as the Chief Accounting Officer and Vice President of Investor Relations.  He previously served as Vice President, Corporate Controller.  Prior to joining SquareTwo in 2009, Mr. Nowicki held the position of Director of M&A Advisory & Due Diligence at KPMG, LLP. |
| David Colson | March 2010 - Present | Treasurer and VP of Finance | Mr. Colson serves as Treasurer and VP of Finance responsible for overseeing all corporate finance activities.  He previously served as VP of Financial Planning and Analysis for SquareTwo Financial and Business Unit Controller for Republic Financial Corp.  He is a licensed |

| Name | Tenure | Position | Experience/Responsibilities |
|---|---|---|---|
| | | | CPA. |
| Bethany Parker | April 2001 - Present | SVP Customer Experience Office | Ms. Parker serves as SVP of the Customer Experience Office and is responsible for strategic oversight of the development, implementation and maintenance of all customer-facing activities for SquareTwo Financial.  She has held numerous leadership roles including SVP of Major Markets and Managing Director of Litigation & Recovery, during her sixteen years at SquareTwo Financial. |

## EXHIBIT K

**Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (excluding officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)[1]** | $ 1,750,000 |
| **Payments to Officers, Directors and Stockholders** | $430,000 |
| **Payments to Financial and Business Consultants** | $770,000 |

---

[1]    Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

## EXHIBIT L

**Debtors' Estimated Cash Receipts and Disbursements for the
Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Estimated Cash Receipts** | $16,900,000 |
| **Estimated Cash Disbursements** | $(16,000,000) |
| **Estimated Net Cash Gain/Loss** | $ 900,000 |

| | |
|---|---|
| **Estimated Unpaid Obligations expected to accrue** | $1,000,000 |
| **Estimated Unpaid Receivables expected to accrue** | $310,000 |