**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PREPACKAGED CHAPTER 11 PLAN PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE AND CORRESPONDING RECOGNITION PROCEEDINGS UNDER PART IV OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA).  NO CHAPTER 11 CASES OR CANADIAN RECOGNITION PROCEEDINGS HAVE YET BEEN COMMENCED AND NEITHER MAY EVER BE COMMENCED.  AS NO REORGANIZATION CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE U.S. BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE, AND NO CORRESPONDING RECOGNITION ORDER HAS BEEN OBTAINED FROM THE CANADIAN COURT.  IF VOLUNTARY REORGANIZATION CASES ARE FILED, IMMEDIATELY FOLLOWING SUCH FILING, THE ENTITIES IDENTIFIED ON THE FOLLOWING PAGE EXPECT TO SEEK AN ORDER OF THE U.S. BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND THE SOLICITATION OF VOTES FOR AND CONFIRMING, THE PREPACKAGED CHAPTER 11 PLAN DESCRIBED HEREIN, AND SEEK A CORRESPONDING RECOGNITION ORDER FROM THE CANADIAN COURT.**

**SOLICITATION AND DISCLOSURE STATEMENT**
**SQUARETWO FINANCIAL SERVICES CORPORATION, et al.[1]**

**THE DEADLINE TO (I) ACCEPT THE PLAN OR (II) REJECT THE PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 17, 2017, UNLESS EXTENDED BY THE DEBTORS.**

---

[1]   The prospective potential debtors are listed on the following page.

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PREPACKAGED CHAPTER 11 PLAN PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE AND CORRESPONDING RECOGNITION PROCEEDINGS UNDER PART IV OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA). NO CHAPTER 11 CASES OR CANADIAN PROCEEDINGS HAVE YET BEEN COMMENCED AND NEITHER MAY EVER BE COMMENCED. AS NO REORGANIZATION CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE U.S. BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE NOR HAS A CORRESPONDING RECOGNITION ORDER BEEN OBTAINED FROM THE CANADIAN COURT. IMMEDIATELY FOLLOWING THE COMMENCEMENT OF ANY REORGANIZATION CASES, THE ENTITIES IDENTIFIED IN THE FOOTNOTE BELOW EXPECT TO SEEK AN ORDER OF THE U.S. BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND THE SOLICITATION OF VOTES FOR AND CONFIRMING, THE PREPACKAGED CHAPTER 11 PLAN DESCRIBED HEREIN, AND SEEK A CORRESPONDING RECOGNITION ORDER FROM THE CANADIAN COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SquareTwo Financial Services | : | Case No. 17-_____ (    ) |
| Corporation, et al.,[2] | : | |
| | : | (Joint Administration to Be Requested) |
| Debtors. | : | |

--------------------------------------------------------x

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED
CHAPTER 11 PLAN FOR SQUARETWO FINANCIAL
SERVICES CORPORATION AND ITS AFFILIATED DEBTORS**

---

[2]   The prospective Debtors in these chapter 11 cases and the last four digits of each prospective Debtor's federal taxpayer identification number and/or Canadian equivalent are as follows: Astrum Financial, LLC (2265); Autus, LLC (2736); CA Internet Marketing, LLC (7434); CACH, LLC (d/b/a Fresh View Funding) (6162); CACV of Colorado, LLC (3409); CACV of New Jersey, LLC (3499); Candeo, LLC (2809); CCL Financial Inc. (7548); Collect Air, LLC (7987); Collect America of Canada, LLC (7137); Healthcare Funding Solutions, LLC (2985); Metropolitan Legal Administration Services, Inc. (6811); Orsa, LLC (2864); Preferred Credit Resources Limited (0637); ReFinance America, Ltd. (4359); SquareTwo Financial Canada Corporation (EIN: 1034; BN: 0174); SquareTwo Financial Corporation (1849); and SquareTwo Financial Services Corporation (d/b/a Fresh View Solutions) (5554). The prospective Debtors' executive headquarters are located at 6300 South Syracuse Way, Suite 300, Centennial, CO 80111.

**THIS DISCLOSURE STATEMENT SOLICITS ACCEPTANCES OF THE JOINT PREPACKAGED CHAPTER 11 PLAN FOR SQUARETWO FINANCIAL SERVICES CORPORATION AND ITS AFFILIATED DEBTORS AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT SUCH PLAN.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE MAKING A DECISION TO ACCEPT THE PLAN OR TO REJECT THE PLAN.  NONE OF SQUARETWO FINANCIAL SERVICES CORPORATION OR ITS AFFILIATES HAVE COMMENCED REORGANIZATION CASES IN THE UNITED STATES OR CANADA AT THIS TIME, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT.**

Dated: March 3, 2017

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for the Prospective Debtors and Debtors in Possession*
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

**IMPORTANT NOTICE**

No reorganization cases have yet been commenced in the United States or Canada by SquareTwo Financial Services Corporation (d/b/a Fresh View Solutions), Astrum Financial, LLC, Autus, LLC, CA Internet Marketing, LLC, CACH, LLC (d/b/a Fresh View Funding), CACV of Colorado, LLC, CACV of New Jersey, LLC, Candeo, LLC, CCL Financial Inc., Collect Air, LLC, Collect America of Canada, LLC, Healthcare Funding Solutions, LLC, Metropolitan Legal Administration Services, Inc., Orsa, LLC, Preferred Credit Resources Limited, ReFinance America, Ltd., SquareTwo Financial Canada Corporation and SquareTwo Financial Corporation (each, a "**Debtor**" and collectively, the "**Debtors**").  This Disclosure Statement has not been approved by any court with respect to whether it contains "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.  Nonetheless, if reorganization cases are subsequently commenced, the Debtors expect to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and determining that the solicitation of votes to accept or reject the Plan by means of this Disclosure Statement was in compliance with section 1126(b) of the Bankruptcy Code, likely at a combined hearing on adequacy of the Disclosure Statement and confirmation of the Plan, and a corresponding recognition order from the Canadian Court at a subsequent hearing.

Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Plan or in the Glossary herein, as applicable.

On March 3, 2017, the Debtors, the Consenting Lenders and the Plan Investor (collectively, the "**Plan Support Parties**") entered into the Restructuring Support Agreement (the "**RSA**") and, as a result, subject to certain terms and conditions, have agreed to support the transactions contemplated in the Plan and the Plan Funding Agreement.  The Debtors intend, provided they obtain the requisite votes in favor of the Plan, as described more fully herein, and determine it is appropriate to do so, to commence the Chapter 11 Cases as well as the Canadian Proceeding.  As the holders of approximately:  (a) 100% of the aggregate amount of the Class 3 Claims (First Lien Lender Claims) (who constitute 100% of the holders of Claims in such Class); (b) 100% of the Class 4 Claims (1.25 Lien Lender Claims) (who constitute 100% of the holders of Claims in such Class); and (c) 83% of the Class 5 Claims (1.5 Lien Lender Claims) have agreed, subject to the terms and conditions of the RSA, to vote in favor of the Plan, the Debtors believe they will obtain the requisite votes in favor of the Plan in order to obtain confirmation of the Plan by the Bankruptcy Court if the Reorganization Cases are commenced.

This Disclosure Statement and its related documents have not been approved by the Bankruptcy Court and no corresponding recognition order has been obtained from the Canadian Court.  No representations have been authorized by the Bankruptcy Court or the Canadian Court concerning the Debtors, their business operations or the value of their assets.

i

The Debtors urge you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification of claims, the history of the Debtors and the Reorganization Cases, the Debtors' businesses, properties and results of operations, historical and projected financial results and a summary and analysis of the Plan.  The Plan and this Disclosure Statement have not been required to be prepared in accordance with federal or state securities laws or other applicable nonbankruptcy law.  The Plan has not been approved or disapproved by the U.S. Securities and Exchange Commission ("SEC") or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein.  Any representation to the contrary is a criminal offense.  Persons trading in or otherwise purchasing, selling or transferring securities of the Debtors should evaluate the Plan in light of the purposes for which it was prepared.

This Disclosure Statement contains only a summary of the Plan.  This Disclosure Statement is not intended to replace the careful and detailed review and analysis of the Plan, only to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan, the Plan Supplement, including the Plan Funding Agreement, and the exhibits attached to each such document and the agreements and documents described therein.  If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern.  You are encouraged to review the full text of the Plan and the Plan Supplement, including the Plan Funding Agreement, and to read carefully the entire Disclosure Statement, including all exhibits to each such document, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of the date hereof and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any time after the date hereof.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court if the Reorganization Cases are commenced.

You should not construe this Disclosure Statement as providing any legal, business, financial or tax advice.  You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters in connection with the Plan, the solicitation of votes on the Plan and the transactions contemplated by the Plan.

As to any actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission or stipulation.  Instead, this Disclosure Statement is, and is for all purposes to be construed as, solely and exclusively a statement made in settlement negotiations.  In particular, this Disclosure Statement is not, and is in no event to be construed as, an admission of insolvency by the Debtors.  No person has been authorized by the Debtors in connection with the Plan or the solicitation of votes on the Plan to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan, the Plan Funding Agreement and other Plan Supplement documents (and the exhibits, notices and schedules attached to or incorporated by reference or referred to in this Disclosure Statement, the Plan, the Plan Funding

Agreement and other Plan Supplement documents) and if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

The Plan and this Disclosure Statement shall not constitute an offer to sell, or the solicitation of an offer to buy, securities nor shall there be any sale or distribution of securities in any jurisdiction in which such offer or sale is not permitted. You must comply with all laws and regulations applicable to you in force in any jurisdiction and must obtain any consent, approval or permission required to be obtained by you under the laws and regulations applicable to you in force in any jurisdiction to which you are subject and the Debtors, their directors, managers and managing members, and their advisors shall not have any responsibility therefor.

As of the date of this Disclosure Statement, the Debtors' current intention is to file any Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York, and any Canadian Proceeding in the Ontario Superior Court of Justice (Commercial List). However, the Debtors may determine, with the consent of the Consenting Lenders and the Plan Investor, to file each such proceeding in different venues and the Debtors reserve all rights to file any Chapter 11 Cases and any Canadian Proceeding in the jurisdictions of their choosing.

FORWARD-LOOKING STATEMENTS:

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' and the Reorganized Debtors' business. In particular, statements using words such as "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under Section IV. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in the Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, the Reorganized Debtors, their respective advisors or any other person that the projected financial conditions or results of operations can or will be achieved.

**IF THE REORGANIZATION CASES ARE FILED, THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORITY FROM THE U.S. BANKRUPTCY COURT AND CANADIAN COURT TO PAY THEIR EMPLOYEES AND CERTAIN OTHER CREDITORS, INCLUDING HOLDERS OF CLAIMS AGAINST ANY CANADIAN DEBTORS, IN FULL AND ON TIME, IN ACCORDANCE WITH EXISTING BUSINESS TERMS.  THE DEBTORS AND THE PLAN SUPPORT PARTIES BELIEVE THAT IT IS IN THE BEST INTERESTS OF THE DEBTORS TO CONTINUE TO PAY SUCH CREDITORS IN FULL AND ON TIME, BECAUSE (A) DOING SO WILL MINIMIZE THE RISK OF DISRUPTION TO THE DEBTORS' BUSINESS; (B) THE PLAN PROVIDES FOR THE UNIMPAIRMENT OF CANADIAN GENERAL UNSECURED CLAIMS; AND (C) THE REORGANIZATION CASES ARE EXPECTED TO BE BRIEF IN DURATION DUE TO THEIR PREPACKAGED NATURE.**

**THE DEBTORS, THE CONSENTING LENDERS AND THE PLAN INVESTOR SUPPORT CONFIRMATION OF THE PLAN, AND THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

GLOSSARY .................................................................................................. viii

I.    SUMMARY OF DISCLOSURE STATEMENT ...........................................1
      A.    Purpose of this Disclosure Statement ...........................................1
      B.    Background Regarding Potential Filing...........................................3
      C.    Restructuring Support Agreement and Plan Funding Agreement ........................5
      D.    Voting and Support for the Plan .....................................................6
      E.    Summary of Plan................................................................10
      F.    Summary of Classification and Treatment Under the Plan ....................12
      G.    Confirmation Hearing .......................................................28

II.   IMPLEMENTATION OF THE PLAN ........................................................30
      A.    Non-Substantive Consolidation ................................................30
      B.    Plan Funding Transaction ....................................................30
      C.    Assumed U.S. Liabilities .....................................................32
      D.    Excluded U.S. Assets .........................................................32
      E.    Canadian Debtors ............................................................33
      F.    Plan Funding.................................................................33
      G.    Continued Corporate Existence in Debtors; Vesting of Assets; Dissolution
            of Certain Debtors........................................................34
      H.    Cancellation of Existing Securities and Agreements........................35
      I.    Boards .......................................................................36
      J.    Management...................................................................36
      K.    Post-Emergence Incentive Program........................................36
      L.    Repurchase of Christopher D. Walker's Equity Securities in CCL
            Financial, Inc. and related matters.......................................37
      M.    Corporate Action............................................................38
      N.    Plan Administrator ..........................................................38
      O.    Wind Down of the Debtors' Estates .........................................40
      P.    Consenting Lender Fee Claims ..............................................41
      Q.    Comprehensive Settlement of Claims and Controversies; Termination of
            Subordination Rights .....................................................41
      R.    Additional Transactions Authorized Under the Plan........................42
      S.    Conditions to Confirmation and Consummation ..............................42
      T.    Binding Effect...............................................................44
      U.    Discharge of Claims Against and Interests in the Debtors ..................44
      V.    Term of Pre-Confirmation Injunctions or Stays ............................45
      W.    Injunction Against Interference with Plan .................................45
      X.    Injunction ...................................................................45
      Y.    Releases......................................................................46
      Z.    Exculpation and Limitation of Liability ....................................49
      AA.   Injunction Related to Releases and Exculpation............................49
      BB.   Retention of Causes of Action/Reservation of Rights .......................49

|  | CC. | Indemnification Obligations | 50 |
|  | DD. | Treatment of Executory Contracts and Unexpired Leases | 50 |
|  | EE. | Miscellaneous Provisions | 55 |
| III. | | ALTERNATIVES TO CONSUMMATION OF THE PROPOSED RESTRUCTURING TRANSACTION | 59 |
|  | A. | Liquidation Under the Bankruptcy Code and/or the Canadian Bankruptcy and Insolvency Act | 59 |
|  | B. | Alternative Chapter 11 Plan | 60 |
|  | C. | Inaction/Maintenance of Status Quo | 60 |
| IV. | | RISK FACTORS | 61 |
|  | A. | Filing of the Reorganization Cases May Disrupt the Debtors' Operations | 61 |
|  | B. | Certain Bankruptcy Risks and Other Considerations | 61 |
|  | C. | Risks Relating to Tax and Accounting Consequences of the Plan | 69 |
| V. | | CONFIRMATION OF THE PLAN | 69 |
|  | A. | Confirmation Generally | 69 |
|  | B. | Voting Procedures and Standards | 70 |
|  | C. | Acceptance | 71 |
|  | D. | Confirmation and Consummation | 72 |
| VI. | | CERTAIN EFFECTS OF THE PLAN | 76 |
|  | A. | The Creditors' Committee | 76 |
|  | B. | Post-Confirmation Jurisdiction of the Bankruptcy Court | 76 |
| VII. | | BUSINESS DESCRIPTION; HISTORICAL INFORMATION | 78 |
|  | A. | General | 78 |
|  | B. | Operations | 81 |
|  | C. | The Debtors' Prepetition Capital Structure | 83 |
|  | D. | Equity Ownership | 86 |
| VIII. | | THE REORGANIZATION CASES | 86 |
|  | A. | Continuation of Business After the Petition Date | 86 |
|  | B. | First Day Relief | 86 |
|  | C. | Case Administration | 87 |
| IX. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 88 |
|  | A. | Federal Income Tax Consequences to the Debtors | 89 |
|  | B. | Federal Income Tax Consequences to U.S. Holders | 91 |
|  | C. | Federal Income Tax Consequences to Non-U.S. Holders | 92 |
|  | D. | Information Reporting and Withholding | 93 |
| X. | | PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN | 94 |
|  | A. | Distributions | 94 |
|  | B. | No Postpetition Interest on Claims | 94 |
|  | C. | Date of Distributions | 94 |
|  | D. | Distribution Record Date | 95 |
|  | E. | Disbursing Agent | 95 |

F.   Delivery of Distributions ....................................................................96
G.   Unclaimed Property ...........................................................................96
H.   Satisfaction of Claims .......................................................................97
I.   Manner of Payment Under Plan .........................................................97
J.   De Minimis Cash Distributions .........................................................97
K.   Distributions on Account of Allowed Claims Only.............................97
L.   No Distribution in Excess of Amount of Allowed Claim.....................97
M.   Setoffs and Recoupments...................................................................97
N.   Withholding and Reporting Requirements ..........................................98

XI.   PROCEDURES FOR RESOLVING CLAIMS ................................................98
A.   Claims Process...................................................................................98
B.   Objections to Claims..........................................................................98
C.   Payments and Distributions with Respect to Disputed Claims............99

XII.   ADDITIONAL INFORMATION ....................................................................99

XIII.   CONCLUSION................................................................................................100

## INDEX OF EXHIBITS

EXHIBIT A   Chapter 11 Plan
EXHIBIT B   Liquidation Analysis
EXHIBIT C   Restructuring Support Agreement (without exhibits or schedules)
EXHIBIT D   Plan Funding Agreement (without exhibits or schedules)
EXHIBIT E   Corporate Structure Chart

## GLOSSARY

When used in this Disclosure Statement, the following terms have the meanings assigned to them in the table below unless otherwise indicated.  Please see the Plan for the definitions of any other capitalized terms used in this Disclosure Statement.

| | |
|---|---|
| Impaired | The status of any holder of a Claim or Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code. |
| Plan Support Parties | Collectively, each of the Consenting Lenders party to the RSA and the Plan Investor. |
| Reorganization Cases | Collectively, any Chapter 11 Cases and any Canadian Proceeding. |
| Unimpaired | The status of any holder of a Claim or Interest whose Claim or Interest is not Impaired. |
| Voting Agent | Prime Clerk LLC ("**Prime Clerk**"), as voting agent, in connection with voting by holders of Claims entitled to vote to accept or reject the Plan. |
| Voting Class | A Class that is Impaired under the Plan and that is not deemed to have accepted or rejected the Plan. |
| Voting Deadline | March 17, 2017 at 5:00 p.m. (prevailing Eastern Time) for holders of First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims, the only Voting Classes under the Plan. |
| Voting Procedures | The procedures governing the solicitation and tabulation of votes to accept or reject the Plan. |
| Voting Record Date | February 27, 2017. |

*The Debtors submit this Disclosure Statement pursuant to*
*section 1125 of the Bankruptcy Code for use in the solicitation of votes*
*on the Joint Prepackaged Chapter 11 Plan for SquareTwo Financial Services Corporation*
*and Its Affiliated Debtors, dated March 3, 2017.*

## I.      SUMMARY OF DISCLOSURE STATEMENT

### A.      Purpose of this Disclosure Statement

The purpose of this Disclosure Statement is to provide holders of Claims that are entitled to vote on the Plan (i.e., holders of Claims in Class 3 (First Lien Lender Claims), Class 4 (1.25 Lien Lender Claims) and Class 5 (1.5 Lien Lender Claims) under the Plan) with sufficient information to allow them to make an informed decision on whether to accept or reject the Plan.

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries, to enhance the financial viability of the Acquired Debtors (i.e., the entities incorporated in Canada, and the entities incorporated in the United States that own the vast majority of the Debtors' U.S. portfolio of financial assets) and provide for the orderly wind down of the Dissolving Debtors (i.e., the remaining entities).  A copy of the Plan is attached as Exhibit A to this Disclosure Statement.  If the Debtors obtain the requisite votes accepting the Plan, the Debtors anticipate commencing the Reorganization Cases and seeking approval of this Disclosure Statement and the Plan from the U.S. Bankruptcy Court and of a corresponding recognition order from the Canadian Court.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the glossary on page viii hereof or the Plan.

**The Debtors have not commenced cases under chapter 11 of the U.S. Bankruptcy Code or under the Companies' Creditors Arrangement Act (Canada) at this time.**

This Disclosure Statement:

- describes how Claims against, and Interests in, the Debtors will be treated under the Plan (Section I.F., "Summary of Classification and Treatment Under the Plan");

- explains how to vote on the Plan and who is entitled to vote (Section I.D., "Voting and Support for the Plan");

- estimates the recoveries for holders of Claims and Interests (Section I.F., "Summary of Classification and Treatment Under the Plan");

- presents a liquidation analysis for the Debtors (Exhibit B) (the "Liquidation Analysis");

- provides certain financial information about the Debtors;

- explains certain legal and practical aspects of implementation of the Plan (Section II, "Implementation of the Plan");

- discusses alternatives to consummation of the Plan (Section III, "Alternatives to Consummation of the Proposed Restructuring Transaction");

- notes certain risk factors that creditors entitled to vote should consider before voting (Section IV, "Risk Factors");

- discusses the procedure for confirming the Plan (Section V, "Confirmation of the Plan");

- discusses the Debtors' business and the reasons they may commence the Reorganization Cases (Section VII, "Business Description; Historical Information");

- summarizes significant events that will occur in the Reorganization Cases, if commenced (Section VIII, "The Reorganization Cases");

- summarizes certain U.S. federal tax considerations (Section IX, "Certain U.S. Federal Income Tax Consequences") as a result of the transactions under the Plan;

- explains how distributions under the Plan will be made (Section X, "Procedures for Distributions Under the Plan");

- describes the manner in which disputed claims will be resolved (Section XI, "Procedures for Resolving Claims"); and

- contains copies of the RSA and Plan Funding Agreement (Exhibits C and D, respectively).

The Plan Supplement contains, or will contain as set forth in the Plan, the following documents in draft form, signed copies or summaries of material terms, as the case may be, to be delivered, assumed and/or performed in connection with the consummation of the Plan on the Effective Date: (a) the Amended Certificates of Formation, (b) the list of proposed officers and directors, members, managers or managing members of each of the Reorganized Debtors, (c) a list of the individuals who will serve in certain senior management positions of each of the Reorganized Debtors, (d) a list containing the compensation arrangement for any insider of the Debtors who will be an officer of a Reorganized Debtor, (e) the Plan Funding Agreement, (f) the Schedule of Assumed Contracts and Leases, (g) the Transition Services Agreement (as defined in the Plan Funding Agreement), (h) the Amended LLC Agreements, (i) the Post-Emergence Incentive Program and the list of the Key Employees, (j) the Walker Stock Purchase Agreement, and (k) any additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement; provided, that, unless consent rights are otherwise expressly set forth in the Plan, each of the documents in the Plan Supplement (whether or not set forth above), including any alternation, restatement, modification

or replacement thereto, shall be in form and substance consistent with the RSA and the consent rights set forth therein. ***Subject to the terms of the RSA and the consent of the parties as set forth in the RSA and the Plan, all documents contained in the Plan Supplement are subject to revision and modification prior to the Effective Date, which may result in material changes to the terms of such documents.*** On the Effective Date, all documents contained in the Plan Supplement and all other agreements entered into or instruments issued in connection with any such document, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

### B.      Background Regarding Potential Filing

The Debtors' primary business is to acquire, manage, and collect charged-off consumer and commercial accounts receivable, which are accounts that credit issuers have charged off as uncollectible, but that remain owed by the borrower and subject to collection. Beginning in early 2015, in response to their financial results and concerns about long-term liquidity, the Debtors began considering options to recapitalize their balance sheet. As a result, the Debtors entered into a series of transactions in May 2016 (together, the "**Recapitalization**") that resulted in their current capital structure. Pursuant to the Recapitalization, as described further in Section VII of this Disclosure Statement, the Debtors sought to improve their capital structure by (a) repaying amounts outstanding under their then-existing secured credit facilities and (b) making an exchange offer for their then-outstanding second lien notes.

The Debtors entered into the Recapitalization as an initial step to improve their capital structure. Thereafter, in early June 2016, the Debtors engaged AP Services, LLC, to, among other things, analyze their business model and organizational structure with the goal of, among other things, understanding the future potential of the Debtors' processes and capabilities. In particular, of concern was a January 1, 2017 springing maturity under each of their secured prepetition credit facilities, which required the outstanding secured second lien notes to be paid down to no more than $1 million by January 1, 2017.

In or around July 2016, the Debtors received a pre-diligence, unsolicited, nonbinding offer from a third party to purchase substantially all of their business at an attractive price. This inquiry led the Debtors to believe that a sale or new investment may be their best option to maximize value for all stakeholders. Accordingly, in order to explore the viability of a sale or other restructuring, in August 2016, the Debtors engaged Keefe, Bruyette & Woods, Inc. as their financial advisor and began a prepetition marketing process, reaching out to over 30 potential acquiring parties and distributing a confidential information memorandum to 27 parties who expressed an interest in acquiring all or a portion of the Debtors' business. After due diligence was conducted, including meetings with management, five bidders submitted bids and the Debtors ultimately invited two such bidders to participate in a final round of bidding. Based on the bids received, the Debtors entered into an exclusivity agreement with one such bidder. However, after months of negotiations and multiple exchanges of draft key definitive documentation, the Debtors were unable to resolve to their satisfaction open business and legal issues during the period of exclusivity. Thus, in February 2017, the Debtors reopened non-exclusive negotiations with other bidders.

Ultimately, the Debtors determined that the most value-maximizing approach was to proceed with a restructuring involving a new money investment from Resurgent Holdings LLC (the "**Plan Investor**") through a chapter 11 restructuring, and Canadian recognition proceedings, in exchange for which the Plan Investor would receive all of the equity in Reorganized CACH, Reorganized CACV of Colorado, and Reorganized SquareTwo Financial Canada Corporation, with (a) the Plan Investor (and/or any permitted assignee) to own the Acquired Debtors, and (b) Wind Down Co (i.e., SquareTwo on and after the Effective Date) to continue to own the remaining other Debtors (i.e., the other Dissolving Debtors) and, among other things, effectuate substantially all distributions under the Plan (collectively, the "**Proposed Restructuring Transaction**").  Negotiations among the Debtors, the Plan Investor and the Consenting Lenders culminated in such parties entering into the RSA, which binds the Debtors' senior creditor constituencies to support the Plan and the Plan Funding Agreement, in each case, subject to certain terms and conditions.

Among other things, the Plan provides for:  (a) a new money investment in the Debtors in Cash from the Plan Investor in exchange for 100% of the new equity of Reorganized CACH, Reorganized CACV of Colorado, and Reorganized SquareTwo Financial Canada Corporation; (b) holders of claims under the First Lien Financing Agreement and 1.25 Lien Credit Agreement to receive payment of their claims owed as of the Petition Date in full in Cash (plus postpetition interest at a combination of the default and non-default rates as set forth in the Plan) in full and final satisfaction of their respective claims; (c) holders of claims under the 1.5 Lien Credit Agreement to receive their pro rata share of the Remaining Cash (i.e., the remainder of the cash proceeds from the Proposed Restructuring Transaction after payment of all other amounts required to be paid under the Plan) in full and final satisfaction of their claims; and (d) Wind Down Co to effectuate the Plan, including the winding down and dissolution of the Dissolving Debtors.

In addition to distributions on account of the Prepetition Secured Lender Claims, the Plan provides for: (a) the payment in full in Cash of Allowed (i) Administrative Expense Claims, (ii) Priority Tax Claims, and (iii) Fee Claims; and (b) reinstatement or payment in full, as applicable, of (x) Priority Non-Tax Claims, (y) Other Secured Claims, and (z) Canadian Claims and Assumed U.S. Liabilities.  Under the Plan, holders of (i) Claims under the Second Lien Indenture, (ii) General Unsecured Claims against the U.S. Debtors, and (iii) Existing U.S. Interests will not receive a recovery on account of their Claims and/or Interests.  The Dissolving Debtors will be liquidated and no distributions other than as set forth above are expected to be made.

The U.S. Debtors are either borrowers or guarantors under the Second Lien Indenture.  The Canadian Debtors are neither borrowers nor guarantors thereunder.  Accordingly, as part of the terms of the RSA (discussed in the section immediately below), the Consenting Lenders have agreed to support and vote in favor of the Plan (which proposes to compromise the First Lien Lender Claims, the 1.25 Lien Lender Claims and the 1.5 Lien Lender Claims) and have agreed that all undisputed unsecured claims against the Canadian Debtors either will be, subject to Bankruptcy Court approval, paid in the ordinary course during the pendency of these Chapter 11 Cases, or be unimpaired and reinstated under the Plan.  In addition, as part of the Proposed Restructuring Transactions, on the Effective Date, Debtor SquareTwo Financial Canada Corporation shall repurchase for a lump sum cash payment all equity securities of Debtor

- 4 -

CCL Financial Inc. held by Christopher D. Walker, Debtor SquareTwo Financial Canada
Corporation's current President and Chief Executive Officer.

In addition, the Debtors intend to continue operating their business in the ordinary
course and, in the event the Debtors file the Reorganization Cases, will seek authority from the
Bankruptcy Court to pay their employees, and certain other creditors, including, as noted above,
the holders of claims against any Canadian Debtors, in full and on time, in accordance with
existing business terms.  The Debtors and the Plan Support Parties believe that it is in the best
interests of the Debtors to continue to pay such creditors in full and on time, because: (a) doing
so will minimize the risk of disruption to the Debtors' business; (b) the Plan provides for the
unimpairment of Canadian General Unsecured Claims and all other Claims against the Canadian
Debtors; and (c) the Reorganization Cases are expected to be brief in duration due to their
prepackaged nature.

Additional information regarding the Debtors is contained in Section VII.A
hereof.

### C.    Restructuring Support Agreement and Plan Funding Agreement

Pursuant to the RSA, on March 3, 2017, the Debtors, the Plan Investor, and the
Consenting Lenders (i.e., certain of the Debtors' prepetition secured lenders then holding 100%
of the outstanding Class 3 Claims (First Lien Lender Claims) (constituting 100% of the holders
of Claims in such Class), 100% of the Class 4 Claims (1.25 Lien Lender Claims) (constituting
100% of the holders of Claims in such Class), and 83% of the Class 5 Claims (1.5 Lien Lender
Claims) agreed, subject to certain terms and conditions, to support the Plan and the Plan Funding
Agreement.  The RSA contemplates the commencement of the potential Chapter 11 Cases and
Canadian Proceeding described herein.  A summary of the termination events under the RSA is
contained in Section IV.B.8 hereof, and a copy of the RSA is attached hereto as Exhibit C.

In connection with executing the RSA, the Debtors and the Plan Investor entered
into the Plan Funding Agreement, which, subject to certain terms and conditions, provides for
the payment of the Final Purchase Price (as defined therein) and transfer of the 100% of the
equity interests of Reorganized CACH, Reorganized CACV of Colorado, and Reorganized
SquareTwo Financial Canada Corporation to the Plan Investor or an assignee thereof on the
Effective Date of the Plan.  A copy of the Plan Funding Agreement is attached hereto as Exhibit
D.  Although the Final Purchase Price is subject to numerous calculations and adjustments, the
Debtors estimate that they will receive approximately $264,000,000 from the Plan Investor
pursuant to the Plan Funding Agreement.  From and after the Effective Date of the Plan, (a) the
Plan Investor will own the Acquired Debtors, and (b) Wind Down Co will continue to own the
other Dissolving Debtors.  Upon execution of the Plan Funding Agreement, the Plan Investor
deposited $40,510,000 into escrow.  Upon consummation of the transactions contemplated by
the Plan and the Plan Funding Agreement, $12,500,000 (the "**Post-Closing Escrow Amount**")
will remain in escrow to satisfy any amounts that may be owed to the Plan Investor (or any
affiliate thereof) after determination of the Final Purchase Price and as a source of payment for
certain post-closing indemnification obligations of the Dissolving Debtors as more fully set forth
in the Plan Funding Agreement.  The Plan Investor and Wind Down Co expect to perform the
Final Purchase Price determinations within approximately four months after the Effective Date.

If the Closing Purchase Price is less than the Final Purchase Price, the difference shall be paid by the Plan Investor to Wind Down Co and all of the Post-Closing Escrow Amount, other than $2,500,000, shall be delivered to Wind Down Co to be used in accordance with the Plan. If the Closing Purchase Price is greater than the Final Purchase Price, the difference shall be paid to the Plan Investor from the amount remaining in Escrow and the remaining balance from the Escrow Account (if any), other than $2,500,000, shall be paid to Wind Down Co to be used in accordance with the Plan. The $2,500,000 that remains in the Post-Closing Escrow Amount may be used to satisfy post-Closing indemnification obligations of the Dissolving Debtors, if applicable. On the first anniversary of the Effective Date, all of the then remaining Post-Closing Escrow Amount, other than $1,000,000, shall be delivered to Wind Down Co to be used in accordance with Plan. The $1,000,000 that remains in the Post-Closing Escrow Amount may be used to satisfy post-Closing tax indemnification obligations of the Dissolving Debtors, if applicable, as well as certain unresolved disputed indemnification claims. On the 18-month anniversary of the Effective Date, all of the then remaining Post-Closing Escrow Amount, if any, other than amounts relating to unresolved disputed indemnification claims, shall be delivered to Wind Down Co to be used in accordance with the Plan.

The Debtors, the Plan Investor and Consenting Lenders believe that the Proposed Restructuring Transaction represents the best opportunity for the Debtors to preserve value and provide the highest and best possible recovery for all creditors. As the Consenting Lenders have agreed, subject to the terms and conditions of the RSA, to vote in favor of the Plan, the Debtors believe they will obtain the requisite votes in favor of the Plan in order to obtain confirmation of the Plan if the Reorganization Cases are commenced. Nevertheless, the Plan may not be confirmed if the Bankruptcy Court determines the Plan fails to satisfy any of the confirmation standards set forth in the Bankruptcy Code. Since the Plan is structured as an integrated whole, the Bankruptcy Court's failure to confirm the Plan would delay the Debtors' emergence from bankruptcy and would increase the risks to the Debtors' business. There can be no assurance that an alternative chapter 11 plan could be negotiated if the Bankruptcy Court declines to confirm the Plan.

D.    **Voting and Support for the Plan**

Holders of Claims in Classes 3, 4 and 5, the only Classes that are entitled to vote to accept or reject the Plan, will receive this Disclosure Statement, the Plan and a ballot for accepting or rejecting the Plan. Any holder of a Claim or Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "Impaired." The Debtors anticipate that, after the Petition Date, each holder of a Claim or Interest of a Class that is deemed to accept or reject the Plan will receive a notice of the combined hearing on approval of the Disclosure Statement and the Plan, but will not have received a ballot because they are not eligible to vote on the Plan. All holders of Claims or Interests may receive a copy of the Plan, Disclosure Statement, Plan Funding Agreement and/or the Plan Supplement upon written request to the Voting Agent.

---

**Which Classes of Claims and Interests
are Entitled to Vote on the Plan?**

Classes of Claims and Interests are or are not entitled to vote on the Plan as follows:

- Claims and Interests in Classes 1 (Priority Non-Tax Claims), 2 (Other Secured Claims), 7B (Canadian General Unsecured Claims) and 8B (Existing Canadian Interests) are Unimpaired under the Plan, are deemed to have accepted the Plan and are not entitled to vote on the Plan.

- Claims in Classes 3 (First Lien Lender Claims), 4 (1.25 Lien Lender Claims) and 5 (1.5 Lien Lender Claims) are Impaired and entitled to vote on the Plan.

- Claims and Interests in Classes 6 (Second Lien Lender Claims), 7A (U.S. General Unsecured Claims) and 8A (Existing U.S. Interests) are Impaired, are deemed to have rejected the Plan, and are not entitled to vote on the Plan.

---

For a description of the Classes of Claims and Interests and their treatment under the Plan, see Section I.F., "Summary of Classification and Treatment Under the Plan" below.

You may only vote on the Plan with respect to a Claim or Interest if that Claim or Interest belongs to a Class that is Impaired under the Plan and is not deemed to have rejected the Plan.  Under the Plan, only Classes 3, 4 and 5 are Impaired and receiving distributions under the Plan, and therefore the holders of First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims in those Classes are the only holders of Claims entitled to vote on the Plan. February 27, 2017 is the Voting Record Date with respect to Impaired Claims entitled to vote on the Plan.  With respect to Claims in Classes 3, 4 and 5, to be eligible to vote on the Plan, Persons holding such Claims must have held them on the Voting Record Date.

Under the Bankruptcy Code, the Plan will be deemed accepted by each Voting Class if the Voting Agent receives votes accepting the Plan from holders representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in each such Voting Class that have voted on the Plan; provided, that there must be at least one Impaired accepting Class that meets the foregoing thresholds excluding the acceptances of any insiders.  A Class of Interests that is entitled to vote on the Plan has accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Interests of such Class that have voted on the Plan.

In respect of Claims in Classes 3, 4 and 5, all properly completed ballots received by the Voting Agent before 5:00 p.m. (prevailing Eastern Time) on March 17, 2017 (the "**Voting**

**Deadline**"), will be counted in determining whether Classes 3, 4 and 5 have accepted the Plan. As set forth more fully herein and in the ballots, including the instructions accompanying the ballots, any ballots received after the Voting Deadline will not be counted, except in the Debtors' sole discretion.  Except with respect to the Voting Agent's "E-ballot" platform (discussed below), faxed copies, copies sent by electronic mail, and votes sent on other forms will not be accepted, except in the Debtors' sole discretion.

---

**Voting on the Plan**

*Which Classes may vote?*  Persons may vote to accept or reject the Plan only with respect to Claims or Interests that belong to a Class that is Impaired under the Plan and is not deemed to have rejected the Plan.  Only Classes 3, 4 and 5 are Impaired under the Plan and entitled to vote.

*When does the vote need to be received?*  In respect of Claims in Classes 3, 4 and 5, the deadline for the receipt by the Voting Agent of properly completed ballots is 5:00 p.m. (prevailing Eastern Time) on March 17, 2017.

*Which members of Claims in Voting Classes may vote?*  The Voting Record Date for determining which members of Classes 3, 4 and 5 may vote on the Plan is February 27, 2017.  Persons may vote on the Plan only with respect to Claims that were held on the applicable Voting Record Date.

*How do I vote on the Plan?*  For a vote to be counted in respect of Claims in Classes 3, 4 and 5, you must *either* (i) electronically complete, sign, and return your customized Electronic Ballot by utilizing the "E-Ballot" platform on Prime Clerk's website by visiting http://cases.primeclerk.com/squaretwoballots, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website or (ii) complete, sign, and return your ballot by first class mail, overnight courier or hand delivery.  Faxed or emailed copies and votes sent on other forms will not be accepted except in the Debtors' sole discretion.

*Whom should I contact if I have questions?*  With respect to Claims in Classes 3, 4 and 5, you may contact the Voting Agent (at the address or phone number identified on the following page) if you have questions or need a ballot.

---

If you are the holder of a Claim in Class 3, 4 and/or 5, this Disclosure Statement, the attached exhibits, the Plan and the Plan Supplement are the only materials that you should use in determining how to vote on the Plan.

---

**Voting Recommendations**

The solicitation of votes on the Plan is being conducted at this time in order to obtain the requisite votes in favor of the Plan prior to filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and corresponding recognition proceedings in Canada.  The Debtors anticipate that, by conducting the solicitation of votes in advance of the Petition Date, the duration of the Reorganization Cases will be significantly shortened, and the administration of the Reorganization Cases will be greatly simplified.

The Debtors believe that confirmation of the Plan represents the best opportunity to maximize value for their stakeholders.  **The Debtors strongly encourage holders of Claims in Voting Classes to vote to <u>accept</u> the Plan.**

---

*Ballots and Voting for Holders of Claims in Classes 3, 4 and 5.*  The ballots in respect of Class 3, Class 4 and Class 5 Claims have been specifically designed for the purpose of soliciting votes on the Plan from such Classes.  For this reason, in voting on the Plan, **please use only the ballot sent to you with this Disclosure Statement**.  If you need another ballot, or have any questions concerning the form of ballot, please contact the Voting Agent.

If you are the holder of a Class 3, Class 4 or Class 5 Claim, <u>prior</u> to the Voting Deadline *either* (i) electronically complete, sign, and return your customized Electronic Ballot by utilizing the "E-Ballot" platform on Prime Clerk's website by visiting http://cases.primeclerk.com/squaretwoballots, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website <u>or</u> (ii) complete, sign, and return your ballot by first class mail, overnight courier or hand delivery.  All correspondence in connection with voting on the Plan should be directed to the Voting Agent at the following address:

---

SquareTwo Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, New York 10022
Phone: (844) 205-4337 (U.S. & Canada toll free)
or (917) 962-8384 (international)

---

Additional copies of the ballots, this Disclosure Statement, the Plan, and other related documents, are available upon request to the Voting Agent.  On or after the Petition Date, these documents will be available on the Voting Agent's website: http://cases.primeclerk.com/squaretwo.  Please contact the Voting Agent with any questions relating to voting on the Plan.

<table>
<tr><td align="center"><strong>Your Vote Is Important</strong></td></tr>
</table>

|  |
|---|
| Your vote on the Plan is important because: |

- Under the Bankruptcy Code, only the votes of those holders of Claims who actually submit votes on the Plan will be counted in determining whether the required majorities of votes in favor of the Plan have been received.

- If you are eligible to vote with respect to a Class 3, Class 4 or Class 5 Claim and do not deliver a properly completed ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will not be considered in determining the number and dollar amount of votes needed to make up the specified majority of Class 3, 4 or 5 (as applicable) for the purpose of approving the Plan.

**Although the solicitation of votes on the Plan relates to the Reorganization Cases and voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code and corresponding recognition proceedings in Canada, no filings have yet occurred. The Debtors intend to file such proceedings if the requisite votes on the Plan have been obtained, or when the Debtors otherwise determine that such filings are necessary or appropriate to protect their property and interests. The Debtors expressly reserve the right to extend the Voting Deadline by oral or written notice to the Voting Agent until the requisite votes have been obtained.**

E.      **Summary of Plan**[3]

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries, to enhance the financial viability of the Acquired Debtors and to provide for the orderly wind down of the Dissolving Debtors. Generally the Plan provides for:

(a)      A balance sheet restructuring regarding the Debtors' current debt obligations under the First Lien Financing Agreement, the 1.25 Lien Credit Agreement, the 1.5 Lien Credit Agreement and the Second Lien Indenture.

---

[3] The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan, and in the event of any inconsistency, the Plan shall control in all respects.

(b)     The Plan Investor will pay the Final Purchase Price in exchange for the equity of Reorganized CACH, Reorganized CACV of Colorado, and Reorganized SquareTwo Financial Canada Corporation pursuant to the Plan Funding Agreement. The subsidiaries of SquareTwo that are being reorganized (i.e., the Acquired Debtors) will be owned by the Plan Investor or an affiliate thereof. The remaining Debtors (i.e., the Dissolving Debtors) ultimately will be merged, dissolved and/or liquidated.

(c)     Wind Down Co (i.e., SquareTwo on and after the Effective Date) will be the parent company of each of the other Dissolving Debtors and will receive and hold all funds paid by the Plan Investor to Wind Down Co in accordance with the Plan and the Plan Funding Agreement, which funds shall be distributed in accordance with the Plan. A Plan Administrator shall be appointed and shall be the sole shareholder, officer, and director or managing member, as applicable, of each of the Dissolving Debtors.

(d)     Each of the holders of First Lien Lender Claims will receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its First Lien Lender Claim, payment in Cash of its Pro Rata Share of the First Lien Lender Distribution.

(e)     Each of the holders of 1.25 Lien Lender Claims will receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its 1.25 Lien Lender Claim, payment in Cash of its Pro Rata Share of the 1.25 Lien Lender Distribution.

(f)     Each of the holders of 1.5 Lien Lender Claims will receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its 1.5 Lien Lender Claim, payment in Cash of its Pro Rata Share of Remaining Cash (i.e., the amount of Cash of the Debtors as of the Effective Date *plus* any Cash received by Wind Down Co or the other Dissolving Debtors thereafter *plus* Cash equal to the Purchase Price, *minus* each of: (a) the First Lien Lender Distribution, (b) the 1.25 Lien Lender Distribution, (c) all Allowed Administrative Expense Claims, (d) all Allowed Other Secured Claims to the extent paid in Cash, (e) all Allowed DIP Claims, (f) all Allowed Priority Tax Claims, (g) all Allowed Non-Priority Tax Claims, (h) the 1.5 Lien Lender Fee Claim, (i) all Allowed Fee Claims, and (j) all amounts required to fund the Wind Down Costs, and in all instances, excluding all Canadian Claims and all Assumed U.S. Liabilities). After payment in full of each of the foregoing and the issuance of a final decree closing each of the Chapter 11 Cases, any amounts remaining in the Wind Down Account shall be distributed to the holders of the 1.5 Lien Lender Claims as of the Effective Date.

(g)     Each holder of an Other Secured Claim will receive Cash or its collateral or will retain its liens, as applicable, in satisfaction of its Allowed Claim.

(h)     All (i) Canadian Claims, (ii) liabilities of a U.S. Debtor that are being assumed or assumed and assigned by an Acquired Debtor on the Effective Date, and (iii) Existing Canadian Interests (subject to Section II.L.), are Unimpaired.

(i)     Holders of Second Lien Lender Claims, U.S. General Unsecured Claims and Existing U.S. Interests shall not receive or retain any distribution under the Plan on account of such Claims and Interests.

(j)      Any and all Intercompany Claims by and among the Acquired Debtors and the Dissolving Debtors shall be canceled; any and all Intercompany Claims by and among the Acquired Debtors will be, at the option of the Acquired Debtors, extinguished or reinstated; and any and all Intercompany Claims by and among the Dissolving Debtors will be, at the option of the Dissolving Debtors, extinguished or reinstated.

(k)      Any and all Intercompany Interests shall: (i) as to the Acquired Debtors, survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Acquired Debtors subject to the terms of the Plan, and (ii) as to the Dissolving Debtors, subject to section 7.7(c) of the Plan, survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Dissolving Debtors subject to the terms of the Plan.

## F.      Summary of Classification and Treatment Under the Plan

The following table and description summarize the classification and treatment of Claims and Interests and the consideration contemplated to be distributed to the holders of Allowed Claims and Interests under the Plan.  Unless otherwise noted, these estimates are as of February 27, 2017.  For an explanation of the assumptions and uncertainties regarding these calculations, see Section IV, "Risk Factors."

Note on Numerical Information.  The numerical information in this Disclosure Statement, including the estimated allowed Claim amounts and estimated recovery percentages in the following table, has been prepared by the Debtors, with the assistance of their advisors, AP Services, LLC.  **The assumptions used in preparing such estimates are inherently subject to significant uncertainties and actual results may differ from such estimates, as further described in Section IV.B.11.  Statements regarding projected amounts of Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.**

1.        **Summary of Classification and Treatment of Claims.**

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|-------|-------------|-----------|--------------------------|----------------------------------|--------|
| Class 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; <u>provided</u>, <u>however,</u> that any Priority Non-Tax Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Priority Non-Tax Claim. | $585,000[4] | 100% | Unimpaired (deemed to accept and not entitled to vote) |
| Class 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of Wind Down Co: (i) Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy | $181,518 | 100% | Unimpaired (deemed to accept and not entitled to vote) |

---

[4]   All or a significant portion of these claims would relate to amounts owed to employees that the Debtors anticipate paying upon approval by the Bankruptcy Court of the Debtors' motion to pay employees amounts owed prepetition in the ordinary course of business (which motion will be filed on the first day of any chapter 11 cases).  Accordingly, if the motion is granted, the Debtors anticipate that this estimate will be reduced to $0 shortly after the Petition Date in the event of a chapter 11 filing.

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|-------|-------------|-----------|--------------------------|---------------------------------|--------|
|  |  | Code; <u>provided</u>, <u>however</u>, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of Wind Down Co, without further notice to or order of the Bankruptcy Court; <u>provided</u>, <u>further</u>, <u>however</u>, that any Other Secured Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Other Secured Claim. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided therein.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>To the extent that the value of the Collateral securing any |  |  |  |

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|---|---|---|---|---|---|
| | | Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a U.S. General Unsecured Claim or Canadian General Unsecured Claim, but only as applicable, and shall be classified and treated as a Class 7A Claim or 7B Claim, but only as applicable. | | | |
| Class 3 | First Lien Lender Claims | On the Effective Date, First Lien Lender Claims shall be Allowed under the Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that the First Lien Administrative Agent or a holder of a First Lien Lender Claim agrees to different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the First Lien Administrative Agent shall receive (for the benefit of itself and the First Lien Lenders), subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of the First Lien Lender Claim, payment in full in Cash from Wind Down Co of the First Lien Lender Distribution, to be distributed consistent with the First Lien Financing Agreement.  For the avoidance of doubt, all First Lien Revolving Loans outstanding as of the Petition Date shall | $105,000,000[5] | 99.5% | Impaired (entitled to vote) |

---

[5]   This amount does not include accrual of either unpaid prepetition interest, or postpetition interest as and to the extent provided for under the Plan.

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|---|---|---|---|---|---|
| | | have been repaid indefeasibly in full in accordance with the terms of the DIP Financing Agreement and the DIP Order, and shall be afforded the treatment provided for DIP Claims as set forth in Section 3.1 of the Plan. | | | |
| Class 4 | 1.25 Lien Lender Claims | On the Effective Date, 1.25 Lien Lender Claims shall be Allowed under the Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.25 Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a 1.25 Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, release and discharge of its 1.25 Lien Lender Claim, payment in Cash from Wind Down Co of its Pro Rata Share of the 1.25 Lien Lender Distribution. | $16,304,130.10[6] | 99.5% | Impaired (entitled to vote) |

---

[6]  This amount does not include accrual of either unpaid prepetition interest after the Voting Record Date, or postpetition interest as and to the extent provided for under the Plan.

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|---|---|---|---|---|---|
| Class 5 | 1.5 Lien Lender Claims | On the Effective Date, 1.5 Lien Lender Claims shall be Allowed under the Plan in an amount equal to the total amount of principal, accrued and unpaid interest at the non-default rate, if any, to the Petition Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.5 Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of 1.5 Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement and release of its 1.5 Lien Lender Claim, payment in Cash from Wind Down Co of its Pro Rata Share of the 1.5 Lien Lender Distribution. | $191,523,223.79[7] | 45% | Impaired (entitled to vote) |
| Class 6 | Second Lien Lender Claims | Holders of Second Lien Lender Claims shall not receive or retain any distribution or Lien under the Plan on account of such Second Lien Lender Claims. | $19,082,000[8] | 0% | Impaired (deemed to reject) |

---

[7]    This amount does not include accrual of either unpaid prepetition interest after the Voting Record Date, or postpetition interest as and to the extent provided for under the Plan.

[8]    This amount does not include accrual of unpaid prepetition interest.

| Class | Description | Treatment | Estimated Allowed Amount | Estimated Recovery (% of Claim) | Voting |
|-------|-------------|-----------|--------------------------|----------------------------------|--------|
| Class 7A | U.S. General Unsecured Claims | Holders of U.S. General Unsecured Claims shall not receive or retain any distribution under the Plan on account of such U.S. General Unsecured Claims. | $4,348,000[9] | 0% | Impaired (deemed to reject) |
| Class 7B | Canadian General Unsecured Claims | Except to the extent that a holder of a Canadian General Unsecured Claim agrees to a different treatment, on the applicable Distribution Date each holder of a Canadian General Unsecured Claim shall receive, at the election of the applicable Acquired Debtor, such treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed Canadian General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed Canadian General Unsecured Claims unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Canadian General Unsecured Claims incurred by an Acquired Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Acquired Debtor, without further notice to or order of the Bankruptcy Court. | $737,000 | 100% | Unimpaired (deemed to accept and not entitled to vote) |

---

[9] The estimated amount of Allowed U.S. General Unsecured Claims above excludes estimates of Allowed U.S. General Unsecured Claims relating to contracts that the Debtors intend to assume or reject.

| Class 8A | Existing U.S. Interests | Existing U.S. Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing U.S. Interests. | N/A | 0% | Impaired (deemed to reject) |
| Class 8B | Existing Canadian Interests | Except to the extent that a holder of an Allowed Existing Canadian Interest agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Existing Canadian Interest shall receive such treatment that will render such Existing Canadian Interest unimpaired pursuant to section 1124 of the Bankruptcy Code. | N/A | 100% | Unimpaired (deemed to accept and not entitled to vote) |

## 2.        Summary of Treatment Under the Plan.

The following section describes more fully the treatment to be provided to each Class of Claims and Interests under the Plan.  This description is only a summary of certain important provisions of the Plan and should not replace careful review of the Plan.  Each holder of a Claim or Interest should read the Plan carefully.  Please refer particularly to Articles IV and V of the Plan, and the Liquidation Analysis annexed as <u>Exhibit B</u> hereto for a more detailed description of the classification and treatment of Claims and Interests provided under the Plan.

### (a)        DIP Claims.

On the Effective Date, the DIP Claims shall be Allowed and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from the proceeds of the Closing Purchase Price.  Upon payment in full of all Allowed DIP Lender Claims, all Liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

### (b)        Administrative Expense Claims.

<u>Time for Filing Administrative Expense Claims.</u>

The holder of an Administrative Expense Claim, other than the holder of:

(i)        a Fee Claim;

(ii)        a DIP Claim;

(iii)        a Consenting Lender Fee Claim;

(iv)        an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(v)        an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor, including, an Administrative Expense Claim that is a Canadian Claim and/or an Assumed U.S. Liability (which Canadian Claim and/or Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor in accordance with the terms of the Plan and the terms of the Plan Funding Agreement); for the avoidance of doubt, an Administrative Expense Claim must be filed for any non-ordinary course litigation Claims;

(vi)        an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(vii)    an Administrative Expense Claim held by a current officer, director, manager or managing member or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to: (A) any Debtor's certificate of incorporation, by-laws, operating agreement, or similar organizational document, or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

(viii)    an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses;

(ix)    a claim by the Plan Investor, or any of its affiliates, arising under any of the Transaction Documents against the Debtors;

(x)    a Claim for fees and expenses held by the Plan Investor or a professional person retained by the Plan Investor, to the extent the Bankruptcy Court does not authorize the Debtors to pay amounts owed under the immediately preceding subsection (ix) without first submitting an application for such fees and expenses to the Bankruptcy Court;

(xi)    an Intercompany Claim; or

(xii)    U.S. Trustee Fees,

must file with the Bankruptcy Court and serve on Wind Down Co, the Claims Agent, and the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "**Administrative Bar Date**").  Such proof of Administrative Expense Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the holder of the Administrative Expense Claim; (3) the asserted amount of the Administrative Expense Claim; (4) the basis of the Administrative Expense Claim; and (5) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

<u>Treatment of Administrative Expense Claims.</u>

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim; <u>provided</u>, <u>however</u>, that Allowed

- 21 -

Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, however, that any Administrative Expense Claim that is a Canadian Claim and/or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Administrative Expense Claim.

(c)    <strong>Fee Claims.</strong>

<u>Time for Filing Fee Claims.</u>

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

<u>Treatment of Fee Claims.</u>

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash to be paid by Wind Down Co, in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) three (3) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and Wind Down Co.  On the Effective Date, to the extent known, Wind Down Co shall reserve and hold in a segregated account Cash in an amount equal to all accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Fee Claims have been either Allowed and paid in full or Disallowed by Final Order, at which time any Remaining Cash in the segregated account shall be deposited into the Wind Down Account and used by Wind Down Co for purposes of the Wind Down.

(d)    <strong>U.S. Trustee Fees.</strong>

Wind Down Co shall pay all outstanding U.S. Trustee Fees of the Dissolving Debtors on an ongoing basis, and of the Acquired Debtors incurred to the Effective Date, on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(e)        **Priority Tax Claims.**

Time for Filing Priority Tax Claims.

The holder of a Priority Tax Claim, other than a holder of a Priority Tax Claim that is a Canadian Claim and/or an Assumed U.S. Liability (which shall be satisfied by the applicable Acquired Debtor in accordance with the terms of the Plan and the Plan Funding Agreement), must file with the Bankruptcy Court and serve on Wind Down Co, the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim **within 180 days after the Petition Date** (the "**Priority Tax Claims Bar Date**").  Such proof of Priority Tax Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the holder of the Priority Tax Claim; (3) the asserted amount of the Priority Tax Claim; (4) the basis of the Priority Tax Claim; and (5) supporting documentation for the Priority Tax Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

Treatment of Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive from Wind Down Co, in Wind Down Co's discretion, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, however, that any Priority Tax Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Priority Tax Claim.

(f)        **Class 1 — Priority Non-Tax Claims.**

Treatment:  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; provided, however, that any Priority Non-Tax Claim

that is a Canadian Claim and/or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Priority Non-Tax Claim.

Voting:  Priority Non-Tax Claims are Unimpaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

(g)    **Class 2 — Other Secured Claims.**

Treatment:  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of Wind Down Co:  (i) Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of Wind Down Co, without further notice to or order of the Bankruptcy Court; provided, further, however, that any Other Secured Claim that is a Canadian Claim and/or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of the Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Other Secured Claim.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Deficiency Claims:  To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a U.S. General Unsecured Claim or Canadian General Unsecured Claim, but only as applicable, and shall be classified and treated as a Class 7A Claim or 7B Claim, but only as applicable.

Voting:  The Other Secured Claims are Unimpaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

(h)    **Class 3 — First Lien Lender Claims.**

Treatment:  On the Effective Date, First Lien Lender Claims shall be Allowed under the Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that the First Lien Administrative Agent or a holder of a First Lien Lender Claim agrees to different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the First Lien Administrative Agent shall receive (for the benefit of itself and the First Lien Lenders), subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of the First Lien Lender Claim, payment in full in Cash from Wind Down Co of the First Lien Lender Distribution, to be distributed consistent with the First Lien Financing Agreement.  For the avoidance of doubt, all First Lien Revolving Loans outstanding as of the Petition Date shall have been repaid indefeasibly in full in accordance with the terms of the DIP Financing Agreement and the DIP Order, and shall be afforded the treatment provided for DIP Claims as set forth in Section 3.1 of the Plan.

Voting:  The First Lien Lender Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such First Lien Lender Claims.

(i)    **Class 4 — 1.25 Lien Lender Claims.**

Treatment:  On the Effective Date, 1.25 Lien Lender Claims shall be Allowed under the Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.25 Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a 1.25 Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, release and discharge of its 1.25 Lien Lender Claim, payment in Cash from Wind Down Co of its Pro Rata Share of the 1.25 Lien Lender Distribution.

Voting:  The 1.25 Lien Lender Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such 1.25 Lien Lender Claims.

(j)    **Class 5 — 1.5 Lien Lender Claims.**

Treatment:  On the Effective Date, 1.5 Lien Lender Claims shall be Allowed under the Plan in an amount equal to the total amount of principal, accrued and unpaid interest at the non-default rate, if any, to the Petition Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.5 Lien Lender Claim agrees to different treatment, on the

Effective Date, or as soon as practicable thereafter, each holder of 1.5 Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement and release of its 1.5 Lien Lender Claim, payment in Cash from Wind Down Co. of its Pro Rata Share of the 1.5 Lien Lender Distribution.

Voting:  The 1.5 Lien Lender Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such 1.5 Lien Lender Claims.

### (k)    Class 6 — Second Lien Lender Claims.

Treatment:  Holders of Second Lien Lender Claims shall not receive or retain any distribution or Lien under the Plan on account of such Second Lien Lender Claims.

Voting:  The Second Lien Lender Claims are Impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Second Lien Lender Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Lender Claims.

### (l)    Class 7A — U.S. General Unsecured Claims.

Treatment:  Holders of U.S. General Unsecured Claims shall not receive or retain any distribution under the Plan on account of such U.S. General Unsecured Claims.

Voting:  The U.S. General Unsecured Claims are Impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of U.S. General Unsecured Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such U.S. General Unsecured Claims.

### (m)    Class 7B — Canadian General Unsecured Claims.

Treatment:  Except to the extent that a holder of a Canadian General Unsecured Claim agrees to a different treatment, each holder of a Canadian General Unsecured Claim shall receive, at the election of the applicable Acquired Debtor, such treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed Canadian General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed Canadian General Unsecured Claims unimpaired pursuant to section 1124 of the Bankruptcy Code.  Subject to Section 9.2 of the Plan, Canadian General Unsecured Claims incurred by an Acquired Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Acquired Debtor, without further notice to or order of the Bankruptcy Court.

Voting:  The Allowed Canadian General Unsecured Claims are Unimpaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Canadian General Unsecured Claims are conclusively presumed to accept the Plan and are not

entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Canadian General Unsecured Claims.

### (n)   Class 8A — Existing U.S. Interests.

Treatment:  Existing U.S. Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing U.S. Interests.

Voting:  The Existing U.S. Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing U.S. Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing U.S. Interests.

### (o)   Class 8B — Existing Canadian Interests.

Treatment:  The legal, equitable and contractual rights of the holders of Allowed Existing Canadian Interests are unaltered by the Plan.  Except to the extent that a holder of an Allowed Existing Canadian Interest agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Existing Canadian Interest shall receive such treatment that will render such Existing Canadian Interest unimpaired pursuant to section 1124 of the Bankruptcy Code.

Voting:  The Allowed Existing Canadian Interests are Unimpaired Interests. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Existing Canadian Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Existing Canadian Interests.

### 3.   Resolution of Certain Inter-Creditor and Inter-Debtor Issues.

(a)   **Settlement of Certain Inter-Creditor Issues.**  The treatment of Claims and Interests under the Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

(b)   **Formation of Debtor Groups for Convenience Purposes.**  The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

4.      **Intercompany Claims and Intercompany Interests.**

(a)      **Intercompany Claims.**

Wind Down Co.  Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims between and among the Dissolving Debtors shall, at the option of Wind Down Co, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Acquired Debtors. Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims between and among the Acquired Debtors shall, at the option of the Plan Investor, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Intercompany Claims by and/or among the Dissolving Debtors and the Acquired Debtors.  Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims between and/or among any of the Acquired Debtors, on the one hand, and any of the Dissolving Debtors, on the other hand, shall be extinguished, canceled and/or discharged on the Effective Date.

(b)      **Intercompany Interests**.  Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Interests shall: (i) as to the Acquired Debtors, survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Acquired Debtors subject to the terms of the Plan, and (ii) as to the Dissolving Debtors, subject to section 7.7(c) of the Plan, survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Dissolving Debtors subject to the terms of the Plan.

G.      **Confirmation Hearing**

If the Debtors receive the requisite votes in favor of the Plan (which the Debtors believe they will in light of the fact that, as set forth above, (a) 100% of the aggregate amount of Class 3 Claims (who constitute 100% of the holders of Claims in such Class); (b) 100% of the Class 4 Claims (who constitute 100% of the holders of Claims in such Class); and (c) 83% of the

Class 5 Claims, subject to certain terms and conditions, have agreed to support and vote in favor of the Plan), then the Debtors intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and file corresponding recognition proceedings in the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada).  Upon the commencement of the Chapter 11 Cases, the Debtors intend to request that the Bankruptcy Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code and the solicitation of votes on the Plan as being in compliance with section 1126 of the Bankruptcy Code, and to confirm the Plan.  Upon commencement of the Canadian Proceeding, the Debtors intend to request that the Canadian Court schedule, as promptly as practicable after the Disclosure Statement is approved and the Plan is confirmed by the Bankruptcy Court, a hearing, among other things, to recognize the Bankruptcy Court order(s) approving and confirming the same.  Even if the Debtors do not receive the requisite votes in favor of the Plan prior to filing for bankruptcy protection, they may decide to file for chapter 11 relief and seek confirmation of the Plan or a modified plan.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan.  Section 1128(b) provides that a party in interest may object to confirmation of a plan.  The Debtors intend to request that the Bankruptcy Court conduct a joint hearing to consider approval of the Disclosure Statement and confirmation of the Plan.  If that request is granted, objections to confirmation as well as to approval of the Disclosure Statement must be filed with the Bankruptcy Court and served on the Debtors and the other parties set forth in the applicable notice of the combined Disclosure Statement Hearing and Confirmation Hearing and to be distributed to all holders of Claims and Interests in the Debtors, as applicable, (the "**Combined Notice of Hearing**") by the objection deadline, as will be set forth therein.  The Combined Notice of Hearing shall be provided to holders of Claims and Interests, or their representatives, as set forth in an order of the Bankruptcy Court and generally governed by the Bankruptcy Rules and local rules of the Bankruptcy Court, and any requirements of the Canadian Court.  At the combined Disclosure Statement Hearing and Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number and amount of Class 3, 4 and 5 Claims;

- determine whether this Disclosure Statement contains adequate information with the meaning of section 1125(a) of the Bankruptcy Code;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

In addition, the Debtors will seek recognition from the Canadian Court of any orders entered by the Bankruptcy Court in connection with the combined Disclosure Statement Hearing and Confirmation Hearing.

## II.    IMPLEMENTATION OF THE PLAN

### A.    Non-Substantive Consolidation

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes of the Plan.  Except as specifically set forth in the Plan, nothing in the Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; provided, however, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.

### B.    Plan Funding Transaction

On the Effective Date, subject to the terms and conditions set forth in the Plan Funding Agreement, SquareTwo and Collect America of Canada, LLC shall sell to the Plan Investor or its assignee as permitted pursuant to Section 10.3 of the Plan Funding Agreement (including the Canadian PurchaseCo), free and clear of any Claims or Encumbrances (other than Permitted Encumbrances), and for (i) the Closing Purchase Price (a) the Plan Investor or its assignee as permitted pursuant to Section 10.3 of the Plan Funding Agreement shall purchase from SquareTwo, one hundred percent (100%) of the Interests in Reorganized CACH and Reorganized CACV of Colorado and (b) the Canadian PurchaseCo shall purchase from Collect America of Canada, LLC 35,000 shares of stock of Reorganized SquareTwo Financial Canada Corporation, which represents one hundred (100%) of the issued and outstanding equity of Reorganized SquareTwo Financial Canada; and (ii) the other obligations of the Plan Investor under the Plan Funding Agreement and this Plan.  Any difference between the Closing Purchase Price and the Final Purchase Price shall be received by or paid to Wind Down Co in accordance with the Plan Funding Agreement.  From and after the Effective Date, (x) the Plan Investor and/or any permitted assignee shall directly and indirectly own the Acquired Debtors, and (y) Wind Down Co shall own the other Dissolving Debtors.  On the Effective Date, all Cash of the Debtors, including all cash and cash equivalents of the Canadian Debtors, shall be transferred to Wind Down Co or remain with the Dissolving Debtors.  After the Effective Date, the Plan Investor shall return to Wind Down Co any cash or cash equivalents pledged to secure surety bonds, letters of credit and other deposits (upon the expiry date, earlier replacement or other return of each of the foregoing) outstanding as of the Effective Date.

The transfer of the New Equity Interests to the Plan Investor shall be authorized without the need for any further corporate action.  The Plan Investor and/or any permitted assignee shall pay the Closing Purchase Price to Wind Down Co on the Effective Date.  After the

Effective Date, Wind Down Co shall (a) be paid any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement; and (b) receive or be paid, as applicable, the difference, if positive, between the Final Purchase Price and the Closing Purchase Price as set forth in the Plan Funding Agreement.

On the Effective Date, CACV of New Jersey, LLC shall sign a limited power of attorney in connection with and transfer all judgments obtained by CACV of New Jersey, LLC arising from or relating to collections on open and active charged-off accounts to CACV of Colorado, LLC.

In addition, a portion of the Good Faith Deposit shall remain in escrow to satisfy any amounts that may be owed to the Plan Investor after determination of the Post-Closing Purchase Price Adjustment and as a source of payment for certain post-closing indemnification obligations of the Dissolving Debtors as more fully set forth in the Plan Funding Agreement. Although the Final Purchase Price is subject to numerous calculations and adjustments, the Debtors estimate that they will receive approximately $264,000,000 from the Plan Investor pursuant to the Plan Funding Agreement. See Section I.C. above, "Restructuring Support Agreement and Plan Funding Agreement."

No more than five (5) Business Days and no less than two (2) Business Days prior to the Effective Date, SquareTwo will deliver to the Plan Investor a statement setting forth the Debtors' computation of the Closing Purchase Price. No later than forty-five (45) days after the Effective Date, the Plan Investor will deliver to Wind Down Co or other authorized representative a statement setting forth the Plan Investor's computation of certain components of the Estimated Purchase Price that were used to calculate the Closing Purchase Price paid on the Effective Date. The Plan Funding Agreement provides for an additional 30-day period following such delivery for the Debtors' Representative to dispute the Plan Investor's statement. If the parties are unable to consensually resolve any dispute, then such dispute will be submitted to an independent auditor. The Final Purchase Price will be determined by the parties or by the independent auditor. If the Final Purchase Price exceeds the Closing Purchase Price, the Plan Investor shall pay such amount to Wind Down Co. If the Closing Purchase Price exceeds the Final Purchase Price, the difference will be disbursed to the Plan Investor from amounts remaining in Escrow; provided that in no event shall the Plan Investor be entitled to receive an amount in excess of the then remaining Post-Closing Escrow Amount regardless of the total amount the Closing Purchase Price exceeds the Final Purchase Price.

As noted above, upon execution of the Plan Funding Agreement, the Plan Investor deposited $40,510,000 into escrow. Upon consummation of the transactions contemplated by the Plan and the Plan Funding Agreement, the Post-Closing Escrow Amount ($12,500,000) will remain in Escrow to satisfy any amounts that may be owed to the Plan Investor (or any affiliate thereof) after determination of the Final Purchase Price and as a source of payment for certain post-closing indemnification obligations of the Dissolving Debtors as more fully set forth in the Plan Funding Agreement. The Plan Investor and Wind Down Co expect to perform the Final Purchase Price determinations within approximately four months after the Effective Date. If the Closing Purchase Price is less than the Final Purchase Price, the difference shall be paid by the Plan Investor to Wind Down Co and all of the Post-Closing Escrow Amount, other than $2,500,000, shall be delivered to Wind Down Co to be used in accordance with the Plan. If the

Closing Purchase Price is greater than the Final Purchase Price, the difference shall be paid to the Plan Investor from the amount remaining in Escrow and the remaining balance from the Escrow Account (if any), other than $2,500,000, shall be paid to Wind Down Co to be used in accordance with the Plan. The $2,500,000 that remains in the Post-Closing Escrow Amount may be used to satisfy post-Closing indemnification obligations of the Dissolving Debtors, if applicable. On the first anniversary of the Effective Date, all of the then remaining Post-Closing Escrow Amount, other than $1,000,000, shall be delivered to Wind Down Co to be used in accordance with Plan. The $1,000,000 that remains in the Post-Closing Escrow Amount may be used to satisfy post-Closing tax indemnification obligations of the Dissolving Debtors, if applicable, if applicable, as well as certain unresolved disputed indemnification claims. On the 18-month anniversary of the Effective Date, all of the then remaining Post-Closing Escrow Amount, if any, other than amounts relating to unresolved disputed indemnification claims, shall be delivered to Wind Down Co to be used in accordance with the Plan.

In addition, from and after the Effective Date, SquareTwo Financial Services (or an affiliate or third-party service provider or subcontractor) will provide certain transition services to the Plan Investor and its affiliates, including assisting with the transfer of accounts, as more fully set forth in the TSA. As and to the extent set forth in the TSA and subject to the occurrence of the Effective Date, SquareTwo Financial Services has agreed to indemnify, defend and hold the Plan Investor and its affiliates and their respective, officers, directors, managers and employees from and against any all Service Provider-Related Losses (as defined in the TSA), which includes, among other things, losses caused by breaches of the TSA by SquareTwo Financial Services and the inaccuracy of representations and warranties made by SquareTwo Financial Services.

### C.    Assumed U.S. Liabilities

On and after the Effective Date, subject to the terms of the Plan Funding Agreement, the Acquired Debtors shall be solely responsible for payment and satisfaction of all Assumed U.S. Liabilities, but only as set forth on Exhibit A to the Plan. All Persons holding Claims and Interests arising out of or concerning an Assumed U.S. Liability, shall be forever barred, estopped and permanently enjoined from asserting against any of the Dissolving Debtors or the Plan Administrator and any of their property, such Persons' Claims or Interests arising out of such Assumed U.S. Liabilities. Except with respect to the Assumed U.S. Liabilities and the Canadian Claims or as otherwise set forth in the Plan Funding Agreement, the Acquired Debtors shall be discharged from liability for and shall have no responsibility to pay or satisfy any other Claims or Interests in or against the Debtors on and after the Effective Date.

### D.    Excluded U.S. Assets

Except as otherwise set forth in the Confirmation Order, nothing in any Plan Document shall be deemed to convey, assign or otherwise transfer the Excluded U.S. Assets to the Acquired Debtors or the Plan Investor, and Wind Down Co and the Dissolving Debtors shall retain all right, title and interest to, in and under the Excluded U.S. Assets. On the Effective Date, the Excluded U.S. Assets shall be deemed transferred to Wind Down Co or remain with the applicable Dissolving Debtor, as applicable, without further action for distribution in accordance with the terms of the Plan.

E.    **Canadian Debtors**

On and after the Effective Date, notwithstanding anything in the Plan to the contrary except with respect to the Prepetition Secured Lender Claims, Fee Claims (except as otherwise set forth in the Plan Funding Agreement), certain Intercompany Claims and certain Intercompany Interests (all of which shall be governed by the terms of the Plan), all Canadian Claims against and all Interests held by, in or against any of the Canadian Debtors are unimpaired by the Plan and shall remain unaffected hereby and are not discharged.  All Persons holding any Canadian Claims against and all Interests held by, in or against any of the Canadian Debtors shall be forever barred, estopped and permanently enjoined from asserting against the Dissolving Debtors or the Plan Administrator and any of their property, such Canadian Claims and Interests.  On the Effective Date, the Acquired Debtors shall be solely responsible for all Canadian Claims against and Interests by, in or against the Canadian Debtors.

Notwithstanding the foregoing, as discussed in Section II.L., in connection with the Effective Date, Canadian Debtor SquareTwo Financial Canada Corporation shall purchase all of the equity interests of Canadian Debtor CCL Financial Inc. from Christopher D. Walker pursuant to the Walker Stock Purchase Agreement.

F.    **Plan Funding**

The Debtors' obligations under the Plan will be funded from all Cash of the Debtors as of the Effective Date, and from the Cash received in respect of the Closing Purchase Price and the Final Purchase Price and any Cash received by Wind Down Co after the Effective Date (subject to the terms of the Plan Funding Agreement), including from the Escrow, if any.  Such Cash shall be used as follows:  (a) first, to satisfy Allowed DIP Claims, Allowed Administrative Expense Claims, including any obligations owed under any key employee incentive plan or severance amounts in each case as approved by the Bankruptcy Court, Allowed First Lien Lender Claims, Allowed 1.25 Lien Lender Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims that are to be paid in Cash; (b) second, to fund the Wind Down Account; and (c) third, to satisfy the Debtors' other obligations under the Plan, the Plan Funding Agreement and the TSA, in accordance with the terms hereof and thereof; provided, however, that any Canadian Claims and/or any Assumed U.S. Liabilities shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible for payment thereof and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Claims.  On the Effective Date, Wind Down Co shall pay or reserve sufficient Cash to pay all amounts required to satisfy (a) through (c) in the foregoing sentence (and also described in (a) through (k) in the definition of Remaining Cash), and after such payment or reserve, as applicable, is established, holders of 1.5 Lien Lender Claims shall receive an initial distribution under the Plan, with the remaining distribution to be made upon the completion of the Wind Down to the extent any funds remain in the Wind Down Account.

G.     **Continued Corporate Existence in Debtors; Vesting of Assets; Dissolution of Certain Debtors**

1.     **General.**

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Formation for the purposes of satisfying their obligations under the Plan and the continuation of their business.  On or after the Effective Date, the Acquired Debtors and the Dissolving Debtors, as applicable, each in its respective sole and exclusive discretion, may take such action as permitted by applicable law and such Debtor's organizational documents, as such Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (i) a Debtor to be merged into another Debtor, or its Subsidiary and/or affiliate; (ii) a Debtor to be dissolved; (iii) the legal name of a Debtor to be changed; or (iv) the closure of a Debtor's case on the Effective Date or any time thereafter.

(b)     On the Effective Date or as soon as reasonably practicable thereafter, the Acquired Debtors and the Dissolving Debtors, as applicable, each in its respective sole and exclusive discretion, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

2.     **Revesting of Assets.**

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including Canada, including all claims, rights and Causes of Action and any property, wherever located, including Canada, acquired by the Debtors under or in connection with the Plan, shall revest in the applicable Acquired Debtor or the applicable Dissolving Debtor, as applicable, free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, except as otherwise provided in the Plan, each applicable Acquired Debtor may operate its business and may use, acquire and dispose of property, wherever located, including Canada, and each Acquired Debtor and each Dissolving Debtor, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation

Order.  Without limiting the foregoing, the Dissolving Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

### 3.    Dissolving Debtors.

On, or as soon as reasonably practicable after the Effective Date of the Plan, Wind Down Co shall be authorized, in its sole and exclusive discretion, to merge, dissolve and/or wind down the Dissolving Debtors under applicable law; provided, that, notwithstanding such dissolution, Wind Down Co shall remain authorized to continue the Wind Down, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Reorganization Cases as to such Debtors.

### 4.    Closing of the Acquired Debtors' Chapter 11 Cases.

On the Effective Date, notwithstanding anything contained in the Local Bankruptcy Rules for the Southern District of New York to the contrary, the Chapter 11 Cases of the Acquired Debtors shall be closed without the need to file any further documents with the Bankruptcy Court, and the Confirmation Order shall act as a final decree closing each of the Acquired Debtors' Chapter 11 Cases.

### H.    Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth therein (including Section 2.3 of the Plan), on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents evidencing, related to or connected with any Claim, other than Canadian Claims, Assumed U.S. Liabilities, certain Intercompany Claims, Existing Canadian Interests and certain other Intercompany Interests, in each case as set forth in the Plan, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, each of the First Lien Financing Agreement, the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement shall continue in effect solely to the extent necessary to:  (a) permit holders of First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims to receive Plan Distributions on account of such respective claims; and (b) permit the 1.25 Lien Administrative Agent and the 1.5 Lien Administrative Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan.  Except as provided pursuant to the Plan, upon satisfaction of the First Lien Lender Claims, the 1.25 Lien Lender Claims and the 1.5 Lien Lender Claims, respectively (and as the case may be), each of the First Lien Administrative Agent, the 1.25 Lien Administrative Agent and the 1.5 Lien Administrative Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the First Lien Financing Facility, the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement, respectively (and as the case may be).

I.    **Boards**

    1.    **Acquired Debtors.**

        (a)    On the Effective Date, the New Boards shall consist of those (x) individuals identified in the Plan Supplement to be filed with the Bankruptcy Court no later than five (5) calendar days before the deadline to object to the Plan or (y) otherwise at or before the Confirmation Hearing.

        (b)    Unless reappointed pursuant to Section 7.9(a) of the Plan, the members of the board of directors, managers, or managing members, as the case may be, of the Acquired Debtors prior to the Effective Date shall have no continuing obligations to the Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors of each of the Acquired Debtors shall serve pursuant to the terms of the applicable Amended LLC Agreement or the applicable organizational documents of such Acquired Debtor and may be replaced or removed in accordance therewith, as applicable.

    2.    **Wind Down Co and the other Dissolving Debtors.**

        The Plan Administrator shall be the sole director or manager, as applicable, of the each of Dissolving Debtors from and following the Effective Date. The members of the boards of the Dissolving Debtors prior to the Effective Date shall have no continuing obligations to the Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

J.    **Management**

        <u>Acquired Debtors.</u>  As of the Effective Date, the individuals who will serve in certain senior management positions of the Acquired Debtors shall consist of those individuals set forth in the Plan Supplement. The compensation arrangement for any insider of the Debtors that shall become an officer of an Acquired Debtor shall be disclosed (x) in the Plan Supplement to be filed with the Bankruptcy Court no later than five (5) calendar days before the deadline to object to the Plan or (y) otherwise at or before the Confirmation Hearing.

        <u>The Dissolving Debtors.</u>  From and after the Effective Date, the Dissolving Debtors shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of each of the Dissolving Debtors and shall have full authority to administer the provisions of the Plan. The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

K.    **Post-Emergence Incentive Program**

        After the Effective Date, in accordance with the terms of the Post-Emergence Incentive Program, Wind Down Co shall pay the Post-Emergence Bonuses to the Key Employees. The payment of the Post-Emergence Bonuses are subject to the Key Employees achieving certain performance targets by the Effective Date. The Post-Emergence Bonus is

designed to incentivize the Key Employees, each of whom is critical to the success of the Plan
and the implementation of the transactions contemplated by the Plan and the Plan Funding
Agreement.  The performance targets, which were approved by the Compensation Committee of
Debtor SquareTwo Financial Corporation's Board of Directors, include the following:

- Collections:  the amount collected by the Debtors from the individual
  obligors during the period of March 1, 2017 through the earlier of (a) May
  31, 2017 and (b) the date the Plan is consummated, which accounts for
  45% of the Post-Emergence Bonus;

- Operating Costs:  the total operating expenses of the Debtors during the
  period from March 1, 2017 through the earlier of (a) May 31, 2017 and
  (b) the date the Plan is consummated, excluding (i) any costs or expenses
  relating to the Debtors' restructuring, (ii) all actual out-of-pocket legal and
  court fees, costs and expenses related to accounts placed for legal action
  incurred by the Debtors and any operating subsidiary in the ordinary
  course of business, (iii) any interest expenses, and (iv) any extraordinary
  payroll expenses (including, without limitation, payments pursuant to any
  key employee incentive programs or any retention programs or severance
  payments), in each case, as determined by the Debtors in good faith,
  which accounts for 45% of the Post-Emergence Bonus; and

- Process Timing:  the number of days between the Petition Date and the
  date the Plan is consummated, which accounts for 10% of the Post-
  Emergence Bonus.

If the Debtors fail to achieve a threshold amount of any performance target, that
corresponding component of the Post-Emergence Bonus will not be funded, reducing the bonus
pool.  If the Debtors achieve between 90% and 110% of a given performance target, the relevant
component of the Post-Emergence Bonus will be funded at that percentage.  If the Debtors
exceed a performance target by more than 110%, that corresponding component of the Post-
Emergence Bonus will be funded at 110% of the target amount.

The performance targets were chosen to ensure that the Debtors maximize value
for all of their prepetition creditors through minimizing (a) the disruption to the Debtors'
business caused by the commencement of these cases and its corresponding impact on
collections and operating costs and (b) the length of these cases.

### L.   Repurchase of Christopher D. Walker's Equity Securities in CCL Financial, Inc. and related matters

In connection with the Proposed Restructuring Transaction, Debtor SquareTwo
Financial Canada Corporation intends to enter into a stock purchase agreement with Christopher
D. Walker to repurchase Mr. Walker's equity securities in Debtor CCL Financial, Inc. for a price
equal to the Full Exercise Right (as defined in the  Amended and Restated Stock Purchase
Agreement, dated March 17, 2014, upon a change of control (as defined in the Stock Purchase
Agreement)).  In addition, it is anticipated that, in connection with the Effective Date, (a) Mr.

Walker's employment agreement with CCL Financial, Inc. will be amended, (b) Mr. Walker will repay to CCL Financial, Inc. $225,000 outstanding on that certain Promissory Note, Guaranty and Pledge Agreement, dated as of August 31, 2011, by and between CCL Financial, Inc. and Mr. Walker, and (c)  Mr. Walker will also agree to release SquareTwo Financial Corporation and its Affiliates from any claims related to his ownership of CCL Financial, Inc.'s stock.

### M.    Corporate Action

The Dissolving Debtors shall serve on the U.S. Trustee quarterly reports of the disbursements made on an entity-by-entity basis until such time as a final decree is entered closing the applicable Chapter 11 Case or the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

On the Effective Date, the Amended LLC Agreements, the Amended Certificates of Formation and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors, including the Dissolving Debtors, shall be deemed authorized in all respects.

Any action under the Plan to be taken by or required of the Debtors, the Acquired Debtors and/or the Dissolving Debtors, including the adoption or amendment of certificates of formation and by-laws, the issuance of securities and instruments, or the selection of officers or directors (or managers or managing members), shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or the Reorganized Debtors', including the Acquired Debtors' and the Dissolving Debtors' respective equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

The Debtors and the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Acquired Debtors and the Dissolving Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date, without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor or applicable Dissolving Debtor, as the case may be.

### N.    Plan Administrator

#### 1.    Appointment; Duties.

Not less than seven (7) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Debtors, with the consent of the Required Consenting 1.5 Lien Lenders (which consent shall not be unreasonably withheld, delayed or conditioned), shall designate the Person who initially will serve as the Plan Administrator; provided, however, that: (a) the Debtors shall have the right

at any time prior to the Effective Date to remove the Plan Administrator without cause; and (b) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtors' obligations under the Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order. On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan.

## 2.    Qualifications; Plan Administrator Agreement.

### (a)    Plan Administrator as Fiduciary.

The Plan Administrator shall be a fiduciary of the Dissolving Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. To the extent necessary, and except with respect to any Canadian Claim and any Assumed U.S. Liability, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

### (b)    Provisions of Agreement and Order.

The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator shall be a fiduciary of the Dissolving Debtors; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managers, managing members, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to the Plan on account of any such action taken or omitted to be taken; (iii) the Plan Administrator, on behalf of the Dissolving Debtors, shall be authorized and responsible for handling the Post-Closing Purchase Price Adjustment and related obligations and responsibilities; and (iv) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

## 3.    Wind Down Co Stock.

On the Effective Date, a single share of stock shall be issued by Wind Down Co to the Plan Administrator.

4.      **Funding.**

Subject to the terms and conditions set forth in the Plan Funding Agreement, (i) the Plan Investor and/or any permitted assignee shall pay the Closing Purchase Price to Wind Down Co on the Effective Date and (ii) after the Effective Date, Wind Down Co shall (x) be paid any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement; and (y) be paid or received, as applicable, the difference, if positive, between the Final Purchase Price and the Closing Purchase Price as set forth in the Plan Funding Agreement.

5.      **Resignation, Death or Removal.**

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

6.      **Wind Down Funds.**

The Plan Administrator shall establish and fund the Wind Down Account from all Cash of the Debtors as of the Effective Date, *plus* any Cash received by the Dissolving Debtors on and after the Effective Date, including the Closing Purchase Price, the remainder of the Purchase Price, if any, in accordance with the terms of the Plan Funding Agreement and any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement.

O.      **Wind Down of the Debtors' Estates**

(a)      The Plan Administrator shall oversee the Wind Down and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, those holders of Allowed Claims and Allowed Interests that is consistent with and in accordance with the Plan and the Confirmation Order.  None of the Dissolving Debtors (including the Plan Administrator) shall be required to post a bond in favor of the United States.

(b)      As set forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts with respect to the Dissolving Debtors, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court:  (i) take all steps and execute all instruments and documents necessary to make distributions to holders of Allowed Claims and Allowed Interests that Wind Down Co is responsible for payment under the Plan; (ii) object to Claims, if any, as provided in the Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment or allowance of Claims, Administrative Expense Claims, or Interests; (iv) comply with the Plan and the obligations hereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) take all actions necessary or appropriate to enforce the Debtors' rights and fulfill the Debtors' obligations under the Plan Funding Agreement, the Escrow Agreement

and the TSA and any related documents; (vii) prepare and file applicable tax returns for the Dissolving Debtors; (viii) deposit Estate funds, draw checks and make disbursements consistent with the terms of the Plan; (ix) purchase or continue insurance protecting the Dissolving Debtors, the Plan Administrator and property of the applicable Estates; (x) seek entry of a final decree in any of the Dissolving Debtors' Chapter 11 Cases at the appropriate time; (xi) resolve, compromise and/or settle any Cure Disputes; (xii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under the Plan; and (xiii) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of the Plan.

(c)     Following the Effective Date, none of the Dissolving Debtors shall engage in any business activities or take any actions, except those necessary to effectuate the Plan, including under the Plan Funding Agreement, and under any and all transition services required pursuant to the TSA, and the Wind Down.  On and after the Effective Date, the Plan Administrator may, in the name of the Dissolving Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.

## P.     Consenting Lender Fee Claims

On the Effective Date, Wind Down Co shall pay the First Lien Lender Fee Claim, the 1.25 Lien Lender Fee Claim (in each case, to the extent not duplicative of the First Lien Lender Claims and the 1.25 Lien Lender Claims, respectively) and the 1.5 Lien Lender Fee Claim.

## Q.     Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights

(a)     Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, including the Dissolving Debtors, and their respective Estates and property, and of holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(b)     Except as provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each

Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan.

### R.    Additional Transactions Authorized Under the Plan

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to reinstate Claims or Interests or render Claims or Interests Unimpaired, as provided for under the Plan.

### S.    Conditions to Confirmation and Consummation

Under Section 11.1 of the Plan, confirmation of the Plan is subject to the following conditions:

- entry of an order approving the Disclosure Statement in form and substance acceptable to the Debtors and each of the Required Parties;

- entry of the Confirmation Order by the Bankruptcy Court;

- the RSA not having been terminated by the Debtors, the Plan Investor or the Required Consenting Lenders in accordance with its terms; and

- the Plan Funding Agreement not having been terminated by the applicable Debtor(s) or the Plan Investor in accordance with its terms.

Under Section 11.2 of the Plan, the occurrence of the Effective Date is subject to:

- the Confirmation Order having become a Final Order in the Chapter 11 Cases;

- the Confirmation Order having been recognized by the Canadian Court in the Canadian Proceeding;

- the Plan Investor having been paid the Closing Purchase Price to Wind Down Co;

- any non-technical and/or immaterial amendments, modifications or supplements to the Plan shall be reasonably acceptable to the Debtors and each of the Required Parties, except as otherwise provided in Section 14.5 of the Plan;

- all reasonable and documented Consenting Lender Fee Claims incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Credit Agreement and related documents, and all transactions set forth in the Plan or necessary to implement and consummate the Plan

(whether incurred before or after the Petition Date) shall have been paid; provided that, if Wind Down Co disputes any such Consenting Lender Fee Claims, Wind Down Co shall pay the undisputed amount of such Consenting Lender Fee Claims, and pay the remaining portion of such Consenting Lender Fee Claims after such dispute is resolved by the parties or by the Bankruptcy Court;

- all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan, including, without limitation, the Plan Funding Agreement , in form and substance acceptable to the Debtors and each of the Required Parties as set forth in the RSA, the Plan Funding Agreement, and the Plan, and the other documents included in the Plan Supplement to be entered into (rather than assumed) by the applicable Debtors having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

- the Debtors obtaining all authorizations, consents and regulatory approvals, if any, required to be obtained, and filing all notices and reports, if any, required to be filed, by the Debtors in connection with the Plan's effectiveness;

- the RSA and the Plan Funding Agreement not having been terminated by the applicable Debtors, the Plan Investor or the Required Consenting Lenders, as applicable, in each case, in accordance with their respective terms;

- all closing conditions and other conditions precedent in the Plan Funding Agreement shall have been satisfied or waived in accordance with the terms thereof; and

- there being sufficient Cash, in the Debtors' good faith determination, to pay in accordance with the Plan all (if they are not Canadian Claims and/or Assumed U.S. Liabilities) DIP Claims, Administrative Expense Claims, Other Secured Claims to the extent paid in Cash, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Fee Claims to the extent paid in Cash, U.S. Trustee Fees for the Dissolving Debtors on an ongoing basis and U.S. Trustee Fees for the Acquired Debtors incurred to the Effective Date, and any other anticipated Wind Down Costs, including, any amounts owed under any key employee incentive and/or retention programs approved by the Bankruptcy Court.

Under Section 11.3 of the Plan, except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Sections 11.1 and 11.2 of the Plan may be waived in whole or part upon agreement by: (x) the Debtors and the Plan Investor (with respect to Section 11.2(i) of the Plan),

(y) the Debtors and each of the Required Parties (with respect to Sections 11.1(a) – (d) and Sections 11.2(a) – (h) of the Plan), or (z) the Debtors and the Required Consenting 1.5 Lien Lenders (with respect to Section 11.2(j) of the Plan), and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision of the Plan.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights under the Plan, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth in the Plan) at any time or from time to time.

Under Section 11.4 of the Plan, if all of the conditions to effectiveness have not been satisfied (as provided in Sections 11.1 and 11.2 of the Plan) or duly waived (as provided in Section 11.3 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Sections 11.1 and 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section 11.4 of the Plan, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

## T.     Binding Effect

Section 12.1 of the Plan provides that, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

## U.     Discharge of Claims Against and Interests in the Debtors

Section 12.2 of the Plan provides that, upon the Effective Date and in consideration of the Plan Distributions, if any, except as otherwise provided therein or in the Confirmation Order (including with respect to Canadian Claims and Assumed U.S. Liabilities), each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests

shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor, any Reorganized Debtor, including any Acquired Debtor or Dissolving Debtor, or any property, wherever located, including Canada, of the Estates.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in any relevant jurisdictions to implement the transactions set out in the Plan, including the Plan's discharge provisions, in order to ensure that they are fully effective.

### V.    Term of Pre-Confirmation Injunctions or Stays

Unless otherwise provided in the Plan, all injunctions or stays provided in the Chapter 11 Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All stays and suspensions provided for in the Canadian Proceeding pursuant to any order of the Canadian Court shall remain in full force and effect until the Effective Date unless otherwise ordered by the Canadian Court.

### W.    Injunction Against Interference with Plan

*Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former affiliates, employees, agents, officers, directors, managers, managing members, or principals, shall be enjoined from taking any actions, whether in the United States, Canada or elsewhere, to interfere with the implementation or consummation of the Plan.  Moreover, solely to the extent provided under applicable law, property dealt with by the Plan is transferred to, or vests in (or both, as applicable) the Reorganized Debtors free and clear of all Claims and Interests pursuant to section 1141(c) of the Bankruptcy Code.  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan and except for Assumed U.S. Liabilities and Canadian Claims.  As of the Confirmation Date, subject to the occurrence of the Effective Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.  Each of the Reorganized Debtors, as applicable, is expressly authorized under the Plan to seek to enforce such injunction.*

### X.    Injunction

*Except as otherwise provided in the Plan or the Confirmation Order (including with respect to Canadian Claims and Assumed U.S. Liabilities), as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing,*

*conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, including Canada, of any such transferee or successor, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Released Parties, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, including Canada, of any such transferee or successor, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, including Canada, of, or successor in interest to, any of the foregoing Persons, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (iv) acting or proceeding in any manner, in any place whatsoever (including in Canada), that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place (including in Canada), any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan. For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in any relevant jurisdictions to implement the transactions set out in the Plan, including the injunctions set forth in Section 12.5 of the Plan, in order to ensure that they are fully effective. Each of the Reorganized Debtors, as applicable, is expressly authorized under the Plan to seek to enforce such injunction.*

## Y.   Releases

### 1.   Released Parties.

*"Released Parties" is defined in the Plan to mean, collectively, and each solely in its capacity as such: (a) the Debtors and Reorganized Debtors (including the Acquired Debtors and the Dissolving Debtors); (b) the DIP Administrative Agent and the DIP Lenders; (c) the First Lien Administrative Agent; (d) the 1.25 Lien Administrative Agent; (e) the 1.5 Lien Administrative Agent; (f) the Consenting Lenders; (g) the Plan Investor; (h) the*

*Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; and (i) each of such parties' respective predecessors, successors, assigns, subsidiaries, owners, affiliates, managed accounts or funds and their current and former officers, directors, managers, managing members, employees (other than with respect to (1) money borrowed from or owed to the Debtors by any such employees as set forth in any of the Debtor's books and records, or (2) any obligations owed by such employees to such Debtor or pursuant to written agreement), managers, members, principals, shareholders, agents, advisory board members, management companies, fund advisors, partners, attorneys, financial advisors or other professionals or representatives, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Cases or the Canadian Proceeding and the transactions contemplated by this Plan; provided, further, that no Person shall be a Released Party if it objects to the releases provided for in Article XII of the Plan.*

**2.    Releases by the Debtors.**

*Section 12.6(a) of the Plan provides that, for good and valuable consideration, the adequacy of which will be confirmed on the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors, the Reorganized Debtors, including the Dissolving Debtors, each in their individual capacities and as debtors in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder) against the other Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the parties released pursuant to Section 12.6 of the Plan, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the DIP Credit Agreement, the Plan Funding Agreement or the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, including the Dissolving Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director, manager or managing member of the Debtors that constitutes gross negligence or willful misconduct or actual fraud, each as determined by a Final Order of the Bankruptcy Court.*

**3.    Releases by and among Released Parties.**

*Section 12.6(b) of the Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, each of the Released Parties (other than the Debtors, the Reorganized Debtors, including the Dissolving Debtors, each in their*

*individual capacities and as debtors in possession and the other parties listed in subsection (i) of the definition of Released Parties as they relate to the Debtors and the Reorganized Debtors), in consideration for the obligations of the Debtors and Reorganized Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will have consented to the Plan for all purposes and the restructuring embodied in the Plan and forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan) against the other Released Parties and the Reorganized Debtors (including the Acquired Debtors and the Dissolving Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors (including the Acquired Debtors and the Dissolving Debtors), the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the DIP Credit Agreement, the Plan Funding Agreement, or the Plan or the Disclosure Statement.*

### 4.    Releases of Directors and Officers.

*Except as otherwise provided in the Plan or the Confirmation Order, and except with respect to any claims against directors that cannot be released under section 5.1(2) of the Companies' Creditors Arrangement Act (Canada), on the Effective Date, each of the directors and officers of the Debtors serving in such capacities as of the Petition Date, each in their capacities as such, shall be deemed to be released from all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities whatsoever (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to May 24, 2016 in any way relating to the Debtors.*

*Notwithstanding anything to the contrary contained in the foregoing description of Releases: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in Section 12.6 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code, Canadian federal tax law, or any state, provincial, city or municipal tax code, or (y) any criminal laws of the United States, Canada or any state, province, city or municipality; and (ii) the releases set forth in Section 12.6 of the Plan shall not release any (x) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, managers, managing members or representatives and (y) claims against*

*any Person arising from or relating to such Person's gross negligence, willful misconduct or actual fraud, each as determined by a Final Order of the Bankruptcy Court.*

### Z.    Exculpation and Limitation of Liability

*On the Effective Date, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the Plan Funding Agreement, the Disclosure Statement, the DIP Facility, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence, or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.*

### AA.    Injunction Related to Releases and Exculpation

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in or encompassed by Sections 12.6 and 12.7 of the Plan.  Each of the Reorganized Debtors, as applicable, is expressly authorized under the Plan to seek to enforce such injunction.*

### BB.    Retention of Causes of Action/Reservation of Rights

Subject to Section 12.6 of the Plan and except as expressly set forth therein, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Subject to Section 12.6 of the Plan and except as expressly set forth in the Plan, the Acquired Debtors and the Dissolving Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left Unimpaired, as set forth in Articles IV and V of the Plan, may be asserted after the Confirmation Date to the same

extent as if the Chapter 11 Cases had not been commenced; provided that, notwithstanding the foregoing but subject to Section 12.6 of the Plan, in consideration of the amounts to be paid by the Plan Investor under the Plan, on the Effective Date, all Causes of Action of the Debtors under chapter 5 of the Bankruptcy Code shall be transferred to the Acquired Debtors.

## CC.    Indemnification Obligations.

(a)    Notwithstanding anything to the contrary contained in the Plan, subject to the occurrence of the Effective Date and to the Plan Funding Agreement, the obligations (i) of the Dissolving Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of any of the Dissolving Debtors as of the Petition Date or who continue to be directors or officers of any of the Dissolving Debtors at any time after the Effective Date, or (ii) of the Acquired Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who continue to be directors or officers of any of the Acquired Debtors at any time after the Effective Date, against any Causes of Action relating to the Dissolving Debtors or the Acquired Debtors, as applicable, remain unaffected thereby after the Effective Date and are not discharged as to the applicable Debtors, respectively.  On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, the Run Off D&O Policy, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such directors and/or officers remain in such positions after the Effective Date, provided, that, nothing in the Plan shall be deemed or construed to require the applicable Reorganized Debtors to renew or extend such polices, or to have any obligations thereunder.  For a period of six years after the Effective Date, the applicable Reorganized Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time prior to the Effective Date, and make available to any such Person, subject to applicable confidentiality and privilege concerns, such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Person may reasonably require in connection with the defense or preparation for the defense of any claim against such Person relating to any action taken in connection with such Person's role as a director or officer of a Debtor.  For the avoidance of doubt, references in this Disclosure Statement, including this Section CC, to "directors" includes managers and managing members, as the context requires.

(b)    Prior to or on the Effective Date, the Debtors or Wind Down Co, on behalf of the Debtors, with funds of the Debtors or proceeds of the Closing Purchase Price, shall purchase a "run off" directors and officers liability policy, which shall (i) be effective as of the Effective Date, (ii) have a six-year coverage period, and (iii) be on terms acceptable to the Debtors.

## DD.    Treatment of Executory Contracts and Unexpired Leases

### 1.    General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount by the Plan Investor, (a) all executory contracts and unexpired leases to

which any U.S. Debtor is a party identified, that are on the Schedule of Assumed Contracts and Leases, shall be deemed assumed or assumed and assigned by and/or to the Acquired Debtors, and all other executory contracts and unexpired leases of the U.S. Debtors shall be deemed rejected, and (b) all executory contracts and unexpired leases to which any Canadian Debtor is a party and a U.S. Debtor is not a party (and which have not expired by their own terms on or prior to the Confirmation Date), shall be deemed assumed or assumed and assigned by and/or to the Acquired Debtors; except, with respect to (a) and (b), that: (i) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; and (ii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as is determined by a Final Order of the Bankruptcy Court resolving such motion. The listing of a document on the Schedule of Assumed Contracts and Leases or service of a notice of assumption or assumption and assignment as set forth in Section 10.3(b) of the Plan shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease. If, prior to the Confirmation Date, the Acquired Debtors (as required by the Plan Investor) identify additional executory contracts and unexpired leases (x) to which a U.S. Debtor is a party that might be assumed or assumed and assigned by the Acquired Debtors, the Acquired Debtors will promptly file a supplemental Schedule of Assumed Contracts and Leases and serve such schedule on each applicable counterparty; and (y) to which a Canadian Debtor is a party that will be assumed or assumed and assigned by the Acquired Debtors, the Acquired Debtors will promptly serve a notice on the non-Debtor counterparty(ies) to such contracts and leases. For the avoidance of doubt, all executory contracts and unexpired leases identified on the Schedule of Assumed Contracts and Leases (as required by the Plan Investor) where the Debtor counterparty is a U.S. Debtor shall be assumed by the applicable Debtor and assigned to an Acquired Debtor in accordance with Article X of the Plan, and no Dissolving Debtors shall have any liability therefor.

2.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Except as otherwise explicitly set forth in the Plan, all Claims (other than Canadian Claims and Assumed U.S. Liabilities) arising from the rejection of executory contracts or unexpired leases shall be discharged as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the Plan Investor, the Plan Administrator, or their respective properties or interests in property. In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim (other than a Canadian Claim and an Assumed U.S. Liability) for such damages shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, including the Acquired Debtors, the Plan Investor, and the Dissolving Debtors, or the Plan Administrator.

3.        **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

(a)        Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in full in Cash by the Plan Investor on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision); provided that, notwithstanding anything herein to the contrary, with respect to all executory contracts and unexpired leases to which a Canadian Debtor is a party (and a U.S. Debtor is not a party), all Cure Amounts shall be paid by the applicable Canadian Debtor(s) in the ordinary course, subject to all defenses and disputes the applicable Canadian Debtor(s) may have with respect to such executory contract or unexpired lease, which the applicable Canadian Debtor(s) may assert in the ordinary course.

(b)        With respect to all executory contracts and unexpired leases to which any U.S. Debtor is a party, no later than seven (7) calendar days after the Petition Date, the Debtors shall file the Cure Schedule, which may be the Schedule of Assumed Contracts and Leases, setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of the Plan, and serve such Cure Schedule on each applicable counterparty. With respect to all executory contracts and unexpired leases to which any Canadian Debtor is a party and a U.S. Debtor is not a party, the Debtors shall serve a notice on the non-Debtor counterparties to such contracts and leases of such Canadian Debtor(s) to be assumed or assumed and assigned reflecting the intention to assume or assume and assign such contracts or leases in connection with the Plan and setting forth the Cure Amount. Any party to an executory contract or unexpired lease to which a U.S. Debtor is a counterparty that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor, Reorganized Debtor, Acquired Debtor, the Plan Investor, and the Dissolving Debtors arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule. If, prior to the Confirmation Date, the Debtors (as required by the Plan Investor) identify additional executory contracts and unexpired leases to which a U.S. Debtor is a counterparty that might be assumed or assumed and assigned by the Debtors, the Debtors will promptly file a Supplemental Cure Schedule and serve such Supplemental Cure Schedule on each applicable counterparty and each applicable counterparty shall have fourteen (14) calendar days of the filing thereof to object to the applicable Cure Amount set forth on the Supplemental Cure Schedule. If, prior to the Confirmation Date, the Debtors identify additional executory contracts and unexpired leases to which a Canadian Debtor is a counter party (and a U.S. Debtor is not a counterparty) that will be assumed or assumed and assigned by the Debtors, the Debtors will promptly serve notice of such assumption or assumption and assignment on the non-Debtor counterparty thereto in accordance with Section 10.3(b) of the Plan.

(c)    In the event of a Cure Dispute regarding: (i) the Cure Amount; (ii) the ability of the applicable Acquired Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute; provided, that, with respect to a Cure Amount associated with an executory contract or unexpired lease to which a U.S. Debtor is a counterparty, the Plan Investor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  Except as set forth in the immediately preceding proviso, all Cure Amounts shall be paid by the Plan Investor on and after the Effective Date and none of the Dissolving Debtors shall have any liability with respect to the payment of Cure Amounts.  Only the Plan Investor may resolve any Cure Dispute relating solely to the Cure Amount for which it is paying.

## 4.    Effect of Confirmation Order on Assumption/Rejection

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in Article X of the Plan and determining that (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estates; (b) with respect to such assumptions, to the extent necessary, that the Plan Investor has (i) cured, or provided adequate assurance that the Plan Investor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or its affiliate will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease, and (c) with respect to any assignment, to the extent necessary, that the Plan Investor has (i) cured, or provided adequate assurance that it or its affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that the Plan Investor will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required.  Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed.  Each executory contract and unexpired lease assumed pursuant to Article X of the Plan shall revest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court

authorizing and providing for its assumption, or applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.  Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract.

## 5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed or assumed and assigned executory contract and unexpired lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

## 6.    Compensation and Benefit Programs; Insurance Policies

Except as otherwise expressly provided under the Plan, the Plan Funding Agreement, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, in each case, with the consent of the Plan Investor (solely with respect to such polices, plans and programs relating to employees to be employed by the Acquired Debtors), all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans, and paid time off policies are treated as executory contracts under the Plan and on the Effective Date will be rejected pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

Each of the Debtors may, prior to the Effective Date and with the consent of the Plan Investor (if the following will become a liability of an Acquired Debtor), enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of the Plan.  Any such agreements (or a summary of the material terms thereof) shall be in form and substance acceptable to the Plan Investor and be included in

the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

### EE.   Miscellaneous Provisions

#### 1.   Exemption from Certain Transfer Taxes.

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

#### 2.   Retiree Benefits.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Acquired Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which any applicable Debtor had obligated itself to provide such benefits. Nothing in the Plan shall: (a) restrict the Debtors' or the applicable Acquired Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

The foregoing is provided in an abundance of caution, however, the Debtors do not believe they pay any retiree benefits within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code.

#### 3.   Termination of Professionals.

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee, if any, shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims, and the Dissolving Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims. Nothing in the Plan shall preclude any Dissolving Debtor or any Acquired Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

4.      **Amendments.**

The Plan may be amended, modified, or supplemented by the Debtors, with the consent of each of the Required Parties, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of holders of Allowed Claims and Allowed Interests pursuant to the Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  The Debtors may make technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications are immaterial or do not adversely affect the treatment of holders of Claims or Interests under the Plan.

5.      **Revocation or Withdrawal of the Plan.**

Subject to the terms and conditions of the RSA and the Plan Funding Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, provided, however, that the Plan Investor, or any of its designees, shall retain its rights and to the extent as expressly provided under the Transaction Documents; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

6.      **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

7.      **Severability.**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to

make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## 8.    Governing Law.

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

## 9.    Section 1125(e) of the Bankruptcy Code.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, the Plan Investor and the Consenting Lenders (and each of their respective affiliates, agents, directors, managers, managing members, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under the Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

## 10.    Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, the RSA, the Plan Funding Agreement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern, provided, however, that the parties to the Plan Funding Agreement and the RSA shall use commercially reasonable efforts to eliminate any such inconsistency by agreement prior to the provisions of this section becoming applicable and enforceable.

## 11.    Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.     **Exhibits.**

All exhibits to the Plan (including, without limitation, the Plan Documents, all documents filed with the Plan Supplement, and the Plan Funding Agreement and all exhibits and ancillary agreements thereto) are incorporated and are a part of the Plan as if set forth in full therein.

13.     **Notices.**

All notices or requests in connection with the Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

> SquareTwo Financial Services Corporation
> 6300 South Syracuse Way, Suite 300
> Centennial, Colorado 80111
> Attention:  J.B. Richardson, Jr., Chief Operating Officer
> Fax:        (303) 713-2517
> E-mail:     jbrichardson@squaretwofinancial.com
>
> with copies to:
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attention:      Matthew A. Feldman, Esq.
> Paul V. Shalhoub, Esq.
> Robin Spigel, Esq.
> Fax:        (212) 728-8111
> E-mail:     mfeldman@willkie.com
> pshalhoub@willkie.com
> rspigel@willkie.com
>
> Resurgent Holdings LLC,
> c/o Sherman Capital Markets LLC
> 200 Meeting Street
> Charleston, South Carolina  29401
> Attention:  Jon Mazzoli, Director
> E-mail:     jmazzoli@sfg.com

with a copy to:

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:  Patricia J. Lane, Esq.
               Benjamin F. Rikkers, Esq.
               Michael J. Small, Esq.
Fax:        (414) 297-4900
E-mail:    plane@foley.com
              brikkers@foley.com
              msmall@foley.com

### 14.    Filing of Additional Documents.

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 15.    Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained therein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

## III.    ALTERNATIVES TO CONSUMMATION OF THE PROPOSED RESTRUCTURING TRANSACTION

As a result of the springing maturity date of January 1, 2017 under the First Lien Financing Agreement, the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement, the Debtors are in default of such agreements, their capital structure is over-leveraged.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### A.    Liquidation Under the Bankruptcy Code and/or the Canadian Bankruptcy and Insolvency Act

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code and/or, in Canada, under the *Bankruptcy and Insolvency Act* (Canada) or the *Companies' Creditors Arrangement Act* (Canada).  A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in this Section and Section V.D.1 of this Disclosure Statement.  The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors of the U.S. Debtors than those provided for in the Plan and that liquidation would result in lower aggregate distributions being made to creditors of the Canadian Debtors, which is demonstrated by the Liquidation Analysis attached as <u>Exhibit B</u> to this Disclosure Statement.

### B.      Alternative Chapter 11 Plan

In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiation process with the Consenting Lenders. The Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims, and also provides superior recoveries to Classes 3, 4 and 5 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

### C.      Inaction/Maintenance of Status Quo

As noted above, as part of the Proposed Restructuring Transaction, the Debtors and the Plan Support Parties are party to the RSA, which requires the Debtors to, among other things, pursue confirmation of the Plan.  Moreover, in order to implement the Plan Funding Agreement, the Debtors must pursue confirmation of the Plan.  Accordingly, inaction is not an option.  Further, if the Debtors are forced to file for bankruptcy protection without a consensual deal, the bankruptcy cases could be time-consuming and much costlier than the current contemplated restructuring and likely would require plenary insolvency proceedings in Canada under applicable Canadian law.  The Debtors believe that these actions could seriously undermine their ability to obtain financing to maintain and enhance the enterprise value of the operating entities, and could possibly lead to their inability to restructure their debt obligations. Therefore, the Debtors believe that inaction is not a viable alternative to consummation of the Plan.

## IV.    RISK FACTORS

---

### Important Risks to Be Considered

**Holders of Claims and Interests against the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Funding Agreement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan before voting to accept or reject the Plan.**

**These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

---

### A.    Filing of the Reorganization Cases May Disrupt the Debtors' Operations

Although the Debtors believe expedited Reorganization Cases will not have a material detrimental impact on the future financial condition and operations of the Acquired Debtors, the impact, if any, the Reorganization Cases may have on the Debtors' operations, cannot be accurately predicted or quantified (including the impact on the Debtors' relationships with clients, customers, and suppliers).  Thus, if confirmation and consummation of the Plan do not occur expeditiously, the Reorganization Cases could adversely affect the Debtors' relationships with its regulators, obligors, collections agencies, collections law firms, employees and other vendors.  Moreover, even expedited Reorganization Cases could have a detrimental impact on the future financial condition and operations of the Debtors due to the possibility that the Reorganization Cases may create a negative image of the Debtors.

In addition, prolonged Reorganization Cases may make it more difficult for the Debtors to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with the Debtors' financial problems instead of focusing on the operation of the Debtors' businesses.

### B.    Certain Bankruptcy Risks and Other Considerations

#### 1.    General.

Although the Plan is "prepackaged" and the Debtors believe they will obtain the requisite votes required under the Bankruptcy Code to confirm the Plan because the Consenting Lenders have agreed to vote in favor of the Plan, and although the Plan is designed to implement a restructuring of the Acquired Debtors and a Wind Down of the Dissolving Debtors, and to provide distributions to certain creditors funded by the Purchase Price paid by the Plan Investor in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

As noted above, if the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could jeopardize the Debtors' ability to maintain their collection rates from obligors and maintain their relationships with their key vendors and suppliers and employees, which, in turn, would have an adverse effect on the Debtors' operations. A material deterioration in the Debtors' operations likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors' may not have sufficient liquidity to operate in bankruptcy for such an extended period.

### 2.    Parties-in-interest may object to the Debtors' classification of Claims.

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Debtors cannot assure you that the Bankruptcy Court will reach the same conclusion.

### 3.    The commencement of the Reorganization Cases may have negative implications under certain contracts of the Debtors.

The Debtors are party to various contractual arrangements under which the commencement of the Reorganization Cases and the other transactions contemplated by the Plan could, subject to the Debtors' rights and powers under sections 362 and 365 of the Bankruptcy Code: (a) result in a breach, violation, default or conflict; (b) give other parties thereto rights of termination or cancellation; or (c) have other adverse consequences for the Debtors. The magnitude of any such adverse consequences may depend on, among other factors, the diligence and vigor with which other parties to such contracts may seek to assert any such rights and pursue any such remedies in respect of such matters, and the ability of the Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

### 4.    The Debtors may not be able to secure confirmation of the Plan.

The Debtors cannot assure you that the Bankruptcy Court will confirm the Plan or that the Canadian Court will recognize the Chapter 11 Cases or grant recognition of the Confirmation Order. A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with applicable non-bankruptcy law or the Bankruptcy Code. If the Bankruptcy Court were to find that the Debtors' prepetition solicitation of votes did not comply with the Bankruptcy Code and applicable non-bankruptcy law, if any, all acceptances received pursuant to the solicitation could be deemed invalid and the Debtors could be forced to resolicit acceptances under section 1125(b) of the Bankruptcy Code, in which case confirmation of the Plan could be delayed and possibly jeopardized. The Debtors believe that the solicitation complies with the requirements of section 1126(b) of the Bankruptcy Code, that duly executed Ballots are in compliance with applicable provisions of the Bankruptcy Code, and that the Plan, if the requisite acceptances thereon are

received, should be confirmed by the Bankruptcy Court.  There can be no assurance, however, that the Plan will ever be filed and, if the Plan is filed, there can be no assurance that modifications thereof will not be required for confirmation, or that such modifications would not result in a resolicitation of acceptances.

Even if the Bankruptcy Court determined that the solicitation procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization, unless provided in the Plan, and that the value of distributions to non-accepting holders of Impaired Claims and Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot assure you that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization of the Acquired Debtors and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.  See Section V.D.1, "Best Interests of Holders of Claims and Interests."

Although the Debtors believe that if a Plan is accepted and confirmed, the Canadian Court will recognize the Confirmation Order, the Canadian Court may not recognize the Confirmation Order on the grounds that the Plan is inconsistent with provisions of the *Companies' Creditors Arrangement Act* (Canada) or for public policy reasons.  The Canadian Court may impose terms in recognizing the Confirmation Order that the Canadian Court considers appropriate but which may not be satisfactory to the Debtors or the Required Parties.

If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims.  If an alternative restructuring could not be agreed to, it is possible that the Debtors would lack sufficient liquidity to effect a successful restructuring, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**5.      All conditions precedent to the Effective Date, including those contained in the Plan Funding Agreement, may not be satisfied or waived.**

The Debtors cannot assure you that all of the conditions to the Effective Date set forth in Sections 11.1 and 11.2 of the Plan will be satisfied or waived, including all conditions contained in the Plan Funding Agreement.  The Plan Funding Agreement requires, among other things, that the Plan Investor obtain all required authorizations, consents and regulatory approvals (including antitrust approval, if required), and also is conditioned upon the repurchase

of Mr. Christopher D. Walker's equity in CCL Financial, Inc.  See Section II.L. above.  If such conditions are not satisfied, the Plan may not be consummated.

**6.      The Final Purchase Price is subject to a post-closing purchase price adjustment.**

Under the terms of the Plan Funding Agreement, the Debtors and the Plan Investor have agreed that, after the Effective Date, they will examine certain elements of the Closing Purchase Price to determine whether the Closing Purchase Price was accurate.  Such Post-Closing Purchase Price Adjustment could result in an increase or decrease in the consideration received by Wind Down Co after the Effective Date in connection with the Proposed Restructuring Transaction.

**7.      Third-parties have consent rights with respect to various documents required to be filed, prepared and/or executed in order to consummate the Plan.**

The Plan and the RSA require the Debtors to obtain the consent of various parties, including, in certain instances, the Required Parties, with respect to the form of certain documents that must be executed by the Debtors in order for the Effective Date to occur.  The Debtors can provide no assurance that they will be able to obtain such consents.  If the Debtors are unable to obtain the consent of such parties to the extent required under the Plan and RSA, the Plan may not be consummated.

**8.      The obligations of the Plan Support Parties to support the terms of the Plan may be terminated in certain circumstances.**

Pursuant to the RSA, certain "Plan Support Party Termination Events" (as defined therein) may permit the Plan Support Parties to withdraw their support for the Plan.  Among others, the following constitute Plan Support Party Termination Events under the RSA:

- 11:59 p.m. (EST) on March 8, 2017, unless the Debtors have commenced solicitation of votes in favor of the Plan;

- 11:59 p.m. (EST) on March 19, 2017, unless the Debtors shall have received votes accepting the Plan from at least (i) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the First Lien Financing Agreement; (ii) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the 1.25 Lien Credit Agreement; and (iii) 66.67% of the principal amount of the obligations under the 1.5 Lien Credit Agreement;

- 11:59 p.m. (EST) on March 24, 2017, unless the Chapter 11 Cases are commenced in the Bankruptcy Court, and the Plan and the Disclosure Statement are filed with the Bankruptcy Court;

- 11:59 p.m. (EST) on the date that is four (4) Business Days after the Petition Date, unless the Canadian Proceeding has been commenced;

- 11:59 p.m. (EST) on the date that is three (3) Business Days after the Petition Date, unless a motion for entry of an order authorizing the Debtors to perform their obligations under the Plan Funding Agreement relating to (a) the payment of the Termination Fee and PI Expenses (each as defined in the Plan Funding Agreement) and (b) the provisions set forth in Section 6.7 of the Plan Funding Agreement has been filed with the Bankruptcy Court;

- 11:59 p.m. (EST) on the date that is five (5) Business Days after the Petition Date, unless the Bankruptcy Court has entered an order scheduling a confirmation hearing for the Plan;

- solely in the case of the Plan Investor, 11:59 p.m. (EST) on the date that is thirty-five (35) days after the Petition Date, unless the Bankruptcy Court has entered the PFA Approval Order;

- 11:59 p.m. (EST) on the date (x) that is five (5) Business Days after the Petition Date, unless the Bankruptcy Court has entered the DIP Order on an interim basis and (y) that is thirty-five (35) days after the Petition Date, unless the Bankruptcy Court has entered the DIP Order on a final basis;

- 11:59 p.m. (EST) on the date that is sixty-five (65) calendar days after the Petition Date, unless the Bankruptcy Court has entered the Confirmation Order and an order approving the Disclosure Statement and the Canadian Court has recognized such orders;

- 11:59 p.m. (EST) on the date that is ninety-five (95) calendar days after the Petition Date, unless the Debtors have substantially consummated the Plan and the Plan Funding Agreement pursuant to their respective terms;

- the occurrence of any material breach by the Debtors of any of the undertakings, representations, warranties or covenants of the Debtors set forth in the RSA or the Plan Funding Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms thereof);

- solely in the case of the Consenting Lenders, the occurrence of any material breach by the Plan Investor of any of the undertakings, representations, warranties or covenants of the Plan Investor set forth in the RSA (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms thereof);

- solely in the case of the Plan Investor, the occurrence of any material breach by any of the Consenting Lenders of any of the undertakings, representations, warranties or covenants of such Consenting Lender set forth in the RSA (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms thereof) such that the non-breaching Consenting Lenders at any time hold less than any of

(i) 66.67% of the obligations under the First Lien Financing Agreement; (ii) 66.67% of the obligations under the 1.25 Lien Credit Agreement, or (iii) 66.67% of the obligations under the 1.5 Lien Credit Agreement;

- the withdrawal of the Plan or Disclosure Statement or the filing of a pleading by the Debtors without the prior written consent of each of the Required Parties, that seeks to amend or modify the Plan, the Disclosure Statement, or the Plan Funding Agreement, which amendment, modification or filing is (i) materially inconsistent with the RSA, the Plan and/or the Plan Funding Agreement, as applicable, and (ii) adverse to any of the Plan Support Parties; and such motion or pleading has not been withdrawn prior to the earlier of (x) two (2) business days after the Debtors receive written notice from the applicable Required Consenting Lenders or the Plan Investor that such motion or pleading is (i) materially inconsistent with this Agreement, the Plan and/or the Plan Funding Agreement and (ii) adverse to such Plan Support Party, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

- the Bankruptcy Court grants relief that is inconsistent with the RSA or the Plan in any respect that is materially adverse to any of the Plan Support Parties;

- the Debtors (i) withdraw the Plan, (ii) file, propounds or otherwise supports any plan of reorganization other than the Plan, or (iii) publicly announce their intention to do either of (i) or (ii);

- the Debtors file with the Bankruptcy Court or the Canadian Court any motion or application seeking authority to sell any material assets (including any assets of one or more Acquired Debtors) without the prior written consent of the Required Parties;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Plan, the Plan Funding Agreement, or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Debtors subject to the reasonable satisfaction of each of the Required Parties;

- other than with respect to the Dissolving Debtors, any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Bankruptcy Cases or the Debtors shall file a motion or other request for such relief;

- the Canadian Proceedings are dismissed or a trustee or receiver shall be appointed pursuant to the applicable provisions of the *Bankruptcy and Insolvency Act* or any other Canadian legislation or any separate process for the sale of the Canadian business is approved or if the Debtors shall file any motion or make any request in respect of the foregoing to the Canadian Court;

- an Event of Default (as defined therein) shall occur under the Interim DIP Order, the Final DIP Order or the DIP Financing Agreement or cash collateral order entered in the Chapter 11 Cases that has not been cured in accordance with the DIP Credit Agreement or waived within 5 Business Days;

- the Bankruptcy Court shall enter an order terminating, annulling, modifying or conditioning the automatic stay with respect to any assets of the Debtors in an amount greater than $250,000;

- solely in the case of the Plan Investor, the Bankruptcy Court shall enter an order or orders, determining that debts or Claims that in the aggregate exceed $250,000 against any of the Acquired Debtors (other than a Canadian Claim or an Assumed U.S. Liability) are non-dischargeable under the Bankruptcy Code;

- upon termination of the Plan Funding Agreement for any reason; provided, that the Plan Investor may not exercise a Plan Support Party Termination Event under Section 2.1(x) of the RSA if the termination of the Plan Funding Agreement is principally due to an act or omission of the Plan Investor that is contrary to its obligations under the RSA or the Plan Funding Agreement;

- (i) the entry of an order denying confirmation of the Plan by the Bankruptcy Court or (ii) the Disclosure Statement Order or Confirmation Order shall have been reversed, vacated or otherwise materially modified in a manner inconsistent with the RSA or the Plan and adverse to any of the Plan Support Parties without the prior written consent of the Plan Investor and written consent of the Required Consenting Lenders;

- any Consenting Class at any time owns less than 66.67% of the relevant debt of such class; provided that such class shall not have the right to terminate pursuant to this clause;

- the occurrence of a termination event under the forbearance agreements dated as of January 1, 2017 (as the same may be amended, modified or supplemented from time to time) by and among the Debtors, on the one hand, and the Consenting First Lien Lenders, the Consenting 1.25 Lien Lenders and the Consenting 1.5 Lien Lenders, respectively, on the other hand;

- the Debtors lose the exclusive right to file and solicit acceptances of a chapter 11 plan; and

- termination by any Plan Support Party if either (i) the Class of First Lien Lender Claims under the Plan, (ii) the Class of 1.25 Lien Lender Claims under the Plan, (iii) the holders of at least 66.67% of the 1.5 Lien Lender Claims (as defined in the Plan), or (iv) the Plan Investor has given a notice of termination of the RSA.

See <u>Exhibit C</u>.  Under the RSA, certain parties thereto may agree to extend the dates set forth above.

**9.      The obligations of the Plan Investor under the Plan Funding Agreement may be terminated in certain circumstances.**

Pursuant to the Plan Funding Agreement, the Plan Investor may terminate the Plan Funding Agreement in certain circumstances, including mutual consent, breach, illegality, the failure of SquareTwo Financial Canada to repurchase Christopher D. Walker's equity securities in CCL Financial, Inc., and the occurrence of the Outside Date under the RSA.  See <u>Exhibit D</u>.

**10.     The Debtors may object to the amount or classification of your Claim.**

Unless Allowed, the Debtors reserve the right to object to the amount or classification of any Claim or Interest.  The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection.  Any such Claim or Interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**11.     Certain actual Plan Distributions may be less than estimated by the Debtors for the purposes of this Disclosure Statement.**

The projected Plan Distributions and recoveries set forth in this Disclosure Statement are based on the estimated Final Purchase Price in the Plan Funding Agreement plus the Debtors' estimates of Allowed Claims and Wind Down Costs.  The Debtors' projected recoveries are based upon certain assumptions that the Debtors believe to be reasonable under the circumstances.  However, there can be no assurance that such estimates will prove accurate.

**12.     The Debtors may not obtain all regulatory approvals required to consummate the Plan.**

Consummation of the Plan is conditioned upon the satisfaction of certain regulatory approvals.  Although the Debtors believe that the required regulatory approvals will be obtained, the Debtors cannot provide assurance that they will be obtained or that they will be obtained within the time period required by the milestones under the RSA.

C.    **Risks Relating to Tax and Accounting Consequences of the Plan**

1.    **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.**

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.*

2.    **Use of Historical Financial Information.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Debtors believe they will be subject to the fresh-start accounting rules. Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP. Application of fresh-start accounting rules could result in the values of certain of the Debtors' assets being written down.

V.    **CONFIRMATION OF THE PLAN**

A.    **Confirmation Generally**

The Bankruptcy Code requires the Bankruptcy Court to determine whether a chapter 11 plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a debtor's disclosures concerning its chapter 11 plan have been adequate.

If the Plan is confirmed, the Debtors expect the Effective Date to occur no later than twenty-one (21) days after the Canadian Court recognizes the Confirmation Order.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met. Thus, even if the statutorily required majority vote in number and dollar amount is achieved for Classes 3, 4 and 5 (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

In addition, to recognize the Confirmation Order, the Canadian Court must be satisfied that the Confirmation Order (a) is not contrary to public policy, (b) is necessary for the protection of the Debtors' assets or the interests of the creditors, and (c) is consistent with an order that may be made under the *Companies' Creditors Arrangement Act* (Canada).

B.        **Voting Procedures and Standards**

Holders of Claims in Classes 3, 4 and 5 (the only Classes entitled to vote under the Plan) as of the Voting Record Date will receive prior to the commencement of the Reorganization Cases, this Disclosure Statement, the Plan, and a ballot for accepting or rejecting the Plan.  Classes 3, 4 and 5 are entitled to vote because they are the only Classes that are Impaired under the Plan but will be receiving some consideration under the Plan.

A class is "Impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

- leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based on such claim or interest.

A class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Among other things, the Debtors will not count or consider for any purpose in determining whether the Plan has been accepted or rejected the following Ballots:

- except in the Debtors' sole discretion, any ballot received after the Voting Deadline;

- any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

- any ballot cast by a person or entity that does not hold a claim or interest in Class 3 (First Lien Lender Claims), Class 4 (1.25 Lien Lender Claims) or Class 5 (1.5 Lien Lender Claims);

- any unsigned or non-original ballot (unless submitted electronically with the Voting Agent as specified in the Ballots);

- except in the Debtors' sole discretion, any ballot transmitted to the Voting Agent by any means not acceptable as explained by the Ballot; and

- any ballots that are otherwise properly completed, executed and timely returned to the Voting Agent, but do not indicate an acceptance or rejection of the Plan, or that indicate both an acceptance and rejection of the Plan.

The Debtors require that holders of Claims in Class 3 (First Lien Lender Claims), Class 4 (1.25 Lien Lender Claims), and Class 5 (1.5 Lien Lender Claims) vote all of their Claims within a particular class either to accept or reject the Plan.  In addition, in accordance with section VII.D. of the Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York, General Order M-454, dated June 28, 2013, whenever two or more ballots are cast voting the same Claim prior to the Voting Deadline, the last ballot received prior to the Voting Deadline will be deemed to reflect the voter's intent and to thus supersede any prior ballot(s).

In connection with the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to approve the Voting Procedures.  In the event the Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of the Voting Procedures, the Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

---

**If a ballot is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Voting Agent:**

SquareTwo Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, New York 10022
Phone:  (844) 205-4337 (U.S. & Canada toll free)
or (917) 962-8384 (international)
Email: squaretwoballots@primeclerk.com

---

A vote may be designated (i.e., disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### C.      Acceptance

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in such class that have voted on the Plan; provided, that there must be one Impaired accepting Class that meets the foregoing thresholds excluding the acceptances of insiders.  A Class of Interests that is entitled to vote on the Plan will have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the allowed interests in such class that actually vote on the plan.  Here, acceptance of the Plan need only be solicited from holders of Claims in Classes 3 (First Lien Lender Claims), 4 (1.25 Lien Lender Claims) and 5 (1.5 Lien Lender Claims), as those are the only Classes which are Impaired and entitled to vote under the Plan.  See Section I.D, "Voting and Support for the Plan," above.  Except in the context of a "cramdown" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Impaired Class accepts the Plan.  The Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Voting Classes that vote to reject the Plan and with respect to Classes deemed to have rejected

the Plan.  This procedure is commonly referred to as a "cramdown."  For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain Impaired Classes, see Section V.D.3, "Cramdown," below.

### D.    Confirmation and Consummation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the plan, for services or for costs and expenses in, or in connection with the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the effective date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the petition date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

### 1.     Best Interests of Holders of Claims and Interests

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case.  The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the

cash held by such Debtor at the time of the commencement of the chapter 7 case.  This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

The Debtors have determined, as discussed in the Liquidation Analysis attached as Exhibit B hereto, that confirmation of the Plan will provide each creditor and Interest holder of each Debtor with a recovery that is not less than it would receive pursuant to a liquidation of the applicable Debtor under chapter 7 of the Bankruptcy Code.  See the Liquidation Analysis annexed as Exhibit B hereto for a further discussion of how the Plan satisfies the "best interests" test.

## 2.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in the Plan.  If the Plan is confirmed, on the Effective Date, Wind Down Co will receive the Closing Purchase Price in Cash from the Plan Investor (and, after the Post-Closing Purchase Price Adjustment, the remainder of the Purchase Price, if any, calculated in accordance with the Plan Funding Agreement), which combined with the Debtors' Cash on hand as of the Effective Date (and after paying certain payments required to be made on the Effective Date such as the Consenting Lender Fee Claims), are expected to be sufficient to satisfy all Plan Distributions, excluding the Assumed U.S. Liabilities and the Canadian Claims.  Additionally, on and after the Effective Date, the Acquired Debtors expect to generate sufficient Cash from post-Effective Date operations to satisfy their respective Assumed U.S. Liabilities and Canadian Claims without the need for liquidation or further reorganization of the Acquired Debtors.  The Plan contemplates that on or after the Effective Date, Wind Down Co will wind down, merge and/or dissolve the Dissolving Debtors.

The Plan Investor has advised the Debtors of the following.  The Plan Investor has been in the applicable industry since 1997 and has extensive experience purchasing and managing assets materially similar to those conveyed under the terms of the Plan.  The Plan Investor is an affiliate of Sherman Financial Group LLC, which is a guarantor under the terms of the PFA.  The Plan Investor and its direct and indirect subsidiaries, provide and conduct master servicer, recovery management, specialty account recovery and non-mortgage secured account servicing, and employ over 350 people in South Carolina and Ohio.  Their management and operational leadership have decades of experience in their respective fields.

Further, the acquisition of the Acquired Debtors by means of the Plan is not being funded by, and not contingent upon, any financing to be secured by the Acquired Debtors or their respective assets.  The Plan Investor has informed the Debtors that if, in the future, the Acquired Debtors are to become obligors for money borrowed, such obligations should be based on their actual profitability.  In addition, the operational costs of the Acquired Debtors will be equal or

less than the current levels.  As a result, the Plan Investor has informed the Debtors that the businesses of the Acquired Debtors will be operated both with less financial burden and at least as efficiently, if not more efficiently, than at present.  The Debtors believe that the Plan Investor understands the industry in which the Acquired Debtors operate and understands that it has successfully acquired other companies in the past.  Accordingly, the Debtors believe the Plan is feasible, as that term is used in connection with confirmation of chapter 11 plan.

### 3.    Cramdown

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan.  The "cramdown" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.  The Debtors intend to seek to cramdown the Plan on Classes 6 (Second Lien Lender Claims), 7A (U.S. General Unsecured Claims) and 8A (Existing U.S. Interests).

Under the "cramdown" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

4.      **Classification of Claims and Interests**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a chapter 11 plan place each claim or interest into a class with other claims or interests that are "substantially similar."

## VI.    CERTAIN EFFECTS OF THE PLAN

A.      **The Creditors' Committee**

Under the Plan, Canadian General Unsecured Claims are Unimpaired.  In addition, the Purchase Price, which is the result of an extensive marketing process and achieving the highest or otherwise best offer for 100% of the equity interests of Reorganized CACH, Reorganized CACV of Colorado, and Reorganized SquareTwo Financial Canada Corporation, is insufficient to pay anything to creditors with a priority below the 1.5 Lien Lenders.  As a result, the Debtors intend to request that the Office of the United States Trustee not appoint a Creditors' Committee during the Chapter 11 Cases.  Notwithstanding this, if a Creditors' Committee is appointed, pursuant to Section 14.3 of the Plan, such Creditors' Committee shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

B.      **Post-Confirmation Jurisdiction of the Bankruptcy Court**

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

- To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

- To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

- To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

- To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

- To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

- To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

- To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

- To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- To hear and determine all Fee Claims;

- To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Plan Funding Agreement and any transactions or payments contemplated thereby, including the Post-Closing Purchase Price Adjustment, the TSA, the Escrow and the Escrow Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

- To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following consummation;

- To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- To hear and determine all disputes involving the existence, nature or scope of the discharge, releases and injunction provisions contained in the Plan;

- To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

- To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases or Canadian Proceeding, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged under the Plan, or for any other purpose;

- To recover all assets of the Debtors and property of the Estates, wherever located, including Canada; and

- To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of Article XIII of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

It is possible, however, that the Bankruptcy Court may elect to construe its post-Effective Date jurisdiction more narrowly than the Debtors are proposing.

## VII.    BUSINESS DESCRIPTION; HISTORICAL INFORMATION

### A.    General.

SquareTwo Financial Corporation, founded in 1994, is a privately held corporation headquartered in Denver, Colorado.  The Debtors' primary business is to acquire, manage, and collect charged-off consumer and commercial accounts receivable ("**Charged-Off Accounts**"), which are accounts that credit issuers have charged off as uncollectible, but that remain owed by the borrower and subject to collection.

Charging off an account is an accounting action that merely removes the obligation from the institution's books.  It does not release the obligor on the account from his or her responsibility to pay amounts due.  Credit issuers facing collection difficulties with respect to Charged-Off Accounts can alleviate the cost these accounts create by selling them, potentially reducing the cost of credit for all of the issuer's customers and increasing the overall efficiency of the credit market.  The market price of Charged-Off Accounts in a sale transaction is substantially lower than their face value.

The Debtors first started purchasing debt in 1998.  Since then, they have invested approximately $2.7 billion in acquiring Charged-Off Accounts, representing over $39 billion in face value of accounts.  The Debtors' annual cash proceeds have steadily increased over this period, from $8.7 million in 1999, their first full year of operations, to $310.5 million in 2016.

The Debtors operate their business through a series of subsidiaries of their parent company, Debtor SquareTwo Financial Corporation.  Debtors CACH, LLC d/b/a Fresh View Funding, CACV of Colorado, LLC, and Preferred Credit Resources Limited (the "**Purchasing Entities**") purchase Charged-Off Accounts from financial institutions, finance and leasing companies, and other credit issuers in the United States and Canada.  Debtors SquareTwo Financial Services Corporation d/b/a Fresh View Solutions and CCL Financial Inc. are licensed collection agencies that collect amounts owed on Charged-Off Accounts (the "**Collecting Entities**").  There are twelve additional subsidiaries with no or nominal operations.

The Purchasing Entities are prominent participants in the purchase market for "fresh" Charged-Off Accounts, which are generally 180-210 days past due at the time of the sale and typically have not been subject to previous collection attempts by a third-party collection agency.  In Canada, the Purchasing Entities also purchase "warehouse debt," "bulk debt" and "out of statute debt," each of which consists of Charged-Off Accounts that have been dormant for several years.

Although the Debtors formerly engaged in the sale of Charged-Off Accounts, they have not regularly done so as part of their business practices since 2014, and have not done so with respect to their Canadian Charged-Off Accounts since 2009.

## 1.    United States

In the United States, the Debtors collect amounts owed on Charged-Off Accounts both within and outside of the judicial system.  In the non-legal setting, the Debtors utilize company-owned call centers that operate under the name Fresh View Solutions (the "**Fresh View Call Centers**") to pursue collections, as well as the services of First Step Group, LLC ("**First Step Group**"), a non-legal collection firm that, until recently, was exclusively dedicated to collecting Charged-Off Accounts owned by the Debtors.  To pursue collections through the court system, the Debtors utilize the services of either:  (a) one of thirteen law firms that, until recently, exclusively represent the Debtors, or rely on the Debtors as a material source of income (each, a "**Partner Law Firm**"), each of which is supported by a member of a network of operational support companies referred to as "advisory groups" (each, an "**Advisory Group**," and together with the Partner Law Firms, the "**Law Firm Network**") or (b) one of a group of additional law firms (each, an "**Additional Law Firm**" and, together with the Partner Law Firms, the "**Law Firms**") that do not exclusively represent the Debtors.  Using the services of the Law Firms to collect on Charged-Off Accounts allows the Debtors to comply with laws in the United States requiring all collections efforts pursued through litigation to be conducted by attorneys.

The Law Firms are responsible for commencing lawsuits, litigating actions and enforcing judgments.  In the Law Firm Network, the role of each Advisory Group is to provide

accounting, human resources, compliance, and other administrative support to its corresponding Law Firm.

Together, the Fresh View Call Centers, First Step Group, the Law Firm Network, and the Additional Law Firms form a unique business model that the Debtors refer to as the "**Closed Loop Network**." All of the Debtors' newly purchased Charged-Off Accounts in the United States are placed into the Closed Loop Network for collections. Specifically, all newly acquired accounts are placed for collection with the Fresh View Call Centers, which are exclusively dedicated to collecting the Debtors' Charged-Off Accounts.

If accounts cannot be collected through the Fresh View Call Centers, they are designated for legal recovery efforts and placed with a Law Firm for collection. The Debtors also use the Law Firms to collect accounts purchased prior to the establishment of the Fresh View Call Centers (specifically, accounts on which legal judgments were entered and for which payment plans were established).

Most of the Debtors' accounts are managed within a centralized, proprietary technology platform called eAGLE. The Debtors use eAGLE to maintain customer account data accurately and securely and to ensure that their collection efforts adhere to a standardized set of compliance policies and operational procedures. The Partner Law Firms, the majority of which were until recently exclusively dedicated to the Debtors, also utilize eAGLE in accordance with contractual arrangements with the Debtors. Accounts collected by the Additional Law Firms are managed through those firms' respective software systems. Regardless of where an account is managed, the Debtors require the Law Firms to adhere to common policies and procedures to maintain high levels of security and precision across their operations.

## 2. Canada

The Debtors also operate through several Canadian subsidiaries (the "**Canadian Debtors**"), directly owned by Debtor Collect America of Canada LLC, that exclusively purchase and collect Canadian Charged-Off Accounts (mainly consumer debt).

Like the Debtors' U.S. subsidiaries, the Canadian Debtors pursue collections through both judicial and non-judicial channels. The Canadian Debtors initially attempt to collect on Charged-Off Accounts in Canada through a call center (referred to as a "collection floor"), where accounts are managed using a software platform named Collect.[10] If those attempts are unsuccessful, the Debtors engage the services of one of a network of collections firms, some of which are law firms (collectively, the "**Alliance Partners**"), to continue their efforts. The Alliance Partners frequently engage law firms to pursue collections through legal channels when non-legal collection efforts fail. The Canadian Debtors also use in-house legal services provided by Debtor Metropolitan Legal Administration Services, Inc. As in the United States, the Canadian Debtors have implemented common policies and procedures across their

---

[10]    Neither the Fresh View trade name nor the eAGLE platform is used in Canada. In addition, from time to time, CCL Financial Inc. collects charged-off accounts on behalf of non-affiliated third parties. Currently, the annual payments received on account of such activities are less than $1,000.

Canadian operations, which are intended to promote accuracy and maximize the security of customer account data.

## B.     Operations

In both the United States and Canada, the Debtors have two primary business processes: (a) underwriting and purchasing and (b) management of collections and other cash proceeds on purchased debt.  In the United States, these processes are subject to oversight by a number of federal regulators, including the Consumer Financial Protection Bureau.  The Debtors also must comply with federal statutes such as the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Telephone Consumer Protection Act, and similar state and local statutes and regulations.  Similarly, in Canada, the Debtors' collection efforts are subject to oversight by a number of provincial ministries, including the Ontario Ministry of Small Business and Consumer Services and the Quebec Office of Consumer Protection.  The Debtors also must comply with guidelines set forth by the Canadian Radio-Television and Telecommunications Commission, federal statutes such as the Personal Information Protection and Electronic Documents Act and the Canadian Anti-Terrorism Act, and federal and provincial statutes governing debt collection agencies.

## 1.     Underwriting and Purchasing

The success of the Debtors' business depends heavily on their ability to find Charged-Off Accounts for purchase, accurately evaluate those assets, and acquire them at the appropriate pricing.  In addition, the Debtors maintain relationships with marketplace lenders, financial technology companies, super-regional and regional banks, and other credit issuers.

The Debtors also review all purchasing opportunities and create forecasted cash flows for each purchase using proprietary statistical models and the Debtors' experience with similar purchases.  These models and related assumptions are reviewed by the Debtors' investment committee, which includes members of their senior leadership team and representatives from each key business function, to determine the appropriate purchase price for the available portfolios.  The Debtors target purchases that meet return thresholds determined by the investment committee.

The majority of the Debtors' purchasing opportunities are sourced through limited offerings or exclusive relationships with debt providers. The Debtors also evaluate one-off negotiated deals and broader auction sales depending on the type of receivable at issue and the type of process desired by the seller.  Finally, the Debtors spend substantial time forging new business relationships with debt providers that have not historically participated in debt sales.

The price of Charged-Off Accounts is primarily dictated by the supply and quality of the accounts for sale.  The Charged-Off Accounts the Debtors purchase can vary dramatically in age, type, quality, and collectability, meaning the Debtors may pay significantly different prices from one purchase to another.  In addition, market forces can drive prices up or down. Regardless of the price paid for Charged-Off Accounts, the Debtors target a required rate of return for each of their purchases based on the unique qualities of each portfolio.  The Debtors'

purchasing strategy in a given period involves seeking a certain level of expected returns at pricing that appropriately accounts for collection risks.

**2.      Management of Collections and Other Cash Proceeds on Purchased Debt**

A key driver of the Debtors' performance, and one of the primary metrics monitored by their management team, is cash proceeds received from purchased debt.  Included in cash proceeds are (x) non-legal collections (as defined below), (y) collections accomplished through the use of lawyers and the court system, and (z) returns of non-conforming accounts (also known as "recourse").  These incoming cash flow streams and their respective relationships to the collection life cycle are described further below.

(a)      **Non-Legal Collections.**

Currently, once the Debtors acquire a Charged-Off Account, they pursue collections through one of the Collecting Entities or First Step Group, each of which engages in activities short of initiating lawsuits (typically, calls and letters to the account holder).  These activities are referred to as "non-legal collections."  Non-legal collections are the most cost-effective means for the Debtors to realize cash proceeds.

(b)      **Legal Collections.**

The Debtors' strong preference is to assist customers in resolving their financial commitments without filing a lawsuit.  In some cases, however, court processes are necessary to collect monies owed on the Charged-Off Accounts where non-legal collection methods fail (for example, where an obligor's apparent financial resources indicate that he or she has the ability, but not the willingness, to pay amounts owed on a Charged-Off Account).

In cases where collections are commenced through legal channels, the Debtors allocate Charged-Off Accounts to law firms for collection in accordance with applicable law and the Debtors' policies and procedures.

Although the Debtors' overall legal collections have decreased over the past three years, they have increased as a percentage of the Debtors' total cash proceeds in the United States because the Debtors have purchased less debt since 2014 than they did in years prior.

(c)      **Recourse.**

The Debtors typically have recourse — or the right to return — certain Charged-Off Accounts to the seller under the relevant purchase contract within a designated time period after the purchase date if the account does not meet certain agreed-upon requirements.  These include, for example, when an obligor on an account was deceased or in bankruptcy at the time the Debtors purchased the account, when an account was opened through fraud, and when an account had been previously resolved, but was sold in error.

In addition, the Debtors advance court costs and related fees through the Law Firms, and from time to time recoup these costs as well as attorneys' fees awarded to them through litigation.

### C.    The Debtors' Prepetition Capital Structure.

Pursuant to the Recapitalization, the Debtors repaid their then-existing revolving credit facility and entered into the First Lien Financing Agreement and the 1.25 Lien Credit Agreement.  The Debtors also made an exchange offer for their then-outstanding 11.625% Senior Second Lien Notes due 2017.  The total consideration for each $1,000 in aggregate principal amount of exchanged Second Lien Notes (the "**Exchanged Notes**") validly tendered and accepted for purchase by the holders of such Exchanged Notes (collectively, the "**Supporting Noteholders**") was (i) $650 in aggregate principal amount of the 1.5 Lien Term Loan (as defined below) and (ii) $350 initial liquidation preference of SquareTwo Financial Corporation's preferred stock.  Approximately 25% of the holders, representing approximately 93% of the dollar amount of the Second Lien Notes, participated in the exchange.

### 1.    First Lien Financing Agreement

In connection with the Recapitalization, the Debtors entered into that certain Financing Agreement (the "**First Lien Financing Agreement**"), dated as of May 24, 2016, by and among SquareTwo Financial Corporation, as Borrower, the loan parties thereto, the lenders from time to time party thereto, and Cerberus Business Finance, LLC, as Collateral Agent and Administrative Agent.  Under the First Lien Financing Agreement, certain of the Debtors are borrowers under (a) a $60 million revolving credit facility (the "**First Lien Revolving Credit Facility**") and (b) a $105 million term loan facility (the "**First Lien Term Loan Facility**," and, together with the First Lien Revolving Credit Facility, the "**First Lien Financing Facility**").  The First Lien Revolving Credit Facility contains a sublimit of $17.5 million that may be borrowed by two Debtors incorporated in Canada:  CCL Financial Inc. and Preferred Credit Resources Limited (the "**Canadian Borrowers**").  Any available commitments under the First Lien Revolving Credit Facility that are not borrowed by the Canadian Borrowers may be borrowed by three Debtors incorporated in the United States:  SquareTwo Financial Corporation, SquareTwo Financial Services Corporation, and CACH, LLC (the "**U.S. Borrowers**").  The U.S. Borrowers and Canadian Borrowers are co-debtors on their respective loans under the First Lien Financing Agreement.  Each of the other Debtors is a guarantor under the First Lien Financing Facility.

As of the Voting Record Date there was $37 million in aggregate principal amount outstanding and approximately $221,495 in accrued but unpaid interest and fees outstanding under the First Lien Revolving Credit Facility.  There was also $105 million in aggregate principal amount outstanding and approximately $721,00 in accrued but unpaid interest and fees under the First Lien Term Loan Facility as of the Voting Record Date.  The First Lien Term Loan Facility is secured by a first priority lien on substantially all of the Debtors' assets.  As a result of the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016 being greater than $1 million, the maturity date under the First Lien Financing Agreement occurred on January 1, 2017.  In connection therewith, the Debtors and the lenders under the First Lien Financing Agreement entered into a series of forbearance

agreements whereby such lenders agreed, among other things, to forbear from exercising remedies against the Debtors until March 13, 2017. The Debtors expect to receive a further extension of the forbearance period to the Petition Date.

## 2.     1.25 Lien Credit Agreement

Pursuant to the Recapitalization, the Debtors also offered the Supporting Noteholders the opportunity to participate in a 1.25 lien term loan facility in the aggregate principal amount of $15 million under that certain 1.25 Lien Credit Agreement, dated as of May 24, 2016, by and among SquareTwo Financial Corporation, as Borrower, the loan parties thereto, the lenders party thereto, and Cortland Capital Market Services LLC, as the Administrative Agent (the "**1.25 Lien Credit Agreement**, and the delayed draw commitments thereunder, the "**1.25 Lien Term Loan Facility**").  Certain of the Supporting Noteholders provided the entire 1.25 Lien Term Loan Facility.

As of the Voting Record Date, there was $16,304,130.10 in aggregate principal amount outstanding under the 1.25 Lien Term Loan Facility.  The 1.25 Lien Term Loan Facility is secured by a lien (subordinated in priority to the lien held by the lenders under the First Lien Financing Agreement) on substantially all of the Debtors' assets.  As a result of the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016 being greater than $1 million, the maturity date under the 1.25 Lien Credit Agreement occurred on January 1, 2017. In connection therewith, the Debtors and the lenders under the 1.25 Lien Credit Agreement entered into a series of forbearance agreements whereby such lenders agreed, among other things, to forbear from exercising remedies against the Debtors until March 13, 2017.  The Debtors expect to receive a further extension of the forbearance period to the Petition Date.

## 3.     1.5 Lien Term Loan Facility

In connection with the Recapitalization, the Debtors also entered into that certain 1.5 Lien Credit Agreement, dated as of May 24, 2016, by and among SquareTwo Financial Corporation, as Borrower, the loan parties thereto, the lenders party thereto, and Cortland Capital Market Services LLC, as administrative agent (the "**1.5 Lien Credit Agreement**").  Under the 1.5 Lien Credit Agreement, SquareTwo Financial Corporation was authorized to issue up to $188.5 million in aggregate principal amount of senior secured term loans (the "**1.5 Lien Term Loan Facility**") as partial consideration for the exchange of the Second Lien Notes.

As of the Voting Record Date, there was $191,523,223.79 in aggregate principal amount outstanding under the 1.5 Lien Term Loan Facility.  The 1.5 Lien Term Loan Facility is secured by a lien (subordinated in priority to the lien held by the lenders under the First Lien Financing Agreement and the lenders under the 1.25 Lien Credit Agreement) on substantially all of the Debtors' assets.  As a result of the aggregate principal amount of Second Lien Notes outstanding as of December 31, 2016 being greater than $1 million, the maturity date under the 1.5 Lien Credit Agreement occurred on January 1, 2017.  In connection therewith, the Debtors and the lenders under the 1.5 Lien Credit Agreement entered into a series of forbearance agreements whereby such lenders agreed, among other things, to forbear from exercising remedies against the Debtors until March 13, 2017.  The Debtors expect to receive a further extension of the forbearance period to the Petition Date.

4.    **Second Lien Notes**

Pursuant to that certain Indenture, dated as of April 7, 2010 (the "**Second Lien Indenture**"), by and between SquareTwo Financial Corporation, as Issuer, the guarantors named therein, and U.S. Bank National Association, as Trustee (the "**Indenture Trustee**"), SquareTwo Financial Corporation issued $290 million in aggregate principal amount of Second Lien Notes.

After the Recapitalization, $19,082,000 in principal amount of Second Lien Notes remain outstanding as of the Voting Record Date, which are owned by holders who did not exchange their notes in the exchange offer conducted in connection with the Recapitalization. As of the Petition Date, there will be approximately $1.05 million in accrued but unpaid interest outstanding under the Second Lien Indenture.  The Second Lien Notes are secured by a lien (subordinated in priority to the lien held by the under the First Lien Financing Agreement, the lenders under the 1.25 Lien Credit Agreement and the lenders under the 1.5 Lien Credit Agreement) on substantially all of the assets of the Debtors incorporated in the United States.[11] Pursuant to the terms of the Second Lien Indenture, the Second Lien Notes mature on April 1, 2017.  Pursuant to the terms of the Second Lien Intercreditor Agreement, holders of Second Lien Notes may not, among other things, object to the forbearance agreements agreed to by the Agents (as defined below) or lenders under the First Lien Financing Agreement, 1.25 Lien Credit Agreement, and 1.5 Lien Credit Agreement nor may they exercise or seek to exercise any rights or remedies with respect to the liens on the collateral or institute any action or proceeding with respect to such rights or remedies.

5.    **Intercreditor Agreements**

The agents under each of the First Lien Financing Agreement, the 1.25 Lien Credit Agreement, and the 1.5 Lien Credit Agreement (each, an "**Agent**" and together, the "**Agents**"), along with Indenture Trustee, are party to several intercreditor agreements executed in connection with the Recapitalization, each dated as of May 24, 2016, which govern the relative rights of the lenders under the First Lien Financing Agreement, the 1.25 Lien Credit Agreement, and the 1.5 Lien Credit Agreement with respect to their shared collateral.

Additionally, the Agent under the 1.25 Lien Credit Agreement and the Agent under the 1.5 Lien Credit Agreement are parties to that certain 1.25 Lien Intercreditor Agreement, dated as of May 24, 2016, which governs the relative rights of the lenders under the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement with respect to their shared collateral.

Finally, the Agents and the Indenture Trustee are each party to that certain Amended and Restated Second Lien Intercreditor Agreement, dated as of May 24, 2016, which governs the relative rights of all of the secured lenders with respect to their shared collateral.

---

[11]    The Debtors incorporated in Canada are not guarantors under the Second Lien Indenture.

### D. Equity Ownership

The Supporting Noteholders received $350 of a new class of convertible preferred stock in consideration for every $1,000 in principal amount of Exchanged Notes.  SquareTwo Financial Corporation's preferred stock interests represent 90% of its common stock on an as-converted basis.  The remaining 10% of its common stock on an as-converted basis is held by the former shareholders of its former parent entity, CA Holding, Inc.

## VIII.   THE REORGANIZATION CASES

### A. Continuation of Business After the Petition Date

Following the Petition Date, the Debtors intend to operate their business in the ordinary course as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

### B. First Day Relief

The Debtors expect that the Reorganization Cases will be of a short duration, and expect to request that the Bankruptcy Court schedule a confirmation hearing within forty (40) days of the Petition Date or as soon thereafter as the Bankruptcy Court has availability.  To expedite their emergence from any Reorganization Cases, the Debtors intend to seek, among other things, the relief detailed below from the Bankruptcy Court on the Petition Date, and seek recognition from the Canadian Court of all orders entered by the Bankruptcy Court.  If granted, this relief will facilitate the administration of the Reorganization Cases.  There can be no assurances, however, that the Bankruptcy Court will grant the requested relief.  Bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of chapter 11 cases.  The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals, including the matters described below.

Together with its petition for relief, the Debtors anticipate filing a number of "first day" motions on the Petition Date.  The Debtors' first day motions may include, among other things, motions for orders:

- authorizing the Debtors to obtain debtor in possession financing and to use cash claimed as collateral;

- authorizing the Debtors (a) to continue the Debtors' current cash management system, (b) to maintain prepetition bank accounts, and (c) to continue use of existing books and records;

- authorizing the Debtors to pay (a) prepetition employee wages, salaries and other compensation, (b) prepetition employee business expenses, and (c) other miscellaneous employee expenses and employee benefits;

- authorizing the Debtors to continue their collections system including through the use of their advisory groups and the continued retention of their collections law firms, and to pay all fees and costs associated thereunder;

- authorizing the Debtors to pay Canadian General Unsecured Claims in the ordinary course of business;

- authorizing the Debtors to pay prepetition sales, use and other taxes and regulatory and other fees;

- authorizing the Debtors to honor and pay prepetition obligor refunds;

- authorizing the Debtors to pay local court costs and recording and garnishment fees; and

- such other orders as are typical in chapter 11 cases or that may be necessary for the preservation of the Debtors' assets or for confirmation of the Plan.

The orders will be sought pursuant to corresponding motions and, if appropriate, memoranda of law. The foregoing list is subject to change depending upon the Debtors' needs in connection with their operations during the Reorganization Cases. Failure of the Bankruptcy Court to enter one or more of these orders, or a delay in doing so, could result in the Reorganization Cases becoming protracted and could delay, perhaps materially, the hearing on, and the ultimate confirmation of, the Plan.

## C.    Case Administration

### 1.    Joint Administration of the Chapter 11 Cases.

The Debtors intend to seek an order authorizing joint administration of the Chapter 11 Cases for procedural purposes only. As many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect all of the Debtors, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders. No party should be prejudiced by the joint administration of the Chapter 11 Cases as such relief is solely procedural and is not intended to affect substantive rights.

### 2.    Scheduling of Combined Disclosure Statement and Confirmation Hearing and Approval of Prepetition Solicitation Procedures.

The Debtors intend to seek an order scheduling a combined Confirmation Hearing and Disclosure Statement Hearing at which time the Debtors will seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1126, 1128 and 1129 of the Bankruptcy Code. The Debtors will request this hearing take place no later than forty (40) days after the Petition Date, or such later date that the Bankruptcy Court is available. The Debtors also will seek approval of the prepetition solicitation procedures of acceptances of the Plan from holders of Claims in the Voting Class.

3.    **Schedules and Statements of Financial Affairs.**

The Debtors intend to seek an order postponing their time to file their schedules of assets and liabilities and statements of financial affairs or waiving such requirement if the Plan is confirmed within sixty (60) days of the Petition Date.

4.    **Retention of Professionals.**

Upon the commencement of the Chapter 11 Cases, the Debtors intend to file certain applications to retain professionals who will assist the Debtors in the administration of the Reorganization Cases.  Among other professionals, the Debtors intend to retain AP Services, LLC as crisis manager and designate certain managing directors and directors of AP Services, LLC as certain officers of the Debtors, Willkie Farr & Gallagher LLP as U.S. bankruptcy counsel, Thornton Grout Finnigan LLP as Canadian bankruptcy counsel, Keefe, Bruyette & Woods, Inc. as financial advisor and investment banker, and Prime Clerk LLC as claims, voting and noticing agent.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain material United States federal income tax consequences of the implementation of the Plan to the Debtors post-consummation of the Plan, and certain holders of Claims.  The following summary is only for general information purposes and only describes the expected tax consequences to holders of Claims entitled to vote on the Plan. The following summary is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the IRS, all as in effect on the date hereof.  Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

For purposes of this discussion, the term "U.S. Holder" means a holder of a Claim that is, for U.S. federal income tax purposes: (a) an individual citizen or resident of the United States; (b) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia; (c) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (ii) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes; or (d) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a holder of a Claim, other than an entity or arrangement classified as a partnership for U.S. federal income tax purposes, that is not a U.S. Holder.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes (other than the federal income tax) or with non-U.S., state, local or other tax considerations.  Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income

tax.  Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner of a partnership that holds a Claim, then you should consult your own tax advisors.

The federal income tax consequences of the Plan are complex and subject to significant uncertainties.  Also, the tax consequences to holders of Claims may vary based on the individual circumstances of each holder.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers, such as, without limitation, foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, investors in pass through entities, litigation claimants, former employees of the Debtors with claims relating to their employment, or shareholders who acquired the stock through the exercise of an employee stock option or otherwise as compensation.  This discussion assumes that holders hold their Claims, and will hold any property received in exchange for such Claims, as "capital assets" within the meaning of Tax Code section 1221. The tax consequences to holders of Claims may vary based on the specific characteristics and circumstances of the holders.

**Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based on the individual circumstances pertaining to the holder of a Claim.  All holders of Claims are urged to consult their own tax advisors in determining the federal, state, local and other tax consequences to them of the Plan.**

### A.    Federal Income Tax Consequences to the Debtors

### 1.    Proposed Restructuring Transaction

In connection with the Proposed Restructuring Transaction, it is anticipated that SquareTwo and the Dissolving Debtors will recognize gain for U.S. federal income tax purposes equal to the difference between the amount of consideration received and the adjusted tax basis in the assets and equity interests transferred.  SquareTwo and the Dissolving Debtors will be able to utilize, subject to certain limitations, any net operating losses ("**NOLs**"), current year losses, or available tax credits to offset such gain.  However, it is anticipated that such gain recognized in connection with the Proposed Restructuring Transaction will be in excess of the tax attributes available, resulting in federal income tax being owed by SquareTwo and the Dissolving Debtors.

### 2.    Cancellation of Debt

As a result of the Plan's implementation, the amount of the Debtors' aggregate outstanding indebtedness will be reduced substantially.  In general, cancellation of debt ("**COD Income**") is includable in a taxpayer's gross income.  If COD Income is recognized by a debtor

in a bankruptcy case, it is generally excluded from the debtor's gross income. The Tax Code provides that where COD Income is excluded because of the bankruptcy or insolvency exceptions, the debtor must reduce certain of its tax attributes, such as NOLs, current year losses, tax credits and tax basis in property, on the first day of the following tax year by the amount of any excluded COD Income after the determination of the federal income tax for the year of the discharge of the debt. The amount of the COD Income will equal the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is without further current or future tax cost to the debtor.

Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group. Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction. To the extent that the excluded discharge of indebtedness income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes to such lower-tier member).

As a result of the discharge of certain Claims pursuant to the Plan, the Debtors are expected to realize significant COD Income. The amount of COD Income will depend, in part, on the amount of cash distributed in discharge of Claims. Under the rules discussed above, the NOLs of the Debtors are expected to be eliminated on the first day of the tax year following the realization of the COD Income as a result of this COD Income. Other tax attributes also may be reduced.

### 3.    Section 382

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock. Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (a) the fair market value of the corporation immediately before the ownership change multiplied by (b) the "long term tax-exempt rate" for the month in which the ownership change occurs. If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses recognized during the five year period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under section 382. If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the five year period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

It is anticipated that an ownership change will occur with respect to the Debtors on the Effective Date.  However, as a result of the Proposed Restructuring Transaction and the Plan's implementation, the NOLs of the Debtors are expected to be utilized to offset the gain described in "*Federal Income Tax Consequences to the Debtors – Proposed Restructuring Transaction.*"  However, if the NOLs of the Debtors are not completely utilized to offset such gain or otherwise eliminated as described in "*Federal Income Tax Consequences to the Debtors – Cancellation of Debt*", then it is expected that section 382 will apply to limit the Debtors' ability to use any remaining NOLs to offset post-Effective Date income.

## B.    Federal Income Tax Consequences to U.S. Holders

### 1.    Exchange of Claims for Cash

The receipt of Cash by a U.S. Holder in exchange of its Claim generally will be a taxable transaction for U.S. federal income tax purposes.  A U.S. Holder generally will recognize gain or loss in an amount equal to the difference between (i) the Cash received in exchange for the Claim and (ii) the U.S. Holder's adjusted tax basis in the Claim. A U.S. Holder's adjusted tax basis in the Claim generally will equal (a) such U.S. Holder's cost for the Claim, (b) increased by any market discount (as discussed below) previously included in gross income by the U.S. Holder with respect to the Claim and (c) decreased (but not below zero) by any bond premium previously amortized by the U.S. Holder with respect to the Claim.  Except with respect to accrued interest and to the extent that gain is recharacterized as ordinary income pursuant to the market discount rules discussed below, such gain or loss will be capital gain or loss and will be a long-term capital gain or loss if the U.S. Holder's holding period for the Claim exceeds one year at the time of the exchange. Long-term capital gains recognized by non-corporate U.S. Holders (including individuals) are currently eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### 2.    Market Discount

A U.S. Holder of Claims with a tax basis less than the amount payable at maturity with respect to such Claims generally will be subject to the market discount rules of the Tax Code (unless such difference is less than a prescribed *de minimis* amount).

Under the market discount rules, a U.S. Holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, Claims as ordinary income to the extent of the accrued market discount that has not previously been included in income at the time of such payment or disposition.  Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of the Claims to their maturity date, unless the U.S. Holder irrevocably elects to compute the accrual of market discount on a constant yield basis.

### 3.    Distributions in Discharge of Accrued Interest

In general, to the extent that any Cash is received by a U.S. Holder of a Claim in satisfaction of accrued interest on such Claim, such amount will be taxable to the holder as interest income if such interest has not been included previously in the U.S. Holder's gross

income.  A U.S. Holder generally will recognize a loss to the extent any accrued interest previously was included in a U.S. Holder's gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for U.S. federal income tax purposes, and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for U.S. federal income tax purposes.

### 4.      Other Considerations

(a)      **Fees**.  To the extent that a U.S. Holder receives cash or other property for fees, expenses and other amounts due under a Claim, such amounts will generally be includible in income in accordance with the U.S. Holder's general method of tax accounting.

(b)      **Additional Tax on Investment Income**.  Certain individuals, estates and trusts are required to pay a 3.8% Medicare tax on "net investment income" including, among other things, interest and proceeds of sales or other dispositions in respect of securities, subject to certain exceptions.  U.S. Holders should consult their tax advisors regarding the effect, if any, of this tax on their ownership and disposition of a Debtor's securities.

### C.      Federal Income Tax Consequences to Non-U.S. Holders

### 1.      Consequences to Non-U.S. Holders of the Plan

Subject to the discussion under "*Federal Income Tax Consequences to Non-U.S. Holders – FATCA Withholding*," any gain or interest income realized by a Non-U.S. Holder on the exchange of its Claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of the voting stock of a Debtor, is not a controlled foreign corporation related, directly or indirectly, to a Debtor through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the Tax Code has been fulfilled with respect to the beneficial owner, as discussed below; and

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States.

The statement requirement referred to in the second bullet point of the preceding paragraph generally will be fulfilled if the beneficial owner of the cash received on the exchange certifies on IRS Form W-8BEN or W-8BEN-E (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address.  The

Non-U.S. Holder must provide the form to the Debtors or their Disbursing Agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their Disbursing Agent a statement that it has received the form and furnish a copy thereof; provided that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its Claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, generally will be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## 2.    FATCA Withholding

Pursuant to Sections 1471 through 1474 of the Tax Code, commonly known as the Foreign Account Tax Compliance Act ("**FATCA**"), a 30% withholding tax ("**FATCA withholding**") may be imposed on certain payments to certain foreign financial institutions, investment funds and other non-U.S. persons receiving payments on a holder's behalf if the holder or such persons fail to comply with certain information reporting requirements. An intergovernmental agreement between the United States and an applicable foreign country, or future Treasury regulations, may modify this regime. Payments of interest (including original issue discount) that a holder receives in respect of a Claim, as applicable, could be affected by this withholding if such holder is subject to the FATCA information reporting requirements and fails to comply with them or if such holder holds the Claim indirectly through a non-U.S. person (e.g., a foreign bank or broker) that fails to comply with these requirements (even if payments to a holder would not otherwise have been subject to FATCA withholding). Payments of gross proceeds from the exchange of a Claim also could be subject to FATCA withholding unless such disposition occurs before January 1, 2019. Non-U.S. Holders should consult their own tax advisors regarding the relevant U.S. law and other official guidance on FATCA withholding.

## D.    Information Reporting and Withholding

Distributions pursuant to the Plan generally will be subject to information reporting by the Disbursing Agent to the IRS. In addition, holders of Allowed Claims claiming a loss in excess of specified thresholds may be required to file a disclosure statement with their federal income tax return reporting such loss. Holders should consult their tax advisors regarding these reporting requirements and whether the transactions contemplated by the Plan would require disclosure on the holders' tax returns.

All distributions to U.S. Holders of Allowed Claims under the Plan are subject to any applicable withholding obligations. Under U.S. federal income tax law, interest, dividends, and other reportable payments may be subject to "backup withholding" at the then applicable rate unless the U.S. Holder (a) is a corporation or other exempt recipient or (b) provides an accurate taxpayer identification number and certifies that it is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a holder will be refunded or credited against the holder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

**THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER OF CLAIMS SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## X.   PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

### A.   Distributions

Except for (a) (i) any Canadian Claims and (ii) any Assumed U.S. Liabilities, in each case, which will be paid by the applicable Acquired Debtors, and (b) certain Intercompany Claims and certain Intercompany Interests in each case being retained by the Acquired Debtors, the Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of the Plan.

### B.   No Postpetition Interest on Claims

Except with respect to Allowed DIP Claims, the First Lien Lender Claims and the 1.25 Lien Lender Claims, and unless otherwise specifically provided for in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### C.   Date of Distributions

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made under the Plan shall be made on the applicable Distribution Date; provided, that the Dissolving Debtors may utilize periodic distribution dates to the extent that use of a periodic distribution date does not delay payment of the Allowed Claim more than thirty (30) days. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

D.      **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors, the Disbursing Agent, nor the Plan Investor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

E.      **Disbursing Agent.**

(a)     **Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable Plan Distributions or payments contemplated thereby in respect of the Dissolving Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     **Expenses Incurred by the Disbursing Agent On or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of Wind Down Co (solely if the Plan Administrator is not the Disbursing Agent), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to Wind Down Co and without the need for approval by the Bankruptcy Court, as set forth in Section 3.2(b) of the Plan.  In the event that the Disbursing Agent and Wind Down Co are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)     **Bond.**

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of

procuring any such bond or surety shall be borne by the Dissolving Debtors.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)    **Cooperation with Disbursing Agent.**

Wind Down Co shall use commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, that are entitled to receive Plan Distributions, as set forth in the Debtors' or the applicable Reorganized Debtors' books and records.  Wind Down Co will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.14 of the Plan.

## F.    Delivery of Distributions

Subject to the provisions contained in Article VIII of the Plan, with respect to distributions required to be made to holders of Allowed Claims by the Dissolving Debtors under the Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by the Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any Plan Distribution to any such holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; provided, however, that such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of ninety (90) days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.  Notwithstanding the foregoing, all distributions to be made on account of (x) the First Lien Lender Claims shall be delivered to the First Lien Administrative Agent for the benefit of itself and the First Lien Lenders in accordance with the terms of the First Lien Financing Agreement; (y) the 1.25 Lien Lender Claims shall be delivered to the 1.25 Lien Administrative Agent for the benefit of itself and the 1.25 Lien Lenders in accordance with the terms of the 1.25 Lien Credit Agreement; and (z) the 1.5 Lien Lender Claims shall be delivered to the 1.5 Lien Administrative Agent for the benefit of itself and the 1.5 Lien Lenders in accordance with the terms of the 1.5 Lien Credit Agreement.

## G.    Unclaimed Property

Ninety (90) days from the later of: (i) the Effective Date, and (ii) the first Distribution Date after such holder's Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable under the Plan on account of such Claim shall revert to the applicable Dissolving Debtor or their respective successors or assigns and be deposited in the Wind Down Account, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  Wind Down Co

and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

### H.    Satisfaction of Claims

Unless otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### I.    Manner of Payment Under Plan

Except as specifically provided in the Plan, at the option of Wind Down Co, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the applicable Reorganized Debtor, as the case may be.

### J.    De Minimis Cash Distributions

None of the Dissolving Debtors, the Plan Administrator or the Disbursing Agent shall have any obligation to make a distribution that is less than $50.00 in Cash.

### K.    Distributions on Account of Allowed Claims Only

Notwithstanding anything in the Plan to the contrary, no Plan Distribution shall be made on account of a Claim until such Claim becomes an Allowed Claim.

### L.    No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

### M.    Setoffs and Recoupments

Except as expressly provided in the Plan and except with respect to the Prepetition Secured Lender Claims, the Dissolving Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Dissolving Debtor and the holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Reorganized Debtor, including any Acquired Debtor or any Dissolving Debtor, or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of its respective successors may possess against the applicable holder.

N.      **Withholding and Reporting Requirements**

In connection with the Plan and all Plan Distributions under the Plan, the Dissolving Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority, and all Plan Distributions under the Plan shall be subject to any such withholding and reporting requirements. The Dissolving Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to Wind Down Co for the payment and satisfaction of such tax obligations or has, to Wind Down Co's satisfaction, established an exemption therefrom.

## XI.      PROCEDURES FOR RESOLVING CLAIMS

A.      **Claims Process**

Except as otherwise provided by order of the Bankruptcy Court, holders of Claims need not file proofs of claim with the Claims Agent or the Bankruptcy Court and shall be subject to the Bankruptcy Court claims process only to the extent set forth in the Plan and/or Confirmation Order.

All Canadian Claims and all Assumed U.S. Liabilities will be paid in the ordinary course of business of the Acquired Debtors. If an Acquired Debtor disputes the amount of any Canadian Claim or any Assumed U.S. Liability, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Cases had not commenced and shall survive the Effective Date as if the Reorganization Cases had not been commenced.

B.      **Objections to Claims**

Other than with respect to Fee Claims, Canadian Claims and Assumed U.S. Liabilities, only Wind Down Co, on behalf of itself and the other Dissolving Debtors, shall be entitled to object to Claims on and after the Effective Date, except that nothing in the Plan shall be understood to waive the Plan Investors' or Acquired Debtors' right to argue that a Claim filed against the Acquired Debtors has been discharged under the Plan. Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. From and after the Effective Date, Wind Down Co may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### C.    Payments and Distributions with Respect to Disputed Claims

If an objection to a Claim is filed as set forth in Section 9.2 of the Plan, except as otherwise agreed by Wind Down Co, in its sole discretion, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## XII.   ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Restructuring Support Agreement, the Plan Supplement and to this Disclosure Statement, including the Plan Funding Agreement, will be available for inspection by contacting the Voting Agent.  In addition, on or after the Petition Date, such documents will be posted on the Debtors' website at http://cases.primeclerk.com/squaretwo.

## XIII.   CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Class 3 (First Lien Lender Claims), Class 4 (1.25 Lien Lender Claims) and Class 5 (1.5 Lien Lender Claims) Claims to vote to **ACCEPT** the Plan, and to duly complete and return their ballots so that they will be **ACTUALLY RECEIVED** on or before 5:00 p.m. (prevailing Eastern Time) on March 17, 2017.

Dated: March 3, 2017
       New York, New York

> **SQUARETWO FINANCIAL SERVICES CORPORATION,** on behalf of itself and its affiliated Debtors
>
> By:     /s/ J.B. Richardson, Jr._____
> Name: J.B. Richardson, Jr.
> Title:   President and Chief Executive Officer and/or Authorized Signatory

Counsel:

WILLKIE FARR & GALLAGHER LLP
Matthew Feldman, Esq.
Paul V. Shalhoub, Esq.
Robin Spigel, Esq.
Debra C. McElligott, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Counsel for the Prospective Debtors
and Debtors in Possession

# EXHIBIT A

## Chapter 11 Plan

**SQUARETWO FINANCIAL SERVICES CORPORATION, ET AL. HAVE NOT FILED VOLUNTARY CHAPTER 11 CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED. PROMPTLY FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, SQUARETWO FINANCIAL SERVICES CORPORATION, ET AL., EXPECT TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THE DISCLOSURE STATEMENT RELATED TO, AND THE SOLICITATION OF VOTES FOR AND CONFIRMING, THIS PREPACKAGED CHAPTER 11 PLAN.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SquareTwo Financial Services | : | Case No. 17-_____ (      ) |
| Corporation, et al.,[1] | : | |
| | : | (Joint Administration Pending) |
| Debtors. | : | |

---------------------------------------------------------x

---

## JOINT PREPACKAGED CHAPTER 11 PLAN FOR SQUARETWO FINANCIAL SERVICES CORPORATION AND ITS AFFILIATED DEBTORS

---

Dated:     New York, New York
           March 3, 2017

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for the Prospective Debtors and Debtors in Possession*
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number and/or Canadian equivalent are as follows:  Astrum Financial, LLC (2265); Autus, LLC (2736); CA Internet Marketing, LLC (7434); CACH, LLC d/b/a Fresh View Funding (6162); CACV of Colorado, LLC (3409); CACV of New Jersey, LLC (3499); Candeo, LLC (2809); CCL Financial Inc. (7548); Collect Air, LLC (7987); Collect America of Canada, LLC (7137); Healthcare Funding Solutions, LLC (2985); Metropolitan Legal Administration Services, Inc. (6811); Orsa, LLC (2864); Preferred Credit Resources Limited (0637); ReFinance America, Ltd. (4359); SquareTwo Financial Canada Corporation (EIN: 1034; BN: 0174); SquareTwo Financial Corporation (1849); and SquareTwo Financial Services Corporation d/b/a Fresh View Solutions (5554).  The Debtors' executive headquarters are located at 6300 South Syracuse Way, Suite 300, Centennial, CO 80111.

# TABLE OF CONTENTS

ARTICLE I.        DEFINITIONS AND INTERPRETATION ......................................................1

ARTICLE II.       CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES ................17

    2.1.    Settlement of Certain Inter-Creditor Issues ............................................17
    2.2.    Formation of Debtor Groups for Convenience Purposes.........................17
    2.3.    Intercompany Claims and Intercompany Interests .................................18

ARTICLE III.      DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE
                    CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS ..............19

    3.1.    DIP Claims...............................................................................................19
    3.2.    Administrative Expense Claims................................................................19
    3.3.    Fee Claims ...............................................................................................21
    3.4.    U.S. Trustee Fees .....................................................................................22
    3.5.    Priority Tax Claims..................................................................................22

ARTICLE IV.       CLASSIFICATION OF CLAIMS AND INTERESTS ....................................23

    4.1.    Classification of Claims and Interests......................................................23
    4.2.    Unimpaired Classes of Claims.................................................................24
    4.3.    Impaired Classes of Claims .....................................................................24
    4.4.    Separate Classification of Other Secured Claims ...................................24

ARTICLE V.        TREATMENT OF CLAIMS AND INTERESTS ..........................................25

    5.1.    Priority Non-Tax Claims (Class 1) ..........................................................25
    5.2.    Other Secured Claims (Class 2)...............................................................25
    5.3.    First Lien Lender Claims (Class 3)...........................................................26
    5.4.    1.25 Lien Lender Claims (Class 4) ..........................................................26
    5.5.    1.5 Lien Lender Claims (Class 5) ............................................................27
    5.6.    Second Lien Lender Claims (Class 6) ......................................................27
    5.7.    U.S. General Unsecured Claims (Class 7A) ............................................27
    5.8.    Canadian General Unsecured Claims (Class 7B).....................................27
    5.9.    Existing U.S. Interests (Class 8A) ...........................................................28
    5.10.   Existing Canadian Interests (Class 8B)....................................................28

ARTICLE VI.       ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
                    REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
                    INTERESTS......................................................................................29

    6.1.    Class Acceptance Requirement.................................................................29
    6.2.    Tabulation of Votes on a Non-Consolidated Basis..................................29
    6.3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
           "Cramdown." ............................................................................................29

6.4.    Elimination of Vacant Classes ...................................................................29
6.5.    Voting Classes; Deemed Acceptance by Non-Voting Classes ..........................29
6.6.    Confirmation of All Cases .........................................................................30

ARTICLE VII.    MEANS FOR IMPLEMENTATION ...........................................................30

7.1.    Non-Substantive Consolidation .................................................................30
7.2.    Plan Funding Transaction .........................................................................30
7.3.    Assumed U.S. Liabilities ..........................................................................31
7.4.    Excluded U.S. Assets ..............................................................................31
7.5.    Canadian Debtors ..................................................................................31
7.6.    Plan Funding .........................................................................................32
7.7.    Continued Corporate Existence in Certain Debtors; Vesting of Assets;
        Dissolution of Certain Debtors .................................................................32
7.8.    Cancellation of Existing Securities and Agreements .....................................34
7.9.    Boards ..................................................................................................34
7.10.   Management ..........................................................................................35
7.11.   Corporate Action ....................................................................................35
7.12.   Plan Administrator ..................................................................................36
7.13.   Wind Down of the Debtors' Estates ...........................................................37
7.14.   Consenting Lender Fee Claims ..................................................................38
7.15.   Comprehensive Settlement of Claims and Controversies; Termination of
        Subordination Rights ..............................................................................38
7.16.   Additional Transactions Authorized Under this Plan ....................................39

ARTICLE VIII.    DISTRIBUTIONS ...........................................................................39

8.1.    Distributions ..........................................................................................39
8.2.    No Postpetition Interest on Claims ............................................................39
8.3.    Date of Distributions ...............................................................................40
8.4.    Distribution Record Date .........................................................................40
8.5.    Disbursing Agent ....................................................................................40
8.6.    Delivery of Distribution ...........................................................................41
8.7.    Unclaimed Property ................................................................................41
8.8.    Satisfaction of Claims .............................................................................42
8.9.    Manner of Payment Under Plan .................................................................42
8.10.   De Minimis Cash Distributions .................................................................42
8.11.   Distributions on Account of Allowed Claims Only ........................................42
8.12.   No Distribution in Excess of Amount of Allowed Claim .................................42
8.13.   Setoffs and Recoupments ........................................................................42
8.14.   Withholding and Reporting Requirements ...................................................43

ARTICLE IX.    PROCEDURES FOR RESOLVING CLAIMS ..............................................43

9.1.    Claims Process .......................................................................................43
9.2.    Objections to Claims ...............................................................................43
9.3.    Payments and Distributions with Respect to Disputed Claims ........................44

ARTICLE X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................44

    10.1.    General Treatment ...........................................................................................44
    10.2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............45
    10.3.    Cure of Defaults for Assumed or Assumed and Assigned Executory
            Contracts and Unexpired Leases ......................................................................45
    10.4.    Effect of Confirmation Order on Assumption/Rejection......................................46
    10.5.    Modifications, Amendments, Supplements, Restatements, or Other
            Agreements ....................................................................................................47
    10.6.    Compensation and Benefit Programs...............................................................47

ARTICLE XI.     CONDITIONS PRECEDENT TO CONSUMMATION OF THE
                 PLAN ...........................................................................................................48

    11.1.    Conditions Precedent to Confirmation............................................................48
    11.2.    Conditions Precedent to the Effective Date .....................................................48
    11.3.    Satisfaction and Waiver of Conditions Precedent .............................................50
    11.4.    Effect of Failure of Conditions ........................................................................50

ARTICLE XII.    EFFECT OF CONFIRMATION ........................................................50

    12.1.    Binding Effect................................................................................................50
    12.2.    Discharge of Claims Against and Interests in the Debtors .................................51
    12.3.    Term of Pre-Confirmation Injunctions or Stays ...............................................51
    12.4.    Injunction Against Interference with Plan ........................................................51
    12.5.    Injunction .....................................................................................................52
    12.6.    Releases........................................................................................................53
    12.7.    Exculpation and Limitation of Liability ...........................................................54
    12.8.    Injunction Related to Releases and Exculpation................................................55
    12.9.    Retention of Causes of Action/Reservation of Rights ........................................55
    12.10.  Indemnification Obligations ...........................................................................55

ARTICLE XIII.   RETENTION OF JURISDICTION .................................................56

ARTICLE XIV.   MISCELLANEOUS PROVISIONS .................................................58

    14.1.    Exemption from Certain Transfer Taxes ..........................................................58
    14.2.    Retiree Benefits.............................................................................................58
    14.3.    Dissolution of Creditors' Committee................................................................59
    14.4.    Termination of Professionals ..........................................................................59
    14.5.    Amendments .................................................................................................59
    14.6.    Revocation or Withdrawal of this Plan.............................................................59
    14.7.    Allocation of Plan Distributions Between Principal and Interest .........................60
    14.8.    Severability ...................................................................................................60
    14.9.    Governing Law ..............................................................................................60
    14.10.  Section 1125(e) of the Bankruptcy Code..........................................................60
    14.11.  Inconsistency.................................................................................................61
    14.12.  Time .............................................................................................................61

14.13.  Exhibits ...................................................................................................61
14.14.  Notices ....................................................................................................61
14.15.  Filing of Additional Documents ...........................................................62
14.16.  Reservation of Rights.............................................................................62

## INDEX OF EXHIBITS

EXHIBIT A    Assumed U.S. Liabilities
EXHIBIT B    Excluded U.S. Assets

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.   Definitions.[2]

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1.**   *1.25 Lien Administrative Agent* means Cortland Capital Market Services LLC, or its successors and assigns, in its capacity as administrative agent for the 1.25 Lien Lenders under the 1.25 Lien Credit Agreement.

**1.2.**   *1.25 Lien Credit Agreement* means the 1.25 Lien Credit Agreement, dated as of May 24, 2016 (as amended, modified or supplemented from time to time), by and among SquareTwo, as borrower, the other Debtors as guarantors, the 1.25 Lien Administrative Agent and the 1.25 Lien Lenders, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.3.**   *1.25 Lien Lender* means any lender, in its capacity as such, under the 1.25 Lien Term Loan Facility pursuant to the 1.25 Lien Credit Agreement, and its successors and assigns.

**1.4.**   *1.25 Lien Lender Claim* means all Claims against any Debtor related to, arising under, or in connection with, the 1.25 Lien Term Loan Facility and the 1.25 Lien Credit Agreement, which shall be Allowed on the Effective Date in the aggregate principal amount of $16,304,130.10, plus (x) accrued and unpaid interest at the default rate to the Petition Date, (y) postpetition interest at the non-default rate from the Petition Date to the 45th day after the Petition Date and at the default rate thereafter to the Effective Date, and (z) the 1.25 Lien Lender Fee Claim.

**1.5.**   *1.25 Lien Lender Distribution* means Cash in an amount equal to the amount of the Allowed 1.25 Lien Lender Claim.

**1.6.**   *1.25 Lien Lender Fee Claim* means the reasonable and documented out-of-pocket fees and expenses incurred by the 1.25 Lien Administrative Agent and the 1.25 Lien Lenders who are party to the RSA (and remain party thereto on the Effective Date) (including those of Paul, Weiss, Rifkind, Wharton & Garrison LLP and of one Canadian counsel, on behalf of the 1.25 Lien Lenders party to the RSA and the Consenting 1.5 Lien Lenders) incurred under the 1.25 Credit Agreement, which Claims shall be Allowed on the Effective Date.

**1.7.**   *1.25 Lien Term Loan* means the term loan in the original principal amount of $15,000,000 made pursuant to the 1.25 Lien Credit Agreement.

---

[2]   Capitalized terms not defined herein shall have the meanings given them in the Plan Funding Agreement, the RSA, and the TSA, as applicable.

**1.8.** ***1.25 Lien Term Loan Facility*** means the prepetition term loan facility consisting of the 1.25 Lien Term Loan provided to the Debtors pursuant to the 1.25 Lien Credit Agreement.

**1.9.** ***1.5 Lien Administrative Agent*** means Cortland Capital Market Services LLC, or its successors and assigns, in its capacity as administrative agent for the 1.5 Lien Lenders under the 1.5 Lien Credit Agreement.

**1.10.** ***1.5 Lien Credit Agreement*** means the 1.5 Lien Credit Agreement, dated as of May 24, 2016 (as amended, modified or supplemented from time to time), by and among SquareTwo, as borrower, the other Debtors as guarantors, the 1.5 Lien Administrative Agent and the 1.5 Lien Lenders, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.11.** ***1.5 Lien Lender*** means any lender, in its capacity as such, under the 1.5 Lien Term Loan Facility pursuant to the 1.5 Lien Credit Agreement, and its successors and assigns.

**1.12.** ***1.5 Lien Lender Claim*** means all Claims against any Debtor related to, arising under, or in connection with, the 1.5 Lien Term Loan Facility and the 1.5 Lien Credit Agreement, which shall be Allowed on the Effective Date in the aggregate principal amount of $191,523,223.79, plus accrued and unpaid interest at the non-default rate, if any, to the Petition Date.

**1.13.** ***1.5 Lien Lender Distribution*** means the Remaining Cash.

**1.14.** ***1.5 Lien Lender Fee Claim*** means the unpaid reasonable and documented out-of-pocket fees and expenses incurred by the 1.5 Lien Administrative Agent and the 1.5 Lien Lenders who are party to the RSA (and remain party thereto on the Effective Date) (including those of Paul, Weiss, Rifkind, Wharton & Garrison LLP and of one Canadian counsel, on behalf of the Consenting 1.5 Lien Lenders and the 1.25 Lien Lenders party to the RSA) incurred under the 1.5 Lien Credit Agreement, which Claims shall be Allowed on the Effective Date.

**1.15.** ***1.5 Lien Term Loan*** means the term loan in the original principal amount of $176,096,700 made pursuant to the 1.5 Lien Credit Agreement.

**1.16.** ***1.5 Lien Term Loan Facility*** means the prepetition term loan facility consisting of the 1.5 Lien Term Loan provided to the Debtors pursuant to the 1.5 Lien Credit Agreement.

**1.17.** ***Acquired Debtors*** means CACH, LLC (d/b/a Fresh View Funding); CACV of Colorado, LLC; CCL Financial Inc.; Metropolitan Legal Administration Services, Inc.; Preferred Credit Resources Limited; SquareTwo Financial Canada Corporation (and any of their respective successors).

**1.18.** ***Administrative Bar Date*** has the meaning set forth in Section 3.2(a) of this Plan.

**1.19.** ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365,

503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than a DIP Claim, Fee Claim or U.S. Trustee Fees) incurred during the period from the Petition Date to the Effective Date, including: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by any of the Debtors during the Chapter 11 Cases; (b) any payment to be made under this Plan to cure a default under an assumed, or assumed and assigned, executory contract or unexpired lease; and (c) any amounts payable to the Plan Investor as provided under the Plan Funding Agreement.

**1.20.** ***Allowed*** means, with respect to a Claim under this Plan, a Claim that is an Allowed Claim or an Allowed _____ Claim.

**1.21.** ***Allowed Claim or Allowed*** _____ ***Claim*** (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, disallow, deny or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by this Plan or applicable law, or, if an action to dispute, disallow, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with this Plan, (ii) pursuant to the terms of this Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

**1.22.** ***Amended Certificates of Formation*** means the amended and restated certificates of formation or similar constitutive document for the Reorganized Debtors (as may be amended, modified or supplemented from time to time), on terms and conditions satisfactory to: (a) the Debtors with respect to the Dissolving Debtors and (b) the Debtors and the Plan Investor with respect to the Acquired Debtors. A form of Amended Certificate of Formation for the Acquired Debtors will be filed as part of the Plan Supplement.

**1.23.** ***Amended LLC Agreements*** means the amended and restated limited liability company agreements or similar constitutive document for the applicable Acquired Debtors (as may be amended, modified or supplemented from time to time), on terms and conditions satisfactory to the Debtors and the Plan Investor. A form of Amended LLC Agreement will be included in the Plan Supplement.

**1.24.** ***Assumed U.S. Liabilities*** means only those liabilities of a U.S. Debtor that are being assumed or assumed and assigned by the applicable Acquired Debtor on the Effective Date, which are set forth on Exhibit A.

**1.25.** ***Ballot*** means the form distributed by the Debtors or the Claims Agent to holders of impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated.

**1.26.** ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.27.** ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.28.** ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.29.** ***Business Day*** means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which banks are not open for general business in Toronto, Ontario, Canada or New York, New York.

**1.30.** ***Canadian Borrowers*** means each of Debtors CCL Financial, Inc. and Preferred Credit Resources Limited, as borrowers under the First Lien Financing Agreement.

**1.31.** ***Canadian Claims*** means all Claims against any Canadian Debtor, including Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Canadian General Unsecured Claims, but specifically excluding all Prepetition Secured Lender Claims and 1.5 Lien Lender Fee Claims and, except as set forth in the Plan Funding Agreement, Fee Claims, provided that no Claims solely against U.S. Debtors shall also be Canadian Claims.

**1.32.** ***Canadian Court*** means the Ontario Superior Court of Justice (Commercial list) or any other court exercising competent jurisdiction over the Canadian Proceeding.

**1.33.** ***Canadian Debtors*** means Debtors SquareTwo Financial Canada Corporation, CCL Financial Inc., Preferred Credit Resources Limited, and Metropolitan Legal Administration Services, Inc.

**1.34.** ***Canadian General Unsecured Claim*** means any Claim against a Canadian Debtor other than: (a) a First Lien Lender Claim; (b) a 1.25 Lien Lender Claim; (c) a 1.5 Lien Lender Claim; (d) an Other Secured Claim; (e) a Second Lien Lender Claim; (f) a DIP Claim; (g) an Administrative Expense Claim; (h) a Fee Claim (except to the extent set forth in the Plan Funding Agreement); (i) a Priority Tax Claim; (j) a Priority Non-Tax Claim; (k) an Intercompany Claim; and (l) U.S. Trustee Fees.

**1.35.** ***Canadian Proceeding*** means the recognition proceedings commenced on or around the Petition Date under Part IV of the *Companies Creditors Arrangement Act*, R.S.C. 1985 c C-36, in the Canadian Court to, among other things, recognize the Chapter 11 Cases as "foreign main proceedings."

**1.36.** ***Canadian PurchaseCo*** has the meaning set forth in the Plan Funding Agreement.

**1.37.**   ***Canadian Revolving Loans*** means the revolving loans made by the First Lien Revolving Loan Lenders to the Canadian Borrowers pursuant to the First Lien Financing Agreement in the principal amount of up to $17,500,000.

**1.38.**   ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.39.**   ***Causes of Action*** means any and all actions, causes of action (including causes of action under sections 510, 541, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code), suits, actions, controversies, obligations, judgments, damages, demands, debts, rights, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims (as defined in section 101(5) of the Bankruptcy Code), whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or tort, arising in law, equity or otherwise.

**1.40.**   ***Chapter 11 Cases*** means the cases (anticipated to be jointly-administered cases) under chapter 11 of the Bankruptcy Code to be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.41.**   ***Claim*** means any "claim" as defined in section 101(5) of the Bankruptcy Code against any Debtor or property of any Debtor, including any Claim arising after the Petition Date.

**1.42.**   ***Claims Agent*** means Prime Clerk LLC or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. §156(c).

**1.43.**   ***Class*** means each category of Claims or Interests established under Article IV of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.44.**   ***Closing Purchase Price*** has the meaning set forth in the Plan Funding Agreement.

**1.45.**   ***Collateral*** means any property, wherever located, including Canada, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

**1.46.**   ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.47.**   ***Confirmation Hearing*** means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.48.**   ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, the form and substance of which shall be acceptable to each of the Required Parties and the Debtors, as may be amended, modified, or supplemented from time to time with the consent of each of the Required Parties and the Debtors.

**1.49.**    ***Consenting 1.5 Lien Lenders*** means, as of the relevant time, those 1.5 Lien Lenders that are party to the RSA.

**1.50.**    ***Consenting Lender Fee Claims*** means the First Lien Lender Fee Claims, the 1.25 Lien Lender Fee Claims and the 1.5 Lien Lender Fee Claims.

**1.51.**    ***Consenting Lenders*** means, as of the relevant time, those First Lien Lenders, 1.25 Lien Lenders and 1.5 Lien Lenders that are party to the RSA.

**1.52.**    ***Creditors' Committee*** means the statutory committee of unsecured creditors, if any, appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

**1.53.**    ***Cure Amount*** has the meaning set forth in Section 10.3(a) of this Plan.

**1.54.**    ***Cure Dispute*** has the meaning set forth in Section 10.3(c) of this Plan.

**1.55.**    ***Cure Schedule*** has the meaning set forth in Section 10.3(b) of this Plan.

**1.56.**    ***Debtor(s)*** means, individually or collectively, as the context requires, SquareTwo, and each of its affiliated debtors and debtors in possession in the Chapter 11 Cases listed in footnote 1 hereto that commenced the Chapter 11 Cases on the Petition Date.

**1.57.**    ***DIP Administrative Agent*** means Cerberus Business Finance, LLC, solely in its respective capacities as administrative agent and collateral agent under the DIP Financing Agreement, or any other administrative agent appointed pursuant to the terms therein.

**1.58.**    ***DIP Claims*** means all Claims of the DIP Administrative Agent and/or the DIP Lenders related to, arising under, or in connection with a DIP Order and the DIP Financing Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of both U.S. and Canadian counsel as set forth in the DIP Financing Agreement), costs and other charges of the DIP Administrative Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Financing Agreement.

**1.59.**    ***DIP Financing Agreement*** means the Senior Secured Super-Priority Debtor in Possession Financing Agreement, dated as of [_____], 2017, by and among the Debtors and the DIP Lenders, as the same may be modified, amended or supplemented from time to time, in accordance with the terms thereof (and including any and all documents and instruments executed in connection therewith).

**1.60.**    ***DIP Financing Documents*** means the DIP Financing Agreement and all other agreements, documents and instruments entered into in connection with the DIP Financing Agreement.

**1.61.**    ***DIP Lenders*** means, collectively, and as of the relevant time, those lenders that are party to the DIP Financing Agreement.

6

**1.62.**    *DIP Order* means the order or orders of the Bankruptcy Court authorizing and approving the Debtors' entry into the DIP Financing Agreement, as recognized by order of the Canadian Court.

**1.63.**    *Disallowed* means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Interest.

**1.64.**    *Disbursing Agent* means the applicable Reorganized Debtor or the entity designated by such Reorganized Debtor, who may be the Plan Administrator, to distribute the Plan Consideration.

**1.65.**    *Disclosure Statement* means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein, (in each case, as it or they may be amended, modified, or supplemented from time to time), which shall be in form and substance acceptable to each of the Required Parties and the Debtors.

**1.66.**    *Disclosure Statement Hearing* means a hearing (which also may be the Confirmation Hearing) held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.67.**    *Disputed Claim* means, as of any relevant date, any Claim, or any portion thereof: (a) that is not an Allowed Claim as of the relevant date; and/or (b) is otherwise disputed by any of the Debtors, the Acquired Debtors, the Plan Administrator or the Dissolving Debtors, as applicable, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled; or (c) for which a proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

**1.68.**    *Dissolving Debtors* means each of Astrum Financial, LLC; Autus, LLC; CACV of New Jersey, LLC; CA Internet Marketing, LLC; Collect Air, LLC; Collect America of Canada, LLC; Orsa, LLC; ReFinance America, Ltd.; Healthcare Funding Solutions, LLC; Candeo, LLC; SquareTwo (also referred to herein as "Wind Down Co" on and after the Effective Date); and SquareTwo Financial Services Corporation (d/b/a Fresh View Solutions) (and any of their respective successors).

**1.69.**    *Distribution Date* means: (a) with respect to DIP Claims, First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims, the Effective Date, or as soon thereafter as is reasonably practicable; (b) with respect to Administrative Expense Claims, Priority Non-Tax Claims, U.S. Trustee Fees, Priority Tax Claims, and Other Secured Claims, the date that is the latest of:  (i) the Effective Date (or any date within thirty (30) days thereafter); (ii) the date such Claim would be due and payable in the ordinary course of business; and (iii) any date that is within thirty (30) days after such Claim becomes an Allowed Claim or otherwise becomes payable under this Plan (or, if such date is not a Business Day, on the next

Business Day thereafter); and (c) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims become Allowed Claims.

**1.70.** ***Distribution Record Date*** means with respect to all Classes, the third Business Day after the date the Confirmation Order is entered by the Bankruptcy Court or such other date as shall be established by the Bankruptcy Court in the Confirmation Order.

**1.71.** ***Effective Date*** means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.2 of this Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.

**1.72.** ***Escrow*** means the escrow account to be established on or before the Effective Date which shall be funded on the Effective Date by the Plan Investor in the initial amount of $12,500,000 on the terms and as more fully set forth in the Plan Funding Agreement and the Escrow Agreement.

**1.73.** ***Escrow Agreement*** has the meaning set forth in the Plan Funding Agreement.

**1.74.** ***Estate*** means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.75.** ***Excluded U.S. Assets*** means those assets of a Debtor that are being retained by the Dissolving Debtors, which are identified on Exhibit B to this Plan.

**1.76.** ***Existing Canadian Interests*** means all existing Interests (other than Intercompany Interests) in the Canadian Debtors that are outstanding immediately prior to the Effective Date.

**1.77.** ***Existing U.S. Interests*** means all existing Interests (other than Intercompany Interests) in the U.S. Debtors that are outstanding immediately prior to the Effective Date.

**1.78.** ***Fee Claim*** means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including in connection with final fee applications of such Professional Persons.

**1.79.** ***Final Order*** means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction, including the Canadian Court) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction, including the Canadian Court) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been

denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rules in connection with the Canadian Proceeding, has been or may be filed with respect to such order or judgment; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

    **1.80.**   *Final Purchase Price* has the meaning set forth in the Plan Funding Agreement.

    **1.81.**   *First Lien Administrative Agent* means Cerberus Business Finance, LLC, or its successors and assigns, in its capacity as collateral agent and administrative agent for the First Lien Lenders under the First Lien Financing Agreement.

    **1.82.**   *First Lien Financing Agreement* means the Financing Agreement, dated as of May 24, 2016 (as amended, modified or supplemented from time to time), among the U.S. Borrowers and the Canadian Borrowers, as borrowers, the other Debtors as guarantors, the First Lien Administrative Agent and the First Lien Lenders, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

    **1.83.**   *First Lien Financing Facility* means the prepetition loan facility consisting of the First Lien Revolving Loans and the First Lien Term Loan provided to the Debtors pursuant to the First Lien Financing Agreement.

    **1.84.**   *First Lien Lender* means a First Lien Revolving Loan Lender and/or a First Lien Term Loan Lender.

    **1.85.**   *First Lien Lender Claim* means all First Lien Term Loan Claims against any Debtor related to, arising under, or in connection with, the First Lien Financing Facility and the First Lien Financing Agreement which shall be Allowed on the Effective Date in the aggregate principal amount of $105,000,000, plus (x) accrued and unpaid interest at the default rate to the Petition Date, (y) postpetition interest at the non-default rate from the Petition Date to the 45th day after the Petition Date and at the default rate thereafter to the Effective Date, and (z) the First Lien Lender Fee Claim.

    **1.86.**   *First Lien Lender Distribution* means Cash in an amount equal to the amount of the Allowed First Lien Lender Claim.

    **1.87.**   *First Lien Lender Fee Claim* means the reasonable and documented out-of-pocket fees and expenses incurred by the First Lien Administrative Agent, and the First Lien Lenders who are party to the RSA (and remain party thereto on the Effective Date) (including those of Schulte Roth & Zabel LLP and McMillan LLP) incurred under the First Lien Financing Agreement, which Claims shall be Allowed on the Effective Date.

**1.88.**   ***First Lien Revolving Loan Lender*** means any lender, in its capacity as such, with a revolving credit commitment or a revolving loan under the First Lien Financing Facility pursuant to the First Lien Financing Agreement, and its successors and assigns.

**1.89.**   ***First Lien Revolving Loans*** means (a) the U.S. Revolving Loans and (b) the Canadian Revolving Loans, in each case, made at any time and from time to time during the term of and pursuant to the First Lien Financing Agreement, in the outstanding aggregate principal amount as of February 24, 2017 of $37,000,000.

**1.90.**   ***First Lien Term Loan*** means the term loan in the principal amount of $105,000,000 made pursuant to the First Lien Financing Agreement.

**1.91.**   ***First Lien Term Loan Lender*** means any lender, in its capacity as such, with a term loan commitment or a term loan under the First Lien Financing Facility pursuant to the First Lien Financing Agreement, and its successors and assigns.

**1.92.**   ***Good Faith Deposit*** has the meaning set forth in the Plan Funding Agreement.

**1.93.**   ***Intercompany Claim*** means any Claim, Cause of Action, or remedy held by or asserted against a Debtor by another Debtor.

**1.94.**   ***Intercompany Interest*** means any Interest held by a Debtor in another Debtor.

**1.95.**   ***Interest*** means the interest (whether legal, equitable, contractual or otherwise) of any holders of any class of equity securities of any of the Debtors, represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

**1.96.**   ***Key Employees*** means those employees, each of whom is an insider (as such term is defined in section 101(31) of the Bankruptcy Code), that shall be set forth on a list to be contained in the Plan Supplement.

**1.97.**   ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.98.**   ***New Boards*** means the initial boards of each of the Acquired Debtors.

**1.99.**   ***New Equity Interests*** means the membership units of Reorganized CACH and Reorganized CACV of Colorado, and the common stock of Reorganized SquareTwo Financial Canada Corporation.

**1.100.**   ***Other Secured Claim*** means any Secured Claim against a Debtor other than a First Lien Lender Claim, a 1.25 Lien Lender Claim, a 1.5 Lien Lender Claim or a Second Lien Lender Claim.

**1.101.**   ***Person*** means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture,

estate, fund, trust, unincorporated organization, governmental unit or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.102.**  ***Petition Date*** means the date on which the Debtors commence the Chapter 11 Cases.

**1.103.**  ***Plan*** means this joint prepackaged chapter 11 plan proposed by the Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Plan Funding Agreement, and the terms hereof.  If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case where the context otherwise requires.

**1.104.**  ***Plan Administrator*** means such Person designated by the Debtors, with the consent of the Required Consenting 1.5 Lien Lenders, and approved by the Bankruptcy Court as Plan Administrator pursuant to Article VII of this Plan, or any successor appointed pursuant to the Plan Administrator Agreement.

**1.105.**  ***Plan Administrator Agreement*** means the agreement governing, among other things, the retention and duties of the Plan Administrator, as described in Section 7.12 of this Plan, which shall be in form and substance acceptable to the Debtors and the Required Consenting 1.5 Lien Lenders and as contained in the Plan Supplement.

**1.106.**  ***Plan Administrator Expenses*** means all actual and necessary costs and expenses incurred on and after the Effective Date in connection with the Wind Down and the administration of this Plan, including, but not limited to, the Debtors' costs, expenses and legal fees incurred related to: (a) making Distributions in accordance with and otherwise administering this Plan; (b) merging and/or dissolving the Dissolving Debtors; (c) winding down the Dissolving Debtors' Estates; (d) performing the duties set forth in Section 7.12 of this Plan and the Plan Administrator Agreement; and (e) paying all fees payable pursuant to section 1930 of title 28 of the United States Code with respect to the Dissolving Debtors.

**1.107.**  ***Plan Consideration*** means, with respect to any Class of Claims entitled to distributions under this Plan, Cash.

**1.108.**  ***Plan Distributions*** means the Plan Consideration distributed under this Plan.

**1.109.**  ***Plan Documents*** means the documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement, including the Plan Funding Agreement, each of which shall be in form and substance acceptable to each of those parties as set forth in the RSA and, unless expressly set forth herein, subject to the consent rights set forth in the RSA.

**1.110.**  ***Plan Funding Agreement*** means the Plan Funding Agreement, dated as of March 3, 2017 among SquareTwo, Collect America of Canada, LLC and the Plan Investor (as

may be amended, modified and/or supplemented from time to time in accordance with its terms), and attached as Exhibit B to the RSA.

    **1.111.** *Plan Investor* means Resurgent Holdings LLC, on behalf of one or more of its affiliates.

    **1.112.** *Plan Supplement* means the supplemental appendix to this Plan (as may be amended, modified and/or supplemented from time to time), to be filed no later than five (5) calendar days prior to the deadline for filing objections to this Plan or such other earlier or later date(s) as expressly set forth in this Plan, which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of (a) the Amended Certificates of Formation, (b) the list of proposed officers and directors, members, managers or managing members of each of the Reorganized Debtors, (c) a list of the individuals who will serve in certain senior management positions of each of the Reorganized Debtors, (d) a list containing the compensation arrangement for any insider of the Debtors who will be an officer of a Reorganized Debtor, (e) the Plan Funding Agreement, (f) the Schedule of Assumed Contracts and Leases, (g) the Transition Services Agreement (as defined in the Plan Funding Agreement), (h) the Amended LLC Agreements, (i) the Post-Emergence Incentive Program and the list of the Key Employees, (j) the Walker Stock Purchase Agreement, and (k) any additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement; provided, that, unless consent rights are otherwise expressly set forth in this Plan, each of the documents in the Plan Supplement (whether or not set forth above), including any alternation, restatement, modification or replacement thereto, shall be in form and substance consistent with the RSA and the consent rights set forth therein.

    **1.113.** *Post-Closing Purchase Price Adjustment* means the post-closing purchase price adjustment as more fully set forth in the Plan Funding Agreement.

    **1.114.** *Post-Emergence Bonuses* means the bonuses to be paid by Wind Down Co to the Key Employees pursuant to the Post-Emergence Incentive Program in an amount not to exceed $1,460,000 in the aggregate.

    **1.115.** *Post-Emergence Incentive Program* means the incentive program that provides for payment of bonuses to the Key Employees, which will be filed as part of the Plan Supplement.

    **1.116.** *Pre-Effective Date PA Duties* has the meaning set forth in Section 7.12(a) of this Plan.

    **1.117.** *Prepetition Secured Lender Claims* means the First Lien Lender Claims, the 1.25 Lien Lender Claims and the 1.5 Lien Lender Claims (in each case to the extent of the value of the collateral securing such Claim).

    **1.118.** *Priority Non-Tax Claim* means any Claim, other than a DIP Claim, an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.119.**   ***Priority Tax Claim*** means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.120.**   ***Professional Person(s)*** means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court.

**1.121.**   ***Pro Rata Share*** means with respect to any distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

**1.122.**   ***Purchase Price*** means Cash in an amount equal to the Final Purchase Price (as defined in the Plan Funding Agreement).

**1.123.**   ***Released Parties*** means, collectively, and each solely in its capacity as such: (a) the Debtors and Reorganized Debtors (including the Acquired Debtors and the Dissolving Debtors); (b) the DIP Administrative Agent and the DIP Lenders; (c) the First Lien Administrative Agent; (d) the 1.25 Lien Administrative Agent; (e) the 1.5 Lien Administrative Agent; (f) the Consenting Lenders; (g) the Plan Investor; (h) the Creditors' Committee (if any) and each of its members solely in their capacity as members of the Creditors' Committee; and (i) each of such parties' respective predecessors, successors, assigns, subsidiaries, owners, affiliates, managed accounts or funds and their current and former officers, directors, managers, managing members, employees (other than with respect to (1) money borrowed from or owed to the Debtors by any such employees as set forth in any of the Debtor's books and records, or (2) any obligations owed by such employees to such Debtor or pursuant to written agreement), managers, members, principals, shareholders, agents, advisory board members, management companies, fund advisors, partners, attorneys, financial advisors or other professionals or representatives, together with their successors and assigns; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Cases or the Canadian Proceeding and the transactions contemplated by this Plan; provided, further, that no Person shall be a Released Party if it objects to the releases provided for in Article XII of this Plan.

**1.124.**   ***Remaining Cash*** means the amount of Cash of the Debtors as of the Effective Date *plus* any Cash received by Wind Down Co or the other Dissolving Debtors thereafter *plus* Cash equal to the Purchase Price, *minus* each of: (a) the First Lien Lender Distribution, (b) the 1.25 Lien Lender Distribution, (d) all Allowed Administrative Expense Claims, (e) all Allowed Other Secured Claims to the extent paid in Cash, (f) all Allowed DIP Claims, (g) all Allowed Priority-Tax Claims, (h) all Allowed Priority Non-Tax Claims, (i) the 1.5 Lien Lender Fee Claim, (j) all Allowed Fee Claims, and (k) all amounts required to fund the Wind Down Costs, and in all instances, excluding all Canadian Claims and all Assumed U.S. Liabilities.  After payment in full of each of the foregoing and the issuance of a final decree closing each of the Chapter 11 Cases, any amounts remaining in the Wind Down Account shall be distributed to the holders of the 1.5 Lien Lender Claims as of the Effective Date.

**1.125.** ***Reorganized CACH*** means CACH, LLC on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

**1.126.** ***Reorganized CACV of Colorado*** means CACV of Colorado, LLC on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

**1.127.** ***Reorganized Debtor(s)*** means, as the context requires, the applicable Acquired Debtor(s), the Dissolving Debtor(s) or any successors thereto by merger, consolidation or otherwise, on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

**1.128.** ***Reorganized SquareTwo Financial Canada Corporation*** means SquareTwo Financial Canada Corporation on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

**1.129.** ***Required Consenting Lenders*** means the Required Consenting Lenders as defined in the RSA.

**1.130.** ***Required Consenting 1.5 Lien Lenders*** means the 1.5 Lien Lenders party to the RSA that hold at least 66 2/3% of the principal amount of the obligations under the 1.5 Lien Credit Agreement.

**1.131.** ***Required Parties*** means the Required Consenting Lenders and the Plan Investor.

**1.132.** ***RSA*** means the Restructuring Support Agreement, dated as of March 3, 2017, inclusive of all exhibits thereto, by and among the Debtors, the Consenting Lenders, the Plan Investor, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended from time to time in accordance with its terms.

**1.133.** ***Run Off D&O Policy*** has the meaning set forth in Section 12.10(b) of this Plan.

**1.134.** ***Schedule of Assumed Contracts and Leases*** means a schedule of the contracts and leases to be assumed or assumed and assigned pursuant to section 365 of the Bankruptcy Code and Section 10.1 of this Plan, which shall initially be filed by the Debtors (as designated by the Plan Investor) no later than seven (7) days after the Petition Date, as such schedule may be amended from time to time thereafter as required by the Plan Investor.

**1.135.** ***Second Lien Indenture*** means the Indenture, dated as of April 7, 2010, by and between SquareTwo, as issuer, the guarantors named therein, and the Second Lien Trustee, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.136.** ***Second Lien Lender*** means any holder, in its capacity as such, of Second Lien Notes pursuant to the Second Lien Indenture.

**1.137.  *Second Lien Lender Claim*** means all Claims against any Debtor, related to, arising under, on in connection with, the Second Lien Indenture and the Second Lien Notes.

**1.138.  *Second Lien Notes*** means the 11.625% Senior Second Lien Notes due 2017 issued pursuant to the Second Lien Indenture.

**1.139.  *Second Lien Trustee*** means U.S. Bank National Association, or its successors and assigns, in its capacity as trustee and collateral agent for the Second Lien Lenders under the Second Lien Indenture.

**1.140.  *Secured Claim*** means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) against a Canadian Debtor that is a valid trust, lien or other priority claim under Canadian law.

**1.141.  *Securities Act*** means the Securities Act of 1933, as amended.

**1.142.  *SquareTwo*** means SquareTwo Financial Corporation, a Delaware corporation.

**1.143.  *SquareTwo Financial Services*** means SquareTwo Financial Services Corporation d/b/a Fresh View Solutions, a Delaware corporation.

**1.144.  *Subsidiary*** means any corporation, association or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by SquareTwo and/or one or more subsidiaries of SquareTwo.

**1.145.  *Transaction Documents*** means this Plan, the Plan Funding Agreement, the RSA, the TSA, and each other contract, exhibit, schedule, certificate and other document being delivered pursuant to, or in furtherance of the transactions contemplated by this Plan, the Plan Funding Agreement or the RSA.

**1.146.  *TSA*** means the transition services agreement entered into contemporaneously with the execution and delivery of the Plan Funding Agreement between and among the Plan Investor, Resurgent Capital Services L.P, as the Master Servicer, SquareTwo Financial Services, as the Service Provider, and the Plan Administrator or other authorized representative of the Dissolving Debtors, as applicable (as the same may be amended, restated, supplemented and/or otherwise modified from time to time in accordance with its terms), a form of which shall be included in the Plan Supplement.

**1.147.  *U.S. Borrowers*** means each of SquareTwo, SquareTwo Financial Services, and Debtor CACH LLC, as borrowers under the First Lien Financing Agreement.

**1.148.  *U.S. Debtor*** means any Debtor that is not a Canadian Debtor.

**1.149.  *U.S. General Unsecured Claim*** means any Claim against a U.S. Debtor other than: (a) a First Lien Lender Claim; (b) a 1.25 Lien Lender Claim; (c) a 1.5 Lien Lender Claim; (d) an Other Secured Claim; (e) a Second Lien Lender Claim; (f) a DIP Claim; (g) an

Administrative Expense Claim; (h) a Fee Claim; (i) a Priority Tax Claim; (j) a Priority Non-Tax Claim; (k) an Intercompany Claim; and (l) U.S. Trustee Fees.

**1.150.** ***U.S. Revolving Loans*** means the revolving loans made by the First Lien Revolving Loan Lenders to the U.S. Borrowers made pursuant to the First Lien Financing Agreement.

**1.151.** ***U.S. Trustee*** means the United States Trustee for Region 2.

**1.152.** ***U.S. Trustee Fees*** means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.153.** ***Walker Stock Purchase Agreement*** means that certain Stock Purchase Agreement, dated March 3, 2017, between Christopher D. Walker, the President and Chief Executive Officer of Canadian Debtor SquareTwo Financial Canada Corporation, and SquareTwo Financial Canada Corporation, whereby, among other things, SquareTwo Financial Canada Corporation shall repurchase all equity securities of Canadian Debtor CCL Financial Inc. from Mr. Walker.

**1.154.** ***Wind Down*** means the implementation of this Plan and the wind down of the Dissolving Debtors in accordance with this Plan, as more fully set forth in Article VII of this Plan.

**1.155.** ***Wind Down Account*** means the account to be established by SquareTwo on or prior to the Effective Date to be used to effect the Wind Down, which account shall be funded in an amount determined by the Debtors, with the consent of the Required Consenting 1.5 Lien Lenders (not to be unreasonably withheld, delayed or conditioned), prior to the Effective Date.

**1.156.** ***Wind Down Co*** means SquareTwo on and after the Effective Date.

**1.157.** ***Wind Down Costs*** includes the fees and expenses incurred by the Dissolving Debtors following the Effective Date (including reasonable fees and expenses of attorneys and other professionals) for the purpose of: (i) effectuating distributions to holders of Allowed Claims, including any payments to be made under any Bankruptcy Court approved key employee incentive program and/or severance program; (ii) resolving Disputed Claims, if any; (iii) satisfying the Dissolving Debtors' obligations under Section 12.10(a) of this Plan; (iv) paying the Plan Administrator Expenses; (v) otherwise implementing this Plan, the Plan Funding Agreement, the TSA, the Escrow Agreement, the Wind Down and the closing of the Chapter 11 Cases; and (vi) undertaking such other matters relating to implementation of the Plan as are deemed necessary and appropriate by Wind Down Co.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular

and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code, other than section 102(5), shall apply to the construction of this Plan.  Any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, with the consent of the applicable Required Parties as set forth herein or in the RSA and the Debtors (except as otherwise expressly set forth in this Article I).  Subject to the provisions of any contracts, certificates or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.  Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires.

### C.    Appendices and Plan Documents.

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at http://cases.primeclerk.com/squaretwo, or obtain a copy of any of the Plan Documents by a written request sent to the Claims Agent at the following address:

SquareTwo Ballot Processing
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, New York 10022
Phone: 844-205-4337 (U.S. & Canada toll free)
or 917-962-8384 (international)

### ARTICLE II.

### CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

#### 2.1.    *Settlement of Certain Inter-Creditor Issues.*

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

#### 2.2.    *Formation of Debtor Groups for Convenience Purposes.*

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's

17

status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

**2.3.** *Intercompany Claims and Intercompany Interests.*

(a)   Intercompany Claims.

(i)   Wind Down Co.  Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims between and among the Dissolving Debtors shall, at the option of Wind Down Co, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(ii)   Acquired Debtors. Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims between and among the Acquired Debtors shall, at the option of the Plan Investor, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(iii)   Intercompany Claims by and/or among the Dissolving Debtors and the Acquired Debtors.  Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims between and/or among any of the Acquired Debtors, on the one hand, and any of the Dissolving Debtors, on the other hand, shall be extinguished, canceled and/or discharged on the Effective Date.

(b)   Intercompany Interests.

Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Interests shall: (i) as to the Acquired Debtors, survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Acquired Debtors subject to the terms of this Plan, and (ii) as to the Dissolving Debtors, subject to section 7.7(c) of this Plan, survive the Debtors'

restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Dissolving Debtors subject to the terms of this Plan.

## ARTICLE III.

## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors. All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on this Plan. A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1.   *DIP Claims.*

On the Effective Date, the DIP Claims shall be Allowed and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be indefeasibly paid in full in Cash from the proceeds of the Closing Purchase Price. Upon payment in full of all Allowed DIP Lender Claims, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

### 3.2.   *Administrative Expense Claims.*

(a)   Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than the holder of:

(i)   a Fee Claim;

(ii)   a DIP Claim;

(iii)   a Consenting Lender Fee Claim;

19

(iv)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(v)    an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor, including, an Administrative Expense Claim that is a Canadian Claim and/or an Assumed U.S. Liability (which Canadian Claim and/or Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor in accordance with the terms of this Plan and the terms of the Plan Funding Agreement); for the avoidance of doubt, an Administrative Expense Claim <u>must</u> be filed for any non-ordinary course litigation Claims;

(vi)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(vii)    an Administrative Expense Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to: (A) any Debtor's certificate of incorporation, by-laws, operating agreement, or similar organizational document, or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

(viii)    an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses;

(ix)    a claim by the Plan Investor, or any of its affiliates, arising under any of the Transaction Documents against the Debtors;

(x)    a Claim for fees and expenses held by the Plan Investor or a professional person retained by the Plan Investor, to the extent the Bankruptcy Court does not authorize the Debtors to pay amounts owed under the preceding Article 3.2(ix) without first submitting an application for such fees and expenses to the Bankruptcy Court;

(xi)    an Intercompany Claim; or

(xii)    U.S. Trustee Fees,

must file with the Bankruptcy Court and serve on Wind Down Co, the Claims Agent, and the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "*Administrative Bar Date*").  Such proof of Administrative Expense Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the holder of the Administrative Expense Claim; (3) the asserted amount of the Administrative Expense Claim; (4) the basis of the Administrative Expense Claim; and

(5) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

      (b)      <u>Treatment of Administrative Expense Claims</u>.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive Cash to be paid by Wind Down Co, in an amount equal to such Allowed Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; <u>provided</u>, <u>further</u>, <u>however</u>, that any Administrative Expense Claim that is a Canadian Claim and/or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of this Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Administrative Expense Claim.

      **3.3.**     ***Fee Claims.***

      (a)      <u>Time for Filing Fee Claims</u>.

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

      (b)      <u>Treatment of Fee Claims</u>.

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash by Wind Down Co in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) three (3) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and Wind Down Co.  On the Effective Date, to the extent known, Wind Down Co shall reserve and hold in a segregated account Cash in an amount equal to all accrued but unpaid Fee Claims

as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Fee Claims have been either Allowed and paid in full or Disallowed by Final Order, at which time any Remaining Cash in the segregated account shall be deposited into the Wind Down Account and used by Wind Down Co for purposes of the Wind Down.

### 3.4.    *U.S. Trustee Fees.*

Wind Down Co shall pay all outstanding U.S. Trustee Fees of the Dissolving Debtors on an ongoing basis, and of the Acquired Debtors incurred through the Effective Date, on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

### 3.5.    *Priority Tax Claims.*

(a)    Time for Filing Priority Tax Claims.

The holder of a Priority Tax Claim, other than a holder of a Priority Tax Claim that is a Canadian Claim and/or an Assumed U.S. Liability (which shall be satisfied by the applicable Acquired Debtor in accordance with the terms of this Plan and the Plan Funding Agreement), must file with the Bankruptcy Court and serve on Wind Down Co, the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim **within 180 days after the Petition Date** (the "***Priority Tax Claims Bar Date***").  Such proof of Priority Tax Claim must include at a minimum: (1) the name of the applicable Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (2) the name of the holder of the Priority Tax Claim; (3) the asserted amount of the Priority Tax Claim; (4) the basis of the Priority Tax Claim; and (5) supporting documentation for the Priority Tax Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

(b)    Treatment of Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive from Wind Down Co, in Wind Down Co's discretion, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date

shall be paid in the ordinary course of business as they become due; provided, further, however, that any Priority Tax Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of this Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Priority Tax Claim.

## ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.** *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; or (c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | First Lien Lender Claims | Yes | Yes |
| Class 4 | 1.25 Lien Lender Claims | Yes | Yes |
| Class 5 | 1.5 Lien Lender Claims | Yes | Yes |
| Class 6 | Second Lien Lender Claims | Yes | No (Deemed to reject) |
| Class 7A | U.S. General Unsecured Claims | Yes | No (Deemed to reject) |
| Class 7B | Canadian General Unsecured Claims | No | No (Deemed to accept) |
| Class 8A | Existing U.S. Interests | Yes | No (Deemed to reject) |
| Class 8B | Existing Canadian Interests | No | No (Deemed to accept) |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2.**     ***Unimpaired Classes of Claims.***

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a)     Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)     Class 2: Class 2 consists of all Other Secured Claims.

(c)     Class 7B: Class 7B consists of all Canadian General Unsecured Claims.

(d)     Class 8B: Class 8B consists of all Existing Canadian Interests.

**4.3.**     ***Impaired Classes of Claims.***

(a)     The following Classes of Claims are impaired and entitled to vote on this Plan:

(i)     Class 3: Class 3 consists of all First Lien Lender Claims.

(ii)     Class 4: Class 4 consists of all 1.25 Lien Lender Claims.

(iii)     Class 5: Class 5 consists of all 1.5 Lien Lender Claims.

(b)     The following Classes of Claims and Interests are impaired and deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code:

(i)     Class 6: Class 6 consists of all Second Lien Lender Claims.

(ii)     Class 7A: Class 7A consists of all U.S. General Unsecured Claims.

(iii)     Class 8A: Class 8A consists of all Existing U.S. Interests.

**4.4.**     ***Separate Classification of Other Secured Claims.***

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

24

# ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

### 5.1.   *Priority Non-Tax Claims (Class 1).*

(a)    Treatment:  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; provided, however, that any Priority Non-Tax Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of this Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Priority Non-Tax Claim.

(b)    Voting:  Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 5.2.   *Other Secured Claims (Class 2).*

(a)    Treatment:  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of Wind Down Co: (i) Cash to be paid by Wind Down Co in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of Wind Down Co, without further notice to or order of the Bankruptcy Court; provided, further, however, that any Other Secured Claim that is a Canadian Claim or an Assumed U.S. Liability shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible therefor in accordance with the terms of this Plan and the Plan Funding Agreement and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Other Secured Claim.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)     Deficiency Claims:  To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as a U.S. General Unsecured Claim or Canadian General Unsecured Claim, but only as applicable, and shall be classified and treated as a Class 7A Claim or 7B Claim, but only as applicable.

(c)     Voting:  The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### 5.3.     *First Lien Lender Claims (Class 3).*

(a)     Treatment:  On the Effective Date, First Lien Lender Claims shall be Allowed under this Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that the First Lien Administrative Agent or a holder of a First Lien Lender Claim agrees to different treatment with respect to such holder's Claim, on the Effective Date, or as soon as practicable thereafter, the First Lien Administrative Agent shall receive (for the benefit of itself and the First Lien Lenders), subject to the terms of this Plan, in full and final satisfaction, settlement, release and discharge of the First Lien Lender Claim, payment in full in Cash from Wind Down Co of the First Lien Lender Distribution, to be distributed consistent with the First Lien Financing Agreement.  For the avoidance of doubt, all First Lien Revolving Loans outstanding as of the Petition Date shall have been repaid indefeasibly in full in accordance with the terms of the DIP Financing Agreement and the DIP Order, and shall be afforded the treatment provided for DIP Claims as set forth in Section 3.1 of the Plan.

(b)     Voting:  The First Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such First Lien Lender Claims.

### 5.4.     *1.25 Lien Lender Claims (Class 4).*

(a)     Treatment:  On the Effective Date, 1.25 Lien Lender Claims shall be Allowed under this Plan, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.25 Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a 1.25 Lien Lender Claim shall receive, subject to the terms of this Plan, in full and final satisfaction, release and discharge of its 1.25 Lien Lender Claim, payment in Cash from Wind Down Co of its Pro Rata Share of the 1.25 Lien Lender Distribution.

(b)     Voting:  The 1.25 Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such 1.25 Lien Lender Claims.

### 5.5.   *1.5 Lien Lender Claims (Class 5).*

(a)     Treatment:  On the Effective Date, 1.5 Lien Lender Claims shall be Allowed under this Plan in an amount equal to the total amount of principal, accrued and unpaid interest at the non-default rate, if any, to the Petition Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  Except to the extent that a holder of a 1.5 Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of 1.5 Lien Lender Claim shall receive, subject to the terms of this Plan, in full and final satisfaction, settlement and release of its 1.5 Lien Lender Claim, payment in Cash from Wind Down Co of its Pro Rata Share of the 1.5 Lien Lender Distribution.

(b)     Voting:  The 1.5 Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such 1.5 Lien Lender Claims.

### 5.6.   *Second Lien Lender Claims (Class 6).*

(a)     Treatment:  Holders of Second Lien Lender Claims shall not receive or retain any distribution or Lien under the Plan on account of such Second Lien Lender Claims.

(b)     Voting:  The Second Lien Lender Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Second Lien Lender Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Lender Claims.

### 5.7.   *U.S. General Unsecured Claims (Class 7A).*

(a)     Treatment:  Holders of U.S. General Unsecured Claims shall not receive or retain any distribution under the Plan on account of such U.S. General Unsecured Claims.

(b)     Voting:  The U.S. General Unsecured Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of U.S. General Unsecured Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such U.S. General Unsecured Claims.

### 5.8.   *Canadian General Unsecured Claims (Class 7B).*

(a)     Treatment:  Except to the extent that a holder of a Canadian General Unsecured Claim agrees to a different treatment, each holder of a Canadian General Unsecured

Claim shall receive, at the election of the applicable Acquired Debtor, such treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed Canadian General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed Canadian General Unsecured Claims unimpaired pursuant to section 1124 of the Bankruptcy Code. Subject to Section 9.2 of this Plan, Canadian General Unsecured Claims incurred by an Acquired Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Acquired Debtor, without further notice to or order of the Bankruptcy Court.

(b)      Voting:  The Allowed Canadian General Unsecured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Canadian General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Canadian General Unsecured Claims.

### 5.9.    *Existing U.S. Interests (Class 8A).*

(a)      Treatment:  Existing U.S. Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing U.S. Interests.

(b)      Voting:  The Existing U.S. Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing U.S. Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing U.S. Interests.

### 5.10.   *Existing Canadian Interests (Class 8B).*

(a)      Treatment:  The legal, equitable and contractual rights of the holders of Allowed Existing Canadian Interests are unaltered by this Plan.  Except to the extent that a holder of an Allowed Existing Canadian Interest agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Existing Canadian Interest shall receive such treatment that will render such Existing Canadian Interest unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)      Voting:  The Allowed Existing Canadian Interests are not impaired Interests. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Existing Canadian Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Existing Canadian Interests.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR INTERESTS

### 6.1.    *Class Acceptance Requirement.*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.  A Class of Interests that is entitled to vote on the Plan has accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Interests of such Class that have voted on the Plan.

### 6.2.    *Tabulation of Votes on a Non-Consolidated Basis.*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

### 6.3.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Sections 14.5 and 14.6 of this Plan, the Debtors reserve the right (with the consent of each of the Required Parties) to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Sections 14.5 and 14.6 of this Plan (including the consent of each of the Required Parties), the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

### 6.4.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.5.    *Voting Classes; Deemed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

### 6.6.    *Confirmation of All Cases.*

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; <u>provided</u>, <u>however</u>, that the Debtors, with the consent of each of the Required Parties, may at any time waive this Section 6.6.

## ARTICLE VII.

## <u>MEANS FOR IMPLEMENTATION</u>

### 7.1.    *Non-Substantive Consolidation.*

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate, <u>provided</u>, <u>however</u>, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

### 7.2.    *Plan Funding Transaction.*

On the Effective Date, subject to the terms and conditions set forth in the Plan Funding Agreement, SquareTwo and Collect America of Canada, LLC shall sell to the Plan Investor or its assignee as permitted pursuant to Section 10.3 of the Plan Funding Agreement (including the Canadian PurchaseCo), free and clear of any Claims or Encumbrances (other than Permitted Encumbrances), and for (i) the Closing Purchase Price (a) the Plan Investor or its assignee as permitted pursuant to Section 10.3 of the Plan Funding Agreement shall purchase from SquareTwo, one hundred percent (100%) of the Interests in Reorganized CACH and Reorganized CACV of Colorado and (b) the Canadian PurchaseCo shall purchase from Collect America of Canada, LLC 35,000 shares of stock of Reorganized SquareTwo Financial Canada Corporation, which represents one hundred (100%) of the issued and outstanding equity of Reorganized SquareTwo Financial Canada; and (ii) the other obligations of the Plan Investor under the Plan Funding Agreement and this Plan.  Any difference between the Closing Purchase Price and the Final Purchase Price shall be received by or paid to Wind Down Co in accordance with the Plan Funding Agreement.  From and after the Effective Date, (x) the Plan Investor and/or any permitted assignee shall directly and indirectly own the Acquired Debtors, and (y) Wind Down Co shall own the other Dissolving Debtors.  On the Effective Date, all Cash of the Debtors, including cash and cash equivalents of the Canadian Debtors, shall be transferred to Wind Down Co or remain with the Dissolving Debtors.  After the Effective Date, the Plan Investor shall return to Wind Down Co any cash or cash equivalents pledged to secure surety

bonds, letters of credit and other deposits (upon the expiry date, earlier replacement or other return of each of the foregoing) outstanding as of the Effective Date.

The transfer of the New Equity Interests to the Plan Investor shall be authorized without the need for any further corporate action.  The Plan Investor and/or any permitted assignee shall pay the Closing Purchase Price to Wind Down Co on the Effective Date.  After the Effective Date, Wind Down Co shall (a) be paid any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement; and (b) receive or be paid, as applicable, the difference, if positive, between the Final Purchase Price and the Closing Purchase Price as set forth in the Plan Funding Agreement.

On the Effective Date, CACV of New Jersey, LLC shall sign a limited power of attorney in connection with and shall transfer all judgments obtained by CACV of New Jersey, LLC arising from or relating to collections on open and active charged-off accounts to CACV of Colorado, LLC.

**7.3.**   ***Assumed U.S. Liabilities.***

On and after the Effective Date, subject to the terms of the Plan Funding Agreement, the Acquired Debtors shall be solely responsible for payment and satisfaction of all Assumed U.S. Liabilities, but only as set forth on Exhibit A.  All Persons holding Claims and Interests arising out of or concerning an Assumed U.S. Liability shall be forever barred, estopped and permanently enjoined from asserting against any of the Dissolving Debtors or the Plan Administrator and any of their property such Persons' Claims or Interests arising out of such Assumed U.S. Liabilities.

**7.4.**   ***Excluded U.S. Assets.***

Except as otherwise set forth in the Confirmation Order, nothing in any Plan Document shall be deemed to convey, assign or otherwise transfer the Excluded U.S. Assets to the Acquired Debtors or the Plan Investor, and the Dissolving Debtors shall retain all right, title and interest to, in and under the Excluded U.S. Assets.  On the Effective Date, the Excluded U.S. Assets shall be deemed transferred to Wind Down Co or remain with the applicable Dissolving Debtor, as applicable, without further action for distribution in accordance with the terms of this Plan.

**7.5.**   ***Canadian Debtors.***

On and after the Effective Date, notwithstanding anything herein to the contrary except with respect to the Prepetition Secured Lender Claims, Fee Claims (except as otherwise set forth in the Plan Funding Agreement), certain Intercompany Claims and certain Intercompany Interests (all of which shall be governed by the terms of this Plan), all Canadian Claims against and all Interests held by, in or against any of the Canadian Debtors are unimpaired by this Plan and shall remain unaffected hereby and are not discharged.  All Persons holding any Canadian Claims against and all Interests held by, in or against any of the Canadian Debtors shall be forever barred, estopped and permanently enjoined from asserting against the Dissolving Debtors or the Plan Administrator and any of their property, such Canadian Claims

and Interests.  On the Effective Date, the Acquired Debtors shall be solely responsible for all Canadian Claims against and Interests by, in or against the Canadian Debtors.

Notwithstanding the foregoing, in connection with the Effective Date, SquareTwo Financial Canada Corporation shall purchase all of the equity interests of Canadian Debtor CCL Financial Inc. from Christopher D. Walker pursuant to the Walker Stock Purchase Agreement.

### 7.6.   *Plan Funding.*

The Debtors' obligations under the Plan will be funded from all Cash of the Debtors as of the Effective Date, and from the Cash received in respect of the Closing Purchase Price and the Final Purchase Price and any Cash received by Wind Down Co after the Effective Date (subject to the terms of the Plan Funding Agreement), including from the Escrow, if any. Such Cash shall be used as follows:  (a) first, to satisfy Allowed DIP Claims, Allowed Administrative Expense Claims, including any obligations owed under any key employee incentive plan or severance amounts in each case as approved by the Bankruptcy Court, Allowed First Lien Lender Claims, Allowed 1.25 Lien Lender Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims that are to be paid in Cash; (b) second, to fund the Wind Down Account; and (c) third, to satisfy the Debtors' other obligations under this Plan, the Plan Funding Agreement and the TSA, in accordance with the terms hereof and thereof; provided, however, that any Canadian Claims and/or any Assumed U.S. Liabilities shall be satisfied by the applicable Acquired Debtor and the applicable Acquired Debtor shall be solely responsible for payment thereof and the holder thereof shall have no recourse against the Dissolving Debtors or the Plan Administrator or any of their property on account of such Claims.  On the Effective Date, Wind Down Co shall pay or reserve sufficient Cash to pay all amounts required to satisfy (a) through (c) in the foregoing sentence (and also described in (a) through (k) in the definition of Remaining Cash), and after such payment or reserve, as applicable, is established, holders of 1.5 Lien Lender Claims shall receive an initial distribution under the Plan, with the remaining distribution to be made upon the completion of the Wind Down to the extent any funds remain in the Wind Down Account.

### 7.7.   *Continued Corporate Existence in Certain Debtors; Vesting of Assets; Dissolution of Certain Debtors.*

(a)   General.

(i)   Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Formation for the purposes of satisfying their obligations under the Plan and the continuation of their business.  On or after the Effective Date, the Acquired Debtors and the Dissolving Debtors, as applicable, each in its respective sole and exclusive discretion, may take such action as permitted by applicable law and such Debtor's organizational documents, as such Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (w) a Debtor to be merged into another

32

Debtor, or its Subsidiary and/or affiliate; (x) a Debtor to be dissolved; (z) the legal name of a Debtor to be changed; or (y) the closure of a Debtor's case on the Effective Date or any time thereafter.

(ii)    On the Effective Date or as soon as reasonably practicable thereafter, the Acquired Debtors and the Dissolving Debtors, as applicable, each in its respective sole and exclusive discretion, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(b)    Revesting of Assets.  Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates, wherever located, including Canada, including all claims, rights and Causes of Action and any property, wherever located, including Canada, acquired by the Debtors under or in connection with this Plan, shall revest in the applicable Acquired Debtor or the applicable Dissolving Debtor, as applicable, free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, except as otherwise provided in this Plan, each applicable Acquired Debtor may operate its business and may use, acquire and dispose of property, wherever located, including Canada, and each Acquired Debtor and each Dissolving Debtor, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Dissolving Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)    Dissolving Debtors.  On or as soon as reasonably practicable after the Effective Date of the Plan, Wind Down Co shall be authorized, in its sole and exclusive discretion, to merge, dissolve and/or wind down the Dissolving Debtors under applicable law; provided, that, notwithstanding such dissolution, Wind Down Co shall remain authorized to continue the Wind Down, including filing any necessary documents with the appropriate authorities, including any tax returns, and to facilitate the closing of the Chapter 11 Cases as to such Debtors.

(d)    Closing of the Acquired Debtors' Chapter 11 Cases.  On the Effective Date, notwithstanding anything contained in the Local Bankruptcy Rules for the Southern

District of New York to the contrary, the Chapter 11 Cases of the Acquired Debtors shall be closed without the need to file any further documents with the Bankruptcy Court, and the Confirmation Order shall act as a final decree closing each of the Acquired Debtors' Chapter 11 Cases.

### 7.8. *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth in this Plan (including Section 2.3 hereof), on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents evidencing, related to or connected with any Claim, other than Canadian Claims, Assumed U.S. Liabilities, certain Intercompany Claims, Existing Canadian Interests and certain other Intercompany Interests, in each case as set forth in the Plan, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary herein, each of the First Lien Financing Agreement, the 1.25 Lien Credit Agreement and the 1.5 Lien Credit Agreement shall continue in effect solely to the extent necessary to: (a) permit holders of First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims to receive Plan Distributions on account of such respective claims; and (b) permit the 1.25 Lien Administrative Agent and the 1.5 Lien Administrative Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan. Except as provided pursuant to this Plan, upon satisfaction of the First Lien Lender Claims, the 1.25 Lien Lender Claims and the 1.5 Lien Lender Claims, respectively (and as the case may be), each of the First Lien Administrative Agent, the 1.25 Lien Administrative Agent and the 1.5 Lien Administrative Agent, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the First Lien Financing Facility, the 1.25 Lien Term Loan Facility and the 1.5 Lien Term Loan Facility, respectively (and as the case may be).

### 7.9. *Boards.*

(a)    Acquired Debtors.

(i)    On the Effective Date, the New Boards shall consist of those individuals (x) identified in the Plan Supplement to be filed with the Bankruptcy Court no later than five (5) calendar days before the deadline to object to the Plan or (y) otherwise at or before the Confirmation Hearing.

(ii)    Unless reappointed pursuant to Section 7.9(a) hereof, the members of the boards of the Acquired Debtors prior to the Effective Date shall have no continuing obligations to the Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors of each of the Acquired Debtors shall serve pursuant to the terms of the applicable Amended LLC Agreement or the applicable organizational documents of such Acquired Debtor and may be replaced or removed in accordance therewith, as applicable.

(b)    <u>Wind Down Co and the other Dissolving Debtors</u>.  The Plan Administrator shall be the sole director, manager or managing member, as applicable, of each of the Dissolving Debtors from and following the Effective Date.  The members of the boards of the Dissolving Debtors prior to the Effective Date shall have no continuing obligations to the Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

### 7.10. *Management.*

(a)    <u>Acquired Debtors</u>.  As of the Effective Date, the individuals who will serve in certain senior management positions of the Acquired Debtors shall consist of those individuals set forth in the Plan Supplement.  The compensation arrangement for any insider of the Debtors that shall become an officer of an Acquired Debtor shall be disclosed (x) in the Plan Supplement to be filed with the Bankruptcy Court no later than five (5) calendar days before the deadline to object to the Plan or (y) otherwise at or before the Confirmation Hearing.

(b)    <u>The Dissolving Debtors</u>.  From and after the Effective Date, the Dissolving Debtors shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of each of the Dissolving Debtors and shall have full authority to administer the provisions of the Plan.  The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Plan.

(c)    <u>Post-Emergence Incentive Program</u>.  After the Effective Date, in accordance with the terms of the Post-Emergence Incentive Program, Wind Down Co shall pay the Post-Emergence Bonuses to the Key Employees.

### 7.11. *Corporate Action.*

(a)    The Dissolving Debtors shall serve on the U.S. Trustee quarterly reports of the disbursements made on an entity-by-entity basis until such time as a final decree is entered closing the applicable Chapter 11 Case or the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

(b)    On the Effective Date, the Amended LLC Agreements, the Amended Certificates of Formation and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors, including the Dissolving Debtors, shall be deemed authorized in all respects.

(c)    Any action under the Plan to be taken by or required of the Debtors, the Acquired Debtors and/or the Dissolving Debtors, including the adoption or amendment of certificates of formation, incorporation and by-laws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or the Reorganized Debtors', including the Acquired Debtors' and the Dissolving Debtors', equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(d)    The Debtors and the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Acquired Debtors and the Dissolving Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor, applicable Acquired Debtor or applicable Dissolving Debtor, as the case may be.

### 7.12.    *Plan Administrator.*

(a)    Appointment; Duties.  Not less than seven (7) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Debtors, with the consent of the Required Consenting 1.5 Lien Lenders (which consent shall not be unreasonably withheld, delayed or conditioned), shall designate the Person who initially will serve as the Plan Administrator; provided, however, that: (i) the Debtors shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time.  On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish bank accounts as may be required to fulfill the Debtors' obligations under this Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "***Pre-Effective Date PA Duties***").  On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan.

(b)    Qualifications; Plan Administrator Agreement.

(i)    *Plan Administrator as Fiduciary*.  The Plan Administrator shall be a fiduciary of the Dissolving Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under this Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement.  To the extent necessary, and except with respect to any Canadian Claim and any Assumed U.S. Liability, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

(ii)    *Provisions of Agreement and Order*.  The Plan Administrator Agreement and the Confirmation Order shall provide that:  (i) the Plan Administrator shall be a fiduciary of the Dissolving Debtors; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken; (iii) the Plan Administrator, on behalf of the Dissolving Debtors, shall be authorized and responsible for handling the Post-Closing Purchase Price Adjustment and related obligations and responsibilities; and (iv) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved automatically.

(c)    <u>Wind Down Co Stock</u>.  On the Effective Date, a single share of stock shall be issued by Wind Down Co to the Plan Administrator.

(d)    <u>Funding</u>.  Subject to the terms and conditions set forth in the Plan Funding Agreement, (i) the Plan Investor and/or any permitted assignee shall pay the Closing Purchase Price to Wind Down Co on the Effective Date and (ii) after the Effective Date, Wind Down Co shall (x) be paid any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement; and (y) be paid or receive, as applicable, any difference between the Closing Purchase Price and the Final Purchase Price as set forth in the Plan Funding Agreement.

(e)    <u>Resignation, Death or Removal</u>.  The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

(f)    <u>Wind Down Funds</u>.  The Plan Administrator shall establish and fund the Wind Down Account from all Cash of the Debtors as of the Effective Date, *plus* any Cash received by the Dissolving Debtors on and after the Effective Date, including the Closing Purchase Price, the remainder of the Purchase Price, if any, in accordance with the terms of the Plan Funding Agreement and any Cash remaining in the Escrow to the extent it is entitled thereto under and in accordance with the terms of the Plan Funding Agreement.

**7.13.    *Wind Down of the Debtors' Estates.***

(a)    The Plan Administrator shall oversee the Wind Down and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, those holders of Allowed Claims and Allowed Interests that is consistent with and in accordance with the Plan and the Confirmation Order.  None of the Dissolving Debtors (including the Plan Administrator) shall be required to post a bond in favor of the United States.

37

(b)      As set forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts with respect to the Dissolving Debtors, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court:  (i) take all steps and execute all instruments and documents necessary to make distributions to holders of Allowed Claims and Allowed Interests that Wind Down Co is responsible for payment of under this Plan; (ii) object to Claims, if any, as provided in this Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment or allowance of Claims, Administrative Expense Claims, or Interests; (iv) comply with this Plan and the obligations hereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) take all actions necessary or appropriate to enforce the Debtors' rights and fulfill the Debtors' obligations under the Plan Funding Agreement, the Escrow Agreement and the TSA and any related documents; (vii) prepare and file applicable tax returns for the Dissolving Debtors; (viii) deposit Estate funds, draw checks and make disbursements consistent with the terms of this Plan; (ix) purchase or continue insurance protecting the Dissolving Debtors, the Plan Administrator and property of the applicable Estates; (x) seek entry of a final decree in any of the Dissolving Debtors' Chapter 11 Cases at the appropriate time; (xi) resolve, compromise and/or settle any Cure Disputes; (xii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under this Plan; and (xiii) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of this Plan.

(c)      Following the Effective Date, none of the Dissolving Debtors shall engage in any business activities or take any actions, except those necessary to effectuate the Plan, including under the Plan Funding Agreement, and under any and all transition services required pursuant to the TSA, and the Wind Down.  On and after the Effective Date, the Plan Administrator may, in the name of the Dissolving Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.

### 7.14.    *Consenting Lender Fee Claims.*

On the Effective Date, Wind Down Co shall pay the First Lien Lender Fee Claim, the 1.25 Lien Lender Fee Claim (in each case, to the extent not duplicative of the First Lien Lender Claims and the 1.25 Lien Lender Claims, respectively) and the 1.5 Lien Lender Fee Claim.

### 7.15.    *Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.*

(a)      Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the

38

rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to this Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Reorganized Debtors, including the Dissolving Debtors, and their respective Estates and property, and of holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(b)    Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to this Plan.

**7.16.** *Additional Transactions Authorized Under this Plan.*

On or prior to the Effective Date, the Debtors shall be authorized to take any such actions as may be necessary or appropriate to reinstate Claims or Interests or render Claims or Interests not impaired, as provided for under this Plan.

## ARTICLE VIII.

## DISTRIBUTIONS

**8.1.** *Distributions.*

Except for (a) any Canadian Claims, which will be paid by the applicable Acquired Debtors, (b) certain Intercompany Claims and certain Intercompany Interests in each case being retained by the Acquired Debtors, and (c) Assumed U.S. Liabilities, the Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of this Plan.

**8.2.** *No Postpetition Interest on Claims.*

Except with respect to Allowed DIP Claims, the First Lien Lender Claims and the 1.25 Lien Lender Claims, and unless otherwise specifically provided for in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3.**    *Date of Distributions.*

Unless otherwise provided herein, any Plan Distributions and deliveries to be made hereunder shall be made on the applicable Distribution Date; provided, that the Dissolving Debtors may utilize periodic distribution dates to the extent that use of a periodic distribution date does not delay payment of the Allowed Claim more than thirty (30) days.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4.**    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors, the Disbursing Agent nor the Plan Investor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

**8.5.**    *Disbursing Agent.*

(a)    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable Plan Distributions or payments contemplated hereby in respect of the Dissolving Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred by the Disbursing Agent On or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of Wind Down Co (solely if the Plan Administrator is not the Disbursing Agent), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to Wind Down Co and without the need for approval by the Bankruptcy Court, as set forth in Section 3.2(b) of this Plan.  In the event that the Disbursing Agent and Wind Down Co are unable to resolve a dispute with respect

40

to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)    Bond.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Dissolving Debtors. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)    Cooperation with Disbursing Agent.  Wind Down Co shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, that are entitled to receive Plan Distributions, as set forth in the Debtors' or the applicable Reorganized Debtors' books and records.  Wind Down Co will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.14 of this Plan.

## 8.6.    *Delivery of Distribution.*

Subject to the provisions contained in this Article VIII, with respect to distributions required to be made to holders of Allowed Claims by the Dissolving Debtors under this Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by this Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any Plan Distribution to any such holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; provided, however, that such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of ninety (90) days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.  Notwithstanding the foregoing, all distributions to be made on account of (x) the First Lien Lender Claims shall be delivered to the First Lien Administrative Agent for the benefit of itself and the First Lien Lenders in accordance with the terms of the First Lien Financing Agreement; (y) the 1.25 Lien Lender Claims shall be delivered to the 1.25 Lien Administrative Agent for the benefit of itself and the 1.25 Lien Lenders in accordance with the terms of the 1.25 Lien Credit Agreement; and (z) the 1.5 Lien Lender Claims shall be delivered to the 1.5 Lien Administrative Agent for the benefit of itself and the 1.5 Lien Lenders in accordance with the terms of the 1.5 Lien Credit Agreement.

## 8.7.    *Unclaimed Property.*

Ninety (90) days from the later of: (i) the Effective Date, and (ii) the first Distribution Date after such holder's Claim is first Allowed, all unclaimed property, wherever

located, or interests in property distributable hereunder on account of such Claim shall revert to the applicable Dissolving Debtor or their respective successors or assigns and be deposited in the Wind Down Account, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  Wind Down Co and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

**8.8.    *Satisfaction of Claims.***

Unless otherwise specifically provided herein, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**8.9.    *Manner of Payment Under Plan.***

Except as specifically provided herein, at the option of Wind Down Co, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or the applicable Reorganized Debtor, as the case may be.

**8.10.    *De Minimis Cash Distributions.***

None of the Dissolving Debtors, the Plan Administrator or the Disbursing Agent shall have any obligation to make a distribution that is less than $50.00 in Cash.

**8.11.    *Distributions on Account of Allowed Claims Only.***

Notwithstanding anything herein to the contrary, no Plan Distribution shall be made on account of a Claim until such Claim becomes an Allowed Claim.

**8.12.    *No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything herein to the contrary, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

**8.13.    *Setoffs and Recoupments.***

Except as expressly provided in this Plan and except with respect to the Prepetition Secured Lender Claims, the Dissolving Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that the applicable Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount between the applicable Dissolving Debtor and the holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall

42

constitute a waiver or release by a Reorganized Debtor, including any Acquired Debtor or any Dissolving Debtor, or any of their respective successors of any and all claims, rights and Causes of Action that such Persons or any of their respective successors may possess against the applicable holder.

### 8.14.   *Withholding and Reporting Requirements.*

In connection with this Plan and all Plan Distributions hereunder, the Dissolving Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Dissolving Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a holder of a Claim to submit appropriate tax and withholding certifications.  Notwithstanding any other provision of this Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to Wind Down Co for the payment and satisfaction of such tax obligations or has, to Wind Down Co's satisfaction, established an exemption therefrom.

## ARTICLE IX.

## PROCEDURES FOR RESOLVING CLAIMS

### 9.1.   *Claims Process.*

Except as otherwise required by order of the Bankruptcy Court, holders of Claims need not file proofs of claim with the Claims Agent or the Bankruptcy Court and shall be subject to the Bankruptcy Court claims process only to the extent set forth in this Plan and/or Confirmation Order.  Except as otherwise provided in this Plan, all Canadian Claims and all Assumed U.S. Liabilities will be paid in the ordinary course of business of the applicable Acquired Debtor.  If an Acquired Debtor disputes the amount of any Canadian Claim or any Assumed U.S. Liability, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.

### 9.2.   *Objections to Claims.*

Other than with respect to Fee Claims, Canadian Claims and Assumed U.S. Liabilities, only Wind Down Co, on behalf of itself and the other Dissolving Debtors, shall be entitled to object to Claims on and after the Effective Date, except that nothing herein shall be understood to waive the Plan Investor's or Acquired Debtors' right to argue that a Claim filed against the Acquired Debtors has been discharged under the Plan.  Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) one hundred eighty (180) days following the later of (x) the Effective Date and (y) the date

that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.  From and after the Effective Date, Wind Down Co may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 9.3.    *Payments and Distributions with Respect to Disputed Claims.*

If an objection to a Claim is filed as set forth in Section 9.2, except as otherwise agreed by Wind Down Co, in its sole discretion, if any portion of a Claim (other than a Fee Claim) is a Disputed Claim, no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1.    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount by the Plan Investor, (a) all executory contracts and unexpired leases to which any U.S. Debtor is a party identified, that are on the Schedule of Assumed Contracts and Leases, shall be deemed assumed or assumed and assigned by and/or to the Acquired Debtors, and all other executory contracts and unexpired leases of the U.S. Debtors shall be deemed rejected, and (b) all executory contracts and unexpired leases to which any Canadian Debtor is a party and a U.S. Debtor is not a party (and which have not expired by their own terms on or prior to the Confirmation Date), shall be deemed assumed or assumed and assigned by and/or to the Acquired Debtors; except, with respect to (a) and (b), that: (i) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; and (ii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as determined by a Final Order of the Bankruptcy Court resolving such motion.  The listing of a document on the Schedule of Assumed Contracts and Leases shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease.  If, prior to the Confirmation Date, the Acquired Debtors (as required by the Plan Investor) identify additional executory contracts and unexpired leases (x) to which a U.S. Debtor is a party that might be assumed or assumed and assigned by the Acquired Debtors, the Acquired Debtors will promptly file a supplemental Schedule of Assumed Contracts and Leases and serve such schedule on each applicable counterparty; and (y) to which a Canadian Debtor is a party that will be assumed or assumed and assigned by the Acquired Debtors, the Acquired Debtors will promptly serve a notice on the non-Debtor counterparty(ies) to such contracts and leases.  For the avoidance of doubt, all executory contracts and unexpired leases identified on the Schedule of Assumed Contracts and Leases (as required by the Plan Investor) where the Debtor counterparty is a U.S. Debtor shall be assumed by the applicable Debtor and assigned to an Acquired Debtor in accordance with this Article X, and no Dissolving Debtors shall have any liability therefor.

**10.2.**   ***Claims Based on Rejection of Executory Contracts or Unexpired Leases.***

Except as otherwise explicitly set forth in the Plan, all Claims (other than Canadian Claims and Assumed U.S. Liabilities) arising from the rejection of executory contracts or unexpired leases shall be discharged as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors, including the Acquired Debtors and the Dissolving Debtors, the Plan Investor, the Plan Administrator, or their respective properties or interests in property.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim (other than a Canadian Claim and an Assumed U.S. Liability) for such damages shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, including the Acquired Debtors, the Plan Investor, and the Dissolving Debtors, or the Plan Administrator.

**10.3.**   ***Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases.***

(a)   Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "***Cure Amount***") in full in Cash by the Plan Investor on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision); provided that, notwithstanding anything herein to the contrary, with respect to all executory contracts and unexpired leases to which a Canadian Debtor is a party (and a U.S. Debtor is not a party), all Cure Amounts shall be paid by the applicable Canadian Debtor(s) in the ordinary course, subject to all defenses and disputes the applicable Canadian Debtor(s) may have with respect to such executory contract or unexpired lease, which the applicable Canadian Debtor(s) may assert in the ordinary course.

(b)   With respect to all executory contracts and unexpired leases to which any U.S. Debtor is a party, no later than seven (7) calendar days after the Petition Date, the Debtors shall file a schedule (the "***Cure Schedule***"), which may be the Schedule of Assumed Contracts and Leases, setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of this Plan, and serve such Cure Schedule on each applicable counterparty.  With respect to all executory contracts and unexpired leases to which any Canadian Debtor is a party and a U.S. Debtor is not a party, the Debtors shall serve a notice on the non-Debtor counterparties to such contracts and leases of such Canadian Debtor(s) to be assumed or assumed and assigned reflecting the intention to assume or assume and assign such contracts or leases in connection with the Plan and setting forth the Cure Amount.  Any party to an executory contract or unexpired lease to which a U.S. Debtor is a counterparty that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor, Reorganized Debtor, Acquired Debtor, the Plan Investor, and the Dissolving Debtors

arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule. If, prior to the Confirmation Date, the Debtors (as required by the Plan Investor) identify additional executory contracts and unexpired leases to which a U.S. Debtor is a counterparty that might be assumed or assumed and assigned by the Debtors, the Debtors will promptly file a supplemental Cure Schedule ("*Supplemental Cure Schedule*") and serve such Supplemental Cure Schedule on each applicable counterparty and each applicable counterparty shall have fourteen (14) calendar days of the filing thereof to object to the applicable Cure Amount set forth on the Supplemental Cure Schedule. If, prior to the Confirmation Date, the Debtors identify additional executory contracts and unexpired leases to which a Canadian Debtor is a counter party (and a U.S. Debtor is not a counterparty) that will be assumed or assumed and assigned by the Debtors, the Debtors will promptly serve notice of such assumption or assumption and assignment on the non-Debtor counterparty thereto in accordance with this Section 10(b).

(c)     In the event of a dispute (each, a "*Cure Dispute*") regarding: (i) the Cure Amount; (ii) the ability of the applicable Acquired Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute; provided, that, with respect to a Cure Amount associated with an executory contract or unexpired lease to which a U.S. Debtor is a counterparty, the Plan Investor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). Except as set forth in the immediately preceding proviso, all Cure Amounts shall be paid by the Plan Investor on and after the Effective Date and none of the Dissolving Debtors shall have any liability with respect to the payment of Cure Amounts. Only the Plan Investor may resolve any Cure Dispute relating solely to the Cure Amount for which it is paying.

### 10.4.   *Effect of Confirmation Order on Assumption/Rejection*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in this Article X and determining that (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estates; (b) with respect to such assumptions, to the extent necessary, that the Plan Investor has (i) cured, or provided adequate assurance that the Plan Investor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or its affiliate will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease, and (c) with respect to any assignment, to the extent necessary, that the Plan Investor has (i) cured, or provided adequate assurance that it or its affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the

46

Bankruptcy Code, (ii) compensated or provided adequate assurance that the Plan Investor will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required.  Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed.  Each executory contract and unexpired lease assumed pursuant to this Article X shall revest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.  Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract.

### 10.5.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each assumed or assumed and assigned executory contract and unexpired lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### 10.6.    *Compensation and Benefit Programs.*

Except as otherwise expressly provided in this Plan, the Plan Funding Agreement, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, in each case, with the consent of the Plan Investor (solely with respect to such policies, plans and programs relating to employees to be employed by the Acquired Debtors), all employment and severance policies, and all compensation and

benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans, and paid time off policies are treated as executory contracts under the Plan and on the Effective Date will be rejected pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

Each of the Debtors may, prior to the Effective Date and with the consent of the Plan Investor (if the following will become a liability of an Acquired Debtor), enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of this Plan. Any such agreements (or a summary of the material terms thereof) shall be in form and substance acceptable to the Plan Investor and be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

**11.1.** *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the following conditions:

(a) entry of an order approving the Disclosure Statement in form and substance acceptable to the Debtors and each of the Required Parties;

(b) entry of the Confirmation Order by the Bankruptcy Court;

(c) the RSA not having been terminated by the Debtors, the Plan Investor or the Required Consenting Lenders in accordance with its terms; and

(d) the Plan Funding Agreement not having been terminated by the applicable Debtor(s) or the Plan Investor in accordance with its terms.

**11.2.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to:

(a) the Confirmation Order having become a Final Order in the Chapter 11 Cases;

(b) the Confirmation Order having been recognized by the Canadian Court in the Canadian Proceeding;

(c) the Plan Investor shall have paid the Closing Purchase Price to Wind Down Co;

(d)    any non-technical and/or immaterial amendments, modifications or supplements to the Plan shall be reasonably acceptable to the Debtors and each of the Required Parties, except as otherwise provided in Section 14.5 of this Plan;

(e)    all reasonable and documented Consenting Lender Fee Claims incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Credit Agreement and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Petition Date) shall have been paid; provided that, if Wind Down Co disputes any such Consenting Lender Fee Claims, Wind Down Co shall pay the undisputed amount of such Consenting Lender Fee Claims, and pay the remaining portion of such Consenting Lender Fee Claims after such dispute is resolved by the parties or by the Bankruptcy Court;

(f)    all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of this Plan, including, without limitation, the Plan Funding Agreement and the other documents included in the Plan Supplement, in form and substance acceptable to the Debtors and each of the Required Parties as set forth in the RSA, the Plan Funding Agreement, and herein, to be entered into (rather than assumed) by the applicable Debtors being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(g)    the Debtors obtaining all authorizations, consents and regulatory approvals, if any, required to be obtained, and filing all notices and reports, if any, required to be filed, by the Debtors in connection with this Plan's effectiveness;

(h)    the RSA and the Plan Funding Agreement not having been terminated by the applicable Debtors, the Plan Investor or the Required Consenting Lenders, as applicable, in each case, in accordance with their respective terms;

(i)    all closing conditions and other conditions precedent in the Plan Funding Agreement shall have been satisfied or waived in accordance with the terms thereof; and

(j)    there being sufficient Cash, in the Debtors' good faith determination to pay in accordance with the Plan all (if they are not Canadian Claims and/or Assumed U.S. Liabilities) DIP Claims, Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Fee Claims to the extent paid in Cash, U.S. Trustee Fees for the Dissolving Debtors on an ongoing basis and U.S. Trustee Fees for the Acquired Debtors incurred to the Effective Date, and any other anticipated Wind Down Costs, including, any amounts owed under any key employee incentive and/or retention programs approved by the Bankruptcy Court.

For the avoidance of doubt, notwithstanding the occurrence of the Effective Date, on and after the Effective Date, the Plan Investor shall remain obligated to pay to Wind Down Co the remainder of the Purchase Price, if any, subject to and in accordance with the terms of the Plan Funding Agreement.

### 11.3. *Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Sections 11.1 and 11.2 of this Plan may be waived in whole or part upon agreement by: (x) the Debtors and the Plan Investor (with respect to Section 11.2(i) of this Plan), (y) the Debtors and each of the Required Parties (with respect to Sections 11.1(a) – (d) and Sections 11.2(a) – (h) of this Plan), or (z) the Debtors and the Required Consenting 1.5 Lien Lenders (with respect to Section 11.2(j) of this Plan), and as the case may be, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine, but only to the extent applicable, shall be unaffected by any provision hereof.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### 11.4. *Effect of Failure of Conditions.*

If all of the conditions to effectiveness have not been satisfied (as provided in Sections 11.1 and 11.2 hereof) or duly waived (as provided in Section 11.3 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Sections 11.1 and 11.2 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 11.4, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

## ARTICLE XII.

## EFFECT OF CONFIRMATION

### 12.1. *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such holder has accepted this Plan.

**12.2.    *Discharge of Claims Against and Interests in the Debtors.***

Upon the Effective Date and in consideration of the Plan Distributions, if any, except as otherwise provided herein or in the Confirmation Order (including with respect to Canadian Claims and Assumed U.S. Liabilities), each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor, any Reorganized Debtor, including any Acquired Debtor or Dissolving Debtor, or any property, wherever located, including Canada, of the Estates.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in any relevant jurisdictions to implement the transactions set out in this Plan, including this Plan's discharge provisions, in order to ensure that they are fully effective.

**12.3.    *Term of Pre-Confirmation Injunctions or Stays.***

Unless otherwise provided herein, all injunctions or stays provided in the Chapter 11 Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All stays and suspensions provided for in the Canadian Proceeding pursuant to any order of the Canadian Court shall remain in full force and effect until the Effective Date unless otherwise ordered by the Canadian Court.

**12.4.    *Injunction Against Interference with Plan.***

**Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States, Canada or elsewhere, to interfere with the implementation or consummation of this Plan.  Moreover, solely to the extent provided under applicable law, the property dealt with by this Plan is transferred to, or vests in (or both, as applicable) the Reorganized Debtors free and clear of all Claims and Interests pursuant to section 1141(c) of the Bankruptcy Code.  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Person under this Plan and except for Assumed U.S. Liabilities and Canadian Claims.  As of the Confirmation Date, subject to the occurrence of the Effective Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under this Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in this Plan or the**

51

**Confirmation Order.  Each of the Reorganized Debtors, as applicable, is expressly authorized hereby to seek to enforce such injunction.**

**12.5.**  *Injunction.*

 **Except as otherwise provided in this Plan or the Confirmation Order (including with respect to Canadian Claims and Assumed U.S. Liabilities), as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties, the Reorganized Debtors, including the Acquired Debtors, and the Dissolving Debtors, the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, including Canada, of any such transferee or successor, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Released Parties, the Reorganized Debtors, including the Acquired Debtors, and the Dissolving Debtors, the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, including Canada, of any such transferee or successor, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties, the Reorganized Debtors, including the Acquired Debtors, the Dissolving Debtors or the Estates (including any of the foregoing located in Canada) or any of their property, wherever located, including Canada, or any direct or indirect transferee of any property, wherever located, including Canada, of, or successor in interest to, any of the foregoing Persons, on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, Causes of Action or liabilities; (iv) acting or proceeding in any manner, in any place whatsoever (including in Canada), that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place (including in Canada), any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in any relevant jurisdictions to implement the transactions set out in this Plan, including the injunctions set forth in this Section 12.5, in order to ensure that they are fully effective.  Each of the**

Reorganized Debtors, as applicable, is expressly authorized hereby to seek to enforce such injunction.

**12.6.**   *Releases.*

(a)    **Releases by the Debtors.**  For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, the Debtors, the Reorganized Debtors, and the Dissolving Debtors in their individual capacities and as debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce this Plan and the contracts, instruments, releases, agreements and documents delivered thereunder) against the other Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, including the Acquired Debtors, and the Dissolving Debtors, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the parties released pursuant to this Section 12.6, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the DIP Facility, the Plan Funding Agreement, or this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors or Dissolving Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtors that constitutes gross negligence, willful misconduct or actual fraud, each as determined by a Final Order of the Bankruptcy Court.

(b)    **Releases by and among Released Parties.**  Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, each of the Released Parties (other than the Debtors, the Reorganized Debtors, and the Dissolving Debtors, in their individual capacities and as debtor in possession and the other parties listed in subsection (i) of the definition of Released Parties as they relate to the Debtors and the Reorganized Debtors), in consideration for the obligations of the Debtors and Reorganized Debtors under this Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, will have consented to this Plan for all purposes and the restructuring embodied herein and forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) against the other Released Parties and the Reorganized Debtors (including the Acquired Debtors, and the Dissolving Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or

53

omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, including the Acquired Debtors, and the Dissolving Debtors, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the DIP Facility, the Plan Funding Agreement, or this Plan or the Disclosure Statement.

(c)    **Releases of Directors and Officers**.  Except as otherwise provided in this Plan or the Confirmation Order, and except with respect to any claims against directors that cannot be released under section 5.1(2) of the *Companies' Creditors Arrangement Act* (Canada), on the Effective Date, each of the directors and officers of the Debtors serving in such capacities as of the Petition Date, each in their capacities as such, shall be deemed to be released from all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities whatsoever (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to May 24, 2016 in any way relating to the Debtors.

(d)    Notwithstanding anything to the contrary contained herein: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.6 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code, Canadian federal tax law, or any state, provincial, city or municipal tax code, or (y) any criminal laws of the United States, Canada or any state, province, city or municipality; and (ii) the releases set forth in this Section 12.6 shall not release any (x) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, managers, managing members, or representatives and (y) claims against any Person arising from or relating to such Person's gross negligence, willful misconduct or actual fraud, each as determined by a Final Order of the Bankruptcy Court.

12.7.    *Exculpation and Limitation of Liability.*

On the Effective Date, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of this Plan, the Chapter 11 Cases, the Canadian Proceeding, the RSA, the Plan Funding Agreement, the Disclosure Statement, the DIP Credit Agreement, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions,

**actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence, or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.**

## 12.8. *Injunction Related to Releases and Exculpation.*

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in or encompassed by Sections 12.6 and 12.7 of this Plan.  Each of the Reorganized Debtors, as applicable, is expressly authorized hereby to seek to enforce such injunction.**

## 12.9. *Retention of Causes of Action/Reservation of Rights.*

Subject to Section 12.6 of this Plan and except as expressly set forth herein, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Subject to Section 12.6 of this Plan and except as expressly set forth herein, the Acquired Debtors and the Dissolving Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Articles IV and V of this Plan, may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced; provided that, notwithstanding the foregoing but subject to Section 12.6 of this Plan, in consideration of the amounts to be paid by the Plan Investor under this Plan, on the Effective Date, all Causes of Action of the Debtors under chapter 5 of the Bankruptcy Code shall be transferred to the Acquired Debtors.

## 12.10. *Indemnification Obligations.*

(a)     Notwithstanding anything to the contrary contained herein, subject to the occurrence of the Effective Date and to the Plan Funding Agreement, the obligations (i) of the Dissolving Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of any of the Dissolving Debtors as of the Petition Date or who continue to be directors or officers of any of the Dissolving Debtors at any time after the Effective Date, or (ii) of the Acquired Debtors to

indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who continue to be directors or officers of any of the Acquired Debtors at any time after the Effective Date, against any Causes of Action relating to the Dissolving Debtors or the Acquired Debtors, as applicable, remain unaffected thereby after the Effective Date and are not discharged as to the applicable Debtors, respectively.  On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, the Run Off D&O Policy, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such directors and/or officers remain in such positions after the Effective Date, provided, that, nothing in this Plan shall be deemed or construed to require the applicable Reorganized Debtors to renew or extend such polices, or to have any obligations thereunder.  For a period of six years after the Effective Date, the applicable Reorganized Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time prior to the Effective Date, and make available to any such Person, subject to applicable confidentiality and privilege concerns, such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Person may reasonably require in connection with the defense or preparation for the defense of any claim against such Person relating to any action taken in connection with such Person's role as a director or officer of a Debtor.

(b)     Prior to or on the Effective Date, the Debtors or Wind Down Co, on behalf of the Debtors, with funds of the Debtors or proceeds of the Closing Purchase Price, shall purchase a "run off" directors and officers liability policy, which shall (i) be effective as of the Effective Date, (ii) have a six-year coverage period, and (iii) be on terms acceptable to the Debtors (the "***Run Off D&O Policy***").

## ARTICLE XIII.

## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided herein;

(e)      To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)      To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)      To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      To hear and determine all Fee Claims;

(j)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, the Plan Funding Agreement and any transactions or payments contemplated hereby or thereby, including the Post-Closing Purchase Price Adjustment, the TSA, the Escrow and the Escrow Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(k)      To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)      To hear and determine all disputes involving the existence, nature or scope of the discharge, releases and injunction provisions contained in the Plan;

(n)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases or Canadian Proceeding, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)     To recover all assets of the Debtors and property of the Estates, wherever located, including Canada; and

(r)     To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1.   *Exemption from Certain Transfer Taxes.*

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 14.2.   *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Acquired Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which any applicable Debtor had obligated itself to provide such benefits.  Nothing herein shall: (a) restrict the Debtors' or the applicable Acquired Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

### 14.3.   *Dissolution of Creditors' Committee.*

The Debtors do not anticipate that a Creditors' Committee will be formed in the Chapter 11 Cases.  If, however, a Creditors' Committee is appointed, it shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

### 14.4.   *Termination of Professionals.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee, if any, shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims, and the Dissolving Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims.  Nothing herein shall preclude any Dissolving Debtor or any Acquired Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.5.   *Amendments.*

This Plan may be amended, modified, or supplemented by the Debtors, with the consent of each of the Required Parties, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of holders of Allowed Claims and Allowed Interests pursuant to this Plan, the Debtors may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.  The Debtors may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that, such technical adjustments and modifications are immaterial or do not adversely affect the treatment of holders of Claims or Interests under the Plan.

### 14.6.   *Revocation or Withdrawal of this Plan.*

Subject to the terms and conditions of the RSA and the Plan Funding Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date.  If the Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by this Plan,

and any document or agreement executed pursuant to this Plan shall be deemed null and void, provided, however, that the Plan Investor, or any of its designees, shall retain its rights and to the extent as expressly provided under the Transaction Documents; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 14.7. *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.8. *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.9. *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.10. *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, the Plan Investor and the Consenting Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or

regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

**14.11.  *Inconsistency.***

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, the RSA, the Plan Funding Agreement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern, provided, however, that the parties to the Plan Funding Agreement and the RSA shall use commercially reasonable efforts to eliminate any such inconsistency by agreement prior to the provisions of this section becoming applicable and enforceable.

**14.12.  *Time.***

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**14.13.  *Exhibits.***

All exhibits to this Plan (including, without limitation, the Plan Documents, all documents filed with the Plan Supplement, and the Plan Funding Agreement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.

**14.14.  *Notices.***

All notices or requests in connection with the Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

SquareTwo Financial Services Corporation
6300 South Syracuse Way, Suite 300
Centennial, Colorado 80111
Attention:  J.B. Richardson, Jr., Chief Operating Officer
E-mail:       jbrichardson@squaretwofinancial.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:      Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Robin Spigel, Esq.
E-mail:    mfeldman@willkie.com

61

pshalhoub@willkie.com
rspigel@willkie.com

Resurgent Holdings LLC
c/o Sherman Capital Markets LLC
200 Meeting Street
Charleston, South Carolina 29401
Attention:  Jon Mazzoli, Director
E-mail:  jmazzoli@sfg.com

with a copy to:

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:  Patricia J. Lane, Esq.
           Benjamin F. Rikkers, Esq.
           Michael J. Small, Esq.
E-mail:    plane@foley.com
           brikkers@foley.com
           msmall@foley.com

### 14.15.  *Filing of Additional Documents.*

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.16.  *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: March 3, 2017
New York, New York

Respectfully submitted,

**SQUARETWO FINANCIAL SERVICES
CORPORATION,** on behalf of itself and its affiliated
Debtors

By:    /s/ J.B. Richardson, Jr.
Name: J.B. Richardson, Jr.
Title:  President and Chief Executive Officer
and/or Authorized Signatory

Counsel:

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Robin Spigel, Esq.
Debra C. McElligott, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
Counsel for the Prospective Debtors
and Debtors in Possession

## Exhibit A

(Assumed U.S. Liabilities)

1.      Cure Amounts associated with any contracts and leases to be assumed by the Plan Investor as determined by the Plan Investor in accordance with Article X of the Plan.

2.      All Claims (excluding non-ordinary course litigation Claims) incurred by the Acquired Debtors in the ordinary course of business on and after the Petition Date that remain unpaid on the Effective Date; provided that the Debtors have complied with their obligations as and to the extent set forth in Section 6.1 of the Plan Funding Agreement in all material respects.

## Exhibit B

(Excluded U.S. Assets)

All cash and cash equivalents, wherever located, and by whomever held in which one or more U.S. Debtors and/or Canadian Debtors, hold any right, title and interest to, in or under, including but not limited to, the below deposits:

| Deposits | | |
|---|---|---|
| Surety Bond | $2,000,000 | Cash collateral with Old Republic Surety Company |
| Cascades Deposit (UMB) | $1,717,851 | Cash collateral for Letter of Credit with UMB |
| Corporate Aircraft | $487,723 | Cash deposit, held with Huntington |
| Other Security Deposits | $148,475 | Cash deposit with various leasing companies |
| IOLTA | $1,250,000 | Cash balances in multiple IOLTAs with several legal offices |
| Global One Pay | $500,000 | Cash deposit with credit card processor, held by Global One |
| Misc. Retainers | $1,700,000 | Cash retainers paid to professional firms for future work performed |

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

**Liquidation Analysis for the Debtors**

The Debtors, with assistance from their financial and other advisors, have performed a hypothetical liquidation analysis ("**Liquidation Analysis**") in connection with the Disclosure Statement[1] to which this Liquidation Analysis is attached as an exhibit for the purpose of evaluating whether the Plan meets the so-called "best interests" test under Section 1129(a)(7) of the Bankruptcy Code.  Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether the best interests test has been met is to determine the dollar amount that would be generated from the hypothetical liquidation of the Debtors' assets in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  Such amount would then be reduced by the amount of:  (a) any Claims secured by such assets; (b) the costs and expenses of the liquidation and such additional administrative expenses that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation; and (c) chapter 11 Allowed Administrative Expenses, Allowed U.S. Trustee Fees, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

Since the Plan contemplates "prepackaged" chapter 11 cases, the Liquidation Analysis assumes that the bankruptcy cases would be filed initially under chapter 7 of the Bankruptcy Code.  If the Debtors initially file voluntary petitions under chapter 11 of the Bankruptcy Code, and such chapter 11 cases are subsequently converted to cases under chapter 7 of the Bankruptcy Code, additional claims may arise against the Estates that are not currently reflected in the Liquidation Analysis, such as DIP Claims, which may significantly impact the conclusions set forth herein.

Set forth on the following pages is a Liquidation Analysis for the Debtors, assuming a hypothetical chapter 7 liquidation in which a Court appointed trustee liquidates the Debtors' assets.  A general summary of the assumptions used in preparing this Liquidation Analysis follows.

**Estimate of Net Proceeds**

Estimates were made of the cash proceeds that might be realized from the hypothetical liquidation of the Debtors' assets.  The chapter 7 is assumed to commence on February 28, 2017 (the "**Liquidation Date**") and to last four months (the "**Liquidation Period**") following the appointment of a chapter 7 trustee for the Debtors.  For purposes of the analysis, the Debtors' balance sheets as of January 31, 2017 were used for fixed asset, personal property, prepaid asset

---

[1]    All capitalized terms used but not otherwise defined in this Liquidation Analysis have the meanings given to them in the accompanying Disclosure Statement.

and intangible asset balances for both US and Canadian assets.  The analysis derived cash from the Debtors' forecast through February 28, 2017.

The Debtors' main asset of value is its purchased debt portfolio of various charged-off consumer and commercial accounts receivable (the "**Portfolio**"), the value of which is based on a buyer's ability to successfully pursue collections.

Because there is no easy way to accelerate or simplify the process of monetizing the Portfolio, a chapter 7 liquidation likely would result in both the impairment to value and in collection timing of such assets.  Charged off receivables, by their nature, require persistence, spending and patience to monetize.  The individuals who owe amounts in connection with such receivables generally are unable to pay in a lump sum and, thus, only are able to agree to a payment plan or, following collection suits that are rendered to judgments, result in garnishments.  The impact of a chapter 7 filing on these obligations to pay is uncertain and thus the value if liquidated also is uncertain.

The estimated value for the Portfolio represents bids that could be received in a chapter 7 liquidation.  In arriving at this estimated value, the Debtors primarily relied on the two lowest bids received from potential buyers during their sales process conducted in the months leading up to the Petition Date as guidance.  The Debtors believe such bids represented the maximum amount a buyer of only the Portfolio would be willing to pay.  Further, such bids assumed a smooth transition by the Debtors of the Portfolio to the buyer with adequate follow on support by the Debtors' employees, which would be unlikely in a chapter 7 liquidation.  As such, in the view of the Debtors, such bids were representative of the estimated maximum amount a potential buyer would be able to achieve in an orderly liquidation not conducted in a forced sale atmosphere.

For purposes of the Liquidation Analysis, the Debtors utilized various purchase price adjustments respective to the bid of each such term sheet received to arrive at an estimated Net Adjusted Purchase Price ("**NAPP**").  Purchase price adjustments included, among other things, purchasing and collection activity, associated costs since receipt of the bid through the Liquidation Date, as well as accounting for the forced sale atmosphere.  The estimated NAPP value of the Portfolio also includes deductions for various holdback amounts assumed to be negotiated by potential buyers in a hypothetical sales process.  In total, this provided a starting low estimate of $161.9 million and a starting high estimate of $165.9 million.  Assuming a condensed four month timeframe for a liquidation to be completed and significant friction costs expected in the rapid sale of assets with limited seller support to the buyer, a 10% discount was applied to the high scenario and a 30% discount was applied to the low scenario to arrive at a liquidation scenario estimated NAPP range of $113.3 million to $149.3 million.

There can be no assurance that the liquidation would be completed in a limited time frame nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of the parties in interest.

**Estimate of Costs**

The Debtors' cost of liquidation under chapter 7 would include fees payable to a chapter 7 trustee, as well as those fees which might be payable to attorneys and other professionals that such a trustee may engage. Further costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors until conclusion of their chapter 7 cases, including, operating expenses and other costs considered likely to be incurred during the Liquidation Period. Significant liquidation activities would include: (a) collections on the Portfolio; (b) negotiation and documentation related to the sale of the Portfolio; (c) negotiation and documentation related to the sale of other tangible and intangible assets; and (d) occupancy and office closing costs.

Additional administrative expenses would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors during the Chapter 11 Cases. It is possible that in a chapter 7 case, the wind down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation.

**Distribution of Net Proceeds Under Absolute Priority**

The foregoing types of administrative expense claims in chapter 7 liquidation cases that may arise would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to holders of unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full. The Debtors believe that in a chapter 7 case, after taking account of the costs of the chapter 7 liquidation, secured creditors would only receive a partial recovery and, as such, holders of administrative expense claims or priority claims would receive no recovery. General unsecured claims and any holders of equity interests would receive no recovery. The claim amounts reflected in the Liquidation Analysis are based on the Debtors' estimate of claims which are expected to be incurred as a result of the liquidation and the Debtors' estimate of claims which would exist as of Liquidation Date.

After consideration of the effects of a chapter 7 liquidation on the ultimate proceeds available for distribution to creditors, including, (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in a bankruptcy and professional advisors to such trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would likely prevail, and (c) the substantial increase in Claims which would be satisfied on a prior basis, **THE DEBTORS HAVE DETERMINED THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR WITH A RECOVERY THAT IS NOT LESS THAN SUCH CREDITOR WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

**General Assumptions**

The Liquidation Analysis reflects estimates of the proceeds that might be realized through the liquidation of the Debtors, in accordance with chapter 7 of the Bankruptcy Code. This analysis is based on the Debtors' asset balances available as of January 31, 2017 or forecast estimates of value through the Liquidation Date. The Liquidation Analysis assumes that there would be pressure to complete the sales process within the Liquidation Period. The Liquidation Period would allow the trustee to sell the Debtors' assets, wind down operational activities, complete the claims reconciliation process and make distributions to parties in interest. The need to convert the Portfolio and other property to cash within the projected timeframe likely would have an adverse impact on the proceeds realized from the sale of the Debtors' assets. Depending on actual circumstances, the Liquidation Period could be significantly longer, in which event, wind down costs would increase and recoveries would likely decrease.

**The Liquidation Analysis is based upon a number of estimates and assumptions that, although developed by and considered reasonable by the management of the Debtors, are inherently subject to significant economic, business, governmental, regulatory, competitive uncertainties as well as other contingencies beyond the control of the Debtors or their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE COMPANY WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY AND ADVERSELY FROM THOSE CONTAINED HEREIN.**

**This Liquidation Analysis was developed solely for purposes of the Disclosure Statement and Plan and to enable the holders of Claims entitled to vote on the Plan to make an informed judgment about the restructuring and Plan and should not be used or relied on for any other purpose, including the purchase or sale of securities of, or claims or interests in, the Debtors.**

**Nothing contained in this hypothetical liquidation analysis is intended to be or constitutes a concession or admission of the Debtors.**

The following is a summary of the major assumptions underlying the Liquidation Analysis:

1. A chapter 7 trustee either would be elected by creditors or appointed by the Bankruptcy Court to administer the estates. The chapter 7 trustee is independent and would be entitled to make all of her own decisions (subject to Bankruptcy Court approval as applicable) regarding the liquidation of the estates, hiring of professionals, the pursuit of Claims or litigation, the payment of or objection to Claims, and the distribution of any ultimate dividend. The chapter 7 trustee would be compensated in accordance with section 326 of the Bankruptcy Code.

2.  The Liquidation Analysis relies on the Debtors' unaudited financial statements as of January 31, 2017, and other figures estimated by management.  The Debtors do not believe that the assets will materially change prior to the assumed liquidation date of February 28, 2017.

3.  This Liquidation Analysis assumes that all assets of the Debtors will be liquidated during the Liquidation Period.  Although the Debtors believe a four month period is sufficient to allow for an orderly liquidation, including the transfer of operations to acquirers, there can be no assurances made that all assets will be completely liquidated during this time period.  Moreover, the assumptions set forth in the "Estimate of Net Proceeds" section and in the immediately preceding section are incorporated in this summary of major assumptions underlying the Liquidation Analysis.

4.  It is assumed that assets will be sold for cash or cash equivalents.

5.  It is assumed that assets subject to capital leases (generally leased furniture and computer hardware) will be returned to the lessor.  The analysis assumes there are no deficiency claims associated with such leases.

6.  It is assumed that all non-operating assets would be disposed of through sale, liquidation, termination and/or abandonment as appropriate.

7.  The Liquidation Analysis presents the liquidation of the Debtors on a consolidated basis because for each individual Debtor, the holders of First Lien Lender Claims, 1.25 Lien Lender Claims and 1.5 Lien Lender Claims have liens on substantially all of the assets of each of the Debtors.  Accordingly, proceeds realized from each Debtor are aggregated in a common distribution source.  For purposes of distribution, each and every Claim asserted against or Interest in any Debtor is presumed to be entitled to a distribution from the aggregated proceeds.  Any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds.  As set forth herein, it is assumed that no value would be available to any creditors other than the holders of Allowed First Lien Lender Claims, Allowed 1.25 Lien Lender Claims and Allowed 1.5 Lien Lender Claims.

8.  The amounts reflected in the Liquidation Analysis are based on the Debtors estimate of administrative expenses that are expected to be incurred as a result of the hypothetical liquidation and the Debtors' estimate of Claims which would exist as of February 28, 2017.

9.  The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

10. Distributions to creditors are assumed to occur on or around July 15, 2017.

| | Notes | Est. Value 2/28/17, unless otherwise noted | Low | | High | |
|---|---|---|---|---|---|---|
| | | | Est. Recovery Value | Est. Recovery Rate | Est. Recovery Value | Est. Recovery Rate |
| **Assets** | | | | | | |
| Cash and Equivalents | A | $ 1,614 | $ 1,614 | 100% | $ 1,614 | 100% |
| Cash from Winddown Collections | B | 28,059 | 7,653 | 27% | 15,305 | 55% |
| Purchased Debt Portfolio | C | 539,878 | 113,324 | 21% | 149,348 | 28% |
| Deposits & Prepaid Assets | D | 7,508 | 2,000 | 27% | 2,000 | 27% |
| Computer Hardware | E | 305 | 15 | 5% | 30 | 10% |
| Leasehold Interests | F | 4,794 | - | 0% | - | 0% |
| Leasehold Improvements | G | 9 | - | 0% | - | 0% |
| Office Furniture & Equipment | H | 106 | - | 0% | - | 0% |
| Developed Software | I | 19,659 | - | 0% | - | 0% |
| Branch Office Network Intangible | J | 13,347 | - | 0% | - | 0% |
| **Total** | | **615,278** | **124,605** | | **168,297** | |
| | | | | | | |
| **Chapter 7 Administrative Claims** | | | | | | |
| Trustee Fees | K | | (3,690) | | (5,000) | |
| Trustee's Counsel and Related | L | | (3,690) | | (5,000) | |
| Wind-Down and Professional Fees | M | | (2,585) | | (2,585) | |
| **Total liquidation costs** | | | **(9,964)** | | **(12,586)** | |
| **Net Proceeds Available to Creditors** | | | **$ 114,641** | | **$ 155,711** | |

| | Notes | Estimated Claim | Estimated Recovery | Estimated Recovery Rate | Estimated Recovery | Estimated Recovery Rate |
|---|---|---|---|---|---|---|
| **Estimated Recovery to Creditors** | | | | | | |
| Secured 1.0 Lienholders | N | 138,000 | 114,641 | 83.1% | 138,000 | 100.0% |
| Secured 1.25 Lienholders | | 16,250 | - | 0.0% | 16,250 | 100.0% |
| Secured 1.5 Lienholders | | 189,932 | - | 0.0% | 1,461 | 0.8% |
| Secured 2.0 Lienholders | | 19,988 | - | 0.0% | - | 0.0% |
| Priority Claims & Unsecured Claims | O | 17,311 | - | 0.0% | - | 0.0% |
| | | $ 381,481 | $ 114,641 | 30.1% | $ 155,711 | 40.8% |

## Notes to Chart

A. Cash and Cash Equivalents — The Liquidation Analysis assumes that the cash at the date of the actual liquidation would be equal to the projected cash balance for the week ending February 28, 2017. The analysis assumes that 100 percent of the cash and cash equivalents value as of February 28, 2017 would be realized over the four month Liquidation Period in addition to cash from ongoing operations during that time.

B. Cash from Wind Down Collections — Cash from operations was based on forecast collections activity on the Portfolio in the normal course. In a liquidation scenario however, the analysis assumes that the Debtors would only realize a discounted portion of the normal course collections estimate given increased account delays or breakage as a result of the chapter 7 liquidation announcement. Further, the analysis assumes that all collections activity would cease following the first two months of the Liquidation Period as the debt portfolios (comprising the Portfolio) are sold.

- 6 -

C.  Purchased Debt Portfolio — Value range as of February 28, 2017 based on the
liquidation scenario estimated NAPP values and assumptions discussed above in
"Estimated Net Proceeds."

D.  Deposits & Prepaid Assets — Deposits and prepaid assets consist primarily of lease
deposits, surety bond deposits, retainers and other prepaid amounts.  The analysis
assumes that the only deposit returned will be the surety deposit totaling $2.0 million
when the surety bond is canceled.

E.  Computer Hardware — Consists primarily of estimated recovery for owned computer
hardware and equipment.  This analysis assumes that five to ten percent of the computer
hardware would be recovered over the four month Liquidation Period.

F.  Leasehold Interests — Consists primarily of estimated recovery for the Debtors' existing
leasehold interests in Colorado, Arizona, Kansas and Ontario.  This analysis assumes that
these leases would hold immaterial value in a liquidation scenario considering the ample
supply of similar properties in the Debtors' areas of operation.

G.  Leasehold Improvements — Consists primarily of estimated recovery for improvements
and renovations made at the Debtors' existing Centennial, CO location.  This analysis
assumes that recovery for these improvements in a liquidation scenario would be de
minimis and most likely would revert back to the lessor.

H.  Office Furniture & Equipment — Consists primarily of estimated recovery for the
Debtors' owned furniture and office equipment.  Considering that the Debtors lease the
majority of their furniture and equipment, this analysis assumes that the Debtors would
not be able to recover anything of value in a liquidation scenario from its owned office
furniture & equipment.

I.  Developed Software — Consists primarily of the capitalized development expenses for
the Debtors' eAGLE and Data Warehouse software.  Based on the bids received in the
sale process conducted by the Debtors in the months leading up to the Petition Date, the
analysis assumes that developed software would have no value in a liquidation scenario.

J.  Branch Office Network Intangible — This intangible asset consists of the Debtors'
extensive branch network of law firms.  This analysis assumes that this network would
have no value in a liquidation scenario considering the intangible nature of the asset.

K.  Trustee Fees — Section 326 of the U.S. Bankruptcy Code limits U.S. Trustee fees to
three percent of gross liquidation proceeds.  For this Liquidation Analysis, a recovery
estimate of three percent is assumed.

L.  Trustee's Counsel and Related — Includes fees and expenses incurred by the Trustee's legal and professional counsel associated with the wind down.  The analysis estimates this fee at three percent of asset recovery excluding cash and equivalents.

M.  Wind Down and Professional Fees — This includes fees and expenses that would be incurred during the wind down period for 15 personnel, including wages, retention bonuses, operating costs and overhead.  These costs were estimated to be approximately $2.6 million over the four month Liquidation Period.

N.  Secured Lienholders — Net proceeds based on secured claim estimates as of February 28, 2017 and the remaining proceeds available to creditors.  The Canadian Debtors did not guarantee the Second Lien Notes.  However, because the Canadian Debtors are guarantors under the 1.5 Lien Credit Agreement and the 1.5 Lien Lenders will not be paid in full, this Liquidation Analysis does not distinguish between the assets of the U.S. Debtors and the Canadian Debtors.

O.  Priority & Unsecured Claims — Net proceeds based on priority employee claims and unsecured claim estimates as of February 28, 2017 and the remaining proceeds available to unsecured creditors, including an estimate of potential rejection damage claims.

## **EXHIBIT C**

**Restructuring Support Agreement (without exhibits or schedules)**

*Execution Copy*

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "<u>Agreement</u>"), dated as of March 3, 2017, is made by and among:  (a) SquareTwo Financial Corporation ("<u>SquareTwo</u>") and each of SquareTwo's direct and indirect subsidiaries (collectively with SquareTwo, the "<u>Company</u>"); (b) each of the undersigned holders (each, a "<u>Consenting Lender</u>" and, collectively, the "<u>Consenting Lenders</u>") of claims (as defined in section 101(5) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")) against the Company (the "<u>Claims</u>") arising under or in connection with:  (i) that certain Financing Agreement, dated as of May 24, 2016 (as amended, restated, modified or supplemented from time to time, the "<u>First Lien Credit Agreement</u>" and a holder of such Claims, a "<u>Consenting First Lien Lender</u>"); (ii) that certain 1.25 Lien Credit Agreement, dated as of May 24, 2016 (as amended, restated, modified or supplemented from time to time, the "<u>1.25 Lien Credit Agreement</u>" and a holder of such Claims, a "<u>Consenting 1.25 Lien Lender</u>"); and/or (iii) that certain 1.5 Lien Credit Agreement, dated as of May 24, 2016 (as amended, restated, modified or supplemented from time to time, the "<u>1.5 Lien Credit Agreement</u>," and a holder of such Claims, a "<u>Consenting 1.5 Lien Lender</u>", and together with the First Lien Credit Agreement, the 1.25 Lien Credit Agreement, and their respective ancillary and related documents, the "<u>Credit Documents</u>"); and (c) Resurgent Holdings LLC (the "<u>Plan Investor</u>" and collectively with the Consenting Lenders, the "<u>Plan Support Parties</u>").  The Company and the Plan Support Parties are each referred to herein as a "<u>Party</u>", and collectively, as the "<u>Parties</u>".  Each of the Consenting First Lien Lenders, the Consenting 1.25 Lien Lenders and the Consenting 1.5 Lien Lenders, as applicable, are referred to herein as a "<u>Consenting Class</u>."

## RECITALS

**WHEREAS**, the Company has determined that it would be in its best interests to implement a restructuring of its indebtedness and other obligations through the prosecution of "prepackaged" chapter 11 cases (the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and commencing recognition proceedings (the "<u>Canadian Proceedings</u>") in the Ontario Superior Court of Justice (the "<u>Canadian Court</u>");

**WHEREAS**, the Parties have agreed that Plan Investor will provide a new money investment in connection with the restructuring of the Company in exchange for 100% of the equity of those Company entities that will be reorganized and any other assets designated in the Plan Funding Agreement and related documents (the "<u>Transaction</u>");

**WHEREAS**, the Parties have agreed on the material terms of the Transaction, which are memorialized:  (a) in the proposed prepackaged chapter 11 plan for the Company, substantially in the form attached hereto as <u>Exhibit A</u> (as may be amended, modified, or supplemented from time to time with the written Consent (as defined in section 8.11(c) hereof) of the Plan Investor and written consent of the Required Consenting Lenders (as defined in Section 8.11(a) hereof), including any schedules and exhibits attached thereto, the "<u>Plan</u>")[1]; and (b) in the plan funding

---

[1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

agreement between the Company and the Plan Investor, attached hereto as <u>Exhibit B</u> (as the same may be amended, modified, or supplemented from time to time, the "<u>Plan Funding Agreement</u>"), and executed concurrently herewith; and

      **WHEREAS**, subject to the terms hereof and, as required, appropriate approvals of the Bankruptcy Court and, to the extent applicable, the Canadian Court, the following sets forth the agreement between the Parties concerning their respective obligations in connection with the Transaction, the Bankruptcy Cases and the Canadian Proceedings.

      **NOW, THEREFORE**, in consideration of the foregoing, the Parties agree as follows:

<u>AGREEMENT</u>

**Section 1.**    <u>**Chapter 11 Plan and Definitive Documentation.**</u>

**1.1**    **Support of Plan and Definitive Documentation.**

(a)    So long as the Termination Date has not occurred, the Company agrees to: (i) take any and all necessary and appropriate actions in furtherance of the restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement and consummating the Transaction within the time frames contemplated by this Agreement; (ii) commence the Bankruptcy Cases and the Canadian Proceedings; (iii) file and seek approval on an interim and final (to the extent applicable) basis of "first day" motions (including the DIP Credit Agreement, substantially in the form attached hereto as Exhibit D), as well as the other Loan Documents (as defined in the DIP Credit Agreement)); (iv) file the Plan and a related disclosure statement (as may be amended, modified or supplemented from time to time with the written Consent of the Plan Investor and written consent of the Required Consenting Lenders, the "<u>Disclosure Statement</u>"), in substantially the form annexed hereto as <u>Exhibit C</u>, with the Bankruptcy Court and seek approval of the Disclosure Statement and confirmation of the Plan (and recognition of the Bankruptcy Court's approval of the Disclosure Statement and confirmation of the Plan in the Canadian Proceedings); (v) act in good faith and use commercially reasonable efforts to support and complete successfully the solicitation of votes in favor of the Plan in accordance with the terms of this Agreement; (vi) use commercially reasonable efforts to obtain any and all required regulatory approvals and third-party approvals of the Transaction; (vii) not take any actions inconsistent with this Agreement, the Plan, the Plan Funding Agreement and any other related documents executed by the Company or the expeditious consummation of the Transaction and the other restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement; and (viii) not take any action to the extent prohibited by Section 6.7 of the Plan Funding Agreement; nor shall the Company solicit or direct any person or entity to undertake any of the foregoing, in the case of each of clauses (i) through (viii), subject to Section 3.1 of this Agreement.

(b)    So long as the Termination Date has not occurred, each Consenting Lender hereby agrees that it shall:  (i) subject to the receipt by such Consenting Lender of the Disclosure Statement and Solicitation Materials, and subject to the

- 2 -

acknowledgements set forth in Section 7 of this Agreement, timely vote its Claims, now or hereafter beneficially owned by such Consenting Lender or for which the Consenting Lender now or hereafter serves as the nominee, investment manager or advisor for beneficial holders, to accept the Plan; provided that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement as to such Consenting Lender prior to the consummation of the Plan pursuant to the terms hereof; (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote subject to the proviso in the immediately preceding clause (i) of this Section 1.1(b); (iii) not (x) object to, delay, impede or take any other action to interfere with acceptance, approval, confirmation or implementation of the Plan or Recognition Order (or support any other person's efforts to do any of the foregoing), (y) directly or indirectly, (A) initiate, solicit, encourage or facilitate any inquiries, proposals or offers from any Person other than the Plan Investor and its affiliates and its and their respective advisors, consultants, legal counsel, investment bankers, agents and other representatives that are providing services in connection with the Transaction, relating to, or that could reasonably result in, any merger, acquisition, divestiture, sale of material assets or equity, business combination, recapitalization, joint venture, or other extraordinary transaction directly or indirectly involving the equity, voting power or all or a material portion of the assets of any of the Acquired Debtors or any other similar transaction that would serve as an alternative to the transactions contemplated by this Agreement, the Plan Funding Agreement or the Plan (any such transaction, an "Alternative Transaction"); (B) participate in discussions or negotiations regarding the Company, the Prepetition Secured Lender Claims, the Plan, or the Transaction with any other Person with respect to, or that would reasonably be expected to result in, an Alternative Transaction with a party other than the Plan Investor or one of its affiliates; or (C) propose, support, solicit, encourage, or participate in the formulation of any chapter 11 plan or any other restructuring or reorganization of the Company in the Bankruptcy Cases other than the Plan, or (z) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Transaction and other restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement; (iv) use commercially reasonable efforts to support and take all reasonably necessary and appropriate actions in furtherance of the restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement and consummating the Transaction within the time frames contemplated by this Agreement; (v) use its commercially reasonable efforts to support confirmation of the Plan and entry of the Confirmation Order (defined below) and the Recognition Order (defined below); and (vi) use its commercially reasonable efforts to support (and not object to) the "first day" motions (including approval of the DIP Credit Agreement and the other Loan Documents, as defined in the DIP Credit Agreement).

(c)     So long as the Termination Date has not occurred, the Plan Investor hereby agrees that it shall:  (i) use its commercially reasonable efforts to support confirmation of the Plan and entry of the Recognition Order, and not object to confirmation of the Plan or entry of the Recognition Order, or support any other person's efforts to object to, confirmation of the Plan or entry of the Recognition Order; (ii) not

propose or support any plan of reorganization in the Bankruptcy Cases other than the Plan or any other restructuring or reorganization of the Company; (iii) use its commercially reasonable efforts to support (and not object to) the "first day" motions (including approval of the DIP Credit Agreement and other Loan Documents, as defined in the DIP Credit Agreement); (iv) not object to, delay, impede or take any other action to interfere with acceptance, approval, confirmation or implementation of the Plan or Recognition Order (or support any other person's efforts to do any of the foregoing) or otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Transaction and other restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement and (v) use commercially reasonable efforts to support and take all reasonably necessary and appropriate actions in furtherance of the restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement and consummating the Transaction within the time frames contemplated by this Agreement.

(d)      Without limiting any other provision hereof, until the Termination Date, the Company and each of the Plan Support Parties hereby agree to negotiate in good faith each of the definitive agreements and documents referenced in, or reasonably necessary or desirable to effectuate the Transaction, this Agreement and the Plan, which shall consist of, among other things: (i) all amendments, exhibits and supplements to the Plan, it being acknowledged and agreed that a condition precedent to consummation of the Plan shall be that this Agreement remains in full force and effect; (ii) the PFA Approval Order (as defined below); (iii) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "Solicitation Materials"), the order to be entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "Disclosure Statement Order"); (iv) the order to be entered by the Bankruptcy Court confirming the Plan (the "Confirmation Order") and pleadings in support of entry of the Confirmation Order; (v) the order to be entered by the Canadian Court recognizing the Confirmation Order (the "Recognition Order"); (vi) in the case of the Plan Support Parties other than the Plan Investor, the DIP Credit Agreement, Interim DIP Order and Final DIP Order, and (vii) such other documents, pleadings, agreements or supplements as may be reasonably necessary or advisable to implement the Transaction and other restructuring transactions contemplated under this Agreement, the Plan and the Plan Funding Agreement (collectively, as may be amended, modified or supplemented from time to time, the "Definitive Documentation"), which Definitive Documentation shall be in form and substance reasonably satisfactory to the Company and each of the Required Parties.  For the avoidance of doubt, any references herein to any document constituting Definitive Documentation (including, without limitation, the Plan, the Disclosure Statement, the Solicitation Materials, the Disclosure Statement Order, the Confirmation Order, and the Recognition Order) shall mean such document in form and substance reasonably satisfactory to the Company and each of the Required Parties.  For the avoidance of doubt, subject to the terms of the Plan and the Plan Funding Agreement, the Plan Investor may designate the addition or subtraction

- 4 -

of any Assumed Contract to the Plan Supplement without the need for consent or approval from the other parties hereto.

For the avoidance of doubt, each of the Consenting Lenders, the Plan Investor and the Company also agrees, severally and not jointly, that, unless this Agreement is terminated in accordance with the terms hereof, it shall take such steps as are commercially reasonably necessary to support, achieve approval of and consummate the Transaction and it will not take any action that would, in any material respect, interfere with, delay, or postpone the effectuation of the Transaction and other restructuring transactions contemplated by this Agreement and confirmation and consummation of the Plan and implementation of the restructuring transactions contemplated thereunder.  Notwithstanding the foregoing, nothing in this Section 1 or elsewhere in this Agreement shall require any Plan Support Party to incur any material expenses, liabilities or obligations, or agree to any commitments, undertaking, concessions, indemnities or other agreements that would result in expenses, liabilities or obligations to any Plan Support Party, other than as expressly stated in other provisions of this Agreement or any other Definitive Documentation.

**Section 2.    Termination Events.**

**2.1    Plan Support Party Termination Events.**

The occurrence of any of the following shall be a "Plan Support Party Termination Event":

(a)    11:59 p.m. (EST) on the date that is five (5) days after this Agreement is executed, unless the Company has commenced solicitation of votes in favor of the Plan (the "Solicitation");

(b)    11:59 p.m. (EST) on the date that is sixteen (16) days after commencement of the Solicitation, unless the Company shall have received votes accepting the Plan from at least (i) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the First Lien Financing Agreement; (ii) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the 1.25 Lien Credit Agreement; and (iii) 66.67% of the principal amount of the obligations under the 1.5 Lien Credit Agreement;

(c)    11:59 p.m. (EST) on the date that is twenty-one (21) days after the commencement of Solicitation (the "Petition Date"), unless the Bankruptcy Cases are commenced in the Bankruptcy Court, and the Plan and the Disclosure Statement are filed with the Bankruptcy Court;

(d)    11:59 p.m. (EST) on the date that is four (4) Business Days[2] after the Petition Date unless the Canadian Proceedings have been commenced;

---

[2]    "Business Day" means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which banks are not open for general business in Toronto, Ontario, or New York, New York.

(e)     11:59 p.m. (EST) on the date that is three (3) Business Days after the Petition Date, unless a motion (such motion, in form and substance acceptable to each of the Required Parties, the "PFA Approval Motion") for entry of an order (such order, in form and substance acceptable to each of the Required Parties, the "PFA Approval Order") authorizing the Company to perform its obligations under the Plan Funding Agreement relating to (i) the payment of the Termination Fee and PI Expenses (each as defined in the Plan Funding Agreement) and (ii) the provisions set forth in Section 6.7 of the Plan Funding Agreement has been filed with the Bankruptcy Court;

(f)     11:59 p.m. (EST) on the date that is five (5) Business Days after the Petition Date, unless the Bankruptcy Court has entered an order scheduling a confirmation hearing for the Plan;

(g)     solely in the case of the Plan Investor, 11:59 p.m. (EST) on the date that is thirty-five (35) days after the Petition Date, unless the Bankruptcy Court has entered the PFA Approval Order;

(h)     11:59 p.m. (EST) on the date (x) that is five (5) Business Days after the Petition Date, unless the Bankruptcy Court has entered the DIP Order on an interim basis (the "Interim DIP Order") and (y) that is thirty-five (35) days after the Petition Date, unless the Bankruptcy Court has entered the DIP Order on a final basis (the "Final DIP Order");

(i)     11:59 p.m. (EST) on the date that is sixty-five (65) calendar days after the Petition Date, unless the Bankruptcy Court has entered the Confirmation Order and Disclosure Statement Order and the Canadian Court has granted the Recognition Order;

(j)     11:59 p.m. (EST) on the date that is ninety-five (95) calendar days after the Petition Date (the "Outside Date"), unless the Company has substantially consummated the Plan and the Plan Funding Agreement pursuant to their respective terms;

(k)     the occurrence of any material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement or the Plan Funding Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof);

(l)     solely in the case of the Consenting Lenders, the occurrence of any material breach by the Plan Investor of any of the undertakings, representations, warranties or covenants of the Plan Investor set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof);

(m)     solely in the case of the Plan Investor, the occurrence of any material breach by any of the Consenting Lenders of any of the undertakings, representations, warranties or covenants of such Consenting Lender set forth in this Agreement (to

- 6 -

the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof) such that the non-breaching Consenting Lenders at any time hold less than any of (i) 66.67% of the obligations under the First Lien Financing Agreement; (ii) 66.67% of the obligations under the 1.25 Lien Credit Agreement, or (iii) 66.67% of the obligations under the 1.5 Lien Credit Agreement;

(n)    the withdrawal of the Plan or Disclosure Statement or the filing of a pleading by the Company without the prior written consent of each of the Required Parties, that seeks to amend or modify the Plan, the Disclosure Statement, or the Plan Funding Agreement, which amendment, modification or filing is (i) materially inconsistent with this Agreement, the Plan and/or the Plan Funding Agreement, as applicable, and (ii) adverse to any of the Plan Support Parties; and such motion or pleading has not been withdrawn prior to the earlier of (x) two (2) business days after the Company receives written notice from the applicable Required Consenting Lenders or the Plan Investor that such motion or pleading is (i) materially inconsistent with this Agreement, the Plan and/or the Plan Funding Agreement and (ii) adverse to such Plan Support Party, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(o)    the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any respect that is materially adverse to any of the Plan Support Parties;

(p)    the Company (i) withdraws the Plan, (ii) files, propounds or otherwise supports any plan of reorganization other than the Plan, or (iii) publicly announces its intention to do either of (i) or (ii);

(q)    the Company files with the Bankruptcy Court or the Canadian Court any motion or application seeking authority to sell any material assets (including any assets of one or more Acquired Debtors) without the prior written consent of the Required Parties;

(r)    any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Plan, the Plan Funding Agreement, or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of each of the Required Parties;

(s)    other than with respect to the Dissolving Debtors, any of the Bankruptcy Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Company (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Bankruptcy Cases or the Company shall file a motion or other request for such relief;

(t)    the Canadian Proceedings are dismissed or a trustee or receiver shall be appointed pursuant to the applicable provisions of the *Bankruptcy and Insolvency Act* or any

other Canadian legislation or any separate process for the sale of the Canadian business is approved or if the Company shall file any motion or make any request in respect of the foregoing to the Canadian Court;

(u)   an Event of Default shall occur under the Interim DIP Order, the Final DIP Order or any other Loan Documents (as defined in the DIP Credit Agreement) or cash collateral order entered in the Bankruptcy Cases that has not been cured in accordance with the DIP Credit Agreement or waived within five (5) business days;

(v)   the Bankruptcy Court shall enter an order terminating, annulling, modifying or conditioning the automatic stay with respect to any assets of the Company in an amount greater than $250,000;

(w)   solely in the case of the Plan Investor, the Bankruptcy Court shall enter an order or orders determining that debts or Claims that in aggregate exceed $250,000 against any of the Acquired Debtors (other than a Canadian Claim or an Assumed U.S. Liability (each as defined in the Plan)) are non-dischargeable under the Bankruptcy Code;

(x)   upon termination of the Plan Funding Agreement for any reason; provided, that the Plan Investor may not exercise a Plan Support Party Termination Event under this Section 2.1(x) if the termination of the Plan Funding Agreement is principally due to an act or omission of the Plan Investor that is contrary to its obligations under this Agreement or the Plan Funding Agreement;

(y)   (i) the entry of an order denying confirmation of the Plan by the Bankruptcy Court or (ii) the Disclosure Statement Order or Confirmation Order shall have been reversed, vacated or otherwise materially modified in a manner inconsistent with this Agreement or the Plan and adverse to any of the Plan Support Parties without the prior written Consent of the Plan Investor and written consent of the Required Consenting Lenders;

(z)   any Consenting Class at any time owns less than 66.67% of the relevant debt of such class; provided that such class shall not have the right to terminate pursuant to this clause (z);

(aa)   the occurrence of a termination event under the forbearance agreements dated as of January 1, 2017 (as the same may be amended, modified or supplemented from time to time) by and among the Company, on the one hand, and the Consenting First Lien Lenders, the Consenting 1.25 Lien Lenders and the Consenting 1.5 Lien Lenders, respectively, on the other hand (each, a "Forbearance Termination Event");

(bb)   the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan; and

(cc)   termination by any Plan Support Party if either (i) the Class of First Lien Lender Claims (as defined in the Plan) under the Plan, (ii) the Class of 1.25 Lien Lender

Claims (as defined in the Plan) under the Plan, (iii) the holders of at least 66.67% of the 1.5 Lien Lender Claims (as defined in the Plan) or (iv) the Plan Investor has given a notice of termination of this Agreement.

**2.2    Company Termination Events.**

The occurrence of any of the following shall be a "Company Termination Event" and together with any Plan Support Party Termination Event, a "Termination Event":

(a)    the board of directors, board of managers, or such similar governing body of the Company (each, a "**Board**") determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Plan and Transaction would be inconsistent with its fiduciary duties;

(b)    the occurrence of any material breach of any of the undertakings, representations, warranties or covenants set forth in this Agreement of (x) the Consenting Lenders by (i) any Consenting Lender and such breach has an adverse effect on the Company in the Company's reasonable judgment or (ii) Consenting Lenders in an applicable Consenting Class holding in the aggregate more than 66.67% of the aggregate principal amount of the Claims held by the Consenting Lenders in such Consenting Class, or (y) the Plan Investor, as the case may be (in the case of each of (x) and (y), to the extent not otherwise cured or waived within five (5) Business Days in accordance with the terms hereof); provided, that, with respect to any termination as a result of a material breach by a Consenting Lender, the Termination Event arising as a result of such breach shall apply only to the breaching Consenting Lender and this Agreement shall otherwise remain in full force and effect with respect to the Company and all other remaining Parties;

(c)    the Consenting Lenders at any time consist of less than (i) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the First Lien Financing Agreement; (ii) 50.1% in number of the lenders and 66,67% of the principal amount of obligations under the 1.25 Lien Credit Agreement; and (iii) 66.67% of the principal amount of the obligations under the 1.5 Lien Credit Agreement;

(d)    11:59 p.m. (EST) on the Outside Date, unless the Company has substantially consummated the Plan and the Plan Funding Agreement pursuant to their respective terms;

(e)    any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order, or there is a change in law, making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Plan, the Plan Funding Agreement, or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of each of the Required Parties;

(f)    any of the Bankruptcy Cases shall be dismissed;

- 9 -

(g)     the occurrence of a Forbearance Termination Event; and

(h)     the termination of the Plan Funding Agreement for any reason; <u>provided</u>, that the Company may not exercise a Company Termination Event under this Section 2.2(h) if the termination of the Plan Funding Agreement is principally due to an act or omission of the Company that is contrary to its obligations under this Agreement or the Plan Funding Agreement.

**2.3     Company Termination Event Procedures.**

Upon the occurrence of any Company Termination Event under and written notice being provided to each of the Plan Support Parties by the Company, this Agreement and each of the Parties' obligations hereunder shall terminate; <u>provided</u> that in the case of a termination effected pursuant to Subsection 2.2(b), such termination is subject to and shall be effective only upon the breach remaining uncured for at least five (5) Business Days following the Consenting Lender's or the Plan Investor's receipt of such notice (the date of the effectiveness of such termination, the "<u>Company Termination Date</u>").

**2.4     Plan Support Party Termination Event Procedures.**

(a)     The Plan Investor shall have the unilateral right to terminate this Agreement upon the occurrence of any Plan Support Party Termination Event (other than the Plan Support Termination Event set forth in Subsection 2.1(l)) in accordance with this Section 2.4.  The Required Consenting Lenders shall have the unilateral right to terminate this Agreement upon the occurrence of a Plan Support Party Termination Event (other than the Plan Support Termination Events set forth in Subsections 2.1(g), (m) and (w)) in accordance with this Section 2.4.  Upon the occurrence of a Plan Support Party Termination Event, this Agreement shall, upon any of (i) the Class of First Lien Lender Claims, (ii) the Class of 1.25 Lien Lender Claims, or (iii) the holders of at least 66.67% of the 1.5 Lien Lender Claims or (iv) the Plan Investor (as applicable, the "<u>Terminating Party</u>") providing written notice to counsel to the other Parties (with email being sufficient) of the exercise of its right to terminate this Agreement, terminate immediately with respect to such Terminating Party; <u>provided</u> that with respect to the occurrence of a Plan Support Party Termination Event under Subsections 2.1 (k), (l), (m), (n) or (u) of this Agreement, this Agreement shall terminate upon written notice after the applicable notice period in such subsections has expired and the breach or other matter giving rise to the right to so terminate this Agreement shall not have been cured or waived during the applicable notice period (the date of termination pursuant to this Section 2.4(a), together with the Company Termination Date, being the "<u>Termination Date</u>").  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder and the Company agrees it shall not take any action to enforce the automatic stay to prevent such termination.

(b)     Notwithstanding anything herein to the contrary, but subject to Subsection 2.2(c) of this Agreement, if any Consenting Lender shall breach its obligations pursuant to this Agreement, the Termination Date arising as a result of such act or omission

shall apply only to such Consenting Lender and this Agreement shall otherwise remain in full force and effect with respect to the Company, the Plan Investor and all such remaining Consenting Lenders, and the transactions contemplated by this Agreement and the Plan shall be effectuated pursuant to the Definitive Documentation; provided, that, in the event that the termination of this Agreement as to any Consenting Lender causes the condition set forth in clause (x) of Section 4 of this Agreement not to be satisfied as of 11:59 p.m. (EST) on the fifth (5th) Business Day following the Termination Date with respect to such Consenting Lender Class (regardless of whether such condition was satisfied prior to such time), each of the Plan Investor, the Company, and the Required Consenting Lenders shall have the unilateral right to terminate this Agreement in its entirety accordance with Section 2.4(a) above.

## 2.5    Limitation on Termination.

Except with respect to a termination pursuant to Section 3 below, no occurrence shall constitute a Termination Event if such occurrence is the result of the action or omission of the Party seeking to terminate this Agreement; provided, however, that (i) the exercise by the Plan Investor of any of its rights under the Plan Funding Agreement and/or (ii) the taking of any action (or refraining from taking any action) that is expressly permitted under the Plan Funding Agreement shall not be deemed to be an action or omission of the Plan Investor that in any way limits or otherwise affects any termination rights of the Plan Investor under this Agreement.

## 2.6    Individual Consenting Lender Termination Date.

This Agreement and the obligations hereunder may be terminated as to any Consenting Lender upon such Consenting Lender giving written notice to the Company (with email being sufficient) if the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan and the Plan Funding Agreement has not occurred by the Outside Date.

## 2.7    Consensual Termination.

In addition to any Termination Event otherwise set forth herein, this Agreement shall terminate immediately upon the written agreement of the Company, the Plan Investor, and the Required Consenting Lenders.

## 2.8    Effect of Termination.

Upon termination of this Agreement, (a) except as otherwise set forth herein, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings and agreements under this Agreement, and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement; (b) any and all votes tendered by the Parties prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement, the Transaction, the Plan or otherwise; and (c) if Bankruptcy Court permission shall be required for a Consenting Lender to change or withdraw (or cause to be changed or withdrawn) its vote in favor of the Plan, no Party to this Agreement shall oppose any attempt by

such Party to change or withdraw (or cause to be changed or withdrawn) such vote. Nothing in this section shall relieve any Party from (i) liability for such Party's breach of such Party's obligations hereunder or (ii) obligations under this Agreement that expressly survive termination of this Agreement, including, without limitation, the Company's obligation to pay professional fees and expenses pursuant to Section 8.12 hereof that accrued on or prior to the Termination Date. Except with respect to the obligations under this Agreement that expressly survive termination of this Agreement and this Section 2.8, this Agreement shall terminate automatically without any further required action or notice upon consummation of the Plan.

## Section 3.    Fiduciary Obligations.

### 3.1    The Company's Fiduciary Obligations.

Notwithstanding anything to the contrary herein, but subject in all cases to compliance with Section 6.7 of the Plan Funding Agreement in all respects, the Boards shall be permitted to take (or permitted to refrain from taking) any action with respect to the Transaction to the extent such Board determines, in good faith based upon advice of counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with applicable law, including its fiduciary duties, and may take such action without incurring any liability to the Consenting Lenders or the Plan Investor under this Agreement or the Plan; provided, that nothing herein shall limit or otherwise affect the rights or remedies of (i) the Plan Investor under the Plan Funding Agreement, including, without limitation, under Section 8.2 of the Plan Funding Agreement; (ii) the Consenting Lenders under Section 8.12 of this Agreement; and (iii) the officers and employees of the Company shall not be required to take any actions inconsistent with applicable law. In the event that a Board determines, following compliance with Section 6.7 of the Plan Funding Agreement in all respects (including the provision of notice to the Plan Investor in accordance therewith), that its fiduciary duties require it to terminate this Agreement, the Company shall provide written notice to the Consenting Lenders within two (2) Business Days of making such determination.

### 3.2    Consenting Lender Fiduciary Obligations.

Each Consenting Lender agrees not to request that the United States Trustee appoint an official committee of creditors or equity holders (either or both, an "Official Committee") in the Chapter 11 Cases. Notwithstanding anything herein to the contrary, if any Consenting Lender is appointed to and serves on any Official Committee in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Lender's exercise of its fiduciary duties to any person arising from its service on such Official Committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided, that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any Official Committee in any such chapter 11 case.

## Section 4.    Conditions Precedent to Agreement.

The obligations of the Parties and the effectiveness of this Agreement are subject to satisfaction of each of the following (the date upon which all such conditions are satisfied, the "Effective Date"): (w) execution and delivery of signature pages for the Plan Funding Agreement by each of the parties thereto; (x) execution and delivery of signature pages for this

Agreement by each of the Company, the Plan Investor and the Consenting Lenders (who, in any event, shall not be less than (i) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the First Lien Financing Agreement; (ii) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the 1.25 Lien Credit Agreement; and (iii) 66.67% of the principal amount of the obligations under the 1.5 Lien Credit Agreement) and (y) payment of all PI Expenses (as defined in the Plan Funding Agreement) to the extent then required to be paid under such agreement and (z) payment of all outstanding fees and expenses of the following advisors:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, Schulte Roth & Zabel LLP, and McMillan LLP, under their respective engagement letters or other contractual arrangements.

**Section 5.**        **Representations, Warranties and Covenants.**

**5.1**    **Power and Authority.**

Each Plan Support Party, severally and not jointly, represents, warrants, and covenants to the Company, and the Company, jointly and severally, represents, warrants, and covenants to each Plan Support Party, that, as of the date of this Agreement, (a) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under this Agreement, and (b) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2**    **Enforceability.**

Each Plan Support Party, severally and not jointly, represents and warrants to the Company, and the Company, jointly and severally, represents and warrants to each Plan Support Party, that this Agreement is its legally valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court or, to the extent applicable, the Canadian Court.

**5.3**    **Governmental Consents.**

Each Plan Support Party, severally and not jointly, represents and warrants to the Company, and the Company, jointly and severally, represents and warrants to each Plan Support Party that, as of the date of this Agreement, its execution, delivery, and performance of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any federal, state, or other governmental authority or regulatory body, except:  (a) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws; (b) any of the foregoing as may be necessary and/or required in connection with the Bankruptcy Cases or the Canadian Court, including the approval of the Disclosure Statement and confirmation of the Plan; (c) in the case of the Company, (i) filings of amended articles of incorporation or formation or other organizational documents with applicable state authorities, and (ii) other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company; (d) authorizations, consents, orders or approvals of, or

registrations or declarations with, any federal, state, or other governmental authority or regulatory body that have been or will be obtained or made prior to or on the closing date of the Transaction (the "Closing Date"); and (e) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely to, individually or in the aggregate, materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby.

**5.4     Ownership.**

Each Consenting Lender, severally and not jointly, represents, warrants, and covenants to the Company that, without limiting the ability to sell, transfer or assign the Claims, subject to Section 8 of this Agreement, (a) such Party is either (i) the sole legal and beneficial owner of its share of the Claims in the amounts indicated on Schedule 1 of this Agreement or (ii) such Consenting Lender has investment or voting discretion or control with respect to accounts for the holders or beneficial owners concerning its pro rata share of the Claims; (b) it has full power and authority to vote on and consent to all matters concerning its pro rata share of the Claims and to exchange, assign and transfer such Claims; and (c) other than pursuant to this Agreement, such Claims are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

**5.5     Other Support Agreements.**

Until the Termination Date, the Company shall not enter into any other restructuring support agreement related to a partial or total restructuring of the Company's obligations unless such support agreement is not inconsistent with the Plan and is reasonably satisfactory to each of the Required Parties.

**5.6     No Conflict**

Each Plan Support Party, severally and not jointly, represents and warrants to the Company, and the Company, jointly and severally, represents and warrants, to each Plan Support Party that, as of the date of this Agreement, the execution, delivery and performance by such Party of this Agreement does not and will not (A) subject to receipt of the authorizations, consents, orders or approvals of, or registrations or declarations with, any federal, state, or other governmental authority or regulatory body that have been or will be obtained or made prior to or on the Closing Date with respect to the Transaction, violate any material provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Company, for the filing of the Chapter 11 Cases.

**5.7     Publicity; Confidentiality**

Each of SquareTwo and the Plan Support Parties shall consult each other regarding the content of, and shall not issue without the consent of the other party, any press release or public announcement regarding the transactions contemplated by the Transaction Documents (as

- 14 -

defined in the Plan Funding Agreement) (other than with respect to the Debtors' filings in the Bankruptcy Cases and the Canadian Proceedings in which case the Parties' obligations are governed by Section 8.2 herein); provided that prior to the Petition Date, SquareTwo shall use commercially reasonable efforts to provide a copy of any press release or public announcement to the Plan Support Parties prior to the issuance thereof and, to the extent reasonably practicable, incorporate reasonably provided comments therein, however SquareTwo, acting in good faith, shall be permitted to issue press releases or public statements without the Plan Support Parties' prior consent if there is no information about the Consenting Lenders, Plan Investor or its Affiliates (as defined in the Plan Funding Agreement) in such press release or public statement other than the Plan Investor's and Sherman Financial Group LLC's identity.

Confidentiality. Each Party agrees to use commercially reasonable efforts to maintain the confidentiality of the existence of this Agreement and all related documents until the commencement of the Solicitation; provided, however, that such information may be disclosed: (i) to each Party's respective affiliates, and its and their respective directors, trustees, executives, officers, managers, members, partners, auditors, advisors (including financial and legal advisors), other agents, and potential debt and equity financing sources (provided that such sources have executed with the Company a confidentiality agreement prior to the date thereof) (and any others as permitted pursuant to a confidentiality agreement signed prior to the date hereof between the Company and any Plan Support Party) (collectively referred to herein as the "Representatives" and individually as a "Representative"); (ii) as otherwise provided in the Credit Documents; (iii) in connection with any suit, action or proceeding related to this Agreement and the transactions underlying the Transaction and the restructuring described herein; and (iv) to persons in response to, and to the extent required by, any subpoena, or other legal process or other disclosure required by law or to any other regulatory agency or authority. Unless required by applicable law or regulation or requested by any regulatory authority, no Party shall disclose the amount of a Consenting Lender's holdings of Claims without the prior written consent of such Consenting Lender; provided, however, that the Company may disclose the aggregate holdings and percentages of the Consenting Lenders, by class, and, if required by the Bankruptcy Court, may disclose the amount of a Consenting Lender's holdings of Claims without the prior written consent of such Consenting Lender.  If any Party or any of its Representatives receives a subpoena or other legal process as referred to in this Section 5.7 in connection with the Agreement, such Party shall provide the other Parties hereto with prompt written notice of any such request or requirement, to the fullest extent permissible and practicable under the circumstances (as advised by such Party's internal or outside counsel), so that the other Parties may seek a protective order or other appropriate remedy or waiver of compliance with the provisions of this Agreement.

**Section 6.    Remedies.**

Subject to Section 2.8 of this Agreement, it is understood and agreed by each of the Parties that any breach of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief for any such breach without the posting of a bond or other security.  The Parties agree to waive any defense in any action for specific performance that a remedy at law would be adequate.  The Company and each of the Plan Support Parties agree that for so long as the Company and the Plan Support Parties have not taken any action to prejudice

the enforceability of this Agreement (including without limitation, alleging in any pleading that this Agreement is unenforceable), and have taken such actions as are reasonably required or desirable for the enforcement hereof, then the Company and the Plan Support Parties shall have no liability for damages hereunder in the event a court determines that this Agreement is not enforceable.

## Section 7.   <u>Acknowledgement.</u>

This Agreement and the Plan and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any chapter 11 plan for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Notwithstanding anything herein to the contrary, the Company will not solicit acceptances of the Plan from any Consenting Lender until such Consenting Lender has been provided with information required by section 1125(g) of the Bankruptcy Code.

## Section 8.   <u>Miscellaneous Terms.</u>

**8.1   Assignment; Transfer Restrictions.**

(a)   Each Consenting Lender agrees, severally and not jointly, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, hypothecate or otherwise dispose of (including by participation) any Claim against the Company unless, (i) the transferee is a Consenting Lender, *provided*, that upon any purchase, acquisition or assumption by any Consenting Lender of any Claims, such Claims shall automatically be deemed to be subject to the terms of this Agreement, or (ii) as a condition precedent to any such transaction, the transferee thereof executes and delivers a Lender Joinder (as defined in Subsection 8.1(c)) to the Company, with a copy to counsel for each Consenting Class, immediately upon the execution of the agreement in respect of the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Lender for purposes of this Agreement and the transferor Consenting Lender shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred Claims.

(b)   Any sale, assignment, transfer, hypothecation or other disposition of any Claim that does not comply with the procedures set forth in Subsection 8.1(a) of this Agreement shall be deemed void *ab initio*.

(c)   Any person that receives or acquires a portion of the Claims pursuant to a sale, assignment, transfer, hypothecation or other disposition of such Claims by a Consenting Lender hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "<u>Joining Lender Party</u>") by executing and delivering a joinder in the form of <u>Exhibit E</u> hereto (the "<u>Lender Joinder</u>").  The Joining Lender Party shall thereafter be deemed to be a "Consenting Lender" and a Party for all purposes under this Agreement.

(d)    With respect to the Claims held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such Claims, the Joining Lender Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 5 of this Agreement to the Company.

(e)    This Agreement shall in no way be construed to preclude any Consenting Lender from acquiring additional Claims; provided, that, any such Claims shall automatically be deemed to be subject to the terms of this Agreement.

(f)    Notwithstanding Section 8.1(a): (i) a Consenting Lender may transfer any right, title, or interest in its Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Consenting Lender only if such Qualified Marketmaker has purchased such Claims with a view to immediate resale of such Claims (by purchase, sale, assignment, transfer, participation or otherwise) as soon as reasonably practicable, and in no event later than the earlier of (A) one (1) business day prior to any voting deadline with respect to the Plan (solely if such Qualified Marketmaker acquires such Claims prior to such voting deadline) and (B) ten (10) business days of its acquisition to a transferee Consenting Lender that is or becomes a Consenting Lender (by executing the Lender Joinder); and (ii) to the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may transfer or participate any right, title, or interest in any Claims that the Qualified Marketmaker acquires from a holder of such Claims who is not a Consenting Lender without the requirement that the transferee be or become a Consenting Lender.  Notwithstanding the foregoing, (w) if at the time of a proposed transfer of any Claim to the Qualified Marketmaker in accordance with the foregoing, the date of such proposed Transfer is the voting deadline with respect to the Plan, the proposed transferor Consenting Lender shall first vote such Claim in accordance with the requirements of Section 1.1(b) hereof prior to any transfer or (x) if, after a transfer in accordance with this Section 8.1(f), a Qualified Marketmaker is holding a Claim on the voting deadline with respect to the Plan, such Qualified Marketmaker shall vote such Claim in accordance with the requirements of Section 1.1(b) hereof.  For these purposes, a "Qualified Marketmaker" means an entity that: (y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company and its affiliates (including debt securities or other debt) or enter into with customers long and short positions in claims against the Company and its affiliates (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Company and its affiliates; and (z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).  A Qualified Marketmaker acting in such capacity may purchase, sell, assign, transfer, or participate any Claims against or interests in the Company other than Claims held by a Consenting Lender without any requirement that the transferee be or become subject to this Agreement.

- 17 -

**8.2    Certain Additional Chapter 11 Related Matters.**

The Company shall provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, ballots and other solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, the Confirmation Order and any other Definitive Documentation) it intends to file with the Bankruptcy Court and all related materials to be filed with the Canadian Court to counsel for the Plan Investor and each Consenting Class, at least three (3) days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement or Confirmation Order) at least three (3) days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court or the Canadian Court, as the case may be.  Subject to Section 1.1(b), nothing in this Agreement shall restrict, limit, prohibit or preclude, in any manner not inconsistent with its obligations under this Agreement, any of the Consenting Lenders or the Plan Investor from appearing in the Bankruptcy Court with respect to any motion, application, or other documents filed by the Company and objecting to, or commenting upon, the relief requested therein.

**8.3    No Third Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Company, the Plan Investor, and each Consenting Lender.  No other person or entity shall be a third party beneficiary.

**8.4    Entire Agreement.**

This Agreement, including exhibits and annexes hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, including exhibits and annexes, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, including exhibits and annexes hereto; provided, however, that any confidentiality agreement executed by any Party shall survive this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

**8.5    Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

**8.6    Settlement Discussions.**

This Agreement and the Plan are part of a proposed settlement of disputes among certain of the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other

than a proceeding to enforce the terms of this Agreement or in connection with the confirmation of the Plan.

**8.7      Reservation of Rights.**

(a)      Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests (if any), including, but not limited to, all of its rights and remedies under the Credit Documents (if any), including any such rights and remedies relating to defaults or other events that may have occurred prior to the execution of this Agreement, any and all of its claims and causes of action against the Company or any third parties, any liens or security interests it may have in any assets of the Company or any third parties, or its full participation in the Bankruptcy Cases, if commenced.

(b)      Without limiting Subsection 8.7(a) in any way, if the transactions contemplated by this Agreement and in the Plan are not consummated as provided herein, if a Termination Date occurs, or if this Agreement is otherwise terminated for any reason, each Party fully reserves any and all of its respective rights, remedies and interests (if any) under the Credit Documents, the Plan Funding Agreement, applicable law and in equity.  Notwithstanding anything to the contrary herein, termination of this Agreement shall not relieve any Party that breaches this Agreement from liability for such breach.

**8.8      Governing Law; Waiver of Jury Trial.**

(a)      The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between or among the Parties arising out of this Agreement, whether sounding in contract, tort or otherwise.

(b)      This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that, subject to Subsection 8.8(c), any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Agreement, each of the Parties hereby:  (i) irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding; and (ii) waives any objection to laying venue in any such action, suit or proceeding.

(c)      Notwithstanding the foregoing, if the Bankruptcy Cases are commenced, nothing in Subsections 8.8(a)-(b) shall limit the authority of the Bankruptcy Court or the Canadian Court, as applicable, to hear any matter related to or arising out of this Agreement, and each Party irrevocably and unconditionally consents to the

- 19 -

jurisdiction and venue of the Bankruptcy Court and Canadian Court, as applicable, to hear and determine such matters during the pendency of the Bankruptcy Cases or Canadian Proceedings.

**8.9    Successors.**

This Agreement is intended to bind the Parties and inure to the benefit of the Consenting Lenders, the Plan Investor and the Company and each of their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 8.9 shall be deemed to permit any transfer, tender, vote or consent of any claims other than in accordance with the terms of this Agreement.

**8.10    Acknowledgment of Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.11    Amendments, Modifications, Waivers.**

(a)    This Agreement (including, without limitation, the Plan, the Plan Funding Agreement and the Disclosure Statement) may only be modified, amended or supplemented, and any of the terms thereof may only be waived with the written Consent (which may be by email (with written acknowledgement by the recipient)) by each of (a) the Company, (b) the Required Consenting Lenders (as defined below) and (c) the Plan Investor (each of the Required Consenting Lenders and the Plan Investor are each a "Required Party" and shall be referred to herein collectively as the "Required Parties"); provided, that, if the modification, amendment, supplement or waiver at issue adversely impacts the treatment or rights of any Consenting Lender differently than other Consenting Lenders in its Consenting Class, the agreement in writing of such Consenting Lender whose treatment or rights are adversely impacted in a different manner than other Consenting Lenders in its Consenting Class shall also be required for such modification, amendment, supplement, or waiver to be effective; provided further, that the waiver of a Termination Event arising from the breach of a Required Party's obligations hereunder shall not require the consent of such breaching Required Party. "Required Consenting Lenders" shall mean the Consenting Lenders that are equal to or greater than: (i) 50.1% in number of the lenders and 66.67% of the principal amount of obligations under the First Lien Financing Agreement; (ii) 50.1% in number of the lenders and 66.67% of the holders of the principal amount of obligations under the 1.25 Lien Credit Agreement; and (iii) 66.67% of the principal amount of the obligations under the 1.5 Lien Credit Agreement (it being agreed that this definition may not be modified, amended or supplemented, or any of its terms waived, without the prior written consent of the

Required Consenting Lenders, the Plan Investor and the Company and the definition of Outside Date may not be modified, amended or supplemented, or any of its terms waived, without the prior written consent of the Required Consenting Lenders).

(b)     Each of the Parties agrees to negotiate in good faith all amendments and modifications to the Plan and Disclosure Statement as reasonably necessary and appropriate to obtain Bankruptcy Court confirmation of the Plan pursuant to a final order of the Bankruptcy Court; *provided* that neither the Consenting Lenders nor the Plan Investor shall have any obligation to agree to any modification that (i) creates any new material obligation on such Party or (ii) adversely affects the treatment or rights of such Party in any respect (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Consenting Class under the Plan shall be deemed to adversely affect such Consenting Class) whether such change is made directly to the treatment of a Consenting Class or to the treatment of another Consenting Class or otherwise.  Notwithstanding the foregoing, the Company may amend, modify or supplement the Plan and Disclosure Statement, from time to time, without the consent of any Required Parties, to cure any ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements do not adversely affect the rights, interests or treatment of such Plan Support Parties under such Plan and Disclosure Statement.

(c)     Except as otherwise expressly set forth herein, "Consent," as used in this Agreement, with respect to the Plan Investor, shall mean the prior written consent of the Plan Investor solely to the extent such consent rights are provided for under the Plan Funding Agreement.

**8.12   Professional Fees.**

The Company agrees to pay all fees and expenses of the following advisors: (i) to the extent such fees constitute PI Expenses under the Plan Funding Agreement, all advisors to the Plan Investor and/or its affiliates whose fees and expenses constitute PI Expenses under the Plan Funding Agreement, (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, one Canadian counsel on behalf of the Consenting 1.25 Lien Lenders and the Consenting 1.5 Lien Lenders, Schulte Roth & Zabel LLP, and McMillan LLP under their respective engagement letters or other contractual arrangements, in connection with the Transaction and implementation of the Plan (including, without limitation, fees and expenses incurred after the Petition Date); without the need to file any interim or final fee applications with the Bankruptcy Court, subject to the Company obtaining Bankruptcy Court approval of any postpetition payments.  For the avoidance of doubt, the Company's obligation to pay professional fees and expenses pursuant to this Section 8.12 shall be unaffected by, and shall survive, termination of this Agreement; provided, however, that the Company shall only be obligated pursuant to this Agreement to pay such fees and expenses incurred through the Termination Date.

**8.13    Severability of Provisions.**

If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement.

**8.14    Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

**8.15    Notices.**

Any notices required to be given hereunder must be in writing and may be served in person or by overnight mail or telecopy upon the respective parties as follows (or to such other addresses as may hereafter be designated):

if to the Company:

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 300
Centennial, Colorado 80111
Attention: J.B. Richardson, Jr.
Fax: (303) 713-2509

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Matthew A. Feldman, Esq. and Paul V. Shalhoub, Esq.
Fax: (212) 728-8111

if to the Consenting Lenders:

as set forth in each signature page

with a copy to:

(For holders of loans under the First Lien Credit Agreement)
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Facsimile: (212) 593-5955
Attention:  Adam C. Harris and Frederic L. Ragucci
Email:  adam.harris@srz.com; frederic.ragucci@srz.com

(For holders of loans under the 1.25 and 1.5 Lien Credit Agreements)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Facsimile: (212) 373-3000
Attention:  Alan W. Kornberg and Elizabeth R. McColm
Email:  akornberg@paulweiss.com; emccolm@paulweiss.com

if to the Plan Investor:

as set forth on its signature page

with a copy to:

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI  53202
Facsimile:  (414) 297-4900
Attention:  Patricia J. Lane, Benjamin F. Rikkers, and Michael J. Small
Email:  plane@foley.com; brikkers@foley.com; msmall@foley.com

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

SQUARETWO FINANCIAL CORPORATION

By:  /s/ J.B. Richardson, Jr.
Name:  J.B. Richardson, Jr.
Title:  Chief Operating Officer

SQUARETWO FINANCIAL SERVICES CORPORATION

By:  /s/ J.B. Richardson, Jr.
Name:  J.B. Richardson, Jr.
Title:  President and Chief Executive Officer

CACH, LLC

By:  /s/ J.B. Richardson, Jr.
Name:  J.B. Richardson, Jr.
Title:  Authorized Signatory

CCL FINANCIAL, INC.

By:  /s/ Christopher Walker
Name:  Christopher Walker
Title:  President and Chief Executive Officer

PREFERRED CREDIT RESOURCES LIMITED

By:  /s/ Christopher Walker
Name:  Christopher Walker
Title:  President and Chief Executive Officer

*[Signature Page - Restructuring Support Agreement]*

ASTRUM FINANCIAL LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


CACV OF COLORADO, LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


CACV OF NEW JERSEY, LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


HEALTHCARE FUNDING SOLUTIONS, LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


ORSA, LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


CANDEO, LLC


By:   /s/ J.B. Richardson, Jr.
       Name:  J.B. Richardson, Jr.
       Title:  Authorized Signatory


*[Signature Page - Restructuring Support Agreement]*

AUTUS, LLC


By:    /s/ J.B. Richardson, Jr.
          Name:  J.B. Richardson, Jr.
          Title:  Authorized Signatory


CA INTERNET MARKETING, LLC


By:    /s/ J.B. Richardson, Jr.
          Name:  J.B. Richardson, Jr.
          Title:  Authorized Signatory


COLLECT AIR, LLC


By:    /s/ J.B. Richardson, Jr.
          Name:  J.B. Richardson, Jr.
          Title:  Authorized Signatory


REFINANCE AMERICA, LTD.


By:    /s/ J.B. Richardson, Jr.
          Name:  J.B. Richardson, Jr.
          Title:  Authorized Signatory
COLLECT AMERICA OF CANADA, LLC


By:    /s/ J.B. Richardson, Jr.
          Name:  J.B. Richardson, Jr.
          Title:  Authorized Signatory


*[Signature Page - Restructuring Support Agreement]*

SQUARETWO FINANCIAL CANADA
CORPORATION


By:    /s/ Christopher Walker
       Name:  Christopher Walker
       Title:  President and Chief Executive Officer


METROPOLITAN LEGAL ADMINISTRATION
SERVICES INC.


By:    /s/ Christopher Walker
       Name:  Christopher Walker
       Title:  President and Chief Executive Officer

PLAN INVESTOR:

RESURGENT HOLDINGS LLC

By:    /s/ Bryan Faliero
          Name:  Bryan Faliero
          Title:  President

[Consenting Lender signature pages redacted]

## **EXHIBIT D**

**Plan Funding Agreement (without exhibits or schedules)**

**EXECUTION VERSION**

SQUARETWO FINANCIAL CORPORATION,

THE DEBTORS' REPRESENTATIVE,

RESURGENT HOLDINGS LLC,

SHERMAN FINANCIAL GROUP LLC

AND

COLLECT AMERICA OF CANADA, LLC

PLAN FUNDING AGREEMENT

MARCH 3, 2017

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS.................................................................................................2

    Section 1.1.    Definitions .................................................................................2

    Section 1.2.    Other Definitions......................................................................11

ARTICLE II. SALE ..........................................................................................................12

    Section 2.1.    Sale .........................................................................................12

    Section 2.2.    Good Faith Deposit; Purchase Price.......................................12

    Section 2.3.    Escrow; Disbursements. ..........................................................13

    Section 2.4.    Purchase Price; Post-Closing Purchase Price Adjustment. ....15

    Section 2.5.    Purchase Price Allocation .......................................................17

ARTICLE III. THE CLOSING..........................................................................................18

    Section 3.1.    The Closing .............................................................................18

    Section 3.2.    Deliveries. ...............................................................................18

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SQUARETWO...............18

    Section 4.1.    Organization ...........................................................................18

    Section 4.2.    Qualification; Due Authorization; Power and Authority ........19

    Section 4.3.    Consents and Approvals..........................................................19

    Section 4.4.    Capitalization ..........................................................................20

    Section 4.5.    Financial Statements................................................................20

    Section 4.6.    No Undisclosed Liabilities ......................................................21

    Section 4.7.    Recent Events ..........................................................................21

    Section 4.8.    Contracts and Commitments ...................................................22

    Section 4.9.    Title to Assets; Real Property..................................................23

    Section 4.10.    Serviced Accounts Receivable. ...............................................24

    Section 4.11.    Intellectual Property. ...............................................................25

    Section 4.12.    Databases; Personally Identifiable Information ......................25

    Section 4.13.    Legal Compliance; Permits .....................................................26

    Section 4.14.    Environmental Compliance and Conditions.............................26

    Section 4.15.    Litigation ................................................................................26

    Section 4.16.    Tax Matters .............................................................................27

    Section 4.17.    Insurance ................................................................................28

    Section 4.18.    Illegal or Improper Payments.................................................28

    Section 4.19.    Related Party Transactions .....................................................29

Section 4.20.    Brokers' Fees..................................................................................29

Section 4.21.    Employees. .................................................................................29

Section 4.22.    Privacy Laws. .............................................................................32

Section 4.23.    Canadian Claims.. .......................................................................33

Section 4.24.    No Other Representations or Warranties...................................33

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE PLAN INVESTOR ...................33

Section 5.1.     Organization ...............................................................................33

Section 5.2.     Qualification; Due Authorization; Power and Authority. .........................33

Section 5.3.     Consents and Approvals .............................................................34

Section 5.4.     No Violations ..............................................................................34

Section 5.5.     Financing. ...................................................................................34

Section 5.6.     Securities Law Compliance. .......................................................34

Section 5.7.     Litigation. ....................................................................................35

Section 5.8.     Brokers' Fees. .............................................................................35

Section 5.9.     Sophistication. .............................................................................35

Section 5.10.    Investment Entirely for Own Account. .......................................35

Section 5.11.    Disclosure of Information. ..........................................................35

ARTICLE VI. COVENANTS ......................................................................................36

Section 6.1.     Conduct of Business Pending the Closing ..................................36

Section 6.2.     Cooperation; Access to Information............................................37

Section 6.3.     Further Actions; Reasonable Efforts. .........................................38

Section 6.4.     Restructuring; Compliance with the Plan ...................................39

Section 6.5.     Regulatory Filings ......................................................................39

Section 6.6.     Financing. ...................................................................................41

Section 6.7.     Alternative Proposals. .................................................................41

Section 6.8.     Excluded Liabilities.....................................................................43

Section 6.9.     Intercompany Obligations ..........................................................44

Section 6.10.    Serviced Accounts Receivable ...................................................44

Section 6.11.    Post-Closing Collections ............................................................44

Section 6.12.    Disclosure...................................................................................44

ARTICLE VII. CONDITIONS TO CLOSING ............................................................44

Section 7.1.     Conditions to the Plan Investor's Obligations............................44

Section 7.2.     Conditions to the Obligations of SquareTwo ............................45

Section 7.3.     Frustration of Closing Conditions. .............................................46

ii

ARTICLE VIII. TERMINATION ..................................................................................47

    Section 8.1.    Termination ...........................................................................47

    Section 8.2.    Effect of Termination ..........................................................48

ARTICLE IX. BANKRUPTCY COURT MATTERS .....................................................49

    Section 9.1.    PFA Order ...........................................................................49

    Section 9.2.    Excluded Assets ..................................................................49

ARTICLE X. MISCELLANEOUS...................................................................................49

    Section 10.1.    Governing Law....................................................................49

    Section 10.2.    Jurisdiction; Forum; Service of Process; Waiver of Jury Trial ...............49

    Section 10.3.    Successors and Assigns .......................................................50

    Section 10.4.    Entire Agreement; Amendment............................................50

    Section 10.5.    Notices................................................................................50

    Section 10.6.    Delays or Omissions ...........................................................51

    Section 10.7.    Counterparts .......................................................................52

    Section 10.8.    Severability.........................................................................52

    Section 10.9.    Headings .............................................................................52

    Section 10.10.    No Third-Party Beneficiaries ..............................................52

    Section 10.11.    Survival. .............................................................................52

    Section 10.12.    Fees and Expenses...............................................................52

    Section 10.13.    No Public Announcement ....................................................52

    Section 10.14.    Non-Disparagement ............................................................52

    Section 10.15.    Specific Performance ..........................................................52

    Section 10.16.    Construction .......................................................................53

    Section 10.17.    Debtors' Representative .......................................................53

    Section 10.18.    Sherman Parent. ..................................................................53

Annexes

Annex A – Latest Balance Sheet
Annex B – Serviced Accounts Receivable Data Tape, which are .txt file titled "Loan Tape Feb 2017.txt"
and .csv file titled "can_loan_tape.csv", each of the foregoing of which is uploaded on or about March 1,
2017 to a data room titled "Project Diamondback" that is maintained by Firmex.


Exhibits

Exhibit A – Escrow Agreement
Exhibit B – Milestones
Exhibit C – PFA Order
Exhibit D – Estimated Purchase Price and Methodologies, which is the excel files titled "Purchase Price
Adjustment_SquareTwo Financial_January 2017 w December 2016 Support.xlsx" and "SquareTwo
Financial_December 2016 US Collections Detail.xlsx" in an email sent from Mark Thorson of
AlixPartners to Greg Hammond of SFG on Tuesday February 28th, 2017 at approximately 6:26PM EST.
Exhibit E – Pre-Approved Acquisitions

Schedules

SquareTwo Disclosure Schedule

SQUARETWO PLAN FUNDING AGREEMENT

THIS SQUARETWO PLAN FUNDING AGREEMENT (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is made as of March 2, 2017 among SquareTwo Financial Corporation, a Delaware corporation ("SquareTwo"), Collect America of Canada, LLC, a Colorado limited liability company ("CACLLC"), Resurgent Holdings LLC, a Delaware limited liability company (the "Plan Investor"), SquareTwo, as the authorized representative of the Dissolving Debtors (as such term is defined in the Plan) (the "Debtors' Representative") and Sherman Financial Group LLC, a Delaware limited liability company, solely with respect to Section 10.18 ("Sherman Parent").

RECITALS

WHEREAS, SquareTwo and the Plan Investor desire to undertake the transactions contemplated by the Transaction Documents;

WHEREAS, in order to facilitate the transactions contemplated by the Transaction Documents, the Company intends to take certain actions, including: filing voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), on or before March 21, 2017; and commencing recognition proceedings under Part IV of the Companies' Creditors Arrangement Act (the "Canadian Cases"), in the Ontario Superior Court of Justice or another Canadian court of competent jurisdiction agreed to by the parties (the "Canadian Court");

WHEREAS, the Plan Investor, the Company and certain lenders to the Company have entered into the Restructuring Support Agreement, dated as of the date hereof (as it may be amended, modified or supplemented from time to time in accordance with its terms, the "Restructuring Support Agreement");

WHEREAS, to implement the restructuring described in the Restructuring Support Agreement (the "Restructuring") and in connection with the transactions contemplated by the Transaction Documents, the Plan Investor or its assignee as permitted pursuant to Section 10.3 (including the Canadian PurchaseCo, as defined below) desires to purchase from SquareTwo or CACLLC, as applicable, and SquareTwo or CACLLC, as applicable, desires to sell to the Plan Investor or its assignee as permitted pursuant to Section 10.3 (including the Canadian PurchaseCo) the Reorganized Entities Interests upon the terms and subject to the conditions set forth herein;

WHEREAS, on March 2, 2017, SquareTwo Financial Canada (defined below) entered into a stock purchase agreement pursuant to which SquareTwo Financial Canada agreed to repurchase all equity securities of CCL held by Christopher D. Walker immediately prior to the Closing; and

WHEREAS, contemporaneously with the execution of this Agreement, (a) the Plan Investor, SquareTwo and certain of their Affiliates have entered into the Transition Services Agreement and (b) the Plan Investor, SquareTwo and the Escrow Agent have entered into the Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I.

DEFINITIONS

Section 1.1.    Definitions.  For the purposes of this Agreement, the following terms shall have the meanings set forth below.  Capitalized terms used but not defined herein shall have the meanings attributed to them in the Restructuring Support Agreement or the Plan that is attached as Exhibit A to the Restructuring Support Agreement.

"Acceptable Confidentiality Agreement" means a confidentiality agreement containing limitations on the use and disclosure of all non-public information furnished to such Person by or on behalf of any of SquareTwo and its Subsidiaries no less favorable to SquareTwo in any material respect than the terms set forth in the Confidentiality Agreement.

"Acquired Subsidiaries" means any direct or indirect subsidiary of any Reorganized Entity other than CACV of New Jersey.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise.  Following the Closing, the Reorganized Entities and the Acquired Subsidiaries shall be deemed to be Affiliates of the Plan Investor.

"Alternative Proposal" means any unsolicited bona fide proposal or offer from any Person (other than the Plan Investor or any of its Affiliates) with respect to an Alternative Transaction (as defined herein).

"Base Purchase Price" means an amount in cash equal to Four Hundred and Five Million and One Hundred Thousand Dollars ($405,100,000).

"Business" means the business that is currently conducted by SquareTwo and the Subsidiaries, including acquiring, managing and collecting charged-off consumer and commercial accounts receivable purchased from financial institutions, finance and leasing companies, and other issuers in the United States and Canada.

"Business Day" means any day other than a Saturday, Sunday, a "legal holiday," as defined in Federal Rule of Bankruptcy Procedure 9006(a), or a day on which banks are not open for general business in Toronto, Ontario or New York, New York.

"CACV of New Jersey" mean CACV of New Jersey, LLC, a Colorado limited liability company.

"Canadian Laws" means any Laws promulgated by Canada or any province, territory or locality thereof, or any Governmental Entity located or having competent jurisdiction in Canada or any such province, territory or locality.

"CCL" means CCL Financial Inc., an Ontario corporation.

"Charter Documents" means:  (i) the articles or certificate of incorporation and the bylaws of a corporation; (ii) the partnership agreement and any statement of partnership of a general partnership; (iii) the limited partnership agreement and the  certificate of limited partnership of a limited partnership; (iv) the limited liability company agreement, the operating agreement and the certificate of organization of a limited liability company; (v) any document adopted or filed with any Governmental Entity in connection with the creation, formation or organization of the applicable Person; and (vi) any amendment to, or amended and restated or otherwise modified version of, any of the foregoing.

"Claims" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing Purchase Price" means the Estimated Purchase Price, as set forth on the Estimated Closing Statement delivered in accordance with Section 2.4.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" means SquareTwo and all of its Subsidiaries.

"Company's Knowledge" means the actual knowledge, after commercially reasonable inquiry of those individuals identified in Section 1.1(a) of the SquareTwo Disclosure Schedule.

"Confidentiality Agreement" means the confidentiality agreement, dated June 28, 2016, by and between Sherman Capital Markets, LLC and SquareTwo.

"Confirmation Order"  shall have the meaning set forth in the Plan.

"Contracts" means all contracts, agreements, leases, understandings and arrangements to which any Reorganized Entity or Acquired Subsidiary is a party or by which any such Person or any of its assets is bound or under which any such Person has rights, including any Real Property Leases, in each case including any amendments and other modifications thereto.

"Court Costs" means any fees, costs or expenses that are actually incurred in the enforcement of the Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable) during the applicable period and are of the type and calculated using the same methodology as set forth in the row titled "Court Costs" of the "Purchase Price Adjustment" tab of Exhibit D.

"Cutoff Date" means June 30, 2016.

"Debtors" shall have the meaning set forth in the Plan prior to the Closing Date and shall mean Wind Down Co and the Dissolving Debtors on and after the Closing Date for purposes of Section 2.3 and Section 2.4 of this Agreement.

"DIP Financing Agreement" shall have the meaning set forth in the Plan.

"Dissolving Debtors" shall have the meaning set forth in the Plan.

"Effective Date" shall have the meaning set forth in the Plan.

"Employee Benefit Plan" means any:  (a) employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is maintained or sponsored by SquareTwo or any of the Subsidiaries or to which any such Person contributes (or is required to contribute) or for which SquareTwo or any of the Subsidiaries otherwise has or may have any Liability, either directly or as

3

a result of being an ERISA Affiliate or otherwise under Canadian Law, whether or not funded and whether or not terminated, (b) personnel policies of SquareTwo or any of the Subsidiaries and (c) fringe or other benefit or compensation plans, policies, programs and arrangements, whether or not subject to ERISA or Canadian Law, whether or not funded and whether or not terminated, including stock bonus or other equity compensation, deferred compensation, incentive compensation, pension, severance, retention, change of control, bonus, vacation, travel, incentive, and health or other medical, disability, life and welfare plans or insurance (whether insured or self-insured), policies, programs or arrangements, share purchase, share option, stock appreciation, phantom stock, savings, profit sharing or termination pay, supplementary unemployment benefit, retirement and supplementary retirement plans, programs, agreements and arrangements, that are maintained or sponsored by SquareTwo or any of the Subsidiaries or to which any such Person contributes (or is required to contribute), or, in each case, for which SquareTwo or any of the Subsidiaries has any Liability, either directly or as a result of being an ERISA Affiliate or otherwise under Canadian Law.

"Encumbrance" means, with respect to any Person, any mortgage, lien, pledge, Security Interest, hypothecation, charge, restriction or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or capital lease, upon or with respect to any property or asset of such Person (including, in the case of stock, stockholder agreements, voting trust agreements, voting rights agreements and all similar arrangements).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person that, together with SquareTwo and any of the Subsidiaries, is or was at any time treated as a "single employer" under Section 414 of the Code or Section 4001(b)(1) of ERISA.

"Escrow Account" means the account created and maintained by the Escrow Agent to hold the Good Faith Deposit and the Post-Closing Escrow Amount pursuant to the Escrow Agreement.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, among the Plan Investor, SquareTwo and the Escrow Agent, entered into contemporaneously with this Agreement, a copy of which is attached hereto as Exhibit A.

"Estimated Purchase Price" means, without duplication,

(a)        the Base Purchase Price, *minus*

(b)        all PI Expenses, *minus*

(c)        the amount of all collections and Recourse Payments with respect to all Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable) that are actually collected in cash by SquareTwo or any of its Subsidiaries during the period beginning at 12:00 midnight ET at the beginning of July 1, 2016 and ending at 11:59 PM ET on October 31, 2016, *minus*

(d)        the amount of Net Collections and Recourse Payments with respect to all Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable) that are actually

4

collected in cash by SquareTwo or any of its Subsidiaries during the period beginning at 12:00 midnight ET at the beginning of November 1, 2016 and ending at 11:59 PM ET on the Closing Date, *minus*

(e) the estimated amount of Taxes that would be shown as due and payable on any Tax Return that would be filed after the Closing Date by a Reorganized Entity or an Acquired Subsidiary for any taxable period ending on or before 11:59 ET PM on the Closing Date, including Taxes payable only after the Closing Date, which shall be determined in a manner consistent with past practice for Tax purposes, *minus*

(f) the proceeds from any sale and transfer of any Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable) that is consummated during the period beginning at 12:00 midnight ET at the beginning of July 1, 2016 and ending at 11:59 ET PM on the Closing Date, *plus*

(g) all Court Costs during the period beginning at 12:00 midnight ET at the beginning of November 1, 2016 and ending at 11:59 PM ET on the Closing Date relating to Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable), provided that they have been paid by the Company *plus*

(h) the amount actually paid for the purchase of Serviced Accounts Receivable acquired by SquareTwo or any Subsidiary from November 1, 2016 until 11:59 PM ET on the Closing Date.

Notwithstanding anything to the contrary in this Agreement and for greater certainty, (i) the parties agree that in calculating each of the reductions or additions to the Base Purchase Price set forth in clauses (c)-(h) of this definition, no asset, Liability or other amount shall be considered or counted in calculating the amount of more than one such clause and (ii) the Plan Investor, through its ownership of the Reorganized Entities and Acquired Subsidiaries, shall be entitled to all proceeds and cash flow generated by the Serviced Accounts Receivable beginning at 12:00 midnight ET at the beginning of the date immediately following the Closing Date, except with respect to the Excluded Serviced Accounts Receivable.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Serviced Accounts Receivable" means those Serviced Accounts Receivable identified in writing by the Plan Investor as Excluded Serviced Accounts Receivable not later than three (3) Business Days prior to the Closing Date.

"Final Order" shall have the meaning set forth in the Plan.

"Final Purchase Price" means the Closing Purchase Price, as recalculated utilizing the Final Purchase Price Determinations and as set forth in Section 2.4(e).

"Financing" means any financing procured, or proposed to be procured, by the Plan Investor or any of its Affiliates in connection with the transactions contemplated by this Agreement.

"GAAP" means United States generally accepted accounting principles and practices as in effect on the date hereof.

"Good Faith Deposit" means an amount in cash equal to Forty Million Five Hundred and Ten Thousand Dollars ($40,510,000).

"Governmental Entity" means any supranational, national, foreign, federal, state, provincial or local judicial, legislative, executive, administrative or regulatory body or authority or other instrumentality of the United States of America, any foreign jurisdiction, or any state, provincial, county, municipality or local governmental unit thereof, including any Tax authority.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Income Tax Act" means the Income Tax Act (Canada), as amended, and all rules and regulations promulgated thereunder.

"Intellectual Property" means all intellectual property and industrial property related to, used in or held for use in the Business throughout North America, whether or not registrable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including: (a) patents, patent applications, statutory invention registrations, including reissues, divisions, continuations, continuations in part, and reexaminations; (b) trademarks, trademark applications, trademark registrations, trade names, fictitious business names (d/b/as), service marks, service mark applications, service mark registrations, URLs, domain names, trade dress, and logos; (c) copyrights, whether or not registered, copyright registrations, and copyright applications; (d) computer software programs and software systems and related documentation, whether in source code or object code form; and (e) trade secret and confidential information, including all confidential source code, know-how, processes, formulae, customer lists, inventions, and marketing information.

"ICA" means the Investment Canada Act.

"Latest Balance Sheet" means the unaudited consolidated balance sheet of SquareTwo and the Subsidiaries as of December 31, 2016 as set forth on Section 1.1(b) of the SquareTwo Disclosure Schedule.

"Law" or "Laws" means any applicable law, statute, ordinance, rule, regulation, order, judgment, decree or body of law of any Governmental Entity.

"Liability" or "Liabilities" means any and all assessments, charges, costs, damages, debts, obligations, expenses, fines, liabilities, losses and penalties, accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, liquidated or unliquidated, asserted or unasserted, due or to become due, including those arising under any Law or in connection with any counterclaim or class action with respect to any of the Serviced Accounts Receivable or any claim by any Governmental Entity and those arising under any Contract and costs and expenses of any proceeding, assessment, judgment, settlement or compromise relating thereto, and all interest, fines and penalties and reasonable legal fees and expenses incurred in connection therewith.

"Loss" means any direct, out-of-pocket costs (including Claims), damages, penalties, fines, judgments, awards, settlements, costs, fees (including reasonable and documented investigation fees), expenses (including reasonable and documented attorneys' fees) and disbursements.

"Material Adverse Effect" means any consideration, effect, occurrence, condition, change, development, event, state of facts or circumstance that has had or would reasonably be expected to have a material adverse effect, individually or in the aggregate, on (a) the business, results of operations, financial condition, assets or Liabilities or property of the Reorganized Entities and the Acquired Subsidiaries, taken as a whole, or the Plan Investor, as applicable, or (b) the ability of the

6

Company or the Plan Investor, as applicable, to consummate the transactions set forth in, or perform its obligations under, any Transaction Document, in each case in any material respect; but, in each case, none of the following, either alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a material adverse effect:  any consideration, effect, occurrence, condition, change, development, event, state of facts or circumstance (i) arising from general economic or political conditions or financial, banking, credit or securities market conditions, including any disruption thereof and any interest or exchange rate fluctuations affecting companies in the industry in which it conducts its business generally; (ii) arising from the announcement or performance of, or compliance with, the pendency of, or the public or industry knowledge of, this Agreement or the transactions contemplated by this Agreement, the Bankruptcy Cases or the Canadian Cases; (iii) arising from any changes in Laws or GAAP, with respect to the applicable Person(s); (iv) arising from any actions required under this Agreement; (v) arising from natural disasters, acts of terrorism or war (whether or not declared) or epidemics or pandemics; (vi) in the case of the Reorganized Entities and the Acquired Subsidiaries, arising from the failure of such Persons to meet any projections or forecasts but not the underlying causes thereof (the impact of which may, unless the impact thereof is otherwise excluded hereunder, be considered in determining whether a Material Adverse Effect has occurred); or (vii) arising out of any action taken or omitted to be taken at the written request of the other party; provided that in each case of the clauses (i), (iii) and (v) above, such consideration, effect, occurrence, condition, change, development, event, state of facts or circumstance does not have a disproportionate impact on the Reorganized Entities and the Acquired Subsidiaries, taken as a whole, or the Plan Investor, as applicable, to other companies operating in the industry in which the Reorganized Entities and the Acquired Subsidiaries, taken as a whole, or the Plan Investor, as applicable, operate and in such event, only any such disproportionate impact shall be considered in determining whether a Material Adverse Effect has occurred.

"Milestones" means each of the events and conditions set forth on Exhibit B to this Agreement.

"Net Collections" means the amount of collections with respect to all Serviced Accounts Receivable (other than Excluded Serviced Accounts Receivable) that are actually collected in cash by SquareTwo or any of its Subsidiaries during the period beginning 12:00 midnight ET at the beginning of November 1, 2016 and ending at 11:59 PM ET on the Closing Date *minus* a servicing fee equal to forty percent (40%) of the aggregate amount of such collections.

"Permit" means any authorization, approval, consent, certificate, declaration, filing, notification, qualification, registration, license, permit or franchise or any waiver of any of the foregoing, of or from, or to be filed with or delivered to, any Person or pursuant to any Law.

"Permitted Encumbrances" means: (a) any Encumbrance permitted under the Plan or the Restructuring Support Agreement; (b) mechanics', materialmen's, and similar liens arising by operation of law and incurred in the ordinary course of business consistent with past practice; (c) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting through appropriate proceedings; (d) purchase money liens with respect to equipment and liens securing rental payments under capital lease arrangements with respect to equipment; (e) liens incurred in connection with any indebtedness for borrowed money or as identified in the Plan (including the DIP Financing Agreement), in each case, that shall be released at or prior to the Closing; and (f) liens identified in Section 1.1(c) of the SquareTwo Disclosure Schedule; provided, however, for purposes of this definition as it is applied on the Closing Date, only those Encumbrances identified on Section 1.1(c) of the SquareTwo Disclosure Schedule that Plan Investor designates pursuant to the Plan that will survive the Closing Date shall be deemed "Permitted Encumbrances".

"Person" shall have the meaning set forth in the Plan.

7

"<u>Personally Identifiable Information</u>" means information that (a) can be used to identify or contact a Person, which may include his or her or its first and last name, physical address, email address and telephone number, and (b) is collected, used, disclosed or retained by any of the Reorganized Entities and the Acquired Subsidiaries, including information regarding the Reorganized Entities' and the Acquired Subsidiaries' customers, suppliers, employees and agents, such as an individual's name, address, age, gender, identification number, income, family status, citizenship, employment, assets, liabilities, source of funds, payment records, credit information, personal references and health records.

"<u>Petition Date</u>" shall have the meaning set forth in the Plan.

"<u>PFA Order</u>" means an order of the Bankruptcy Court approving the allowance and payment of the Termination Fee (as defined in <u>Section 8.2(b)</u>)) and the PI Expenses payable to the Plan Investor as permitted pursuant to this Agreement, as administrative expenses of the Debtors' estate, and <u>Section 6.7</u>, which order shall be substantially in the form attached as <u>Exhibit C</u>.

"<u>PI Expenses</u>" means all reasonable and documented out-of-pocket fees and expenses incurred by the Plan Investor in connection with the Restructuring and the transactions contemplated by the Transaction Documents, provided that the aggregate amount of the foregoing fees and expenses shall not exceed (i) Three Hundred Fifty Thousand Dollars ($350,000) if the Closing occurs on or before 65 days from the Petition Date or (ii) Seven Hundred Thousand Dollars ($700,000) if the Closing occurs after such date.  For the avoidance of doubt, filing fees payable to the Federal Trade Commission with respect to the HSR Act, if applicable, or any other filing fees with respect to Antitrust Laws (defined below) shall be excluded from the caps in clauses (i) and (ii) above.  Notwithstanding the foregoing, the legal fees and other expenses with respect to Antitrust Laws incurred by the Plan Investor shall not be deemed to be PI Expenses.

"<u>Plan</u>" means the Joint Prepackaged Chapter 11 Plan for SquareTwo Financial Services Corporation and its Affiliated Debtors (as amended, modified or supplemented from time to time in accordance with its terms), a copy of which is attached as <u>Exhibit A</u> to the Restructuring Support Agreement.

"<u>Plan Investor Fundamental Representations</u>" means the representations set forth in <u>Section 5.1</u> (Organization), <u>Section 5.2(b)</u> (Qualification; Due Authorization; Power and Authority) and <u>Section 5.8</u> (Brokers' Fees).

"<u>Privacy Laws</u>" means all Laws governing the collection, use, disclosure and retention of Personally Identifiable Information, including the Personal Information Protection and Electronic Documents Act (Canada).

"<u>Privacy Policies</u>" means all privacy, data protection and similar policies adopted or used by any of the Reorganized Entities or Acquired Subsidiaries in respect of Personally Identifiable Information, including those policies adopted or used to comply with privacy, data protection and similar terms of all contracts to which the Reorganized Entities or Acquired Subsidiaries are a party and any complaints process.

"<u>Recognition Order</u>" means the order of the Canadian Court recognizing the Confirmation Order.

"<u>Recourse Payments</u>" means the proceeds arising from any Serviced Account Receivable that is: (i) put-back to a prior owner; (ii) recalled by a prior owner; or (iii) subject to an adjustment required by a written contract with a prior owner.

"Reorganized CACH" means (i) CACH, LLC, a Colorado limited liability company, until the Effective Date, and (ii) on and after the Effective Date, such Person after giving effect to the restructuring transactions occurring on the Effective Date in accordance with the Plan.

"Reorganized CACV of Colorado" means (i) CACV of Colorado, LLC, a Colorado limited liability company, until the Effective Date, and (ii) on and after the Effective Date, such Person after giving effect to the restructuring transactions occurring on the Effective Date in accordance with the Plan.

"Reorganized Entities" means Reorganized CACH, Reorganized CACV of Colorado and Reorganized SquareTwo Financial Canada.

"Reorganized Entities Interests" means all of the issued and outstanding equity interests of the Reorganized Entities.

"Reorganized SquareTwo Financial Canada" means SquareTwo Financial Canada Corporation on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

"Security Interest" or "Security Interests" means any adverse claim, mortgage, security interest, pledge, hypothecation, assignment, deposit arrangement, Encumbrance (statutory or otherwise), charge, preference, priority or other security agreement, option, warrant, attachment, right of first refusal, preemption, conversion, put, call or other claim or right, restriction on transfer, or preferential arrangement of any kind or nature whatsoever (including any restriction on the transfer of any assets), any conditional sale or other title retention agreement and any financing lease involving substantially the same economic effect as any of the foregoing.

"Serviced Accounts Receivable" means any accounts and/or related receivables owned by the Reorganized Entities and the Acquired Subsidiaries at any time from the Cutoff Date through the Closing Date, which includes accounts and related receivables that are (a) put back to the original debt seller, collected or recalled, (b) owned by the Reorganized Entities and the Acquired Subsidiaries on July 1, 2016 or (c) purchased during the period beginning at 12:00 midnight ET at the beginning of July 1, 2016 and ending on 11:59 PM ET on the Closing Date. For the purposes of this definition any accounts and related receivables transferred in connection with a Recourse Payment shall be deemed Serviced Accounts Receivable.

"Serviced Accounts Receivable Data Tape" means, as of the date such tape is prepared, an electronic listing of the Serviced Accounts Receivable. A copy of the Serviced Accounts Receivable Data Tape made available to the Plan Investor by SquareTwo or its representatives on or about the date hereof is attached hereto as Annex B, as may be updated from time to time and pursuant to Section 6.10.

"SquareTwo Financial Canada" means SquareTwo Financial Canada Corporation, a Nova Scotia unlimited liability company.

"SquareTwo Fundamental Representations" means the representations set forth in Section 4.1 (Organization), Section 4.2 (Qualification; Due Authorization; Power and Authority), Section 4.4 (Capitalization), Section 4.13 (Legal Compliance; Permits), Section 4.14 (Environmental Compliance and Conditions), Section 4.16 (Tax Matters), Section 4.19 (Related Party Transactions) and Section 4.20 (Brokers' Fees).

9

"Subsidiaries" or "Subsidiary" means each corporation, limited liability company, partnership, business association or other Person in which SquareTwo owns, directly or indirectly, a majority of the voting power.

"Superior Proposal" means an unsolicited, bona fide written Alternative Proposal that the board of directors of SquareTwo determines in good faith (after consultation with the Company's outside counsel and financial advisors) is reasonably likely (a) to result in a transaction, after giving effect to the payments to the Plan Investor of the amounts described in Section 6.7(d)(iv) of this Agreement, that is more favorable to SquareTwo or the Debtors from a financial point of view, taking into account all relevant factors, than the transactions contemplated by this Agreement, the Restructuring Support Agreement and the Plan (after giving effect to all adjustments to the terms hereof that may be offered by the Plan Investor in writing pursuant to Section 6.7(d)) and (b) to be consummated on the terms proposed in such Alternative Proposal, taking into account all financial (including the status and terms of financing of such Alternative Proposal), legal, regulatory and other aspects of the Alternative Proposal.

"Tax" or "Taxes" means all taxes, assessments, charges, dues, duties, rates, fees, imposts, levies and similar charges of any kind lawfully levied, assessed or imposed by any Governmental Entity under any applicable Tax Legislation, including Canadian and United States federal, provincial, state, territorial, county, municipal and local, foreign or other income, capital, capital gains, goods and services, sales, use, consumption, excise, value added, business, real property, personal property, transfer, franchise, withholding, payroll, or employer health taxes, customs, import, anti-dumping or countervailing duties, Canadian pension plan contributions and similar employer contributions, employment insurance premiums, and provincial workers' compensation payments, levy, assessment, tariff, impost, imposition, toll and duty, whether computed on a separate, combined, unitary or consolidated basis or in any other manner, including any interest, penalties and fines associated therewith.

"Tax Legislation" means, collectively, the Income Tax Act and all Canadian and United States federal, provincial, state, territorial, county, municipal and local, foreign or other statutes, ordinances or regulations imposing a Tax, including all treaties, conventions, rules, regulations, orders and decrees of any jurisdiction.

"Tax Returns" means all returns, reports, declarations, elections, forms, slips, notices, filings, information returns, and statements in respect of Taxes that are required to be filed with any applicable Governmental Entity, including all amendments, schedules, attachments or supplements thereto and whether in tangible or electronic form.

"Third-Party Servicer" means each collection agency, collection law firm, member of the law firm network or advisory group or any advisor, consultant, broker, legal counsel, investment banker, agent or other representative of SquareTwo or any of its Subsidiaries, solely in their capacity as such.

"Transaction Documents" means this Agreement, the Restructuring Support Agreement, the Plan, the Transition Services Agreement, the Escrow Agreement and each other Contract, exhibit, schedule, certificate and other document being delivered pursuant to, or in furtherance of the transactions contemplated by, this Agreement, the Restructuring Support Agreement or the Plan.

"Transition Services Agreement" shall mean the "TSA" as defined in the Plan.

"Treasury Regulations" means the U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"Wind Down Co" shall have the meaning set forth in the Plan.

10

Section 1.2.    <u>Other Definitions</u>.    The following terms shall have the meanings defined in the Section indicated:

Agreement...............................................................................Preamble
Alternative Acquisition Agreement .............................................Section 6.7(a)
Alternative Transaction...............................................................Section 6.7(a)
Antitrust Laws............................................................................Section 6.5
Audited Financial Statements .....................................................Section 4.5
Bankruptcy Cases ......................................................................Recitals
Bankruptcy Code .......................................................................Recitals
Bankruptcy Court.......................................................................Recitals
CACLLC.....................................................................................Preamble
Canadian Cases .........................................................................Recitals
Canadian Court .........................................................................Recitals
Canadian Entities ......................................................................Section 4.21(e)
Canadian Portion.......................................................................Section 2.2(b)
Canadian PurchaseCo ...............................................................Section 2.1
Closing ......................................................................................Section 3.1
Closing Date ..............................................................................Section 3.1
Company-Owned Intellectual Property Rights.............................Section 4.11(a)
Compensation Policies...............................................................Section 4.21(p)
Databases .................................................................................Section 4.12
Debtors' Representative.............................................................Preamble
Debtors' Representative Governmental Requirements..................Section 5.3
Disputed Items ..........................................................................Section 2.4(c)
Environmental and Safety Requirements.....................................Section 4.14(a)
Estimated Closing Statement .....................................................Section 2.4(a)
Excluded Liabilities ...................................................................Section 6.8
Final Purchase Price Determinations ..........................................Section 2.4(e)
Financial Statements .................................................................Section 4.5
Governmental Requirements ......................................................Section 5.3
Hazardous Materials ..................................................................Section 4.14(a)
Independent Auditor ..................................................................Section 2.4(d)
Investment.................................................................................Section 2.2(c)
Joint Instruction Letter...............................................................Section 2.3(b)(i)
Latest Balance Sheet Date ........................................................Section 4.5
Material Contracts......................................................................Section 4.8(b)
No-Shop Period..........................................................................Section 6.7(a)
Objection Notice ........................................................................Section 2.4(c)
Outside Date ..............................................................................Section 7.1(b)
Plan Investor .............................................................................Preamble
Plan Investor Guaranty ..............................................................Section 10.18(a)
Plan Investor Obligations...........................................................Section 10.18(a)
Plan Investor Reconciliation Statement ......................................Section 2.4(b)
Position Statements ...................................................................Section 2.4(c)
Post-Closing Escrow Amount.....................................................Section 2.3(b)(ii)(C)
Proceeding ................................................................................Section 10.2
Purchase Price Allocation ..........................................................Section 2.5
Real Property Leases .................................................................Section 4.9(b)
Representative............................................................................Section 6.7(a)
Response Period.........................................................................Section 2.4(c)

11

Restraint ...................................................................................... Section 7.1(e)
Restructuring ............................................................................... Recitals and Section 6.4
Restructuring Support Agreement ............................................... Recitals
Second Lien Indenture .................................................................. Section 4.23
Second Lien Indenture Documents ............................................... Section 4.23
Second Lien Notes ........................................................................ Section 4.23
Selected Court .............................................................................. Section 10.2(a)
Sherman Parent ........................................................................... Recitals
SquareTwo ................................................................................... Preamble
SquareTwo Disclosure Schedule .................................................. Article IV
SquareTwo Financial Canada ...................................................... Article I
SquareTwo Governmental Requirements ...................................... Section 4.2
SquareTwo Canada Shares ........................................................... Section 2.1
Tax Loss....................................................................................... Section 2.3(b)(ii)(H)
Termination Fee ........................................................................... Section 8.2(b)
Triggering Termination Event ...................................................... Section 8.2(b)
TSA Breach................................................................................... Section 2.3(b)(ii)(H)

ARTICLE II.

SALE

Section 2.1.   <u>Sale</u>.   Upon the terms and subject to the conditions set forth herein, at the Closing, SquareTwo and CACLLC shall sell to the Plan Investor or its assignee as permitted pursuant to <u>Section 10.3</u> (including the Canadian PurchaseCo, as defined below), free and clear of any Claims or Encumbrances (other than Permitted Encumbrances), and, for the Closing Purchase Price (i) the Plan Investor or its assignee as permitted pursuant to <u>Section 10.3</u> shall purchase from SquareTwo, the Reorganized Entities Interests other than the SquareTwo Canada Shares (as defined below), representing one hundred percent (100%) of the issued and outstanding equity interests of the Reorganized Entities, other than the SquareTwo Canada Shares as of the Closing and (ii) a newly formed Canadian organized entity that will be at Closing an Affiliate of Plan Investor or its assignee as permitted pursuant to <u>Section 10.3</u> (the "<u>Canadian PurchaseCo</u>") shall purchase from CACLLC 35,000 shares of stock of SquareTwo Financial Canada, which represents one hundred percent (100%) of the issued and outstanding equity of Reorganized SquareTwo Financial Canada (the "<u>SquareTwo Canada Shares</u>").

Section 2.2.   <u>Good Faith Deposit; Purchase Price</u>.

(a)   Contemporaneously with the execution of this Agreement, as partial consideration for the future sale of the Reorganized Entities Interests to the Plan Investor at the Closing, the Plan Investor shall pay to the Escrow Agent an amount in cash equal to the Good Faith Deposit to be held pursuant to the terms of <u>Section 2.3</u> and the Escrow Agreement.

(b)   At the Closing, the Plan Investor (on its own behalf, and on behalf of Canadian PurchaseCo for the Canadian Portion) shall pay to SquareTwo (on its own behalf, and acting as agent of CACLLC for the Canadian Portion) an amount in cash equal to the Closing Purchase Price *less* the Good Faith Deposit, in accordance with the Plan, which payment shall be the remainder of the consideration payable to SquareTwo and CACLLC in connection with the sale of the Reorganized Entities Interests to the Plan Investor (and its assignees as permitted in <u>Section 10.3</u>) as of the Closing Date, but subject to the determination and payment of the Final Purchase Price pursuant to <u>Section 2.4</u>.   The portion of the Final Portion Price that is allocable to the SquareTwo Canada Shares is the amount that is so reflected

12

under the Purchase Price Allocation, as adjusted from time to time pursuant to the terms of this Agreement, and is referred to in this Agreement as the "Canadian Portion."

(c)    The payment of the consideration set forth in this <u>Section 2.2</u>, in whole or in part, shall sometimes be referred to herein as the "<u>Investment</u>."

Section 2.3.    <u>Escrow; Disbursements</u>.

(a)    <u>Deposits</u>.  As provided in <u>Section 2.2(a)</u>, the Plan Investor will deliver the Good Faith Deposit to the Escrow Agent to be held, safeguarded, invested and released pursuant to the terms of the Escrow Agreement as well as this Agreement.

(b)    <u>Disbursements</u>.

(i)    <u>Generally</u>.  The Escrow Agreement will provide that disbursements of the Good Faith Deposit from the Escrow Account will only be made in accordance with written instructions jointly signed by the Plan Investor and the Debtors' Representative in the form specified in or permitted by the Escrow Agreement (each, a "<u>Joint Instruction Letter</u>") or pursuant to an order of a court of competent jurisdiction.

(ii)    <u>Escrow Account</u>.

(A)    Upon a termination of this Agreement pursuant to <u>Section 8.1(e)(i)</u>, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse the entire Good Faith Deposit to SquareTwo.

(B)    Upon a termination of this Agreement for any reason other than pursuant to <u>Section 8.1(e)(i)</u>, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse the entire Good Faith Deposit to the Plan Investor.

(C)    Upon Closing, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Debtors Twenty Eight Million Dollars and Ten Thousand Dollars ($28,010,000).  Following such disbursement, Twelve Million Five Hundred Thousand Dollars $(12,500,000) of the Good Faith Deposit shall remain in the Escrow Account and shall be deemed the "<u>Post-Closing Escrow Amount</u>."

(D)    Upon the delivery of the Plan Investor Reconciliation Statement in accordance with <u>Section 2.4(b)</u>, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse from the Post-Closing Escrow Amount to the Debtors an amount equal to  Ten Million Dollars ($10,000,000) less the aggregate amount alleged to be owed to the Plan Investor pursuant to the Plan Investor Reconciliation Statement.

(E)    Following satisfaction of the payments, if any, required by <u>Section 2.4(f)</u>, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Debtors an amount equal to the then-remaining Post-Closing Escrow Amount less the excess of Two Million Five Hundred Thousand Dollars ($2,500,000) over the amounts, if any,

13

theretofore paid to the Plan Investor pursuant to Section 2.3(b)(ii)(H), which shall remain in the Escrow Account until disbursed under the terms of Section 2.3(b)(ii)(F) or 2.3(b)(ii)(G).

(F)    Upon the first anniversary of the Closing, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Debtors an amount equal to the greater of (x) zero dollars ($0) and (y) then-remaining Post-Closing Escrow Amount less One Million Dollars ($1,000,000).  The lesser of the then remaining Post-Closing Escrow Amount and One Million Dollars ($1,000,000) shall remain in the Escrow Account until disbursed under the terms of Section 2.3(b)(ii)(G).

(G)    Upon the 18-month anniversary of the Closing, each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Debtors an amount equal to the then-remaining Post-Closing Escrow Amount less the amount of any pending disputes pursuant to Section 2.3(b)(ii)(H).

(H)    Following (i) the Company's failure to fully and completely fulfill its obligations under the Transition Services Agreement (a "TSA Breach") or (ii) the incurrence of a Loss by a Reorganized Entity or Acquired Subsidiary arising or resulting from any (A) breach of SquareTwo's covenants set forth in Section 2.4, Section 6.8 and Section 6.11 or (B) Taxes imposed on a Reorganized Entity or an Acquired Subsidiary for any taxable period ending on or before the Closing Date, including Taxes payable only after the Closing Date but excluding (1) any Taxes taken into account in clause (e) of the definition of Estimated Purchase Price and (2) any Taxes paid on or before the Closing Date (any Loss described in this clause (ii)(B) being referred to as a "Tax Loss"), each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Plan Investor an amount equal to the Losses incurred by the Plan Investor as mutually agreed to by the Plan Investor and the Company, which Losses arise out of (I) a TSA Breach, (II) any breach of the covenants set forth in Section 2.4, Section 6.8 and Section 6.11 or (III) a Tax Loss, up to and including the then-remaining Post-Closing Escrow Amount.  In the event that the parties cannot mutually agree on the amount of the Plan Investor's Losses specified by the Plan Investor, the parties shall invoke the dispute resolution process further defined in Section 2.4 of this Agreement.  If Losses resulting from a TSA Breach exceed the then-remaining Post-Closing Escrow Amount, then Wind Down Co shall be obligated to pay such excess amount to the Plan Investor within fifteen (15) Business Days of final determination of such Losses, or, if such amount is in dispute, upon completion of the dispute resolution process further defined in Section 2.4 of this Agreement. The Plan Investor's claim for such payment shall be an Administrative Expense Claim under the Plan.  Any claim made by the Plan Investor pursuant to this Section 2.3(b)(ii)(H) shall be treated in the same manner as the Plan Investor Reconciliation Statement under Section 2.4(b) and the Debtor Representative's response shall be made in the time of and in the same manner as an Objection Notice in Section 2.4(c), and disputes shall be resolved in the same manner as otherwise contemplated by Section 2.4(d).    The ability of the Plan Investor to make a claim for a Tax Loss pursuant to this Section 2.3(b)(ii)(H) shall survive until the 18-month anniversary of the Closing and the Plan Investor's ability to make a claim for any other Losses

14

pursuant to this <u>Section 2.3(b)(ii)(H)</u> shall survive until the first anniversary of the Closing.

(iii)    <u>Failure to Issue Joint Instruction Letter</u>.  If either of the Plan Investor or the Debtors' Representative fails to timely execute and deliver a Joint Instruction Letter when required under this Agreement, either of the Plan Investor or the Debtors' Representative that has executed and delivered such letter, as applicable, will be entitled to an order of a court of competent jurisdiction to authorize and instruct the Escrow Agent to disburse to the applicable party hereto the Good Faith Deposit as set forth in <u>Section 2.3(b)(ii)</u> and to damages, including court costs and attorneys' fees, from the party hereto that has failed to execute and deliver such letter, as applicable.

Section 2.4.    <u>Purchase Price; Post-Closing Purchase Price Adjustment</u>.

(a)    Set forth on <u>Exhibit D</u> is SquareTwo's calculation of the Estimated Purchase Price as of December 31, 2016.  No more than five (5) Business Days and no fewer than two (2) Business Days prior to Closing, SquareTwo will prepare in good faith and in accordance with the principles and methodologies set forth on <u>Exhibit D</u> hereto and deliver to the Plan Investor a statement (the "<u>Estimated Closing Statement</u>"), setting forth SquareTwo's computation of the Closing Purchase Price, including SquareTwo's reasonable estimate and calculation of each of the components set forth in clauses (c)-(h) of the definition of Estimated Purchase Price, accompanied by materials showing in reasonable detail SquareTwo's support for its calculations.  The Plan Investor will be entitled to review and make reasonable objections to the matters and amounts set forth on the Estimated Closing Statement, which objections, if any, will be considered and incorporated into the Estimated Closing Statement in good faith by SquareTwo.  At least five (5) Business Days prior to Closing, the Plan Investor will prepare and deliver to SquareTwo its calculation of PI Expenses.  For greater certainty, each of the components in clauses (c)-(h) of the definition of Estimated Purchase Price are to be calculated and prepared in a manner consistent, and in accordance with, the principles and methodologies set forth in <u>Exhibit D</u> hereto. SquareTwo will cooperate, and cause its Subsidiaries to cooperate, with the Plan Investor in the review of the Estimated Closing Statement.

(b)    No later than 45 days after the Closing Date, the Plan Investor will prepare in good faith and in accordance with the same principles utilized to prepare the Estimated Closing Statement, and deliver to the Debtors' Representative a statement (the "<u>Plan Investor Reconciliation Statement</u>") setting forth the Plan Investor's computation of the components set forth in clauses (c)-(h) of the definition of Estimated Purchase Price that were utilized to calculate the Closing Purchase Price paid at Closing pursuant to <u>Section 2.2(b)</u>, accompanied by materials showing in reasonable detail the Plan Investor's support for the Plan Investor's calculations.

(c)    For the 30-day period following the Debtors' Representative's receipt of the Plan Investor Reconciliation Statement (such 30-day period, the "<u>Response Period</u>"), at the Debtors' Representative's request, the Plan Investor will provide the Debtors, the Debtors' Representative and their respective representatives with reasonable access during normal business hours to the financial books and records pertaining to, and personnel and representatives of, SquareTwo and the Subsidiaries to the extent reasonably necessary to confirm the amounts stated in the Plan Investor Reconciliation Statement. During the period following the delivery of the Estimated Closing Statement and prior to the Closing, (x) SquareTwo shall provide the Plan Investor and its Affiliates and its and their respective Representatives with reasonable access during normal business hours to the financial books and records pertaining to, and personnel and representatives of, SquareTwo and the Subsidiaries to the extent reasonably necessary to confirm the amounts stated in the Estimated Closing Statement and (y) SquareTwo shall cooperate in good faith to answer any reasonable questions raised by the Plan Investor or its Representatives in connection with their review of the Estimated Closing Statement.  Prior to the expiration of the Response

15

Period, the Debtors' Representative may deliver a written objection to the Plan Investor's calculation of any of the items stated in the Plan Investor Reconciliation Statement accompanied by materials showing in reasonable detail the Debtors' Representative's support for the Debtors' Representative's position (such notice and supporting materials being the "Objection Notice").   The Debtors and the Debtors' Representative will be deemed to have waived their right to object to any item stated in the Plan Investor Reconciliation Statement, and the Plan Investor's determination of any items stated therein will be deemed to be final and binding on the Debtors and the Debtors' Representative, unless the Debtors' Representative delivers the Objection Notice to the Plan Investor prior to the expiration of the Response Period.  If the Debtors' Representative delivers the Objection Notice to the Plan Investor prior to the expiration of the Response Period, (i) the Debtors' Representative will be deemed to have waived its right to object to any item stated in the Plan Investor Reconciliation Statement that is not addressed in the Objection Notice and (ii) the Debtors' Representative and the Plan Investor will meet within 15 days (in person, by telephone or otherwise) after the delivery of the Objection Notice to discuss each other's respective position and to attempt to resolve all items set forth in the Objection Notice.  If the Plan Investor and the Debtors' Representative are not able to resolve their differences at such meeting (or by any later date mutually agreed to by them), then the Plan Investor and the Debtors' Representative will prepare a single list of the items that remain in dispute (the "Disputed Items").  The Plan Investor and the Debtors' Representative will separately prepare statements (the "Position Statements") specifying in reasonable detail their respective positions on each of the Disputed Items (including the dollar amount attributable to each item).  The Debtors' Representative and the Plan Investor will exchange their Position Statements with one another within 15 days after the Debtors' Representative and the Plan Investor meet.

(d)     If the Plan Investor and the Debtors' Representative are unable to resolve their differences with respect to all of the Disputed Items in accordance with the above procedures within 15 days of the exchange of the Position Statements, either or both of them will submit a list of the remaining Disputed Items (together with the Plan Investor's and the Debtors' Representative's Position Statements) to be resolved by Deloitte LLP (the "Independent Auditor").  Regardless of whether the Plan Investor or the Debtors' Representative submits the matter to the Independent Auditor for resolution, both the Plan Investor and the Debtors' Representative will promptly enter into the Independent Auditor's standard engagement letter (including any standard provisions relating to a retainer which shall be initially advanced in equal amounts by the Plan Investor and the Debtors' Representative) and both will instruct the Independent Auditor to resolve each of the Disputed Items (but no other items) as soon as practicable but in any event within 30 days of being engaged.  Based solely on the Position Statements and financial statements, documents or information provided in connection therewith, the Independent Auditor will choose either of the Plan Investor's or the Debtors' Representative's position with respect to each Disputed Item.  In resolving any dispute, the Independent Auditor shall (a) be bound by the terms of this Agreement, including the methodologies and illustrations set forth on Exhibit D and (b) not be permitted to determine that any Disputed Item is greater or less than the amount of such Disputed Item set forth by the Plan Investor or the Debtors' Representative in their respective Position Statements.  The Plan Investor and the Debtors' Representative will cooperate with the Independent Auditor in all reasonable respects, but neither of the Plan Investor nor the Debtors' Representative will have ex parte meetings, teleconferences or other correspondence with the Independent Auditor as it is intended that both the Debtors' Representative and the Plan Investor be included in all discussions and correspondence with the Independent Auditor.   The fees and expenses of the Independent Auditor will be allocated by the Independent Auditor between the Plan Investor, on the one hand, and the Debtors, on the other hand, to reflect the extent to which the decision of the Independent Auditor favors the Plan Investor or the Debtors, as applicable.  The determination of the Independent Auditor with respect to the Disputed Items and the apportionment of fees and expenses will be final and binding on the Plan Investor, the Debtors and the Debtors' Representative, will be non-appealable, and may be enforced by a court of competent jurisdiction.

16

(e)     The "Final Purchase Price Determinations" (as such term is used herein) will be the computations and supporting materials for the determination of the Closing Purchase Price (i) as stated in the Plan Investor Reconciliation Statement if the Debtors' Representative fails to deliver an Objection Notice prior to the expiration of the Response Period (or to the extent that the Objection Notice fails to object to any particular item of the Plan Investor Reconciliation Statement) or (ii) if the Plan Investor delivers the Plan Investor Reconciliation Statement and if the Debtors' Representative delivers an Objection Notice prior to the expiration of the Response Period, (A) the amounts mutually agreed to by the Plan Investor and the Debtors' Representative or (B) if any Disputed Item is submitted for resolution to the Independent Auditor, the amount of each Disputed Item as determined by the Independent Auditor together with the amounts mutually agreed to by the Debtors' Representative and the Plan Investor (i.e., items that are not Disputed Items).

(f)     Upon the final determination of the Final Purchase Price Determinations as set forth in Section 2.4(e), the Plan Investor and the Debtors' Representative will compute the Final Purchase Price, and the necessary true-up payments will be made as follows:

(i)     If the Final Purchase Price exceeds the Closing Purchase Price, the Plan Investor will pay to Wind Down Co the amount of such excess.

(ii)     If the Closing Purchase Price exceeds the Final Purchase Price, the Plan Investor and the Debtors' Representative will promptly (but in any event within two (2) Business Days of such determination) execute a Joint Instruction Letter directing the Escrow Agent to first, disburse such excess from the Post-Closing Escrow Amount to the Plan Investor. For the avoidance of doubt, if the Closing Purchase Price exceeds the Final Purchase Price by an amount that is greater than the Post-Closing Escrow Amount, the Plan Investor will only be entitled to the Post-Closing Escrow Amount, and neither Debtor (nor any other Person) will be required to make any payment to the Plan Investor in connection with the payments required under this Section 2.4(f).

(iii)     Any payments required under this Section 2.4(f) will be made by wire transfer in immediately available funds to an account specified by the Plan Investor or the Debtors' Representative, as applicable, within five (5) Business Days after the date the Final Purchase Price is determined pursuant to Section 2.4(e).

Section 2.5.     Purchase Price Allocation.     During the 90-day period following the final determination of the Final Purchase Price in accordance with Section 2.4, the Plan Investor and the Debtors' Representative shall negotiate in good faith with a view to reaching agreement on an allocation of the Final Purchase Price and the liabilities of the Reorganized Entities and the Acquired Subsidiaries among the assets of the Reorganized Entities and the Acquired Subsidiaries for all purposes (including Tax and financial accounting purposes) (the "Purchase Price Allocation"). The Debtors' Representative shall furnish the Plan Investor with all information the Plan Investor reasonably requests in connection with the negotiation and drafting of the Purchase Price Allocation. If the Plan Investor and the Debtors' Representative are unable to reach an agreement on the Purchase Price Allocation by the end of such period, the Plan Investor and the Debtors' Representative shall follow dispute procedures similar to those described in Section 2.4(d) and, if necessary, shall submit the dispute to the Independent Auditor for resolution not later than 30 days after the date of such submission. Except to the extent otherwise required pursuant to a "determination" (as defined in Section 1313(a) of the Code or any similar provision of state, local or foreign Law), each of the parties hereto shall (and shall cause its respective Affiliates to) file all Tax Returns in a manner consistent with the Purchase Price Allocation (as determined after the completion of any dispute procedure described in the immediately preceding sentence).

17

ARTICLE III.

THE CLOSING

Section 3.1.    The Closing.  The closing of the purchase and sale of the Reorganized Entities Interests hereunder (the "Closing") shall take place remotely via the electronic exchange of documents and signatures on the second Business Day following the satisfaction or waiver of each of the conditions set forth in Article VII (other than those conditions that are to be satisfied at the Closing), or on such other date or at such other time and place as the parties hereto mutually agree upon in writing (the "Closing Date"); provided, however, that the Closing Date shall be the same date as the Effective Date.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Section 3.2.    Deliveries.

(a)    At the Closing, SquareTwo shall deliver to the Plan Investor or its assignee as permitted pursuant to Section 10.3, and CACLLC shall deliver to Canadian PurchaseCo, stock powers or membership interest powers and other documents reasonably requested, in a form reasonably satisfactory to the Plan Investor, in each case evidencing the transfer of the applicable Reorganized Entity's equity interests to the Plan Investor or Canadian PurchaseCo or their respective assignee as permitted pursuant to Section 10.3, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), following delivery by the Plan Investor or an Affiliate thereof of the Estimated Purchase Price as calculated pursuant to Section 2.4(a) (as ultimately determined pursuant to Section 2.4(e)) to SquareTwo (on its own behalf and on behalf of CACLLC) in immediately available funds by wire transfer to an account number designated by SquareTwo at least 24 hours prior to the Closing.

(b)    At the Closing, the Debtors' Representative shall deliver to the Plan Investor (i) the officers' certificates required under Section 7.1(g) and Section 7.1(h) and (ii) such other documents or instruments as the Plan Investor reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)    At the Closing, the Plan Investor shall deliver to the Debtors' Representative the (i) officers' certificate required under Section 7.2(d) and Section 7.2(e) and (ii) such other documents or instruments as the Debtors' Representative reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF SQUARETWO

Except as set forth in the disclosure schedule prepared by SquareTwo (the "SquareTwo Disclosure Schedule") and delivered to the Plan Investor simultaneously with the execution and delivery hereof, SquareTwo represents and warrants to the Plan Investor as follows:

Section 4.1.    Organization.  Each of the Reorganized Entities and the Acquired Subsidiaries are duly incorporated or formed, validly existing and (in the jurisdictions recognizing the concept) in good standing under the Laws of the jurisdiction in which such Person is incorporated, formed or domiciled.  Section 4.1 of the SquareTwo Disclosure Schedule sets forth each jurisdiction in which each of the Reorganized Entities and the Acquired Subsidiaries is licensed or qualified to do business and each of the Reorganized Entities and the Acquired Subsidiaries is licensed or qualified to do business in each

18

jurisdiction where the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary and has the requisite power and authority to own, lease and operate its properties and to conduct its business as it is now being conducted, except, in each case, where such failure, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 4.2.    Qualification; Due Authorization; Power and Authority.  Subject to approval of the Bankruptcy Court and Canadian Court for actions to be taken after the Petition Date, (a) each of SquareTwo and the Debtors' Representative has all power and authority to execute and deliver this Agreement and any other agreement contemplated hereby, and (b) subject to the approval of the board of directors of SquareTwo, each of SquareTwo and the Debtors' Representative will have, prior to the filing of the Bankruptcy Cases, all power and authority to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof applicable to SquareTwo or the Debtors' Representative.  The making, execution and delivery of this Agreement and other agreements contemplated hereby, and the performance of the obligations and covenants contained in this Agreement and any other agreement contemplated hereby, in each case other than the filing of the Bankruptcy Cases, have been duly and validly authorized by all necessary corporate action of SquareTwo and the Debtors' Representative, as applicable.  The filing of the Bankruptcy Cases will be duly and validly authorized by all necessary corporate action of SquareTwo and the Debtors' Representative prior to the Petition Date.  This Agreement has been duly and validly executed and delivered by SquareTwo and the Debtors' Representative and, assuming the due authorization, execution and delivery hereof and thereof by the Plan Investor, this Agreement (subject to approval by the Bankruptcy Court and Canadian Court after the Petition Date) will constitute the valid and binding obligations of SquareTwo and the Debtors' Representative, enforceable against SquareTwo and the Debtors' Representative, as applicable, in accordance with their respective terms (except as such enforcement may be limited by insolvency, reorganization, moratorium, receivership, conservatorship and by general equity principles).

Section 4.3.    Consents and Approvals.  Neither the execution and delivery of this Agreement or any other agreements contemplated hereby by SquareTwo nor the consummation of the transactions contemplated hereby will (a) require any consent, approval, authorization, registration or filing under any Law to which SquareTwo is subject (the "SquareTwo Governmental Requirements"); (b) require the consent or approval of any other party to, or conflict with, result in any breach of, or constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, any Contract to which any Reorganized Entity or Acquired Subsidiary is a party; (c) give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any Security Interests or Encumbrances (other than Permitted Encumbrances) upon any of the properties or assets of any Reorganized Entity or Acquired Subsidiary; or (d) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, operating agreement, by-laws or other organizational documents of SquareTwo, the Acquired Subsidiaries or Debtors' Representative; in each case, other than (i) on or after the Petition Date, the authorization or approval of the Bankruptcy Court and Canadian Court, (ii) authorizations, consents, orders or approvals of, or registrations or declarations with, any Governmental Entity set forth on Section 4.3 of the SquareTwo Disclosure Schedule, that have been or will be obtained or made prior to or on the Closing Date and a notification under the ICA within thirty (30) days of Closing and (iii) where the failure to obtain such consents, approvals, authorizations or registrations or to make such filings would not be material to the Acquired Subsidiaries.  Any such authorization, consent, approval, order, registration or declaration that has been obtained, effected or given is in full force and effect as of the date hereof. Except as a result of the commencement of the Bankruptcy Cases and the Canadian Cases, neither any Reorganized Entity nor any Acquired Subsidiary is in default under, and no event has occurred that with the lapse of time or action by a third party could result in a default under, the terms of any judgment,

order, writ, decree, Permit or license of any Governmental Entity where such default would be material to any Reorganized Entity or Acquired Subsidiary.

Section 4.4.    Capitalization.   Section 4.4 of the SquareTwo Disclosure Schedule sets forth a true, correct and complete list of the authorized capital of the Reorganized Entities and Acquired Subsidiaries and the number and type of issued and outstanding shares of capital stock or other equity securities of each such Person and all holders thereof, including each Reorganized Entity's and Acquired Subsidiary's name, type of entity, jurisdiction, authorized capital stock, membership interests or equivalent, the number and type of its issued and outstanding shares of capital stock, membership units or other equity securities, and the current ownership of such shares, membership units or similar ownership interests.   Except as set forth in Section 4.4 of the SquareTwo Disclosure Schedule, there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which any Reorganized Entity or any Acquired Subsidiary owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same. Except as set forth in Section 4.4 of the SquareTwo Disclosure Schedule, all outstanding shares of capital stock or other equity securities of the Reorganized Entities and the Acquired Subsidiaries have been duly authorized and validly issued, and all outstanding shares of capital stock or other equity securities of each Reorganized Entity and each Acquired Subsidiary is owned, directly or indirectly, by the Person indicated in Section 4.4 of the SquareTwo Disclosure Schedule free and clear of all Encumbrances (other than Permitted Encumbrances).   Except as set forth in Section 4.4 of the SquareTwo Disclosure Schedule, on the date hereof there are no equity securities of any Reorganized Entity or Acquired Subsidiary, issuable upon conversion or exchange of any issued and outstanding security of any Reorganized Entity or Acquired Subsidiary, as applicable, nor are there any rights, options outstanding or other agreements to acquire shares or any other equity security of any Reorganized Entity or Acquired Subsidiary, as applicable, nor is any Reorganized Entity or Acquired Subsidiary contractually obligated to purchase, redeem or otherwise acquire any of its outstanding equity securities that would survive the Closing. Except as set forth on Section 4.4 of the SquareTwo Disclosure Schedule, there are no outstanding warrants, options, rights, "phantom" stock rights, agreements, convertible or exchangeable securities or other commitments (other than this Agreement) (a) pursuant to which any Reorganized Entity or Acquired Subsidiary is or may become obligated to issue, sell, purchase, return or redeem any shares of capital stock or other equity securities of such Person or (b) that give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Reorganized Entity or Acquired Subsidiary, or the rights to receive any payment in respect thereof.   There are no outstanding bonds, debentures, notes or other indebtedness having the right to vote on any matters on which equityholders of any Reorganized Entity or Acquired Subsidiary may vote.   The Reorganized Entities Interests were issued in compliance with all applicable Laws and were not be issued in violation of any agreement, arrangement or commitment to which SquareTwo or any Reorganized Entity is a party or is subject to or in violation of any preemptive or similar rights of any Person.

Section 4.5.    Financial Statements.   SquareTwo has previously provided the Plan Investor with the following financial statements (collectively, the "Financial Statements"):  (a) the audited consolidated balance sheets of SquareTwo and the Subsidiaries as of December 31, 2015 and the related statements of income, cash flows and changes in owners' equity for the fiscal year then ended, together with the notes to such Financial Statements and the opinion of SquareTwo's independent auditor thereon (the Financial Statements set forth in this clause (a), the "Audited Financial Statements"), and (b) the unaudited consolidated balance sheet of SquareTwo and the Subsidiaries as of the Latest Balance Sheet Date and the related statements of income and cash flows for the twelve-month period then ended.   The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as set forth in footnote disclosure to the Audited Financial Statements) and except for (i) the lack of footnote disclosure in any Financial Statements other than the Audited Financial

Statements and (ii) customary year-end adjustments, the Financial Statements fairly present, in all material respects, the financial position, and results of operations, stockholders' equity and cash flows of SquareTwo and the Subsidiaries, on a consolidated basis, as of the dates and for the periods indicated. The Financial Statements were derived from the books and records of SquareTwo and the Subsidiaries and present fairly in all material respects the financial condition of SquareTwo and the Subsidiaries as of the respective dates they were prepared and the results of operations of SquareTwo and the Subsidiaries for the periods indicated, all in accordance with GAAP.  SquareTwo and the Subsidiaries maintain a standard system of accounting established and administered in accordance with GAAP.

Section 4.6.    No Undisclosed Liabilities.  Exhibit A to the Plan sets forth the list of Assumed U.S. Liabilities.  (i) No Reorganized Entity has any Canadian Claims or other Liabilities (other than Assumed U.S. Liabilities) of a nature and (ii) no Acquired Subsidiary has any Liabilities of a nature, in each of (i) and (ii), that would be required to be disclosed on a balance sheet prepared in accordance with GAAP (as in effect on the date hereof) except for (a) any Liability identified in the Latest Balance Sheet; (b) current Liabilities that have arisen after the Latest Balance Sheet Date in the ordinary course of business; (c) Liabilities arising in the ordinary course of business (none of which arose out of any proceeding) under any Contract (but, in each case, not Liabilities for breaches thereof); or (d) Liabilities incurred in connection with (x) the Bankruptcy Cases, the Canadian Cases, the DIP Financing Agreement or the transactions contemplated hereby, which Liabilities described in this clause (d) will be paid out of the Closing Purchase Price proceeds pursuant to the Plan and (y) this Agreement.  No Reorganized Entity or Acquired Subsidiary has any "off-balance sheet arrangements" (as such term is defined in Item 303(a)(4) of Regulation S-K promulgated under the Exchange Act).

Section 4.7.    Recent Events.  Since July 1, 2016, until the date hereof (i) the Reorganized Entities and the Acquired Subsidiaries have conducted their business in the ordinary course of business and consistent with past practices (except in connection with the transactions contemplated by this Agreement, the Bankruptcy Cases and the Canadian Cases) and (ii) without limiting the generality of the foregoing, except as expressly contemplated by this Agreement, the Restructuring Support Agreement and the Plan or as set forth on Section 4.7 of the SquareTwo Disclosure Schedule, since July 1, 2016, SquareTwo has not:

(a)    subjected a material portion of any Reorganized Entity's or Acquired Subsidiary's properties or assets to any Encumbrance, except for Permitted Encumbrances;

(b)    sold, assigned or transferred a material portion of any Reorganized Entity's or Acquired Subsidiary's assets, except in the ordinary course of business and except for sales of obsolete assets or assets with de minimis book value;

(c)    purchased, acquired, sold, assigned or transferred any Serviced Accounts Receivable;

(d)    amended the charter, operating agreement, by-laws or other organizational documents of a Reorganized Entity or Acquired Subsidiary;

(e)    made any material change in any method of accounting or accounting practice of the Company, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(f)    incurred, assumed or guaranteed any indebtedness for borrowed money except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

21

(g)     taken any action to make, change or rescind any material Tax election, amend any material Tax Return or taken any position on any Tax Return, taken any action, omitted to take any action or entered into any other transaction that would have the effect of increasing the Tax liability of the Plan Investor or any Reorganized Entity or any Acquired Subsidiary in respect of any Tax period starting after the Closing Date, in each case other than in the ordinary course of business; or

(h)     entered into any Contract to do any of the foregoing.

Section 4.8.    Contracts and Commitments.

(a)     Except as set forth in Section 4.8 of the SquareTwo Disclosure Schedule and except for agreements entered into by SquareTwo or any of the Subsidiaries after the date hereof in accordance with Section 6.1, no Reorganized Entity is a party to any Contract and no Acquired Subsidiary is a party under any:

(i)     (A) Contract relating to the borrowing of money or to the issuance of any note, bond, debenture or other evidence of indebtedness, or to mortgaging, pledging or otherwise placing a material Security Interest or Encumbrance on any securities of any Reorganized Entity or Acquired Subsidiary or the assets of any Reorganized Entity or Acquired Subsidiary, other than any such Contracts whose liabilities will be fully discharged under the Bankruptcy Code; (B) letter of credit, bankers' acceptance and similar facilities involving any Reorganized Entity of any Acquired Subsidiary as an account party or beneficiary; (C) capital or direct financing lease that is required by GAAP to be treated as a long-term liability involving payments above Eighty-Five Thousand Dollars ($85,000) annually; and (D) earn-out obligation or other contingent payment or obligation for the deferred purchase price of property or services;

(ii)     Contract involving any guaranty of any obligation for borrowed money or other material guaranty, performance or completion bond or indemnity or surety arrangement or otherwise relating to the assumption or guarantee of any obligation by or of any Reorganized Entity or Acquired Subsidiary, other than any such Contracts whose liabilities will be fully discharged under the Bankruptcy Code;

(iii)     lease or sublease under which it is lessee of, or holds, uses or operates, any personal property involving payments above Eighty-Five Thousand Dollars ($85,000) annually;

(iv)     license or royalty agreement relating to the use of any third-party Intellectual Property (other than commercially available software or software subject to click-through or shrink-wrap agreements);

(v)     Contract involving hedges or swaps, futures, derivatives, swap agreements, collar agreements or similar instruments or arrangements, regardless of value;

(vi)     Contract including a covenant not to compete with any Person that materially restricts the activities of any Reorganized Entity or Acquired Subsidiary;

(vii)     Contract for the acquisition or disposition of any business, any merger, consolidation, plan or scheme of arrangement or reorganization, or acquisition or disposition of a material amount of stock or assets of any Person or any material real property (whether by merger, sale of stock, sale of assets or otherwise) to the extent any Reorganized Entity or Acquired Subsidiary has any remaining material obligations thereunder;

22

(viii)    Contract relating to the servicing or collection of any Serviced Accounts Receivable, including all Contracts with Third-Party Servicers and Contracts for bankruptcy and deceased account scrubbing, in each case with annual expenditures in excess of Eighty-Five Thousand Dollars ($85,000);

(ix)    Contract granting exclusive or preferential rights to any Person with respect to the origination, sale or purchase of any accounts receivable; or otherwise contemplating an exclusive relationship between any Reorganized Entity or Acquired Subsidiary and any other Person;

(x)    Contract (other than Serviced Accounts Receivable) involving aggregate consideration in excess of Eighty-Five Thousand Dollars ($85,000), individually per Contract and Five Hundred Thousand Dollars ($500,000) in aggregate for Contracts involving substantially the same customer, supplier or subject matter, and which, in each case, cannot be cancelled by a Reorganized Entity or Acquired Subsidiary without penalty or without more than 90 days' notice;

(xi)    employment agreements and Contracts with independent contractors or consultants which are not cancellable without material penalty or without more than 90 days' notice; or

(xii)    material Contract that provides for any joint venture, partnership or similar arrangement.

(b)    The Plan Investor either has been supplied with, or has been given access to, a true, correct and complete copy of all written Contracts (including all amendments, terminations and modifications thereof) that are referred to in Section 4.8 of the SquareTwo Disclosure Schedule (collectively, the "Material Contracts").    Except as would not have a Material Adverse Effect, each Material Contract (assuming due power and authority of, and due execution and delivery by, the other party or parties thereto) is valid, binding and enforceable against the applicable Reorganized Entity or Acquired Subsidiary and, to the Company's Knowledge, the other parties thereto, in accordance with their terms (except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors rights), is in full force and effect.

(c)    Except as would not have a Material Adverse Effect or as set forth on Section 4.8 of the SquareTwo Disclosure Schedule, (i) within the one-year period preceding the date of this Agreement, no Reorganized Entity or Acquired Subsidiary has violated or breached, or committed any default in any respect under, any Material Contract that remains uncured as of the date hereof and (ii) to the Company's Knowledge, as of the date of this Agreement, no other Person has violated or breached, or committed any default in any respect under, any Material Contract that remains uncured as of the date hereof; and (iii) as of the date of this Agreement, no event has occurred and is continuing through any Reorganized Entity's or Acquired Subsidiary's actions or inactions, as applicable, that will result in a violation or breach in any respect of any of the provisions of any Material Contract.

Section 4.9.    Title to Assets; Real Property.

(a)    Subject to Article X of the Plan, a Reorganized Entity or Acquired Subsidiary has, or as of the Closing will have, good and valid title to, or a valid leasehold interest in, the Acquired Assets (as defined in the Transition Services Agreement).    All such properties and assets (including the Acquired Assets) are free and clear of Encumbrances (except for Permitted Encumbrances).    The assets of the Acquired Subsidiaries, taken together with the services to be provided under the Transition Services Agreement, are sufficient for the continued conduct of its business after the Closing in substantially the same manner as conducted prior to the Closing and such assets are free and clear of Encumbrances (except for Permitted Encumbrances).

23

(b)     No Reorganized Entity or Acquired Subsidiary owns any real property or any interest in real property other than the leaseholds created under the real property leases for the properties identified in <u>Section 4.9</u> of the SquareTwo Disclosure Schedule, including all amendments, modifications, terminations and extensions thereof (the "<u>Real Property Leases</u>").  <u>Section 4.9</u> of the SquareTwo Disclosure Schedule contains a true, correct and complete list of all Real Property Leases, including leases, licenses, subleases and occupancy agreements, together with all amendments, modifications and extensions thereof, with respect to all real property leased, licensed, subleased or otherwise used or occupied by any Reorganized Entity or Acquired Subsidiary as of the date hereof.

(c)     The Real Property Leases are in full force and effect and are valid and binding against the applicable Reorganized Entity or Acquired Subsidiary and, to the Company's Knowledge, the other parties thereto in accordance with their terms (except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights).  No Reorganized Entity or Acquired Subsidiary, as applicable, has leased, subleased or granted to any Person a right to possess, lease or occupy any portion of the real property subject to any Real Property Lease.

(d)     SquareTwo has delivered or made available to the Plan Investor complete and accurate copies of each of the Real Property Leases, and none of such Real Property Leases has been amended, modified, terminated or extended as of the date hereof in any respect, except to the extent that such amendments, modifications, terminations or extensions are disclosed by copies delivered or made available to the Plan Investor.

(e)     No Reorganized Entity or Acquired Subsidiary, as applicable, is in default in any material respect under any of the Real Property Leases that remains uncured as of the date hereof.

Section 4.10.   <u>Serviced Accounts Receivable</u>.

(a)      Either a Reorganized Entity or an Acquired Subsidiary has good and marketable title to, and is the sole owner of record and holder of, each of the Serviced Accounts Receivable free and clear of all Security Interests and Encumbrances other than Security Interests and Encumbrances set forth in <u>Section 4.10(a)</u> of the SquareTwo Disclosure Schedule (all of which will be released as of the Closing).  Each of the Serviced Accounts Receivable are "accounts" and are "general intangibles" related thereto or arising therefrom and all "proceeds" thereof as defined in the Uniform Commercial Code.

(b)     SquareTwo and each of its and its Subsidiaries' agents, representatives or Third-Party Servicers have acquired, serviced and maintained the Serviced Accounts Receivable and, to the Company's Knowledge, each of the Serviced Accounts Receivable was originated, serviced and maintained by the originator thereof and each other prior owner thereof, in each case in compliance in all material respects with all applicable Laws, including the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Billing Act, the Bank Act (Canada), the Criminal Code of Canada, the Personal Information Protection and Electronic Documents Act (Canada), the Consumer Protection Act and similar legislation and the Collection Agency Act and similar legislation.  No material Contract relating to the purchase of Serviced Accounts Receivable will become unenforceable by any Reorganized Entity or Acquired Subsidiary that is a party thereto as a result of the consummation of the transactions contemplated hereby.  Except as set forth on <u>Section 4.10(b)</u> of the SquareTwo Disclosure Schedule, (i) since January 1, 2013, the Company has not received notice of any material violation or alleged material violation of any Laws or orders from any Governmental Entity related to the acquisition, servicing and maintenance of the Serviced Accounts Receivable and (ii) the Company has not received notice of any violation or alleged violation of any Laws or orders from any Governmental Entity related to the acquisition, servicing and maintenance of the Serviced Accounts Receivable, the subject matter of which is still pending.  All material reports, filings and returns in each

24

case directly related to Serviced Accounts Receivable that are required to be filed by or on behalf of the Company with any Governmental Entity related to the acquisition, servicing, or maintenance of Serviced Accounts Receivable have been filed and, when filed, were correct and complete in all material respects. The Company is registered, licensed, with such type of license as so identified, and/or bonded in each of the jurisdictions set forth in Section 4.10(b) of the SquareTwo Disclosure Schedule.

(c)    There are no obligations to make any future advances to any customer or on behalf of any customer for any Serviced Accounts Receivable. Each originating creditor of a Serviced Accounts Receivable has represented, in the manner identified in the applicable originating purchase agreements, that each Serviced Accounts Receivable is charged-off but enforceable in accordance with its usual and customary banking or applicable commercial practices and all applicable Law. The Serviced Accounts Receivable account balance information contained in the Serviced Accounts Receivable Data Tape is accurate, true and correct as of the date indicated and all other information in the Serviced Accounts Receivable Data Tape is accurate, true and correct in all material respects as of the date indicated. Section 4.10(c) of the SquareTwo Disclosure Schedule accurately sets forth, in all material respects, the collections received by the Company with respect to Serviced Accounts Receivable from the period beginning at 12:00 midnight ET at the beginning of July 1, 2016 and ending on or about February 28, 2017.

Section 4.11.    Intellectual Property.

(a)    All registrations and applications pertaining to copyrights, trademarks, patents, or other material Intellectual Property owned by, purported to be owned by or exclusively licensed to SquareTwo or any of its Subsidiaries as of the date hereof (the "Company-Owned Intellectual Property Rights") are set forth in Section 4.11(a) of the SquareTwo Disclosure Schedule. At the Closing, a Reorganized Entity or an Acquired Subsidiary will own all Company-Owned Intellectual Property Rights, except for such rights that are licensed to SquareTwo or any Subsidiary and set forth on Section 4.11(a) of the SquareTwo Disclosure Schedule. All registrations for Company-Owned Intellectual Property Rights are subsisting and, to the Company's Knowledge, valid and enforceable. SquareTwo or one or more of its Subsidiaries are the exclusive owners of all Company-Owned Intellectual Property Rights, other than such rights that are licensed to SquareTwo or any Subsidiary. Except for any nonconformance with clauses (i) and (ii) below that is not material: (i) SquareTwo and/or one or more of the Subsidiaries own or have the exclusive right to use the Intellectual Property set forth in Section 4.11(a) of the SquareTwo Disclosure Schedule; and (ii) since January 1, 2014, neither SquareTwo nor any Subsidiary has received any written notice of infringement or misappropriation from any third party claiming that SquareTwo or any Subsidiary or its conduct of the Business has infringed or misappropriated any intellectual property of any other Person, nor, to the Company's Knowledge, is there any valid basis for a claim that SquareTwo or any Subsidiary is infringing the intellectual property rights of any other Person. To the Company's Knowledge, no Person is infringing any Company-Owned Intellectual Property Rights. SquareTwo and each of the Subsidiaries have taken prior to the date hereof commercially reasonable steps to maintain the confidentiality of their trade secrets.

(b)    This Section 4.11 constitutes the sole and exclusive representations and warranties of SquareTwo with respect to any Intellectual Property matters, and no other representation or warranty contained in any other section of this Agreement shall apply to any such Intellectual Property matters and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.12.    Databases; Personally Identifiable Information.    Section 4.12 of the SquareTwo Disclosure Schedule describes in reasonable detail all material databases of Personally Identifiable Information of debtors with respect to Serviced Accounts Receivable owned or used by the Company in connection with the operation of or otherwise relating to the Business (the "Databases"), and the nature

25

and quantity of data contained therein.  Except for use in collection activities in the ordinary course of business and in compliance with Law, neither the Company nor, to the Company's Knowledge, any Third-Party Servicer, has sold, assigned, leased, transferred, permitted the use of or otherwise disclosed to any Person any Personally Identifiable Information contained in any of the Databases, and all Personally Identifiable Information contained in the Databases has been collected, used and maintained in accordance with all Laws, including Privacy Laws, in all material respects.  The Closing will not violate in any material respect any privacy policy adopted and made publicly available by SquareTwo or any Subsidiary that applies to the collection, storage or use of Personally Identifiable Information contained in any of the Databases at the time such Personally Identifiable Information was collected, stored or used.

Section 4.13.    Legal Compliance; Permits.    Except as set forth in Section 4.13 of the SquareTwo Disclosure Schedule, since January 1, 2015, the Reorganized Entities and the Acquired Subsidiaries have been in compliance with all Laws of all applicable Governmental Entities other than any such noncompliance that would not, individually or in the aggregate, be material to any Reorganized Entity or Acquired Subsidiary.  All Permits required to conduct the Business are in the possession of SquareTwo or one of the Subsidiaries, are in full force and effect and are being complied with, except, in each case, when such failure would not, individually or in the aggregate, be material to any Reorganized Entity or Acquired Subsidiary.  Except as set forth in Section 4.13 of the SquareTwo Disclosure Schedule, there is no material proceeding or disciplinary action (including fines) currently pending or, to the Company's Knowledge, threatened in writing against the Reorganized Entities and/or the Acquired Subsidiaries by any Governmental Entity.

Section 4.14.    Environmental Compliance and Conditions.

(a)    The Reorganized Entities and the Acquired Subsidiaries have obtained and possess all material Permits required under Laws and regulations concerning occupational health and safety, pollution or protection of the environment that were enacted and in effect on or prior to the date hereof, including all such Laws and regulations relating to the emission, discharge, release or threatened release of any chemicals, petroleum, pollutants, contaminants or hazardous or toxic materials, substances or wastes ("Hazardous Materials") into ambient air, surface water, groundwater or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials ("Environmental and Safety Requirements").

(b)    The Reorganized Entities and the Acquired Subsidiaries are, and for the past three (3) years have been, in compliance in all material respects with all terms and conditions of such Permits and are, and for the past three (3) years have been, in compliance in all material respects with all other Environmental and Safety Requirements or any written notice or demand letter issued, entered, promulgated or approved thereunder.

(c)    Except as set forth in Section 4.7 and Section 4.8, this Section 4.14 constitutes the sole and exclusive representations and warranties of SquareTwo with respect to any environmental, health or safety matters, including any arising under Environmental and Safety Requirements, and no other representation or warranty contained in any other section of this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.15.    Litigation.    Except as set forth in Section 4.15 of the SquareTwo Disclosure Schedule, since January 1, 2016, except for the anticipated Bankruptcy Cases and the anticipated Canadian Cases, there has not been (a) any material pending action, suit, proceeding, claim, administrative or court action or other litigation, or to the Company's Knowledge, any material investigation by any Governmental Entity, pending, or, (b) to the Company's Knowledge, any material threatened or anticipated action, suit, proceeding, claim, administrative or court action or other litigation,

26

in each case (X) against any Reorganized Entity or any Acquired Subsidiary or (Y) that involves SquareTwo or any of its Subsidiaries, excluding any Reorganized Entity or any Acquired Subsidiary, that is reasonably likely to materially and negatively impact a Reorganized Entity or Acquired Subsidiary. Except as set forth in Section 4.15 of the SquareTwo Disclosure Schedule, none of the Company, the Business, its assets or its Liabilities are subject to any material judicial or administrative or other order issued by, or material agreement entered into with, a Governmental Entity.

Section 4.16.   Tax Matters.

(a)    Since January 1, 2015, SquareTwo and each of the Subsidiaries have filed (or have had filed) all federal and other material Tax Returns that they were required to file (or to have filed), taking into account any extensions of time to file.  All such Tax Returns were correct and complete in all material respects.  All material Taxes of SquareTwo or any of the Subsidiaries (whether or not shown as owing by such Person on such Person's Tax Returns) have been fully paid or properly accrued in accordance with GAAP.  No material claim has ever been made by an authority in a jurisdiction where SquareTwo or any of the Subsidiaries does not file Tax Returns that SquareTwo or any of the Subsidiaries is or may be subject to taxation by that jurisdiction.  There are no material liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of SquareTwo or any of the Subsidiaries.

(b)    Neither SquareTwo nor any of the Subsidiaries is, as of the date hereof, the subject of a Tax audit or examination with respect to material Taxes.  There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any federal or other material Tax Return of SquareTwo or any of the Subsidiaries.  Neither SquareTwo nor any of the Subsidiaries has granted a power of attorney that is in effect with respect to any Tax matters.

(c)    Neither SquareTwo nor any of the Subsidiaries has any current material Liability for Taxes of any Person other than itself, including (i) under Treasury Regulations Section 1.1502-6 or (ii) as a transferee or successor, by contract or otherwise.

(d)    Neither SquareTwo nor any Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code and no share of any of SquareTwo or any Acquired Subsidiary is "taxable Canadian property" to the applicable holder, as such term is defined in subsection 248(1) of the Income Tax Act.

(e)    To the Company's Knowledge, the Company has not been a party to a "listed transaction," as such term is defined in Section 6707A(c)(1) and Treasury Regulations Section 1.6011-4(b)(2).

(f)    All material Taxes that SquareTwo or any of the Subsidiaries was obligated to withhold from amounts owing to any person, including any employee, independent contractor, stockholder, creditor or third party, prior to the date hereof have been fully and timely paid, withheld and remitted or properly accrued.

(g)    Neither SquareTwo nor any of the Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(h)    SquareTwo and each of the Subsidiaries is duly registered with the Canada Revenue Agency, if required to be so registered under the *Excise Tax Act* (Canada) for purposes of the goods and services tax and for purposes of any similar tax of any province of Canada.  All material input

27

tax credits and material input tax refunds, as applicable, claimed by any such entity for purposes of the goods and services tax or similar tax of a province of Canada were calculated in accordance with applicable Law.  Each such entity has complied, in all material respects, with all registration, reporting, payment, collection and remittance requirements in respect of goods and services tax and any similar legislation.

(i)        There are no Tax rulings, requests for rulings, closing agreements, or any other Contracts with any Tax authorities that relate to the Reorganized Entities or Acquired Subsidiaries and that could have a material effect on the liability of any Reorganized Entity or Acquired Subsidiary for Taxes for any Tax period ending after the Closing Date.

(j)        Each Reorganized Entity and each Acquired Subsidiary that is organized under the laws of the United States or a political subdivision thereof is and always has been classified as a disregarded entity for U.S. federal income Tax purposes.

(k)        The amounts of qualified expenditures and refundable investment tax credits computed under the Income Tax Act and eligible expenditures and deemed installment payments computed under the *Taxation Act* (Québec) of SquareTwo or of any Subsidiary, as applicable, for scientific research and experimental development activities were, in all material respects, duly and correctly calculated and claimed in accordance with all applicable Laws.

(l)        Except as set forth in <u>Section 4.7</u>, <u>Section 4.8,</u> this <u>Section 4.16</u> constitutes the sole and exclusive representations and warranties of SquareTwo with respect to Taxes related to SquareTwo and the Subsidiaries, and no other representation or warranty contained in any other section of this Agreement shall apply to any such Tax matters and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.17.    <u>Insurance</u>.    <u>Section 4.17</u> of the SquareTwo Disclosure Schedule lists each insurance policy maintained by SquareTwo or any of the Subsidiaries as of the date hereof, and the deductibles and coverage limits for each such policy.  The Company has made available to the Plan Investor a copy of such policies.  All such insurance policies are in full force and effect, and neither SquareTwo nor any Subsidiary is in default with respect to material obligations under any such insurance policy.  All premiums in respect of each insurance policy maintained by any of SquareTwo or any of the Subsidiaries have been paid when due; to the Company's Knowledge as of the date of this Agreement no material default on the part of the counterparty to such policy exists.  None of SquareTwo or any of the Subsidiaries has received written notice of cancellation of any insurance policies listed in <u>Section 4.17</u> of the SquareTwo Disclosure Schedule.  There is no claim pending under any such insurance policies as to which, to the Company's Knowledge, coverage has been questioned, denied or disputed by the underwriters of such policies.

Section 4.18.    <u>Illegal or Improper Payments</u>.  Neither SquareTwo nor any of the Subsidiaries, nor any of its respective owners, Affiliates, managers, officers, employees, or to the Company's Knowledge, any Third-Party Servicer or any other Person acting on the behalf of the Company, has ever:

(a)        made any illegal political contributions;

(b)        been involved in the disbursement or receipt of proprietary funds outside of such Person's normal internal control systems of accountability;

(c)        made or received payments, whether direct or indirect, to or from foreign or domestic governments, officials, employees or agents for purposes other than the satisfaction of lawful

28

obligations, or been involved in any transaction that has or has had as its intended effect the transfer of funds or assets in the manner described; or

       (d)      been involved in the intentional improper or inaccurate recording of payments and receipts on the accounting books of such Person or any other matters of a similar nature involving disbursements of such Person's funds or assets.

       Section 4.19.   <u>Related Party Transactions</u>.  No officer, member of the board of directors or managers (or equivalent governing body) of SquareTwo or any of the Subsidiaries nor, to the Company's Knowledge, any individual in such officer's, director's or manager's immediate family is a party to any Contract or transaction with the Company or has any interest in any property used by the Reorganized Entities and the Acquired Subsidiaries, other than under an Employee Benefit Plan or pursuant to an employment agreement.

       Section 4.20.   <u>Brokers' Fees</u>.  Except with respect to fees payable to Keefe, Bruyette & Woods, in connection with its financial advice to SquareTwo in connection with the transactions contemplated by any of the Transaction Documents, neither SquareTwo nor any of the Subsidiaries will be liable for any brokerage commission, finder's fee or other similar payment in connection with the transactions contemplated by any of the Transaction Documents.

       Section 4.21.   <u>Employees</u>.

       (a)      None of the Reorganized Entities or Acquired Subsidiaries that are incorporated, organized or otherwise formed under the laws of the United States or a political subdivision thereof currently has, and never had since January 1, 2015, any employees.

       (b)      None of the Reorganized Entities or Acquired Subsidiaries has, and never had since January 1, 2015, any Employee Benefit Plans subject to United States or other Law, other than Canadian Laws.

       (c)      Except as set forth in <u>Section 4.21(c)</u> of the SquareTwo Disclosure Schedule, none of the Reorganized Entities and the Acquired Subsidiaries is a party to or is bound by any Contract or commitment to pay any management or consulting fee.

       (d)      Except as set forth in <u>Section 4.21(d)</u> of the SquareTwo Disclosure Schedule, none of the Reorganized Entities and the Acquired Subsidiaries has any written employment Contract with any person whomsoever.

       (e)      <u>Section 4.21(e)</u> of the SquareTwo Disclosure Schedule sets out, with respect to the Reorganized Entities and Acquired Subsidiaries that are incorporated, organized or otherwise formed under Canadian Law (the "<u>Canadian Entities</u>"): (i) the names of all employees of such Reorganized Entities and the Acquired Subsidiaries; (ii) their position or title; (iii) their status such as full time, part time, temporary, casual, seasonal, or co-op student; (iv) their total annual remuneration, including a breakdown of (A) salary and (B) bonus or other incentive compensation, if any; (v) other terms and conditions of their employment (other than Employee Benefit Plans); (vi) whether the employee is a member of a collective bargaining union or agency; (vii) their age; (viii) their total length of employment, including any prior employment that would affect calculation of years of service for any purpose, including statutory entitlements, contractual entitlements (express or implied), benefit entitlement or pension entitlement; (ix) whether any employees are on any approved or statutory leave of absence, and, if so, the reason for such absence and the expected date of return; and (x) whether the employee is a U.S. citizen or is otherwise subject to U.S. tax laws.

29

(f)        Section 4.21(f) of the SquareTwo Disclosure Schedule sets out, with respect to the Canadian Entities: (i) the names of all consultants of such Canadian Entities; (ii) whether the consultant is providing services pursuant to a written consulting Contract; (iii) the term of any Contract under the immediately preceding clause (ii); (iv) notice, if any, required for any Canadian Entity to terminate the consulting relationship without cause; (v) the date the consultant first commenced providing services to the applicable Canadian Entity; (vi) the hourly fee of the consultant; (vii) the annual fees paid to the consultant for the preceding calendar year; and (viii) whether the consultant is a U.S. citizen or is otherwise subject to U.S. tax laws.

(g)        None of the Reorganized Entities and the Acquired Subsidiaries is bound by or a party to any collective bargaining agreement.

(h)        No trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent: (i) holds bargaining rights with respect to any employees of any of the Canadian Entities by way of certification, interim certification, voluntary recognition, designation or successor rights; (ii) has applied to be certified as the bargaining agent of any employees of any of the Canadian Entities; or  (iii) has applied to have any of the Canadian Entities declared a related employer or successor employer pursuant to applicable labor legislation.

(i)        There are no actual, threatened or pending organizing activities of any trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent or any actual, threatened or pending unfair labor practice complaints, strikes, work stoppages, picketing, lock-outs, hand-billings, boycotts, slowdowns, arbitrations, grievances, complaints, charges or similar labor-related disputes or proceedings pertaining to any of the Canadian Entities, and there have not been any such activities or disputes or proceedings within the last year.

(j)        All vacation pay for employees of the Canadian Entities is properly reflected and accrued in the books and accounts of the applicable Canadian Entities.

(k)        Since November 1, 2016, there have been no changes in the terms and conditions of employment of any employees of any of the Canadian Entities, including their salaries, remuneration, benefits and any other payments to them, and there have been no changes in any remuneration payable or benefits provided to any officer, director, consultant, independent or dependent contractor or agent of any of the Canadian Entities, and none of the Canadian Entities has agreed or otherwise become committed to change any of the foregoing since such date.

(l)        The Canadian Entities have satisfied all of their obligations with respect to their current and former employees and any current or former consultants under all applicable Tax, health, labor and employment Laws.

(m)        Each of the Canadian Entities is in compliance with all provisions of the applicable occupational health and safety Law and regulations made pursuant thereto and there are no outstanding claims, charges or orders thereunder.

(n)        Each of the Reorganized Entities and the Acquired Subsidiaries is in compliance with applicable workers' compensation laws and regulations made pursuant thereto and there are no outstanding assessments, levies or penalties thereunder.

(o)        Each of the Canadian Entities has prepared and posted an employment equity plan for all employees of the Canadian Entities as may be required pursuant to the applicable employment equity Law or the Canadian federal contractors program or any similar legislation.

30

(p)     Each of the Canadian Entities has prepared and posted a pay equity plan for all employees of the Canadian Entities and has made all necessary adjustments pursuant to such pay equity plan in full compliance with the applicable pay equity Law, and SquareTwo has fully disclosed to the Plan Investor the terms pertaining thereto.

(q)     Section 4.21(q) of the SquareTwo Disclosure Schedule contains a list of every Employee Benefit Plan.

(r)     Section 4.21(r) of the SquareTwo Disclosure Schedule contains a list of all compensation policies and practices of the Canadian Entities ("Compensation Policies") applicable to employees and dependent and independent contractors of such entities.

(s)     With respect to each Employee Benefit Plan in respect of which any of the Reorganized Entities and the Acquired Subsidiaries may have liability, contingent or otherwise, each of the Reorganized Entities and the Acquired Subsidiaries has delivered to the Plan Investor true, complete and up-to-date copies of all Employee Benefit Plans and Compensation Policies and all amendments thereto together with, if applicable, all summary descriptions of the Employee Benefit Plans and Compensation Policies provided to past or present participants therein, the statement of investment policies for each plan, all funding agreements and service provider Contracts or other Contracts (including insurance Contracts, investment management agreements, subscription and participation agreements and recordkeeping agreements) the two most recent actuarial reports, the financial statements and evidence of any registration in respect thereof.

(t)     No fact, condition or circumstance exists that would materially affect the information contained in the documents provided pursuant to Section 4.21(e) and, in particular, no promises or commitments have been made by any of the Canadian Entities to amend any Employee Benefit Plan or Compensation Policy.

(u)     All of the Employee Benefit Plans are duly registered where required by Law (including registration with the relevant Tax authorities where such registration is required to qualify for Tax exemption or other beneficial Tax status) and have always been administered in compliance with their terms and all Laws.

(v)     Neither the execution, delivery or performance of this Agreement nor the consummation of any of the other transactions contemplated herein will result in any bonus, golden parachute, severance or other payment, obligation or liability to any current or former employee or director of any of the Reorganized Entities and the Acquired Subsidiaries (whether or not under any Employee Benefit Plan), materially increase the benefits payable or provided under any Employee Benefit Plan, result in any acceleration of the time of payment or vesting of any such benefit, or increase or accelerate employer contributions thereunder.

(w)     All Contracts in respect of the Employee Benefit Plans are valid and the Reorganized Entities and the Acquired Subsidiaries can enforce such Contracts or cause such Contracts to be enforced in accordance with their terms.

(x)     All employer and employee obligations in respect of the Employee Benefit Plans, including payments, contributions and premiums required under Law and their terms, have been satisfied and there are no outstanding defaults or violations in respect thereof and, in particular: (i) all employer and employee contribution holidays have been permitted by the terms of the Employee Benefit Plans and in accordance with Law; and (ii) except as permitted by the Employee Benefit Plans, their applicable funding agreements and Law, there has been no withdrawal of assets or any other amounts from any of

31

the Employee Benefit Plans other than proper payments of benefits to eligible beneficiaries, refunds of over-contributions to plan members and permitted payments of reasonable expenses incurred by or in respect of such Employee Benefit Plans.

(y)    There are no claims pending or threatened with respect to the Employee Benefit Plans against any of the Reorganized Entities or the Acquired Subsidiaries, the funding agent, the insurers or the fund of such Employee Benefit Plans, other than claims for benefits in the ordinary course.

(z)    No order has been made or notice given pursuant to any Law requiring (or proposing to require) any of the Reorganized Entities or the Acquired Subsidiaries to take (or refrain from taking) any action in respect of any Employee Benefit Plan, and no event has occurred and no condition or circumstance exists that has resulted or could reasonably result in any Employee Benefit Plan (i) being ordered or required to be terminated or wound up in whole or in part, (ii) having its registration under any Law refused or revoked, (iii) being placed under the administration of any trustee or any regulatory authority or (iv) being required to pay any material Taxes or penalties under any Law.

(aa)    All of the Employee Benefit Plans are fully funded in accordance with their terms and all Laws and generally accepted actuarial principles and practices.

(bb)    None of the Employee Benefit Plans require or permit a retroactive increase in premiums or payments, and the level of insurance reserves, if any, under any self-insured Employee Benefit Plan is reasonable and sufficient to provide for all unreported claims and incurred Losses.

(cc)    The obligations of the Reorganized Entities and the Acquired Subsidiaries to any of the Benefit Plans that are multi-employer plans are restricted to providing information and making contributions and are set out completely and accurately in the Employee Benefit Plans listed in Section 4.21(cc) of the SquareTwo Disclosure Schedule.

Section 4.22.    Privacy Laws.

(a)    The collection, use, retention, disclosure and transfer of the Personally Identifiable Information by the Reorganized Entities and the Acquired Subsidiaries to the Plan Investor as part of the Plan Investor's due diligence and as contemplated by this Agreement or any ancillary agreement complies with all Privacy Laws and are consistent with the Reorganized Entities and the Acquired Subsidiaries' own Privacy Policies.

(b)    There are no restrictions on the Reorganized Entities and the Acquired Subsidiaries' collection, use, disclosure and retention of the Personally Identifiable Information, except as provided by Privacy Laws and the Reorganized Entities and the Acquired Subsidiaries' own Privacy Policies.  To the Company's Knowledge, there are no material claims pending, ongoing or threatened with respect to the Reorganized Entities and the Acquired Subsidiaries' collection, use, disclosure or retention of the Personally Identifiable Information.  No decision, judgment or order, whether statutory or otherwise, is pending or has been made, and no notice has been given pursuant to any Privacy Laws requiring any of the Reorganized Entities and the Acquired Subsidiaries to take (or to refrain from taking) any action with respect to the Personally Identifiable Information.

(c)    Set out, described or cross-referenced in Section 4.22(c) of the SquareTwo Disclosure Schedule are the following in respect of the Personally Identifiable Information: (i) all Privacy Policies, including all versions of the Privacy Policy appearing on the Reorganized Entities and the Acquired Subsidiaries' websites; (ii) a list of all jurisdictions in which the Reorganized Entities and the Acquired Subsidiaries collect, store and use Personally Identifiable Information; (iii) a description of any

32

investigations or audits of the Reorganized Entities and the Acquired Subsidiaries performed by any official under any Privacy Law and a copy of any report or agreement related to such investigations or audits; (iv) a list of the individuals who were designated as responsible for overseeing the Reorganized Entities and the Acquired Subsidiaries' Privacy Policies and ensuring compliance with Privacy Laws; and (v) a list of all material complaints or claims based on collection, use, disclosure or retention of Personally Identifiable Information by third parties received by the Reorganized Entities and Acquired Subsidiaries.

Section 4.23.    Canadian Claims.  There are no Canadian Claims (as defined in the Plan) related to, arising under or in connection with (a) that certain Indenture, dated as of April 7, 2010 (as amended, modified or supplemented from time to time, the "Second Lien Indenture"), among SquareTwo, as issuer, the guarantors named therein, and U.S. Bank National Association, in its capacity as trustee and collateral agent, including all agreements, documents, notes, and instruments delivered pursuant thereto or in connection therewith (in each case, as amended, restated, amended and restated, modified or supplemented from time to time, collectively, the "Second Lien Indenture Documents"), and/or (b) any of the 11.625% Senior Second Lien Notes due 2017 issued pursuant to the Second Lien Indenture (the "Second Lien Notes").  Prepetition Secured Lender Claims (as defined in the Plan) are Excluded Liabilities under the Plan and shall not be Canadian Claims under the Plan. There are no Canadian Claims (as defined in the Plan) in an amount greater than Twelve Thousand Five Hundred Dollars ($12,500) that are also Claims against non-Canadian Debtors, other than as set forth on Section 4.23 of the SquareTwo Disclosure Schedule.

Section 4.24.    No Other Representations or Warranties.  NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SQUARETWO IN THIS ARTICLE IV, NEITHER SQUARETWO NOR ANY SUBSIDIARY OR AFFILIATE THEREOF NOR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO SQUARETWO, ANY SUBSIDIARY OR AFFILIATE OR ANY OTHER PERSON OR ITS RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE PLAN INVESTOR OR ANY OF ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTATION, FORECASTS, PROJECTIONS OR OTHER INFORMATION WITH RESPECT TO ANY ONE OR MORE OF THE FOREGOING.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SQUARETWO IN THIS ARTICLE IV, ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE EXPRESSLY DISCLAIMED BY SQUARETWO.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF THE PLAN INVESTOR

The Plan Investor hereby represents and warrants to SquareTwo as follows:

Section 5.1.    Organization.  The Plan Investor is a limited liability company duly formed, validly existing and (in the jurisdictions recognizing the concept) in good standing under the Laws of the State of Delaware.

Section 5.2.    Qualification; Due Authorization; Power and Authority.

(a)    Neither the execution and delivery of this Agreement by the Plan Investor nor the consummation of the transactions contemplated hereby by the Plan Investor will conflict with, or result in

the breach of, constitute a default under, or accelerate the performance or right of any third party provided by the terms of any Law or contract to which the Plan Investor is a party or subject or by which it is bound, except such conflicts, breaches, defaults or accelerations that would not have, individually or in the aggregate, a Material Adverse Effect on the Plan Investor's ability to consummate the transactions set forth in, or perform its obligations under, this Agreement.

(b)      The Plan Investor has all right, power and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to comply with the terms, conditions and provisions hereof applicable to the Plan Investor. The making, execution, delivery and performance of this Agreement and the consummation by the Plan Investor of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action of the Plan Investor. This Agreement has been duly and validly executed and delivered by the Plan Investor and, assuming the due authorization, execution and delivery hereof and thereof by SquareTwo and Debtors' Representative, this Agreement will constitute the valid and binding obligations of the Plan Investor, enforceable against the Plan Investor in accordance with their respective terms (except as such enforcement may be limited by insolvency, reorganization, moratorium, receivership, or conservatorship and by general equity principles).

Section 5.3.    Consents and Approvals. Neither the execution and delivery of this Agreement by the Plan Investor, nor the consummation of the transactions contemplated hereby, will (a) require any consent, approval, authorization, registration or filing under any Law to which the Plan Investor is subject (the "Debtors' Representative Governmental Requirements") (collectively with the SquareTwo Governmental Requirements and the Debtors' Representative Governmental Requirements, the "Governmental Requirements"), or (b) require the consent or approval of any other party to any contract to which the Plan Investor is a party, in each case, other than (i) authorizations, consents, orders or approvals of, or registrations or declarations with, any Governmental Entity, that have been or will be obtained or made prior to or on the Closing Date and a notification under the ICA within thirty (30) days of Closing and (ii) where the failure to obtain such consents, approvals, authorizations or registrations or to make such filings would not have a Material Adverse Effect on the Plan Investor's ability to consummate the transactions set forth in, or perform its obligations under, this Agreement. Any such authorization, consent, approval, order, registration or declaration that has been obtained, effected or given is in full force and effect as of the date hereof. The Plan Investor is not in default under, and no event has occurred that with the lapse of time or action by a third party that could result in a default in any material respect under, the terms of any judgment, order, writ, decree, Permit or license of any Governmental Entity that would reasonably be expected to have or result in a Material Adverse Effect on the Plan Investor's ability to consummate the transactions set forth in, or perform its obligations under, this Agreement.

Section 5.4.    No Violations. Assuming that the Governmental Requirements will be satisfied, made or obtained and will remain in full force and effect and the conditions set forth in Article VII will be satisfied, neither the execution, delivery or performance by the Plan Investor of this Agreement nor the consummation of the transactions contemplated hereby will conflict with, or result in a breach or a violation of, any provision of the Charter Documents of the Plan Investor.

Section 5.5.    Financing. Upon the satisfaction of all of the conditions to the Closing set forth in Article VII, the Plan Investor will have available to it funds in an amount sufficient to meet all of its obligations hereunder and pay all of the amounts due and owing hereunder in cash and to effect the transactions contemplated by any of the Transaction Documents.

Section 5.6.    Securities Law Compliance. The Plan Investor acknowledges that it may not resell, transfer, assign or distribute any of the Reorganized Entities Interests, except in compliance with

34

all Laws, including the Securities Act of 1933, as amended, and any applicable state and/or provincial securities Laws, or pursuant to an applicable exemption therefrom.

Section 5.7.    Litigation.  As of the date hereof, except for the anticipated Bankruptcy Cases and the anticipated Canadian Cases, there is no action, suit, proceeding, claim, administrative or court action or other litigation, or any investigation by any Governmental Entity, pending, or any action, suit, proceeding, claim, administrative or court action or other litigation or any investigation by any Governmental Entity threatened, in each case against the Plan Investor or any subsidiary thereof that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Plan Investor's ability to consummate the transactions set forth in, or perform its obligations under, this Agreement.

Section 5.8.    Brokers' Fees.    The Plan Investor will not be liable for any brokerage commission, finder's fee or other similar payment in connection with the transactions contemplated by any of the Transaction Documents because of any action taken by, or agreement or understanding reached by, the Plan Investor.

Section 5.9.    Sophistication.  The Plan Investor is as of the date hereof, and shall be as of the Closing Date, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act of 1933, as amended and Section 2.3 of National Instrument 45-106 *Prospectus Exemptions*.  The Plan Investor understands and is able to bear any economic risks associated with the Investment.

Section 5.10.    Investment Entirely for Own Account.    The Plan Investor is acquiring the Reorganized Entities Interests for investment for the Plan Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof (other than to one or more of its Affiliates), and the Plan Investor has no present intention of selling, granting any participation in, or otherwise distributing the same (other than to one or more of its Affiliates).  The Plan Investor does not presently have any contract with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Reorganized Entities Interests or any debt or equity security or interest in SquareTwo or any of the Acquired Subsidiaries.  The Plan Investor has not been formed for the specific purpose of acquiring the Reorganized Entities Interests, excluding the Canadian Entities.

Section 5.11.    Disclosure of Information.  In connection with its investment decision, the Plan Investor or its representatives have inspected and conducted such reasonable independent review, investigation and analysis (financial and otherwise) of SquareTwo and the Subsidiaries as desired by the Plan Investor.    The purchase of the Reorganized Entities Interests by the Plan Investor and the consummation of the transactions contemplated by the Transaction Documents by the Plan Investor are not done in reliance upon any representation or warranty by, or information from SquareTwo, the Subsidiaries or any of their respective subsidiaries, Affiliates, employees or representatives, whether oral or written, express or implied, in each case except for the representations and warranties specifically and expressly set forth in Article IV (in each case, as modified by the SquareTwo Disclosure Schedule), and the Plan Investor acknowledges that SquareTwo expressly disclaims any other representations and warranties.  Such purchase and consummation are instead done entirely on the basis of the Plan Investor's and its representatives' own investigation, analysis, judgment and assessment of SquareTwo and the Subsidiaries, including the present and potential value and earning power thereof, as well as those representations and warranties specifically and expressly set forth in Article IV (in each case, as modified by the SquareTwo Disclosure Schedule).  The Plan Investor further acknowledges that neither SquareTwo nor any Person acting on its behalf has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding SquareTwo, the Subsidiaries, their respective businesses or the transactions contemplated hereby not specifically and expressly set forth in Article IV (in each case, as modified by the SquareTwo Disclosure Schedule), and neither SquareTwo nor any other

35

Person will have or be subject to, any liability to the Plan Investor or to any other Person resulting from the distribution to the Plan Investor or its representatives or the Plan Investor's or any Person's use of any such information, including any confidential information memoranda distributed on behalf of SquareTwo and the Subsidiaries relating to their respective businesses or other publications or data room (including any electronic or "virtual" data room) information provided or made available to the Plan Investor or its representatives, or any other document or information in any form provided or made available to the Plan Investor or its representatives, including management presentations, in connection with the purchase and sale of the Reorganized Entities Interests and the transactions contemplated hereby.

ARTICLE VI.

COVENANTS

Section 6.1.    Conduct of Business Pending the Closing.    Except as (I) otherwise expressly contemplated by any Transaction Document, (II) set forth in Section 6.1 of the SquareTwo Disclosure Schedule, (III) consented to by the Plan Investor or (IV) required by Law, during the period from the date of this Agreement through and including the Closing Date, SquareTwo shall, and shall cause each of the Reorganized Entities and the Acquired Subsidiaries to, use its commercially reasonable efforts to (X) conduct its operations and business in the ordinary course of business and to service the Serviced Accounts Receivable in accordance with applicable Law, and (Y) maintain a level of efficaciousness, results and quality of services with respect to the Serviced Accounts Receivable that is consistent with the level of efficaciousness, results and quality of services provided by Square Two and its Subsidiaries with respect to their accounts and related receivables for the six months prior to the date of this Agreement. Except (i) with the prior consent of the Plan Investor, (ii) as required by Law, or (iii) as required, permitted or authorized by the Bankruptcy Court or the Canadian Court, SquareTwo shall not permit any of the Reorganized Entities or the Acquired Subsidiaries to:

(a)    acquire any material portfolio of Serviced Accounts Receivable that is not reflected on Exhibit E;

(b)    amend any of the Charter Documents except as consistent with the Plan;

(c)    merge or consolidate with or into any other Person;

(d)    excluding debtor in possession financing, sell, assign, lease, sublease, license, sublicense, pledge or otherwise transfer, dispose of or grant any option or rights in, to or under or subject or allow to be subjected to any Security Interest or Encumbrance, any portion of the Reorganized Entities' or Acquired Subsidiaries' properties or assets (including tangible and intangible assets);

(e)    acquire or negotiate for the acquisition of any Person or business or initiate the start-up of any material new business, or otherwise acquire or agree to acquire any securities or assets other than Serviced Accounts Receivable to the extent permitted by Section 6.1(a);

(f)    except as set forth in Section 6.1(f) of the SquareTwo Disclosure Schedule, commence any suit, action or proceeding (other than the Bankruptcy Cases or the Canadian Cases) or waive, release, assign, compromise or settle any suit, action or proceeding, other than for or related to collection of Serviced Accounts Receivable in the ordinary course of business;

(g)    make any Tax election, change any Tax election, adopt any accounting or Tax accounting method, change any accounting or Tax accounting method, file any Tax Return (other than any estimated Tax Return, payroll Tax Return or sales Tax Return) or any amendment to a Tax Return, enter into

36

any closing agreement, waive or extend any statute of limitations with respect to Taxes, settle or compromise any Tax claim or assessment or consent to any Tax claim or assessment, surrender any right to claim a refund of Taxes or take any other similar action relating to the filing of any Tax Return or the payment of any material amount of Taxes;

(h)    make, declare, set aside, establish a record date for or effect a distribution to shareholders of its capital stock;

(i)    (i) materially reduce the amount of any material insurance coverage provided by existing insurance policies other than upon the expiration of any such policy or (ii) fail to maintain in full force and effect insurance coverage materially consistent with past practices;

(j)    enter into any Contract containing material exclusivity, non-compete or most-favored-nations provisions;

(k)    make any changes in its methods of accounting or accounting practices (including with respect to reserves), other than as required by GAAP;

(l)    sell, assign, transfer, license, permit to lapse, abandon, or otherwise dispose of any Company-Owned Intellectual Property Rights, other than in the ordinary course of business in connection with commercial Contracts;

(m)    amend or terminate any Material Contract, or enter into any Contract that, if entered into prior to the date hereof, would be a Material Contract, other than in the ordinary course of business;

(n)    increase the compensation (including bonuses, severance and termination pay) payable on or after the date hereof to any director or executive officer;

(o)    establish, adopt or materially amend any Employee Benefit Plans, as is required by applicable Law, and employment agreements or other compensation arrangements with any existing or future employee; or

(p)    take, or agree (in writing or otherwise) to take, any of the actions described in this Section 6.1(a)-(o) subject to the exceptions in the first paragraph of this Section 6.1.

Section 6.2.    Cooperation; Access to Information; Interim Financial Information.

From the date hereof through the earlier of termination hereof and the Closing Date, SquareTwo shall cause each of the Reorganized Entities and Acquired Subsidiaries to (i) give the Plan Investor and its agents, employees, attorneys, accountants, and representatives reasonable access, during normal business hours upon reasonable notice, to the books, Contracts, records and other documents, properties, facilities and personnel of SquareTwo and the Subsidiaries; provided, however, that none of the foregoing shall unreasonably interfere with the conduct of the business of SquareTwo or any of the Subsidiaries, and (ii) as promptly as reasonably practicable furnish to the Plan Investor all such information concerning its business, properties, facilities, operations and personnel as the Plan Investor shall reasonably request, and (iii) provide drafts of all material motions or applications (and all "first" and "second" day motions or applications) and other documents the Debtors intend to file in the Bankruptcy Cases and the Canadian Cases on the same basis as set forth in the Restructuring Support Agreement. All documents and information obtained by the Plan Investor or any of its Affiliates, agents, attorneys, accountants, and representatives, in each case that is obtained by virtue of the rights granted by, or

otherwise in connection with or pursuant to, this Agreement (including, for the avoidance of doubt, this Section 6.2) shall be subject to the terms and conditions of the Confidentiality Agreement.

(a)      From the date hereof through the earlier of termination hereof and the Closing Date, SquareTwo shall use its reasonable commercial efforts to, at the Plan Investor's sole cost and expense, cause its independent certified public accountants and the independent certified public accountants of each of the Subsidiaries to afford the Plan Investor and its agents, attorneys, accountants, and representatives reasonable access to the audit work papers and other records of each such firm relating to SquareTwo and the Subsidiaries, subject to the Plan Investor executing any agreement reasonably required by the certified public accountants of SquareTwo or the Subsidiaries related to such access.

(b)      For a period of six (6) years after the Closing Date, the Plan Investor shall not cause or permit the destruction or disposal of any books and records of SquareTwo or any of the Reorganized Entities or Acquired Subsidiaries related to the pre-Closing period without first offering to surrender them to the Debtors' Representative.  During such six (6)-year period, the Plan Investor shall, and shall cause its subsidiaries and Affiliates (including, for the avoidance of doubt, the Reorganized Entities and the Acquired Subsidiaries) to, allow the Debtors' Representative access to all such books and records related to the pre-Closing period during regular business hours upon reasonable advance notice for any legitimate purpose, which, for the avoidance of doubt, shall include (i) the Bankruptcy Cases and the Canadian Cases, (ii) compliance with the procedures set forth in Section 2.4 (including the preparation of the Objection Notice, list of Disputed Items and the Position Statement), (iii) the preparation of Tax Returns and (iv) in connection with any audit, assessment or reassessment of the Debtors or any of their subsidiaries or Affiliates by any Governmental Entity.

Section 6.3.      Further Actions; Reasonable Efforts.

(a)      Subject to Section 6.3(b) hereof, and without waiving any right to terminate this Agreement under Section 8.1, upon the terms and subject to the conditions hereof and of the Restructuring Support Agreement, the Plan Investor, SquareTwo and the Debtors' Representative each agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by any of the Transaction Documents in accordance with the terms of the Transaction Documents, including the obtaining of all Governmental Requirements and the execution and delivery of any additional instruments consistent with the terms of the Transaction Documents and necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, the Transaction Documents.

(b)      Notwithstanding anything to the contrary herein, neither the Plan Investor, SquareTwo, the Debtors' Representative nor any of their respective subsidiaries or Affiliates or any Person or individual acting on the behalf of the foregoing shall extend any waiting period or comparable period under any Law in connection with any regulatory filing or enter into any agreement with any Governmental Entity not to consummate the transactions contemplated hereby, without the prior written consent of the other parties hereto.

(c)      Until the Closing Date or termination of this Agreement in accordance with the terms hereof, the Plan Investor hereby agrees to, and to cause its Affiliates to:  (i) use its commercially reasonable efforts to take any and all necessary and appropriate actions in furtherance of the restructuring transactions contemplated under the Restructuring Support Agreement, the Plan and this Agreement and consummation of the transactions contemplated by the Transaction Documents within the time frames

38

contemplated by the Milestones; (ii) use its commercially reasonable efforts to support (and not object to) the "first day" motions; (iii) refrain from taking any action not required by law which is materially inconsistent with, or that would materially delay or materially impede approval, confirmation or consummation of the Plan or that is otherwise materially inconsistent with the express terms of the Restructuring Support Agreement or this Agreement; (iv) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any chapter 11 plan in the Bankruptcy Cases other than the Plan or other restructuring or reorganization of the Company; (v) use commercially reasonable efforts to obtain any and all required regulatory approvals and third-party approvals of the transactions contemplated by the Transaction Documents; and (vi) not take any actions materially inconsistent with the Restructuring Support Agreement, the Plan, this Agreement or any other related documents executed by the Company or the Company's efforts to expeditiously consummate the Restructuring and other transactions contemplated by the Transaction Documents.

(d)      The Plan Investor, or any of its Affiliates, shall have the right, at its sole discretion, to cause SquareTwo Financial Canada to make the election described in subsection 256(9) of the Income Tax Act.

Section 6.4.    Restructuring; Compliance with the Plan.  SquareTwo shall, and shall cause each of the Subsidiaries to, restructure the capitalization of Reorganized CACH,  Reorganized CACV of Colorado and Reorganized SquareTwo Financial Canada and the Acquired Subsidiaries pursuant to the Plan (the "Restructuring") in accordance with the terms of the Restructuring Support Agreement, this Agreement and the Plan, which shall include, subject to Bankruptcy Court approval on and after the Petition Date, (a) the transfer of all of the issued and outstanding equity securities of CACV of New Jersey to SquareTwo or a Subsidiary that is not a Reorganized Entity or an Acquired Subsidiary and (b) subject to Section 365 of the Bankruptcy Code, the transfer or license of any Company-Owned Intellectual Property Rights requested by Plan Investor.  Each of SquareTwo and the Plan Investor shall, and shall cause their respective subsidiaries and, in the case of SquareTwo, its Affiliates to, take all actions, refrain from taking all prohibited actions, comply in all material respects with and consummate all transactions contemplated by the Plan and the Transaction Documents and comply with the Restructuring Support Agreement.  Without limiting the generality of the foregoing, SquareTwo agrees to support and use its commercially reasonable efforts, and agrees to cause the Subsidiaries to use their respective commercially reasonable efforts, to prosecute the Bankruptcy Cases and the Canadian Cases to accomplish the foregoing.

Section 6.5.    Regulatory Filings.  The Plan Investor and SquareTwo shall cooperate to (i) promptly (and in any event within ten (10) Business Days) after the date hereof make or cause, as applicable, to be made all required filings and submissions under the HSR Act, if applicable, or any other applicable antitrust Laws (the HSR Act and any other applicable antitrust Law, in each case if applicable, "Antitrust Laws") and (ii) file the required notification under the ICA within thirty (30) days of Closing. In connection with the consummation of the transactions contemplated by any of the Transaction Documents, each of SquareTwo and the Plan Investor shall promptly comply with any additional requests for information, including requests for production of documents and production of witnesses for interviews or depositions by any Governmental Entity.  Notwithstanding anything herein to the contrary, each of the Plan Investor and SquareTwo shall cause its subsidiaries and Affiliates to cooperate in good faith with any Governmental Entity and use their respective reasonable best efforts to undertake promptly any and all action required to complete the transactions contemplated by any of the Transaction Documents.  In furtherance and not in limitation of the covenants of the parties contained in this Section 6.5, each of the parties hereto shall use its reasonable best efforts to resolve objections, if any, that may be asserted by any Governmental Entity in connection with any Antitrust Laws, in each case with respect to the transactions contemplated by the Transaction Documents, and to avoid the entry of, or effect the dissolution of, any order in any suit or proceeding that would otherwise have the effect of preventing the

39

consummation of the transactions contemplated hereby (including by defending any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the transactions contemplated by any of the Transaction Documents).  Notwithstanding anything to the contrary in this Agreement, neither the Plan Investor nor any of its Affiliates shall have any obligation (i) to proffer to, negotiate to or agree to, sell, divest, lease, license, transfer, dispose of or otherwise encumber or hold separate, before or after the Closing Date, any assets, licenses, properties, operations, rights, product lines, businesses or interest therein of the Plan Investor, its Affiliates, the Reorganized Entities or the Acquired Subsidiaries; (ii) to consent to any sale, divestiture, lease, license, transfer, disposition or other encumbrance by SquareTwo or any of its Affiliates of any of the assets, licenses, properties, operations, rights, product lines, businesses or interests of the Reorganized Entities or the Acquired Subsidiaries or to any agreement to take any of the foregoing actions; or (iii) to agree to any changes (including through a licensing arrangement), condition, restriction, or other requirement imposed on, or other impairment of Plan Investor's or its Affiliates' ability to own or operate, any such assets, licenses, product lines, businesses, properties, or interests of the Plan Investor, its Affiliates, the Reorganized Entities or the Acquired Subsidiaries.  If an action is threatened or instituted by any Governmental Entity or any other Person challenging the validity or legality or seeking to restrain the consummation of the transactions contemplated by any of the Transaction Documents, the Plan Investor and SquareTwo each shall use its reasonable best efforts to avoid, resist, resolve or, if necessary, defend such action and shall afford SquareTwo a reasonable opportunity to participate therein at its own expense.  Subject to Laws relating to the exchange of information, the parties shall cooperate with each other in preparing and filing any and all written communications that are to be submitted to any Governmental Entity in connection with the transactions contemplated by any of the Transaction Documents and in obtaining any governmental or third-party consents, waivers, authorizations or approvals that may be required to be obtained by the other parties in connection with the transactions contemplated by any of the Transaction Documents, which assistance and cooperation shall include: (i) timely furnishing to the other parties all information concerning the Plan Investor, SquareTwo or any of their Affiliates that counsel to the requesting party reasonably determines is required to be included in such documents or would be helpful in obtaining such required consent, waiver, authorization or approval; (ii) promptly providing the other parties with copies of all written communications to or from any Governmental Entity relating to Antitrust Laws; (iii) keeping the other parties reasonably informed of any communication received or given in connection with any proceeding by the Plan Investor regarding the Restructuring and the transactions contemplated by any of the Transaction Documents; and (iv) permitting the other parties to review, and considering in good faith incorporating such parties' comments to, any written communication to any Governmental Entity or in connection with any proceeding related to Antitrust Laws, in each case regarding the Restructuring and transactions contemplated by the Transaction Documents; provided that each party may satisfy its obligations by providing such documents or information to the other party's outside antitrust or corporate counsel, with the understanding that such counsel shall not share such documents and information with its client (although such counsel may use such documents and information in advocating on behalf of its client with any Governmental Entity), and no party shall be obligated to provide to any other party any portion of any notification filing related to Antitrust Laws not customarily furnished to another party in connection with such filings.  Neither the Plan Investor nor SquareTwo, nor any of their respective representatives, shall initiate, or participate in any meeting or discussion with any Governmental Entity with respect to any filings, applications, investigation, or other inquiry regarding the Restructuring or filings under any Antitrust Laws without giving the other party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Entity, the opportunity to attend and participate in such meeting or discussion.  SquareTwo shall be responsible for all filing fees payable to Governmental Entities under any Antitrust Laws and/or the ICA with respect to the transactions contemplated by the Transaction Documents.  The Plan Investor shall not, and shall not permit any of its subsidiaries or Affiliates to, acquire or enter into a definitive agreement to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or enter into a definitive agreement to acquire

any assets, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would (A) impose any material delay in the obtaining of, or materially increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by any of the Transaction Documents, (B) materially increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by any of the Transaction Documents or (C) materially delay the consummation of any such transaction.  All filing fees paid to a Governmental Entity incurred by the Plan Investor and SquareTwo in connection with making or causing to be made all required filings and submissions under any Antitrust Laws (which filings and submissions shall seek early termination of the applicable waiting period)  and/or the ICA shall be paid promptly by SquareTwo.

Section 6.6.    Financing.  The Plan Investor does not require Financing and the Plan Investor's obligations hereunder are not contingent on any financing of any kind.  Notwithstanding the preceding, the Plan Investor may choose to pursue Financing in a transaction that would occur after Closing.  SquareTwo agrees to use its commercially reasonable efforts to comply with any reasonable requests of the Plan Investor in connection with any such Financing, provided that the Plan Investor will promptly reimburse SquareTwo for any reasonable and documented expenses incurred in connection with such efforts.

Section 6.7.    Alternative Proposals.

(a)    Except as expressly permitted by this Section 6.7, from the date hereof until the earlier of (i) the Closing or (ii) the termination of this Agreement in accordance with Article VIII (the "No-Shop Period"), SquareTwo shall not, and shall cause its Subsidiaries, and its and their respective directors, officers and employees and shall direct and use reasonable best efforts to cause its and its Subsidiaries' respective lenders, advisors, members, partners, stockholders, consultants, legal counsel, investment bankers, agents and other representatives that are providing services in connection with the transactions contemplated in the Transaction Documents (each, a "Representative") not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or facilitate any inquiries, proposals or offers from any Person other than the Plan Investor and its Affiliates and its and their respective Representatives and financing sources, relating to, or that could reasonably result in, any merger, acquisition, divestiture, sale of material assets or equity, business combination, recapitalization, joint venture, or other extraordinary transaction directly or indirectly involving the equity, voting power or all or a material portion of the assets of the Reorganized Entities and the Acquired Subsidiaries or any other similar transaction that would serve as an alternative to the transactions contemplated by this Agreement, the Restructuring Support Agreement or the Plan or any proposal that by its terms requires SquareTwo to abandon, terminate or fail to consummate the transactions contemplated by this Agreement (any such transaction or proposal, an "Alternative Transaction"), (ii) enter into any agreement (including any acquisition agreement, restructuring support agreement, plan funding agreement, or similar definitive agreement, or any letter of intent, memorandum of understanding, agreement in principle or similar agreement) relating to any Alternative Transaction (an "Alternative Acquisition Agreement") other than with the Plan Investor or one of its Affiliates; (iii) participate in discussions or negotiations with any other Person with respect to, or that would reasonably be expected to result in, an Alternative Transaction with a party other than the Plan Investor or one of its Affiliates; (iv) provide to any other Person, any material non-public information relating directly or indirectly to SquareTwo or its Subsidiaries, the purpose of which is to assist or facilitate an Alternative Transaction with any Person other than the Plan Investor or one of its Affiliates; or (v) publicly propose to do any of the actions prohibited by any of clauses (i) through (iv), other than in connection with a transaction with the Plan Investor or its Affiliates.  SquareTwo shall promptly cease and terminate, and shall cause each of its Subsidiaries, and direct and use reasonable efforts to cause its and their respective Representatives to, promptly cease and terminate all solicitations, discussions and negotiations with any Persons conducted heretofore with respect to any Alternative

41

Transaction, or any inquiry or proposal that could reasonably result in any Alternative Transaction, and promptly (but in no event later than two (2) Business Days after the date of this Agreement) request that any Person who has any material non-public information about the Company, other than the Plan Investor and its Affiliates and its and their respective Representatives, either return or destroy such information to the extent that SquareTwo or its Subsidiaries are entitled to have such confidential information be returned or destroyed and terminate all physical and electronic data-room access previously granted to any such Person or any of their Representatives, other than with respect to the Plan Investor and its Affiliates and its and their respective Representatives.

(b)    Notwithstanding anything to the contrary in Section 6.7(a), nothing in this Agreement shall prohibit or limit SquareTwo or any of its Representatives from (i) indicating to any Person that SquareTwo or any of its Representatives are not permitted to engage in any negotiations relating to any Alternative Transaction during the No-Shop Period, (ii) participating in any negotiations, or entering into any definitive agreements, with any other Person (or such Person's Representatives) in connection with such Person or an Affiliate thereof providing debt financing to SquareTwo or its Subsidiaries or (iii) participating in any negotiations, or entering into any definitive agreements, with any Person (or such Person's Representatives) who is a debt holder, equity holder or creditor of SquareTwo or any of its Subsidiaries, but in either instance of (ii) or (iii), only in connection with the completion and consummation of the transactions contemplated by the Transaction Documents and making any related filings or petitions for relief under chapter 11 of the Bankruptcy Code or other similar Laws that are consistent with and in furtherance of the transactions contemplated by the Transaction Documents.

(c)    Notwithstanding anything to the contrary in Section 6.7(a), prior to the entry of the Confirmation Order, if SquareTwo receives an Alternative Proposal from any Person, SquareTwo and its Representatives may, in all cases subject to compliance with this Section 6.7(c): (i) communicate with such Person solely to clarify the terms and conditions thereof so as to determine whether such Alternative Proposal constitutes or would reasonably be expected to lead to a Superior Proposal; (ii) provide information (including non-public information and data) regarding, and afford access to the business, properties, assets, books, records and personnel of, SquareTwo and the Subsidiaries to such Person and its Representatives if SquareTwo receives from such Person (or has received from such Person) an executed Acceptable Confidentiality Agreement (a copy of which shall be provided to the Plan Investor promptly after its execution); provided that SquareTwo shall promptly make available to the Plan Investor any information concerning SquareTwo and the Subsidiaries that is provided to any Person and that was not previously made available to the Plan Investor or any of its Representatives; and (iii) engage in, enter into or otherwise participate in any discussions or negotiations with such Person with respect to such Alternative Proposal, if prior to taking any action described in clause (ii) or (iii) above, the board of directors of SquareTwo determines in good faith, after consultation with its outside counsel and financial advisors, that such Alternative Proposal constitutes a Superior Proposal or could reasonably be expected to result in a Superior Proposal and that the failure to take the actions set forth in clauses (ii) and (iii) above would be inconsistent with the board of directors' fiduciary duties.

(d)    SquareTwo shall promptly (and in any event within twenty-four (24) hours) notify the Plan Investor of (i) the receipt of any Alternative Proposal, specifying the material terms thereof and the identity of the Person making such Alternative Proposal and (ii) any material modifications to the financial or other material terms and conditions of such Alternative Proposal.

(i)    Notwithstanding anything to the contrary set forth in this Agreement, prior to the entry of the Confirmation Order, if (i) SquareTwo receives an Alternative Proposal that the board of directors of SquareTwo determines in good faith, after consultation with its outside counsel and financial advisors, constitutes a Superior Proposal and (ii) the board of directors of SquareTwo determines in good faith, after consultation with its outside counsel and financial advisors, that the failure

42

to take the actions set forth in this Section 6.7(d)(i) could be inconsistent with its fiduciary duties, then the board of directors of SquareTwo may authorize, adopt, or approve such Superior Proposal and cause or permit SquareTwo to terminate this Agreement pursuant to Section 8.1(f) in order to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal, provided, however, that the board of directors of SquareTwo may take the actions described in this Section 6.7(d)(i) only if: SquareTwo shall have provided prior written notice to the Plan Investor of the board of directors of SquareTwo's intention to take such actions described in this Section 6.7(d)(i) at least three (3) Business Days in advance of taking such actions, which notice shall include a reasonably detailed description of the material terms and conditions of the Alternative Proposal received by SquareTwo that constitutes a Superior Proposal, including a copy of the Alternative Acquisition Agreement and any other relevant proposed transaction agreements with, and the identity of, the party making such Alternative Proposal;

(ii)     after providing such notice and prior to taking such actions, SquareTwo shall have negotiated, and shall have caused its Representatives to negotiate, with the Plan Investor and its Representatives in good faith (to the extent the Plan Investor desires to negotiate) during such three (3) Business Day period to make such adjustments in the terms and conditions of this Agreement, the Restructuring Support Agreement and/or the Plan as would result in the Alternative Proposal not constituting a Superior Proposal;

(iii)    the board of directors of SquareTwo shall have considered in good faith any changes to this Agreement, the Restructuring Support Agreement and/or the Plan that may be offered in writing by the Plan Investor by 5:00 p.m. Eastern Time on the last Business Day of the period described in clause (ii) above and shall have determined in good faith, after consultation with its outside counsel and financial advisors, that the Alternative Proposal received by SquareTwo would continue to constitute a Superior Proposal if such changes offered in writing by the Plan Investor were given effect; and

(iv)    if the board of directors of SquareTwo exercises its right to terminate this Agreement, SquareTwo (i) pays to the Plan Investor, by wire transfer of immediately available funds, an amount equal to the Termination Fee (as defined in Section 8.2(b)), as applicable, and (ii) executes a Joint Instruction Letter directing the Escrow Agent to promptly disburse the entire Good Faith Deposit to the Plan Investor.

(e)     SquareTwo acknowledges and agrees that any violation of the restrictions set forth in this Section 6.7 by any Representatives of SquareTwo or any of its Subsidiaries shall be deemed to be a breach by SquareTwo of this Section 6.7.

Section 6.8.    Excluded Liabilities.  Only Canadian Claims and Assumed U.S. Liabilities shall be assumed by the Plan Investor, the Reorganized Entities or the Acquired Subsidiaries. For the avoidance of doubt, (i) all Canadian Claims (as defined in the Plan), and (ii) Assumed U.S. Liabilities (as defined in the Plan) shall be assumed by the Plan Investor, the Reorganized Entities or the Acquired Subsidiaries, as applicable.  The Plan, the Confirmation Order and Recognition Order shall provide that none of the Plan Investor or any of the Reorganized Entities or Acquired Subsidiaries shall be liable or responsible for any Claims against or Liabilities of SquareTwo or the Subsidiaries that are not included as Assumed U.S. Liabilities or Canadian Claims in the Plan (together, the "Excluded Liabilities").  Furthermore, none of the Reorganized Entities or Acquired Subsidiaries shall, as provided in the Plan, from and after the Closing Date, be liable or responsible for any Excluded Liabilities.  For the avoidance of doubt, the parties hereto agree and acknowledge that all Liabilities for rejection damages arising from the rejection of any executory contract or unexpired lease of SquareTwo or any of the Subsidiaries (other than Canadian Claims or Assumed U.S. Liabilities) shall be Excluded Liabilities.

43

Section 6.9.    Intercompany Obligations.    From and after the Closing, all intercompany agreements or obligations (including any intercompany account balances or cash pooling arrangements, between SquareTwo or any of its Subsidiaries, on the one hand, and another Subsidiary, on the other hand) shall be treated in accordance with Section 2.3 of the Plan.

Section 6.10.    Serviced Accounts Receivable.    No fewer than fifteen (15) Business Days prior to the Closing Date, SquareTwo will provide the Plan Investor with an updated version of the Serviced Accounts Receivable Data Tape.   On or prior to the Closing, SquareTwo will cause its applicable Subsidiaries to transfer (a) all Serviced Accounts Receivable that are not Excluded Serviced Accounts Receivable to a Reorganized Entity or Acquired Subsidiary that, as of the date of this Agreement, is identified in Section 6.10 of the SquareTwo Disclosure Schedule by the respective owner thereof and (b) any Excluded Serviced Accounts Receivable to a Subsidiary that is not a Reorganized Entity or Acquired Subsidiary, in each case of clause (a) and (b) as mutually agreed by SquareTwo and the Plan Investor.

Section 6.11.    Post-Closing Collections.    From and after the Closing, if the Debtors' Representative, Wind Down Co or any of the Dissolving Debtors receive any collections in respect of Serviced Accounts Receivable that are owned by any Reorganized Entity or Acquired Subsidiary, the Debtors' Representative shall promptly notify the Plan Investor of such collection and shall remit to the applicable Reorganized Entity, as directed by the Plan Investor, the full amount of such collection.  From and after the Closing, if the Plan Investor receives any collections in respect of Excluded Serviced Accounts Receivable or any Serviced Accounts Receivable that resulted in a reduction of the amount of the Final Purchase Price, the Plan Investor shall promptly notify Wind Down Co of such collection and shall remit to Wind Down Co the full amount of such collection.

Section 6.12.    Disclosure.    SquareTwo shall promptly notify the Plan Investor in writing with respect to any matter hereafter arising (but solely those matters that arise after the date hereof) that, if existing on the date hereof, would have been required to be set forth or described in (a) Section 4.13 of the SquareTwo Disclosure Schedule because of the third sentence of Section 4.13 or (b) Section 4.15 of the SquareTwo Disclosure Schedule, and the matter disclosed in any such notification shall be deemed to supplement Section 4.13 of the SquareTwo Disclosure Schedule or Section 4.15 of the SquareTwo Disclosure Schedule, as applicable.

ARTICLE VII.

CONDITIONS TO CLOSING

Section 7.1.    Conditions to the Plan Investor's Obligations.    The obligation of the Plan Investor to consummate the transactions contemplated hereby with respect to the Investment shall be subject to the satisfaction at or prior to the Closing of each of the following conditions; provided, however, that the Plan Investor may, in its sole and absolute discretion, waive any or all of the following conditions:

(a)    PFA Order.  The PFA Order shall have become a Final Order and recognized in the Canadian Cases.

(b)    Restructuring Support Agreement; Plan Confirmation.    The Restructuring Support Agreement shall not have been terminated in accordance with its terms and the Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order, and the Confirmation Order shall have become a Final Order in the Bankruptcy Cases and the Closing Date shall be no later than ninety-five (95) days after the Petition Date (the "Outside Date").

(c)     <u>Canadian Cases</u>.   The Confirmation Order shall have been recognized in the Canadian Cases.

(d)     <u>Plan</u>.   The conditions precedent to the consummation of the Plan (other than those required to be satisfied by the Plan Investor or any Affiliate thereof) have been satisfied or waived in accordance with the terms of the Plan.

(e)     <u>Regulatory Approval</u>. <u>Regulatory Approval</u>.   The applicable waiting period (and any extension thereof) under the Antitrust Laws, if applicable, relating to the transactions contemplated by any of the Transaction Documents shall have been terminated or shall have expired, and any necessary approvals, clearances, decisions or orders required to complete the transactions contemplated by any of the Transaction Documents under the Governmental Requirements shall have been obtained.

(f)     <u>No Injunction</u>.   No order, whether temporary, preliminary or permanent (each, a "<u>Restraint</u>"), shall have been enacted, entered, promulgated, adopted, issued or enforced by any Governmental Entity of competent jurisdiction that is in effect on the Closing Date and has the effect of making any of the transactions contemplated by any of the Transaction Documents illegal or otherwise prohibiting or preventing the consummation of the transactions contemplated by any of the Transaction Documents.

(g)     <u>Representations and Warranties</u>.   (i) The representations and warranties of SquareTwo set forth in this Agreement (other than the SquareTwo Fundamental Representations) shall be true and correct (without giving effect to any limitation as to materiality or Material Adverse Effect) in all respects as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such earlier date), except where the failure of such representations and warranties to be true and correct on the date of the Closing Date would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (ii) the SquareTwo Fundamental Representations shall be true and correct in all respects as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such earlier date) except for immaterial errors or omissions, and (iii) the Plan Investor shall have received a certificate in a form reasonably acceptable to the Plan Investor to such effect signed on the Closing Date on behalf of SquareTwo by a responsible officer.

(h)     <u>Performance of Obligations; Compliance with Milestones</u>.   SquareTwo shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing and each of the Milestones shall have occurred (or, if applicable, been waived by the Debtors (and the applicable parties to the Restructuring Support Agreement if appropriate and/or needed) and the Plan Investor), and SquareTwo shall have delivered to the Plan Investor at the Closing a certificate in a form reasonably acceptable to the Plan Investor signed by a responsible officer, dated the Closing Date.

(i)     <u>CCL Financial Inc</u>. SquareTwo shall have caused SquareTwo Financial Canada to repurchase all of the equity securities of CCL held by Christopher D. Walker free and clear of all Encumbrances pursuant to transaction documents reasonably acceptable to the Plan Investor.

(j)     <u>Transaction Documents</u>.   Each of the parties to the Transaction Documents (other than the Plan Investor and its subsidiaries and Affiliates) shall have executed and delivered the applicable Transaction Documents and such Transaction Documents shall constitute the legal, valid and binding obligation of each of the parties thereto.

Section 7.2.     <u>Conditions to the Obligations of SquareTwo</u>.   The obligation of SquareTwo to consummate the transactions contemplated hereby with respect to the Investment shall be subject to the

45

satisfaction at or prior to the Closing of each of the following conditions; provided, however, that SquareTwo may, in its sole and absolute discretion, waive any or all of the following conditions:

(a)    Plan.  The conditions precedent to the consummation of the Plan (other than those required to be satisfied by SquareTwo or any Subsidiary thereof) have been satisfied or waived in accordance with the terms of the Plan.

(b)    Regulatory Approval.  The applicable waiting period (and any extension thereof) under the Antitrust Laws, if applicable, relating to the transactions contemplated by any of the Transaction Documents shall have been terminated or shall have expired, and any necessary approvals, clearances, decisions or orders required to complete the transactions contemplated by any of the Transaction Documents under the Governmental Requirements shall have been obtained.

(c)    No Injunction.  No Restraint shall have been enacted, entered, promulgated, adopted, issued or enforced by any Governmental Entity of competent jurisdiction that is in effect on the Closing Date and has the effect of making any of the transactions contemplated by any of the Transaction Documents illegal or otherwise prohibiting or preventing the consummation of the transactions contemplated by any of the Transaction Documents.

(d)    Representations and Warranties.  (i) The representations and warranties of the Plan Investor (other than the Plan Investor Fundamental Representations) set forth in this Agreement shall be true and correct (without giving effect to any limitation as to materiality or Material Adverse Effect) in all respects as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such earlier date), except where the failure of such representations and warranties to be true and correct on the date of the Closing Date would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (ii) the Plan Investor Fundamental Representations shall be true and correct in all respects as of the Closing Date (except to the extent expressly made as of an earlier date, in which case, as of such earlier date) except for immaterial errors or omissions, and (iii) the Debtors' Representative shall have received a certificate in a form reasonably acceptable to SquareTwo to such effect signed on the Closing Date on behalf of the Plan Investor by a responsible officer.

(e)    Performance of Obligations.  The Plan Investor shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing, and the Plan Investor shall have delivered to SquareTwo at the Closing a certificate in a form reasonably acceptable to SquareTwo signed by a responsible officer, dated as of the Closing Date.

(f)    Transaction Documents.  Each of the parties to the Transaction Documents (other than SquareTwo and the Subsidiaries and Affiliates) shall have executed and delivered the applicable Transaction Documents and such Transaction Documents shall constitute the legal, valid and binding obligation of each of the parties thereto.

(g)    Restructuring Support Agreement; Plan.  The Restructuring Support Agreement shall not have been terminated in accordance with its terms, and the Plan shall have been approved by the Bankruptcy Court pursuant to the Confirmation Order, and the Confirmation Order shall have become a Final Order in the Bankruptcy Cases, and the Effective Date shall be no later than the Outside Date. The Confirmation Order shall have been recognized in the Canadian Cases.

Section 7.3.    Frustration of Closing Conditions.

(a)    The Plan Investor may not rely on the failure of any condition set forth in Section 7.1 to be satisfied, if such failure was directly the result of the failure of the Plan Investor or any of its

subsidiaries or Affiliates to perform and comply in all material respects with the covenants and agreements in this Agreement to be performed or complied with by it prior to the Closing.

(b)        SquareTwo may not rely on the failure of any condition set forth in Section 7.2 to be satisfied, if such failure was directly the result of the failure of SquareTwo or any of its Subsidiaries or Affiliates to perform and comply in all material respects with the covenants and agreements in this Agreement to be performed or complied with by them prior to the Closing.

ARTICLE VIII.

TERMINATION

Section 8.1.    Termination.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date, notwithstanding the fact that any requisite authorization and approval of the transactions contemplated hereby shall have been received:

(a)        by the mutual written consent of the Plan Investor and SquareTwo;

(b)        by either the Plan Investor or SquareTwo, if there shall be any Law that makes consummation of the transactions contemplated hereby (including the purchase of the Reorganized Entities Interests hereunder) illegal or otherwise prohibited, or if any Governmental Entity shall have issued an order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby (including the purchase of the Reorganized Entities Interests hereunder) and such order or other action shall have become final and non-appealable;

(c)        by either the Plan Investor or SquareTwo, if the Closing has not occurred by the Outside Date; provided, however, that neither Plan Investor nor SquareTwo may terminate this Agreement pursuant to this Section 8.1(c) if the Closing was delayed as a result of such Person's breach of this Agreement or any other Transaction Document;

(d)        by the Plan Investor, (i) if the PFA Order is not entered as set forth in Section 9.1, below, (ii) if SquareTwo is in breach of any representation or warranty or failure to perform any covenant or agreement such that the conditions to the obligations of the Plan Investor set forth in Section 7.1 would not be satisfied at or prior to the Closing, and such failure cannot be or has not been cured by the earlier of the Outside Date or 20 Business Days after the giving of written notice by the Plan Investor to SquareTwo or in a lesser period remaining prior to the Outside Date or (iii) upon termination of the Restructuring Support Agreement (but subject to the terms of the Restructuring Support Agreement, including Section 2.4(b) thereof concerning termination by a Consenting Lender (as defined therein)) for any reason unless the termination of the Restructuring Support Agreement is principally due to an act or omission of the Plan Investor that is contrary to its obligations under this Agreement or the Restructuring Support Agreement;

(e)        by SquareTwo, (i) if the Plan Investor is in breach of any representation or warranty or failure to perform any covenant or agreement such that the conditions to the obligations of SquareTwo set forth in Section 7.2 would not be satisfied at or prior to the Closing, and such failure cannot be or has not been cured by the earlier of the Outside Date or 20 Business Days after the giving of written notice by SquareTwo to the Plan Investor or (ii) upon termination of the Restructuring Support Agreement (but subject to the terms of the Restructuring Support Agreement, including Section 2.4(b) thereof concerning termination by a Consenting Lender (as defined therein)) for any reason unless the termination of the Restructuring Support Agreement is principally due to an act or omission of

47

SquareTwo that is contrary to its obligations under this Agreement or the Restructuring Support Agreement; or

(f)    by SquareTwo if the board of directors of SquareTwo authorizes it to enter into an Alternative Acquisition Agreement pursuant to and in accordance with Section 6.7(d).

Section 8.2.    Effect of Termination.

(a)    If this Agreement is validly terminated in accordance with Section 8.1, this Agreement shall thereafter become void and have no effect, and neither party shall have any liability to the other party, its subsidiaries, or its Affiliates or any of their respective directors, officers, employees, equityholders, partners, members, agents or representatives in connection with this Agreement, except that (i) the obligations of the parties contained in the Confidentiality Agreement, Section 2.3(b), Section 6.6, this Section 8.2, and Article IX shall survive and (ii) termination will not relieve either party from liability for any fraud or willful breach of this Agreement prior to such termination.

(b)    If this Agreement is terminated pursuant to Section 8.1(e)(i), then SquareTwo shall be entitled to retain the Good Faith Deposit (and each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to disburse the Good Faith Deposit to SquareTwo) and SquareTwo will not be obligated to pay any fee to the Plan Investor in connection with such termination (including, for the avoidance of doubt, the Termination Fee (defined below)).  If this Agreement is terminated pursuant to Section 8.1(a) or Section 8.1(b) by either SquareTwo or the Plan Investor, or Section 8.1(c) by the Plan Investor only, then SquareTwo shall not be entitled to retain the Good Faith Deposit (and each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to disburse the Good Faith Deposit to the Plan Investor) and SquareTwo will not pay any fee to the Plan Investor in connection with such termination (including, for the avoidance of doubt, the Termination Fee).  If this Agreement is terminated pursuant to Section 8.1(d)(i), then SquareTwo shall not be entitled to retain the Good Faith Deposit (and each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to disburse the Good Faith Deposit to the Plan Investor) and in addition, the Plan Investor shall be entitled to seek an Administrative Expense Claim in an amount equal to Twelve Million Dollars ($12,000,000) (the "Termination Fee") to be paid by wire transfer in immediately available funds within five (5) Business Days after the Bankruptcy Court shall approve the payment of such amount, subject to the Debtors' or (Debtors' Representative's) right, which shall only be available if SquareTwo complied with its obligations in Section 9.1, to object to and otherwise dispute such claim, and nothing in this Agreement shall be deemed to be an admission that the Plan Investor has a right to such claim in such circumstances and all of the Debtors' rights and defenses in connection therewith are specifically preserved.  If this Agreement is terminated pursuant to Section 8.1(c) (provided such termination is by SquareTwo), Section 8.1(d)(ii) or (iii), Section 8.1(e)(ii) or Section 8.1(f) (any such termination event, together with the termination event referenced in the prior sentence, a "Triggering Termination Event"), then SquareTwo shall not be entitled to retain the Good Faith Deposit (and each of the Plan Investor and the Debtors' Representative will execute a Joint Instruction Letter directing the Escrow Agent to disburse the Good Faith Deposit to the Plan Investor) and in addition, SquareTwo will pay an amount equal to the Termination Fee by wire transfer in immediately available funds within five (5) Business Days after such termination (unless this Agreement is terminated in accordance with Section 8.1(f), in which case the Termination Fee shall be paid simultaneously with such termination).  Under no circumstances shall SquareTwo be required to pay the Termination Fee on more than one occasion.  SquareTwo's obligation to pay the Termination Fee pursuant to this Section 8.2(b) shall survive the termination of this Agreement until satisfied in accordance with the terms of this Section 8.2(b).  The Termination Fee and the release of the Good Faith Deposit to the Plan Investor, in each case if applicable, shall constitute an administrative expense of SquareTwo and the Subsidiaries under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy

48

Code. The Termination Fee and the release of the Good Faith Deposit to the Plan Investor, in each case if applicable, are in consideration of the benefits conferred by the Plan Investor upon the bankruptcy estates of the Debtors and in consideration of the time, expense, and risks associated with serving as such an investor, including legal fees and expenses and other expenses related to the negotiation and preparation of this Agreement and of all the Transaction Documents.  Other than as set forth in Section 10.15, the parties hereto agree that absent fraud or willful misconduct, the sole and exclusive remedy of the Plan Investor or any Affiliate thereof in the event of a Triggering Termination Event are the amounts payable pursuant to this Section 8.2(b).

ARTICLE IX.

BANKRUPTCY COURT MATTERS

Section 9.1.    PFA Order.  On the Petition Date or as soon as reasonably practicable thereafter, but in no event later than three Business Days after the Petition Date, SquareTwo shall file with the Bankruptcy Court a motion seeking (i) approval of payment of the Termination Fee in accordance with Section 6.7(d)(iv) and the PI Expenses and (ii) entry of the PFA Order, and SquareTwo shall use commercially reasonable efforts to obtain the entry of the PFA Order no later than 35 days after the commencement of the Bankruptcy Cases.  The Plan Investor agrees that it will promptly take such actions as are reasonably requested by SquareTwo to assist in obtaining the PFA Order.

Section 9.2.    Excluded Assets.  Excluded U.S. Assets (as defined in the Plan) shall be treated in accordance with the Plan.

ARTICLE X.

MISCELLANEOUS

Section 10.1.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal and substantive Laws of the State of New York without giving effect to conflicts of Law principles thereof, other than sections 5-1401 and 5-1402 of the New York General Obligations Law.

Section 10.2.    Jurisdiction; Forum; Service of Process; Waiver of Jury Trial.  With respect to any suit, action or proceeding arising out of or relating to this Agreement ("Proceeding"), each of SquareTwo, the Plan Investor and the Debtors' Representative hereby irrevocably:

(a)    submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York (the "Selected Court"), for any Proceeding arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any Proceeding relating hereto except in such courts) and waives any objection to venue being laid in the Selected Court whether based on the grounds of forum non conveniens or otherwise; provided that each of SquareTwo and the Plan Investor hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for so long as the Bankruptcy Cases or the Canadian Cases are pending;

(b)    consents to service of process in any Proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized international express carrier or delivery service, to SquareTwo or the Plan Investor at its respective address referred to in Section 10.5 hereof; provided, however, that nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by Law; and

49

(c)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

Section 10.3.    <u>Successors and Assigns</u>.  Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of Law and permitted assigns of the parties hereto.  No assignment of this Agreement may be made by any party at any time, whether or not by operation of Law, without the other parties' prior written consent; provided, however, that the Plan Investor or the Canadian PurchaseCo may assign all or a portion of its rights and obligations under this Agreement to one or more of its Affiliates (including assignments by the Plan Investor to the Canadian PurchaseCo in connection with the acquisition of the SquareTwo Canada Shares by the Canadian PurchaseCo) if the Plan Investor and Sherman Parent guarantees the performance by such Affiliates.  Unless the context requires otherwise, any reference to any Person in this Agreement shall be construed to include such Person's successors and permitted assigns.

Section 10.4.    <u>Entire Agreement; Amendment</u>.  This Agreement (including the Exhibits and Schedules attached hereto), any confidentiality agreement between or among any of the parties hereto or their respective Affiliates (including the Confidentiality Agreement) and the other Transaction Documents constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and supersede all prior agreements relating to the subject matter hereof (other than the Confidentiality Agreement).  Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by each of SquareTwo and the Plan Investor.  Each of SquareTwo and the Plan Investor acknowledges and agrees that nothing herein shall prohibit the Plan Investor from acquiring any further Claims against the Debtors or any interest in such Claims, subject to the terms of the Restructuring Support Agreement.  In the event that any terms of this Agreement conflict with any terms of the Plan, subject to approval by the Bankruptcy Court, the Plan shall govern.

Section 10.5.    <u>Notices</u>.  All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person or sent by email, nationally recognized overnight courier or first-class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the applicable address set forth below or such other address as may hereafter be designated in writing by such party to the other parties:

(a)    if to SquareTwo or to any Subsidiary thereof:

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 300
Centennial, CO  80111
Attention:  Alan Singer, Esq.
Email:  asinger@squaretwofinancial.com

with a copy to (for informational purposes only):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019-6099
Attention:  Matthew A. Feldman, Esq.
                    Adam M. Turteltaub, Esq.
Email:  mfeldman@willkie.com; aturteltaub@willkie.com

(b)      if to the Plan Investor, to:

in care of Sherman Capital Markets LLC
200 Meeting Street
Charleston, SC  29401
Attention:  Jon Mazzoli, Director
Email:  jmazzoli@sfg.com

with a copy to (for informational purposes only):

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI  53202
Attention:  Patricia J. Lane
          Benjamin F. Rikkers
          Michael J. Small
Email:  plane@foley.com, brikkers@foley.com, msmall@foley.com

(c)      if to the Debtors' Representative, to:

SquareTwo Financial Corporation
6300 South Syracuse Way, Suite 300
Centennial, CO 80111
Attention:  J.B. Richardson, Jr.
Email:  jbrichardson@squaretwofinancial.com

with a copy to (for informational purposes only):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019-6099
Attention:  Matthew A. Feldman, Esq.
          Adam M. Turteltaub, Esq.
Email:  mfeldman@willkie.com; aturteltaub@willkie.com


All such notices, requests, consents and other communications shall be deemed to have been given or made if and when delivered personally or by overnight courier to the parties at the above addresses or sent by electronic transmission, with confirmation received, or to the email addresses specified above (or at such other address for a party as shall be specified by like notice).  Any notice delivered by any party hereto to any other party hereto shall also be delivered to each other party hereto simultaneously with delivery to the first party receiving such notice.

Section 10.6.    <u>Delays or Omissions</u>.  Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to SquareTwo or the Plan Investor upon any breach or default of any party under this Agreement shall impair any such right, power or remedy of SquareTwo or the Plan Investor nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, Permit, consent or approval of any kind or character on the part of SquareTwo or the Plan Investor of any breach or default under this Agreement, or any waiver on the part of any such party of any

51

provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by Law or otherwise afforded to SquareTwo or the Plan Investor, shall be cumulative and not alternative.

Section 10.7.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Agreement by facsimile or portable document format shall be effective as delivery of a manually executed signature page of this Agreement.

Section 10.8.   Severability.  In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provisions; provided that no such severability shall be effective if it materially changes the economic benefit of this Agreement to any party.

Section 10.9.   Headings.  The table of contents and headings used in this Agreement are used for convenience only, do not constitute a part of this Agreement and are not to be considered in construing or interpreting this Agreement.

Section 10.10.   No Third-Party Beneficiaries.  Nothing in this Agreement is intended to, or shall, confer any third-party beneficiary or other rights or remedies upon any Person other than the parties hereto.

Section 10.11.   Survival.  The representations and warranties of the parties in this Agreement, other than as set forth in Section 4.24, shall not survive the Closing.  The covenants or agreements of the parties hereto shall only survive the Closing if and as explicitly set forth in the applicable provision of this Agreement.

Section 10.12.   Fees and Expenses.  Except as otherwise set forth in this Agreement, each party shall bear all costs and fees and expenses that it incurs, or that may be incurred on its behalf, in connection with this Agreement and the transactions contemplated by any of the Transaction Documents.

Section 10.13.   No Public Announcement.  Except with respect to the Debtors' filings in the Bankruptcy Cases and the Canadian Cases, each of SquareTwo and the Plan Investor shall consult with each other regarding the content of, and shall not issue without the consent of the other party, any press release or public announcement regarding the transactions contemplated by the Transaction Documents; provided that prior to the Petition Date, SquareTwo shall use commercially reasonable efforts to provide a copy of any press release or public announcement to the Plan Investor prior to the issuance thereof and, to the extent reasonably practicable, incorporate reasonably provided comments therein, however SquareTwo, acting in good faith, shall be permitted to issue press releases or public statements without the Plan Investor's prior consent if there is no information about the Plan Investor or its Affiliates in such press release or public statement other than the Plan Investor's and Sherman Parent's identity.

Section 10.14.   Non-Disparagement.  Prior to and following the Closing, none of the parties shall, and each shall cause its subsidiary(ies) to not, disparage, embarrass or criticize in any manner, directly or indirectly, the Business or any other party or any of its Affiliates or any of their respective officers, directors, partners, members, employees, or agents, whether past, present or future.

Section 10.15.   Specific Performance.  This Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith without the posting of a bond or other security.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies

that a party may have under this Agreement or otherwise. The parties agree to waive any defense in any action for specific performance that a remedy at law would be adequate.

Section 10.16. <u>Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement. Unless otherwise indicated to the contrary herein by the context or use thereof:  (a) any reference to any Law will be deemed also to refer to all rules and regulations promulgated thereunder; (b) all references to the preamble, recitals, Sections, Articles, Exhibits or Schedules are to the preamble, recitals, Sections, Articles, Exhibits or Schedules of or to this Agreement; (c) the words "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; (d) masculine gender shall also include the feminine and neutral genders and vice versa; (e) words importing the singular shall also include the plural and vice versa; (f) the words "include," "including" and "includes" shall mean without limitation by reason of enumeration; (g) all references to "$" or dollar amounts are to lawful currency of the United States of America; (h) all reference to a "day" or a number of "days" (without explicit reference to "Business Days") shall be interpreted as a reference to a calendar day or number of calendar days; and (i) the word "will" shall be construed to have the same meaning as the word "shall" and (ii) the phrase "ordinary course" or "ordinary course of business" shall mean "ordinary course of business and consistent with past practices." If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day.

Section 10.17. <u>Debtors' Representative</u>. From and after the Effective Date and in accordance with the Plan: (a) Wind Down Co and the other Dissolving Debtors may take such action as permitted by applicable law and such Dissolving Debtors' organizational documents and shall have authority to make decisions, actions, consents and instructions to fulfill their obligations hereunder; (b) subject to applicable law and each Dissolving Debtors' organizational documents, a decision, act, consent or instruction of Wind Down Co in writing shall constitute a decision of all the Dissolving Debtors, and the Plan Investor may rely (without any obligation for further inquiry, and disregarding any dispute between the Dissolving Debtors) upon any decision, act, consent or instruction of Wind Down Co in writing as being the decision, act, consent or instruction of each Dissolving Debtor; (c) subject to the terms of the Transition Services Agreement, the Plan Investor is hereby relieved from any liability to any Person for any acts done by the Dissolving Debtors in accordance with such decision, act, consent or instruction of Wind Down Co in writing; and (d) any notice or communication delivered to Wind Down Co shall be deemed to have been delivered to the Dissolving Debtors for all purposes hereof. Notwithstanding the foregoing, from and after the filing of the Bankruptcy Cases or the Canadian Cases, respectively, the decisions of the Debtors' Representative shall not be binding on SquareTwo and its Subsidiaries until Bankruptcy Court or Canadian Court approval is granted, if such Bankruptcy Court or Canadian Court approval, respectively, is required by Law.

Section 10.18. <u>Sherman Parent</u>.

(a)     Sherman Parent is jointly and severally liable for the obligations in accordance with the terms and conditions of this Agreement of the Plan Investor hereunder.

(b)     Sherman Parent is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware, with full limited liability company power and authority to enter into this Agreement and perform its obligations hereunder. There is no pending, or to the knowledge of Sherman Parent, threatened, action for the dissolution, liquidation or insolvency of the Sherman Parent. The execution, delivery and performance of this Agreement by Sherman Parent have

53

been duly and validly authorized by all requisite limited liability company action, and no other proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by it.  This Agreement has been duly executed and delivered by Sherman Parent and, assuming this Agreement is a valid and binding obligation of the other parties hereto, this Agreement constitutes a valid and binding obligation of the Sherman Parent, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.  Sherman Parent is not subject to or obligated under its certificate of formation or operating agreement (or similar organizational documents), any applicable Law or any material Contract, or subject to any order, in each case which would be breached or violated by Sherman Parent's execution, delivery or performance of this Agreement.

[SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused the foregoing Agreement to be executed as of the date first above written.

SQUARETWO FINANCIAL CORPORATION

By: _____
    Name:  J.B. Richardson, Jr.
    Title:  Chief Operating Officer

COLLECT AMERICA OF CANADA, LLC

By: _____
    Name: J.B. Richardson, Jr.
    Title:  Authorized Signatory

RESURGENT HOLDINGS LLC

By: _____
    Name:
    Title:

SHERMAN FINANCIAL GROUP LLC

By: _____
    Name:
    Title:

SQUARETWO FINANCIAL CORPORATION,
*in its capacity as Debtors' Representative*

By: _____
    Name:  J.B. Richardson, Jr.
    Title: Chief Operating Officer

[Signature Page to Plan Funding Agreement]

IN WITNESS WHEREOF, each of the undersigned has caused the foregoing Agreement to be executed as of the date first above written.

**SQUARETWO FINANCIAL CORPORATION**

By:    _____
        Name:
        Title:

**COLLECT AMERICA OF CANADA, LLC**

By:    _____
        Name:
        Title:

**RESURGENT HOLDINGS LLC**

By:    _____
        Name: _Bryan Faliero_
        Title: _President_

**SHERMAN FINANCIAL GROUP LLC**

By:    _____
        Name:
        Title:

**SQUARETWO FINANCIAL CORPORATION**,
*in its capacity as  Debtors' Representative*

By:    _____
        Name:
        Title:

[Signature Page to Plan Funding Agreement]

IN WITNESS WHEREOF, each of the undersigned has caused the foregoing Agreement to be executed as of the date first above written.

**SQUARETWO FINANCIAL CORPORATION**

By: _____
        Name:
        Title:

**COLLECT AMERICA OF CANADA, LLC**

By: _____
        Name:
        Title:

**RESURGENT HOLDINGS LLC**

By: _____
        Name:
        Title:

**SHERMAN FINANCIAL GROUP LLC**

By: _____
        Name: _Scott Silver_
        Title: _Authorized Representative_

**SQUARETWO FINANCIAL CORPORATION**,
*in its capacity as Debtors' Representative*

By: _____
        Name:
        Title:

[Signature Page to Plan Funding Agreement]

## EXHIBIT E

**Corporate Structure Chart**



*Christopher Walker holds approximately a 14% equity position in CCL Financial Inc.