**<u>Exhibit A</u>**

**DIP Agreement (Without Exhibits)**

**SENIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION FINANCING AGREEMENT**


**Dated as of March 22, 2017**


**by and among**


**SQUARETWO FINANCIAL CORPORATION
AND EACH SUBSIDIARY THEREOF LISTED AS
A BORROWER ON THE SIGNATURE PAGES HERETO,**
as debtors and debtors-in-possession,
**as Borrowers,**

**EACH SUBSIDIARY OF SQUARETWO FINANCIAL CORPORATION
LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
as Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
as Lenders,

**CERBERUS BUSINESS FINANCE, LLC,**
as Collateral Agent,

**and**

**CERBERUS BUSINESS FINANCE, LLC,**
as Administrative Agent

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CERTAIN TERMS........................................................................ 2
    Section 1.01    Definitions.................................................................................. 2
    Section 1.02    Terms Generally......................................................................... 44
    Section 1.03    Certain Matters of Construction................................................. 45
    Section 1.04    Accounting and Other Terms..................................................... 45
    Section 1.05    Time References; Notices........................................................... 46
    Section 1.06    Obligation to Make Payments in Dollars.................................... 47

ARTICLE II THE LOANS.................................................................................................... 47
    Section 2.01    Commitments............................................................................. 47
    Section 2.02    Making the Loans...................................................................... 47
    Section 2.03    Repayment of Loans; Evidence of Debt..................................... 48
    Section 2.04    Interest...................................................................................... 49
    Section 2.05    Reduction of Commitment; Prepayment of Loans ..................... 51
    Section 2.06    Fees........................................................................................... 53
    Section 2.07    LIBOR Option .......................................................................... 54
    Section 2.08    Funding Losses.......................................................................... 55
    Section 2.09    Taxes......................................................................................... 55
    Section 2.10    Increased Costs and Reduced Return.......................................... 58
    Section 2.11    Changes in Law; Impracticability or Illegality .......................... 59

ARTICLE III SECURITY AND ADMINISTRATIVE PRIORITY ......................................... 60
    Section 3.01    Pre-Petition Obligations............................................................. 60
    Section 3.02    Acknowledgment of Security Interests....................................... 60
    Section 3.03    Binding Effect of Documents..................................................... 60
    Section 3.04    Collateral; Grant of Lien and Security Interest........................... 61
    Section 3.05    Administrative Priority .............................................................. 61
    Section 3.06    Grants, Rights and Remedies..................................................... 62
    Section 3.07    No Filings Required ................................................................... 62
    Section 3.08    Survival..................................................................................... 62
    Section 3.09    Further Assurances..................................................................... 63

ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS; JOINT
    AND SEVERAL LIABILITY OF BORROWERS ........................................... 63
    Section 4.01    Payments; Computations and Statements.................................... 63
    Section 4.02    Sharing of Payments.................................................................. 64
    Section 4.03    Apportionment of Payments ...................................................... 65
    Section 4.04    Defaulting Lenders.................................................................... 66
    Section 4.05    Administrative Borrower; Joint and Several Liability of the
                Borrowers.................................................................................. 67
    Section 4.06    Mitigation Obligations............................................................... 68

ARTICLE V CONDITIONS TO LOANS................................................................................ 68
    Section 5.01    Conditions Precedent to Effectiveness........................................ 68
    Section 5.02    Conditions Precedent to Final Facility Effectiveness ................. 72

Section 5.03       Conditions Precedent to All Loans ........................................................ 74

ARTICLE VI REPRESENTATIONS AND WARRANTIES .................................................... 74
Section 6.01       Representations and Warranties.......................................................... 74

ARTICLE VII COVENANTS OF THE LOAN PARTIES........................................................ 84
Section 7.01       Affirmative Covenants......................................................................... 84
Section 7.02       Negative Covenants............................................................................. 94
Section 7.03       Financial Covenants.......................................................................... 101

ARTICLE VIII CASH MANAGEMENT ARRANGEMENTS AND OTHER
COLLATERAL MATTERS....................................................................... 101
Section 8.01       Cash Management Arrangements...................................................... 101

ARTICLE IX EVENTS OF DEFAULT................................................................................. 102
Section 9.01       Events of Default ............................................................................... 102
Section 9.02       [Intentionally omitted] ...................................................................... 107

ARTICLE X AGENTS ......................................................................................................... 108
Section 10.01      Appointment ...................................................................................... 108
Section 10.02      Nature of Duties; Delegation ............................................................ 109
Section 10.03      Rights, Exculpation, Etc ................................................................... 109
Section 10.04      Reliance.............................................................................................. 110
Section 10.05      Indemnification .................................................................................. 110
Section 10.06      Agents Individually........................................................................... 111
Section 10.07      Successor Agent ................................................................................ 111
Section 10.08      Collateral Matters.............................................................................. 111
Section 10.09      Agency for Perfection ....................................................................... 114
Section 10.10      No Reliance on any Agent's Customer Identification Program............. 114
Section 10.11      No Third Party Beneficiaries ............................................................ 115
Section 10.12      No Fiduciary Relationship ................................................................ 115
Section 10.13      Reports; Confidentiality; Disclaimers............................................... 115
Section 10.14      Collateral Custodian.......................................................................... 116
Section 10.15      Intercreditor Agreement.................................................................... 116
Section 10.16      Collateral Agent May File Proofs of Claim ..................................... 116

ARTICLE XI GUARANTY .................................................................................................. 117
Section 11.01      Guaranty ............................................................................................ 117
Section 11.02      Guaranty Absolute ............................................................................ 117
Section 11.03      Waiver................................................................................................ 118
Section 11.04      Continuing Guaranty; Assignments.................................................. 118
Section 11.05      Subrogation........................................................................................ 119
Section 11.06      Contribution....................................................................................... 119

ARTICLE XII MISCELLANEOUS....................................................................................... 120
Section 12.01      Notices, Etc ....................................................................................... 120
Section 12.02      Amendments, Etc .............................................................................. 122
Section 12.03      No Waiver; Remedies, Etc................................................................. 123
Section 12.04      Expenses; Taxes; Attorneys' Fees ................................................... 123
Section 12.05      Right of Set-off ................................................................................. 125

Section 12.06    Severability .................................................................................. 125
Section 12.07    Assignments and Participations ............................................. 125
Section 12.08    Counterparts ....................................................................... 129
Section 12.09    GOVERNING LAW.................................................................. 129
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS
                 AND VENUE .......................................................................... 129
Section 12.11    WAIVER OF JURY TRIAL, ETC ............................................ 130
Section 12.12    Consent by the Agents and Lenders ...................................... 131
Section 12.13    No Party Deemed Drafter ...................................................... 131
Section 12.14    Reinstatement; Certain Payments ......................................... 131
Section 12.15    Indemnification; Limitation of Liability for Certain Damages............... 131
Section 12.16    Records .................................................................................. 132
Section 12.17    Binding Effect ....................................................................... 133
Section 12.18    Highest Lawful Rate ............................................................. 133
Section 12.19    Confidentiality ...................................................................... 134
Section 12.20    Public Disclosure .................................................................. 134
Section 12.21    Integration ............................................................................. 135
Section 12.22    USA PATRIOT Act ............................................................... 135
Section 12.23    CAML Legislation ................................................................ 135
Section 12.24    Judgment Currency ............................................................... 135
Section 12.25    Waiver of Immunity ............................................................. 136
Section 12.26    English Language .................................................................. 136
Section 12.27    Parties Including Trustees; Bankruptcy Court Proceedings ................... 136

## SCHEDULE AND EXHIBITS

| | |
|---|---|
| Schedule 1.01(A) | Lenders and Lenders' Commitments |
| Schedule 1.01(B) | Scheduled Dispositions |
| Schedule 1.01(C) | Budget |
| Schedule 6.01(e) | Capitalization; Subsidiaries |
| Schedule 6.01(i) | ERISA |
| Schedule 6.01(q) | Environmental Matters |
| Schedule 6.01(r) | Insurance |
| Schedule 6.01(u) | Intellectual Property |
| Schedule 6.01(x) | Canadian Employee Benefit Plans and Canadian Pension Plans |
| Schedule 6.01(y) | Broker's Fees |
| Schedule 7.02(a) | Existing Liens |
| Schedule 7.02(e) | Existing Investments |
| Schedule 7.02(j) | Affiliate Transactions |
| Schedule 7.02(k) | Limitations on Dividends and Other Payment Restrictions |
| Schedule 8.01 | Cash Management Accounts |

| | |
|---|---|
| Exhibit A | Form of Joinder Agreement |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | Form of LIBOR Notice |
| Exhibit E | Form of Borrowing Base Certificate |
| Exhibit F | Form of ERP Report |
| Exhibit G | Form of Assets Available For Purchase Agreements |
| Exhibit H | Form of Interim Bankruptcy Court Order |

<h1 align="center">SENIOR SECURED SUPER-PRIORITY<br/>DEBTOR-IN-POSSESSION FINANCING AGREEMENT</h1>

This Senior Secured Super-Priority Debtor-in-Possession Financing Agreement, dated as of March 22, 2017, is entered into by and among SquareTwo Financial Corporation, a Delaware corporation (the "<u>Parent</u>"), each subsidiary of the Parent listed as a "Borrower" on the signature pages hereto (together with the Parent and each other Person that executes a joinder agreement and becomes a "Borrower" hereunder, each a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), each subsidiary of the Parent listed as a "U.S. Guarantor" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "U.S. Guarantor" hereunder or otherwise guaranties all or any part of the Obligations (as hereinafter defined), each a "<u>U.S. Guarantor</u>" and collectively, the "<u>U.S. Guarantors</u>"), each subsidiary of the Parent listed as a "Canadian Guarantor" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Canadian Guarantor" hereunder or otherwise guaranties all or any part of the Obligations (as hereinafter defined), each a "<u>Canadian Guarantor</u>" and collectively, the "<u>Canadian Guarantors</u>", and, together with the U.S. Guarantors, each a "<u>Guarantor</u>" and, collectively, the "<u>Guarantors</u>"), the lenders from time to time party hereto (each a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"), Cerberus Business Finance, LLC ("<u>CBF</u>"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>"), and CBF, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "<u>Administrative Agent</u>" and together with the Collateral Agent, each an "<u>Agent</u>" and collectively, the "<u>Agents</u>").

<h2 align="center">RECITALS</h2>

The Parent, the Borrowers, the Guarantors, certain lenders (in such capacities, each a "<u>Pre-Petition Lender</u>" and, collectively, the "<u>Pre-Petition Lenders</u>"), CBF, as administrative agent for such lenders (in such capacity, the "<u>Pre-Petition Administrative Agent</u>") and CBF, as collateral agent for such lenders (in such capacity, the "<u>Pre-Petition Collateral Agent</u>", and together with the Pre-Petition Administrative Agent, in such capacities, each a "<u>Pre-Petition Agent</u>", and, collectively, the "<u>Pre-Petition Agents</u>") are parties to a Financing Agreement, dated as of May 24, 2016, as amended (as so amended, the "<u>Pre-Petition Financing Agreement</u>"), pursuant to which the Pre-Petition Lenders (i) made term loans to the Borrowers in the initial aggregate principal amount of $105,000,000 and (ii) provided a revolving credit facility in an aggregate principal amount not to exceed $60,000,000.  As of the Filing Date, there was (x) $41,000,000 in principal amount of outstanding Pre-Petition Revolving Loans (the "<u>Pre-Petition Revolving Loan Balance</u>") and (y) $105,000,000 in principal amount of outstanding Pre-Petition Term Loans.

The Borrowers and the Guarantors have commenced cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), and the Borrowers and the U.S. Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Parent, in its capacity as foreign representative of the Chapter 11 Cases, commenced cases (the "CCAA Cases") under Part IV of the CCAA (as hereinafter defined) for the purposes of, among other things, obtaining an order of the Canadian Bankruptcy Court recognizing the Chapter 11 Cases as a foreign main proceeding, imposing a stay of proceedings in respect of each Canadian Subsidiary, and authorizing each Canadian Subsidiary to retain possession of its assets and to continue operation of its businesses under the CCAA.

The Borrowers and the Guarantors have asked the Lenders to make post-petition loans and advances to the Borrowers consisting of a revolving credit facility in an aggregate principal amount not to exceed $58,500,000; provided that, until the Final Bankruptcy Court Order (as hereinafter defined) shall have been entered by the Bankruptcy Court, no loans or advances under this Agreement shall be made other than revolving loans in an aggregate principal amount not to exceed $10,000,000 plus an amount equal to the amounts, if any, of the Pre-Petition Revolving Loan Balance permanently repaid during the Interim Period, which aggregate amount may be borrowed, repaid and reborrowed in accordance with the terms of this Agreement. The proceeds of the loans made under the revolving credit facility shall be used for general working capital purposes of the Borrowers and the Guarantors, to pay fees and expenses related to this Agreement, the Chapter 11 Cases and the CCAA Cases and to refinance the outstanding revolving loans under the Pre-Petition Financing Agreement. The Lenders are severally, and not jointly, willing to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01  Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"1.25 Lien Agent" shall mean Cortland Capital Market Services LLC, in its capacity as administrative agent under the 1.25 Lien Credit Agreement, and any successor administrative agent under the 1.25 Lien Credit Agreement.

"1.25 Lien Credit Agreement" shall mean that certain 1.25 Lien Credit Agreement, dated as of May 24, 2016, by and among the Borrowers, the 1.25 Lien, the 1.25 Lien Lenders and the 1.25 Lien Agent, as amended, amended and restated, supplemented or modified from time to time prior to the Filing Date in accordance with the First Lien Intercreditor Agreement.

"1.25 Lien Intercreditor Agreement" shall mean the 1.25 Lien Intercreditor Agreement, dated as of May 24, 2016, by and among the Pre-Petition Administrative Agent and the 1.25 Lien Agent and acknowledged by the Borrowers and Guarantors, as amended, amended and restated, supplemented, modified or replaced from time to time.

"1.25 Lien Lenders" shall mean the lenders from time to time party to the 1.25 Lien Credit Agreement in such capacity.

"1.25 Lien Loan Documents" shall mean the "Loan Documents" as defined in the 1.25 Lien Credit Agreement.

"1.25 Lien Loans" shall mean the "Loans" as defined in the 1.25 Lien Credit Agreement.

"1.25 Lien Obligations" shall mean the "Obligations" as defined in the 1.25 Lien Credit Agreement.

"1.5 Lien Agent" shall mean Cortland Capital Market Services LLC, in its capacity as administrative agent under the 1.5 Lien Credit Agreement, and any successor administrative agent under the 1.5 Lien Credit Agreement.

"1.5 Lien Credit Agreement" shall mean that certain 1.5 Lien Credit Agreement, dated as of May 24, 2016, by and among the Borrowers, the Guarantors, the 1.5 Lien Lenders and the 1.5 Lien Agent, as amended, amended and restated, supplemented or modified from time to time prior to the Filing Date in accordance with the First Lien Intercreditor Agreement.

"1.5 Lien Lenders" shall mean the lenders from time to time party to the 1.5 Lien Credit Agreement in such capacity.

"1.5 Lien Loan Documents" shall mean the "Loan Documents" as defined in the 1.5 Lien Credit Agreement.

"1.5 Lien Loans" shall mean the "Loans" as defined in the 1.5 Lien Credit Agreement.

"1.5 Lien Obligations" shall mean the "Obligations" as defined in the 1.5 Lien Credit Agreement.

"Account Debtor" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"Administrative Borrower" has the meaning specified therefor in Section 4.05.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and includes any Person which has a senior officer who is also a senior officer of such other Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract, ownership of Voting Stock, other Equity Interests or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"Agent" has the meaning specified therefor in the preamble hereto.

"Agreed Administrative Expense Priorities" means that administrative expenses with respect to the Loan Parties and, with respect to sub-clause (ii) of clause "first", any official committee appointed by the Bankruptcy Court, shall have the following order of priority:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) amounts payable in respect of Carve-Out Expenses, provided that the amount entitled to priority under this sub-clause (ii) of this clause first ("Priority Professional Expenses") shall not exceed the sum of (A) the aggregate amount of professional fees, costs and disbursements accrued and not paid immediately prior to the commencement of a Carve-Out Expense Reduction Period, but solely if, as and to the extent such professional fees, costs and disbursements are or have been provided for in, and are consistent with, the Initial Budget and are ultimately allowed by the Bankruptcy Court pursuant to Section 330 of the Bankruptcy Code and (B) $1,000,000 (the "Professional Expense Cap"); provided, however, that (1) during any Carve-Out Expense Reduction Period, any payments actually made in respect of Carve-Out Expenses other than the Carve-Out Expenses described in subclause (A) of this clause (ii), shall reduce the Professional Expense Cap on a dollar-for-dollar basis, and (2) for the avoidance of doubt, so long as no Carve-Out Expense Reduction Period shall be continuing, the payment of Carve-Out Expenses shall not reduce the Professional Expense Cap;

second, all Pre-Petition Revolving Loans and the Obligations, and

third, all other allowed administrative expenses.

"Agreement" means this Financing Agreement, including all amendments, restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"Anti-Corruption Laws" has the meaning specified therefor in Section 6.01(cc).

"Anti-Money Laundering and Anti-Terrorism Laws" means any Requirement of Law relating to terrorism, economic sanctions or money laundering, including, without limitation, (a) the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957), (b) the Bank Secrecy Act of 1970 (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), and the implementing regulations promulgated thereunder, (c) the USA

PATRIOT Act and the implementing regulations promulgated thereunder, (d) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (e) any law prohibiting or directed against terrorist activities or the financing or support of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), and (f) any similar laws enacted in the United States, Canada (including CAML) or any other jurisdictions in which the parties to this Agreement operate, as any of the foregoing laws have been, or shall hereafter be, amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Applicable Margin" means, as of any date of determination, with respect to the interest rate of (a) any Reference Rate Loan or any portion thereof, 6.75% and (b) any LIBOR Rate Loan or any portion thereof, 7.75%.

"Asset(s)" shall mean each purchased Receivable and any property or other right obtained by any Loan Party in connection with the collection of any such purchased Receivable or in substitution therefor, all of which constitutes part of the Asset Pool into which such purchased Receivable was initially delivered.

"Asset Pool" shall mean all Receivables and other Assets, as the context may require, which Receivables were purchased by any Loan Party from a single Asset Pool Seller on the same Business Day, together with (i) each and every Asset obtained in replacement or satisfaction of or substitution for, any such Receivable so purchased, (ii) each and every item of property obtained by any Loan Party as a result of its collection activities with respect to any such purchased Receivable, (iii) each and every item of collateral or security, including all security interests, liens, guarantees and other interests securing payment of any purchased Receivable, and all other rights and interests of any Loan Party with respect to each purchased Receivable, (iv) each judgment rendered against a purchased Account Debtor in respect of a Receivable, together with all lien rights related thereto, (v) Asset Pool Proceeds derived from or paid or payable with respect thereto, together with any and all earnings thereon, and (vi) each and every other right, claim and interest associated therewith.

"Asset Pool Proceeds" shall mean, with respect to an Asset Pool, any and all payments, revenues, income, receipts, collections, recoveries and other proceeds or assets received with respect to such Asset Pool, including, without limitation, (i) payments of principal, interest, fees, premiums, late charges, insufficient funds charges, guaranty payments and any interest thereon, credit insurance costs, guaranty fees and other amounts recovered on account of any Asset in such Asset Pool, and (ii) settlements, compromises, liquidations, foreclosure proceeds, dispositions, sales, transfers or other proceeds, whether cash or otherwise, received as a result of or in any way in connection with collection activities related to any Asset or in connection with the sale of any Asset constituting a part of such Asset Pool.

"Asset Pool Seller" shall mean, with respect to an Asset Pool, the Person that sells a specified Asset Pool to any Loan Party pursuant to the terms of a purchase agreement between any Loan Party and any Asset Pool Seller for the purchase of an Asset Pool.

"Assets Available For Purchase Agreements" shall mean any and all Assets Available For Purchase Agreements between (a) CACH, LLC or other Subsidiaries of the Parent which purchase debt and are Loan Parties, on the one hand, and (b) the Franchisees, on the other hand, which are in the form of Exhibit G to this Agreement, as may be modified pursuant to Section 7.02(m)(vi).

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Collateral Agent (and the Administrative Agent, if applicable), in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Availability" means, at any time, the difference between (a) the least of (i) the Borrowing Base, (ii) the Total Revolving Credit Commitment and (iii) the maximum principal amount of Revolving Loans permitted by the Bankruptcy Court Orders, and (b) the sum of the aggregate outstanding principal amount of all Revolving Loans.

"Bankruptcy Cases" means, collectively, the Chapter 11 Cases and the CCAA Cases.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order and the CCAA Order.

"BIA" means, the Bankruptcy and Insolvency Act (Canada).

"Blocked Person" means any Person:

(a)     that (i) is identified on the list of "Specially Designated Nationals and Blocked Persons" published by OFAC or any Sanctions-related list of designated Persons maintained by or the government of Canada pursuant to, or as described in, any Canadian Economic Sanctions and Export Control Laws; (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of an OFAC Sanctions Program; or (iii) a United States Person is prohibited from dealing or engaging in a transaction with under any of the Anti-Money Laundering and Anti-Terrorism Laws; and

(b)     that is 50 percent or more owned or otherwise controlled by, or that is acting for or on behalf of, any Person described in clause (a) above.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing Base" means, at any time, an amount equal to (a) the difference between (i) the least of (A) 33.0% of ERP at such time, (B) 46.5% of NERP at such time and (C) 140% of the Consolidated EBITDA of the Parent and its Subsidiaries as of the last day of the most recently completed trailing twelve consecutive month period for which financial statements are available and (ii) the aggregate outstanding principal amount of the Pre-Petition Loans at such time, minus (b) the aggregate amount of Reserves established by the Collateral Agent in good faith at such time.

"Borrowing Base Certificate" means a certificate signed by an Authorized Officer of the Administrative Borrower and setting forth the calculation of the Borrowing Base in compliance with Section 7.01(a)(vi), substantially in the form of Exhibit E.

"Budget" means, collectively, the consolidated cash requirement forecasts, cash flow statements, statements of operations and cash availability schedules in the form attached hereto as Schedule 1.01(C), which are (a) prepared by or on behalf of the Loan Parties on a weekly basis (for the next succeeding 13 weeks) and on a monthly basis (for the months from the Interim Facility Effective Date through the Final Maturity Date), and (b) delivered by the Loan Parties to the Agents and the Lenders (i) in the case of the Initial Budget, on or before the Interim Facility Effective Date pursuant to Section 5.01(f)(xii) hereto and (ii) in the case of each subsequently delivered Budget, each month thereafter pursuant to Section 7.01(a)(vii) hereto, in each case, which shall be in form and detail consistent with the Initial Budget.

"Budget Period" means (a) for purposes of determining the amount of Revolving Loans permitted to be outstanding during the Interim Period, each rolling two-week period set forth in the Budget, and (b) for all other purposes, on a monthly basis.

"Business Day" means (a) for all purposes other than as described in clause (b) below, any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close, and (b) with respect to the borrowing, payment or continuation of, or determination of interest rate on, LIBOR Rate Loans, any day that is a Business Day described in clause (a) above and on which dealings in Dollars may be carried on in the interbank eurodollar markets in New York City and London.

"CA Holdings" means CA Holdings, Inc., a Delaware Corporation.

"CAML" means the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other anti-terrorism laws and "know your client" policies, regulations, laws or rules applicable in Canada, including any guidelines or orders thereunder.

"Canadian Bankruptcy Court" means the Ontario Superior Court of Justice (Commercial List).

"Canadian Benefit Plans" means any plan, fund, program, or policy, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, providing employee benefits, including medical, hospital care, dental, sickness, accident, disability, life insurance, pension, retirement or savings benefits, under which any Canadian Loan Party or any Subsidiary of any Canadian Loan Party has any liability with respect to any employee or former employee, but excluding any Canadian Pension Plans.

"Canadian Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by the Canadian Loan Parties upon which a Lien is granted or purported to be granted by the Canadian Loan Parties as security for all or any part of the Obligations.

"Canadian DB Plan" means any Canadian Pension Plan required to be registered under Canadian federal or provincial law which contains a "defined benefit provision" as defined in subsection 147.1(l) of the Income Tax Act (Canada).

"Canadian Economic Sanctions and Export Control Laws" means any Canadian laws, regulations or orders governing transactions in controlled goods or technologies or dealings with countries, entities, organizations, or individuals subject to economic sanctions and similar measures.

"Canadian Guarantor" means any Guarantor that is organized or incorporated under the laws of a jurisdiction in Canada; provided, that the Excluded Canadian Subsidiary shall not be required to be a Guarantor.

"Canadian Guaranty" means each guaranty made by a Canadian Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Canadian Obligations, including the Guaranty in ARTICLE XI hereof, in form and substance reasonably satisfactory to the Collateral Agent.

"Canadian Loan Party" means any Loan Party organized, incorporated, amalgamated, or continued under the laws of Canada or any Province of Canada.

"Canadian Pension Plans" means each pension plan required to be registered under Canadian federal or provincial law that is administered or contributed to by a Canadian Loan Party or any Subsidiary of any Canadian Loan Party for its employees or former employees, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"Canadian PPSL" means Canadian provincial, territorial or federal personal property security laws that are applicable to Collateral or a Loan Party.

"Canadian Priority Reserve" means a reserve established for the aggregate of any amounts accrued or payable (including interest and penalties) of all Liens created by applicable law (in contrast with Liens voluntarily granted), or interests similar thereto under applicable law, which rank or are capable of ranking prior or pari passu with the Liens created by the Collateral Documents including for amounts owing for, or in respect of, employee source deductions, wages, vacation pay, goods and services taxes, sales taxes, harmonized sales taxes, municipal taxes, workers' compensation, Quebec corporate taxes, pension fund obligations and overdue rents.

"Canadian Security Agreement" means the Canadian Pledge and Security Agreement, dated as of the Interim Facility Effective Date, made by the Canadian Loan Parties, in favor of Collateral Agent, for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent, as amended, amended and restated, supplemented, modified, or replaced from time to time.

"Canadian Subsidiary" means any Subsidiary of the Parent organized, incorporated, amalgamated, or continued under the laws of Canada or any province or territory thereof.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out Expenses" means any payments permitted (at any time) to be made by the Bankruptcy Court in respect of fees, costs and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code.

"Carve-Out Expense Reduction Period" means any period following the delivery by any Agent of a written notice to the Administrative Borrower of the occurrence and continuance of an Event of Default under this Agreement or a default by any Loan Party in any of its obligations under any of the Bankruptcy Court Orders.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or the Canadian Government or issued by any agency thereof and backed by the full faith and credit of the United States or Canada, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's or such other comparable rating agencies in Canada; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and

has a combined capital and surplus and undivided profits of not less than $500,000,000 or is a "bank" (as defined in the Bank Act (Canada)); (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or the Canadian Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, or such other comparable rating agencies in Canada, in each case, maturing within 270 days from the date of acquisition thereof.

"Cash Management Accounts" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks listed on Schedule 8.01.

"Cash Management Bank" has the meaning specified therefor in Section 8.01(a).

"CCAA" means the Companies Creditors' Arrangement Act (Canada).

"CCAA Cases" has the meaning specified in the recitals hereto.

"CCAA Order" means the order of the Canadian Bankruptcy Court issued in the CCAA Cases recognizing the Chapter 11 Cases, which order shall be in form, scope and substance satisfactory to the Agents and shall provide for a super priority charge in favor of the Collateral Agent for the benefit of the Lenders on the Canadian Collateral to secure the Obligations, and from which no appeal has been timely filed, or if timely filed, such appeal has been dismissed or denied (unless the Agents waive such requirement), together with all extensions, modifications and amendments thereto, in form, scope and substance satisfactory to the Agents.

"CCL" means CCL Financial Inc., an Ontario corporation.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States, Canadian or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" shall mean (a) the Co-Investors in the aggregate shall at any time cease to have, directly or indirectly, (i) economic ownership of at least a majority of the outstanding equity interests of the Parent, provided that the Co-Investors' aggregate economic

ownership of outstanding equity interests of the Parent may be reduced below a majority as a result of dilution with respect to equity awarded to management and pursuant to employee stock programs without triggering a Change of Control unless the Co-Investors in the aggregate shall cease to have economic ownership of at least forty percent (40%) of the outstanding equity interests of the Parent, or (ii) the power to vote or direct the voting of, at least a majority of the Voting Stock of the Parent; (b) or any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act), other than the Co-Investors, shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of a percentage of the economic ownership of the outstanding equity interests of the Parent or the voting power of the outstanding Voting Stock of the Parent that is greater than the percentage of such economic ownership of the outstanding equity interests or such voting power of such Voting Stock, as applicable, in the aggregate, directly or indirectly, beneficially owned by the Co-Investors; (c) except as a result of a Permitted Disposition, and other than with respect to the Equity Interests of CCL owned by Walker on the Interim Facility Effective Date, the Parent ceases to own and control, directly or indirectly, all of the economic and voting rights associated with all of the outstanding Equity Interests of any of its Subsidiaries; (d) individuals who constituted the Board of Directors of the Parent on the Interim Facility Effective Date, together with any new directors whose election was approved by (x) a vote of at least a majority of the directors of the Parent then still in office who were directors on the Interim Facility Effective Date or (y) the Co-Investors, cease for any reason to constitute a majority of the Board of Directors of the Parent (or its direct or indirect parent holding company); or (e) any "Change of Control" shall occur (as such term is defined in any organizational document of the Parent or any of its Subsidiaries).

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Co-Investors" shall mean each of (a) Apollo Global Management, LLC, (b) KKR Credit Advisors (US) LLC, (c) any Person that is (i) directly or indirectly controlled by any Person in (a) or (b), and (ii) organized by any Person in (a) or (b) (or any subsidiary of such Person) primarily for the purpose of making equity and/or debt investments and (d) any investment accounts or funds managed or sub-advised by Apollo Global Management, LLC, KKR Credit Advisors (US) LLC or any entity directly or indirectly controlled by Apollo Global Management, LLC or KKR Credit Advisors (US) LLC (other than portfolio companies).

"Collateral" means the U.S. Collateral and the Canadian Collateral.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Collateral Reserve Accounts" has the meaning specified therefor in clause (e) of the definition of "Excluded Account".

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commitments" means, with respect to each Lender, such Lender's Revolving Credit Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" has the meaning assigned to such term in Section 7.01(a)(iv).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated EBITDA" means Consolidated Net Income less (to the extent included in the calculation of Consolidated Net Income, but without duplication): (a) income and franchise tax credits and refunds, (b) interest income, (c) gain from extraordinary items, (d) any gain arising from the sale, exchange or other disposition of assets outside of the ordinary course of business, other than Accounts, (e) any other non-cash gains, (f) cash charges associated with interest swaps that result from such swaps not qualifying for effective hedge accounting due to interest rate floors to the extent such cash charges are not included in the calculation of Consolidated Net Income and (g) non-recurring gains; plus: (in each case to the extent deducted in the calculation of Consolidated Net Income, but without duplication): (i) any provision for income and franchise taxes, (ii) interest expense and any interest paid in-kind, (iii) depreciation and amortization, (iv) amortized debt discount, (v) [intentionally omitted], (vi) any non-cash loss arising from the sale, exchange or other disposition of assets outside of the ordinary course of business, other than Accounts, but including amortization of intangibles (including but not limited to goodwill), (vii) any other non-cash losses (other than non-cash losses relating to write-offs, write-downs or reserves with respect to Accounts), (viii) fees, costs and expenses incurred by the Borrowers and any of their respective Subsidiaries in connection with the Transactions, this Agreement and the Chapter 11 Cases, including, without limitation, fees, costs and expenses (including restructuring expenses) incurred in preparation for or in connection with the Chapter 11 Cases, in an aggregate amount not to exceed $20,000,000 during the term of this Agreement and, for any amounts incurred on or after the Interim Facility Effective Date, in amounts provided for in the Initial Budget to the extent not resulting in a Material Adverse Deviation, (ix) additional non-cash amortization expenses resulting from any premiums over the asset value of purchased pools of Accounts as a result of purchase accounting adjustments in accordance with GAAP relating to such acquisition, (x) non-cash charges associated with interest rate swaps that result from such swaps not qualifying for effective hedge accounting due to interest rate floors, (xi) non-cash stock option expense under GAAP, and (xii) Other Cash Expenses to the extent approved by the Collateral Agent.

"Consolidated Net Income" means net income of Loan Parties (provided, however, that for the calculation of revenue on owned Accounts, revenue shall be calculated as total proceeds on such Accounts in a given period and shall not be calculated using modified cost recovery or level-yield accounting in accordance with GAAP) during the measuring period on a consolidated basis excluding:

(a)     the income (or deficit) of any Person accrued prior to the date it became a Subsidiary of, or was merged or consolidated into or amalgamated with, the Parent or any of the Parent's Subsidiaries;

(b)     the income (or deficit) of any Person (other than a Subsidiary) in which a Loan Party has an ownership interest, except to the extent any such income has actually been received by the Parent or any of its Subsidiaries in the form of cash dividends or distributions;

(c)     the undistributed earnings of any Subsidiary of the Parent that is not a Loan Party to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation or requirement of law applicable to such Subsidiary;

(d)     any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period;

(e)     any net gain attributable to the write-up of any asset;

(f)     any loss attributable to the write-down of any asset;

(g)     any net gain from the collection of the proceeds of life insurance policies;

(h)     any net gain arising from the acquisition of any securities, or the extinguishment of any Indebtedness, of the Parent or any of its Subsidiaries;

(i)     any deferred credit representing the excess of equity in any Subsidiary of the Parent at the date of acquisition of such Subsidiary over the cost to the applicable Loan Party of the investment in such Subsidiary; and

(j)     any impairment or similar charges on owned Asset Pools required under GAAP.

"Consumer Laws" (i) in the case of the United States, means all federal, state, and municipal usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board's Regulations B and Z, the Servicemembers Civil Relief Act, the Electronic Funds Transfer Act, the Graham-Leach- Bliley Act, the Consumer Financial Protection Act, the California Military Reservist Relief Act, the Texas Consumer Credit Code, the California Automobile Sales Finance Act, State adaptations of the National Consumer Act and of the Uniform Consumer Credit Code and all other federal, state and municipal financial regulatory laws and regulations thereunder, including, without limitation, respecting consumer credit, privacy, unfair and deceptive acts and practices, and equal credit opportunity and disclosure and (ii) in respect of Canada, means all federal and provincial financial regulatory laws and regulations thereunder, including, without limitation, respecting consumer credit, privacy, unfair and deceptive acts and practices, equal credit opportunity,

disclosure, and the licensing or registration of collection agencies, agents and collectors and the conduct of the activities and practices of such persons.

"Contingent Indemnity Obligations" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the Collateral Agent (and, if applicable, Pre-Petition Collateral Agent, the 1.25 Lien Agent, the 1.5 Lien Agent and the Second Lien Notes Indenture Trustee), the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC or PPSL) over such account to the Collateral Agent, as amended, amended and restated, supplemented, modified, or replaced from time to time.

"Debtor Relief Law" means the Bankruptcy Code, the BIA, the CCAA, the *Winding-Up and Restructuring Act* (Canada) and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, formal or informal moratorium, rearrangement, receivership, insolvency, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, dissolution, winding-up or other similar debtor relief law (including, without limitation, the Canada Business Corporation Act in respect of any of the foregoing) of the United States, Canada or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means, subject to Section 4.04(e), any Lender that (a) has failed to (i) fund all or any portion of its Loans within 2 Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Administrative Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within 2 Business Days of the date when due, (b) has notified the Administrative Borrower, or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within 3 Business Days after written request by the Administrative Agent or the Administrative Borrower, to confirm in writing to the Administrative Agent and the Administrative Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Administrative Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation, the Canada Deposit Insurance Corporation, or any other state or federal regulatory authority acting in such a capacity. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or Canada or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender, subject to Section 4.04(e), upon delivery of written notice of such determination to the Administrative Borrower and each Lender.

"<u>Disbursement Letter</u>" means a disbursement letter, in form and substance satisfactory to the Collateral Agent, by and among the Loan Parties, the Agents, the Lenders and the other Persons party thereto, and the related funds flow memorandum describing the sources and uses of all cash payments in connection with the transactions contemplated to occur on the Interim Facility Effective Date.

"<u>Disposition</u>" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) and (c) any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party.

"<u>Disqualified Equity Interests</u>" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, in whole or in part (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations and the termination of the Commitments), (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is 91 days after the Final Maturity Date.

"<u>Dollar</u>," "<u>Dollars</u>" and the symbol "<u>$</u>" each means lawful money of the United States of America.

"<u>eAGLE Software</u>" means the Loan Parties' proprietary collection management software.

"<u>Eligible Asset Pool</u>" means, as at any date of determination, the aggregate of all Asset Pools of the Borrowers that the Collateral Agent, in its reasonable credit judgment, deems to be eligible for borrowing purposes. Without limiting the generality of the foregoing, the Collateral Agent may determine that the following Asset Pools are not Eligible Asset Pools:

(i) Asset Pools acquired from any Asset Pool Seller that is an Affiliate of any Loan Party or a director, officer, agent, stockholder, member or employee of any Loan Party or any of its Affiliates;

(ii) more than one percent (1%) of the Receivables in such Asset Pool constitute Receivables with respect to which the Account Debtor thereon or any guarantor thereof is an Affiliate of any Loan Party or a director, officer, agent, stockholder, member or employee or any of its Affiliates;

(iii) such Asset Pool, taken as a whole, does not comply in all material respects with all applicable laws, including, but not limited to, truth in lending and credit disclosure laws and regulations;

(iv) any amounts and information appearing on the applicable Borrowing Base Certificate furnished to the Collateral Agent in connection with such Asset Pool is not true and correct in all material respects;

(v) a Borrower does not have good and marketable title and the right to pledge, assign and deliver the Accounts or Assets of such Asset Pool, free from all Liens, claims, encumbrances or security interests whatsoever other than (A) Permitted Liens in favor of the 1.25 Lien Agent, the 1.5 Lien Agent and the Second Lien Notes Indenture Trustee and (B) inchoate Permitted Liens;

(vi) since the acquisition of the Asset Pool by any Borrower, a sale of all or substantially all of the Assets within the Asset Pool has occurred (other than sales or transfers among the Borrowers);

(vii) an Asset Pool with respect to which the Collateral Agent does not have a valid, first priority and fully perfected Lien;

(ix) substantially all of the Account Debtors obligated on the Receivables in such Asset Pool are located or organized under the laws of a jurisdiction outside the United States or Canada;

(x) an Asset Pool in which more than 10% of the Account Debtors in such Asset Pool are Governmental Authorities;

(xi) an Asset Pool in which more than 10% of the Receivables in such Asset Pool have been disputed and the Borrowers have been unable to provide satisfactory validation of the obligation of the affected Account Debtors; and

(xii) any Asset Pool purchased after April 1, 2016, until the Borrowers have demonstrated in a manner reasonably satisfactory to the Collateral Agent that the Asset Pool Seller has provided (or is capable of providing upon demand within 45 days) media sufficiently demonstrating the account balance in accordance with prevailing regulatory standards on at least 90% of the Accounts within such Asset Pool.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the 6 calendar years preceding the date of any borrowing hereunder) for employees of any Loan Party or any of its ERISA Affiliates.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Loan Party or any of its Subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Canadian Environmental Protection Act (Canada), the Fisheries Act (Canada), the Environmental Protection Act (Ontario), The Transportation of Dangerous Goods Act (Canada), the Environment Act (Nova Scotia), the Clean Environment Act (New Brunswick) and related regulations, the Ontario Water Resources Act (Ontario), Environmental Protection and Enhancement Act (Alberta), Waste Management Act (British Columbia), Environment Act (Manitoba), Contaminated Sites Remediation Act (Manitoba), Environmental Management and Protection Act, 2002 (Saskatchewan), Environment Quality Act (Quebec), the Environmental Management Act (British Columbia), in each case, as such laws may be amended or otherwise modified from time to time, and any other applicable Requirement of Law, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, presence, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (a) any property presently or formerly owned by any Loan Party or any of its Subsidiaries or (b) any facility which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the

foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Parent of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"ERP" means, as of any date of determination, the aggregate gross remaining cash proceeds which are anticipated to be received by the Borrowers (excluding, for the avoidance of doubt, any amounts to be distributed to Asset Pool Sellers pursuant to sharing arrangements) over a nine-year period from their existing Eligible Asset Pools (measured from such date of determination and excluding any Account within such Eligible Asset Pools that is deemed ineligible), without giving effect to any purchases made after such date of determination, which amount shall be determined and reported by the Borrowers to the Collateral Agent in each Borrowing Base Certificate and other reporting to Agents and Lenders, calculated in a manner consistent with the Borrowers' proprietary models and past practice, using credit criteria, assumptions and methods of calculations reasonably satisfactory to the Collateral Agent; provided that, without limiting the foregoing, the ERP of each Eligible Asset Pool acquired after the Interim Facility Effective Date shall in no event exceed an amount equal to 225% of the cash purchase price paid by the Loan Parties to acquire such Eligible Asset Pool, without the prior written consent of the Collateral Agent (except with respect to any Eligible Asset Pool acquired after the Interim Facility Effective Date for a cash purchase price of $2,000,000 or less, in which case, the ERP thereof may exceed 225% of the cash purchase price paid by the Loan Parties to acquire such Eligible Asset Pool (each, a "Specified Eligible Asset Pool"); provided further that (i) the aggregate purchase price of all such Specified Eligible Asset Pools acquired during each quarter does not exceed $7,500,000 and (ii) after giving effect to the ERP for any such newly-acquired Specified Eligible Asset Pool, the weighted average ERP for all Eligible Asset Pools (including Specified Eligible Asset Pools) acquired by the Loan Parties during such quarter does not exceed 225% of the cash purchase price paid by the Loan Parties to acquire such Eligible Asset Pools (including Specified Eligible Asset Pools)), in each case, with any excess being deducted from ERP.

"ERP Report" means a report substantially in the form of Exhibit F hereof.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means (a) any deposit account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees and any similar trust accounts pursuant to which any Loan Party receives collections on behalf of third parties, (b) [intentionally omitted], (c) the deposit account ending in 1692 maintained at U.S. Bank, N.A., so long as the amount of Collections received in such deposit account does not exceed $75,000 during any trailing twelve month period and the balance in such account does not exceed the thresholds set forth in clause (d) below (when combined with the balances on deposit in the accounts described in clause (d) below), (d) any other deposit account so long as (i) the balance in any individual deposit account does not exceed $50,000 at any time, and (ii) the balance in all such deposit accounts does not exceed $100,000, (e) the accounts maintained at CoBiz Bank dba Colorado Business Bank, U.S. Bank National Association and Bank of America N.A. with up to $1,500,000 held as collateral to secure the Loan Parties' treasury service liabilities (such accounts, collectively, the "Collateral Reserve Accounts"), [(f) intentionally omitted], and (g) any other deposit account designated in writing by the Collateral Agent as an "Excluded Account".

"Excluded Canadian Subsidiary" means 2566737 Ontario, Inc., an Ontario corporation.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal or Canadian federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Sections 2.09(d), (e), (f) or (i), (d) any U.S. federal withholding Taxes imposed under FATCA and (e) any Canadian federal withholding Taxes which arise as a result of the Recipient not dealing at arm's length with a Loan Party within the meaning of the ITA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Extraordinary Receipts" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(i) or (ii) hereof), including, without limitation, (a) pension plan reversions, (b) proceeds of insurance (other than to the extent such insurance proceeds are (i) immediately payable to a Person that is not the Parent or any of its Subsidiaries in accordance with applicable Requirements of Law or with Contractual Obligations entered into in the ordinary course of

business or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any out-of-pocket costs incurred or made by such Person prior to the receipt thereof directly related to the event resulting from the payment of such proceeds), (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (d) condemnation awards (and payments in lieu thereof), (e) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Parent or any of its Subsidiaries or (ii) received by the Parent or any of its Subsidiaries as reimbursement for any costs previously incurred or any payment previously made by such Person) and (f) any purchase price adjustment received in connection with any purchase agreement.

"Facility" means any fee interest in any real property (wherever located) hereafter acquired by the Parent or any of its Subsidiaries, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"FCPA" has the meaning specified therefor in Section 6.01(cc).

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the fee letter, dated as of the date hereof, among the Borrowers, the Administrative Agent and the Collateral Agent.

"Filing Date" means the date on which the Chapter 11 Cases are commenced.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court with respect to the Loan Parties and relating to this Agreement, substantially in the form of the Interim Bankruptcy Court Order (and otherwise acceptable to the Agents), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrowers.

"Final Bankruptcy Court Order Entry Date" means the date on which the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Final Facility Effective Date" has the meaning specified therefor in Section 5.02.

"Final Maturity Date" means the date which is the earliest of (a) the date which is 35 days following the Filing Date if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date, (b) if the Final Bankruptcy Court Order has been entered by the Bankruptcy Court on or prior to the date that is 35 days following the Filing Date, then September 22, 2017, (c) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) the date of a sale of substantially all or substantially all of the assets of the Loan Parties; and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"Financial Statements" means the unaudited consolidated balance sheet of the Parent and its Subsidiaries for the 12 months ended December 31, 2016, and the related consolidated statement of operations, shareholder's equity and cash flows for the 12 months then ended.

"First Day Orders" means all orders entered by the Bankruptcy Court on the Filing Date or within five (5) Business Days of the Filing Date or based on motions filed on the Filing Date, in each case, which are reasonably acceptable to the Administrative Agent.

"First Lien Intercreditor Agreement" means the Intercreditor Agreement, dated as of May 24, 2016, by and among the Pre-Petition Collateral Agent, the 1.25 Lien Agent and the 1.5 Lien Agent and acknowledged by the Loan Parties, as amended, amended and restated, supplemented, modified, or replaced from time to time.

"Fiscal Year" means the fiscal year of the Parent and its Subsidiaries ending on December 31 of each year.

"Foreign Official" has the meaning specified therefor in Section 6.01(cc).

"Foreign Sovereign Immunities Act" means the U.S. Foreign Sovereign Immunities Act of 1976 (28 U.S.C. Sections 1602-1611), as amended.

"Franchisee" or "Franchisees" means those Person(s) who have entered into Franchising Contracts and those partners or branch offices who are collecting debt on the Borrower's behalf pursuant to contractual arrangements.

"Franchisee Program Reserve" means as of any date the Borrowing Base Certificate is delivered, the aggregate amount owed to Franchisees in connection with investments made in Asset Pools by Franchisees.

"Franchising Contracts" means all contracts pursuant to which any Borrower grants to any other Person any right, license or right to license, option or right of first refusal or

negotiation to operate franchises and businesses using any of such Borrower's Intellectual Property.

"Funding Losses" has the meaning specified therefor in Section 2.08.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 7.03 hereof and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 7.02(g) and/or Section 7.03 hereof, the Collateral Agent and the Administrative Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lenders and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 7.02(g) and/or Section 7.03 hereof shall be calculated as if no such change in GAAP has occurred.

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any foreign, federal (including the federal government of Canada), state, provincial, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto and (b) each Person that guarantees, pursuant to Article XI, Section 7.01(b), a Canadian Guaranty or otherwise, all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each U.S. Loan Party and each Canadian Loan Party contained in Article XI hereof, (b) each Canadian Guaranty, if any, and (c) each other guaranty, in form and substance reasonably satisfactory to the Collateral Agent, made by any

other Person in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdout Lender" has the meaning specified therefor in Section 12.02(b).

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created), including any earn-out or similar obligations (other than sharing arrangements with Asset Pool Sellers); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and

similar facilities; (g) liabilities, calculated on a marked to market basis in accordance with GAAP, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations relating to obligations described in clauses (a) through (h) of this definition; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer, except to the extent that such Person is not liable for such Indebtedness.

"Indemnified Matters" has the meaning specified therefor in Section 12.15.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified therefor in Section 12.15.

"Initial Budget" means the Budget delivered to the Agents on or prior to the Interim Facility Effective Date pursuant to Section 5.01(f)(xii).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreement, and includes, for the avoidance of doubt, the eAGLE Software.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement made by the Parent and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"Intercreditor Agreements" shall mean, collectively, the First Lien Intercreditor Agreement, the 1.25 Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Reference Rate Loan to a LIBOR Rate Loan) and ending 1, 2, or 3 months thereafter, as selected by the Administrative Borrower; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such

Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2 or 3 months after the date on which the Interest Period began, as applicable, and (e) the Borrowers may not elect an Interest Period which will end after the Final Maturity Date.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Loan Parties and relating to this Agreement, substantially in the form of Exhibit H, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrowers.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Interim Facility Effective Date" means the date that is no later than five (5) Business Days following the Filing Date, on which all of the conditions precedent set forth in Section 5.01 are satisfied.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Final Maturity Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"ITA" means the Income Tax Act (Canada), as the same may be amended from time to time, in effect.

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"Judgment Reserve" means the amount of any money judgments, writs or warrants of attachment, or similar process with respect to which the appropriate Loan Party has notified the insurance company but for which the insurance company has not affirmatively acknowledged coverage within thirty (30) days of receiving such notice.

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" has the meaning specified therefor in the preamble hereto.

"Liabilities" shall have the meaning given that term in accordance with GAAP and shall include, without limitation, Indebtedness.

"LIBOR" means, with respect to any LIBOR Loan for any Interest Period, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on page LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time. "Interpolated Rate" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"LIBOR Deadline" has the meaning specified therefor in Section 2.07(a).

"LIBOR Notice" means a written notice substantially in the form of Exhibit D.

"LIBOR Option" has the meaning specified therefor in Section 2.07(a).

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the greater of (a) the rate per annum determined by the Administrative Agent (rounded upwards if necessary, to the next 1/100%) by dividing (i) LIBOR for such Interest Period by (ii) 100% minus the Reserve Percentage and (b) 1.0%. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"LIBOR Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Light Users" shall mean those attorneys retained by a Loan Party to collect an Account through legal action.

"Loan" means any Revolving Loan made by an Agent or a Lender to the Borrowers pursuant to ARTICLE II hereof.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Document" means this Agreement, any Control Agreement, the Disbursement Letter, the Fee Letter, any Guaranty, the Intercompany Subordination Agreement, the First Lien Intercreditor Agreement, any Joinder Agreement, any Mortgage, any Security Agreement, any UCC Filing Authorization Letter, any landlord waiver, any collateral access agreement, any Perfection Certificate, the Second Lien Intercreditor Agreement, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order, the Pre-Petition Collateral Agreements and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Loan Party" means any Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of the amount set forth for any Budget Period in any line item of the Initial Budget under the heading "Inflows" or "Outflows" that results in (a) any receipts being less than 80% of the amount set forth in any line item of the Initial Budget for any Budget Period under the heading "Total Cash Receipts"; provided, that, if for any Budget Period, the actual cash receipts are in excess of 100% of the amount set forth in the Initial Budget for such period under the heading "Total Cash Receipts" (such excess over 100%, the "Carry Forward Amount"), then, for purposes of determining whether there was a Material Adverse Deviation during the immediately succeeding Budget Period, the amount of cash receipts for such Budget Period may be increased by the Carry Forward Amount, or (b) any cash disbursements being more than 120% of the amount set forth in the Initial Budget for any Budget Period under the heading "Total Cash Disbursements".

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities or financial condition of the Loan Parties taken as a whole (except for the commencement of the Bankruptcy Cases and events that typically result from the

commencement of cases under Chapter 11 of the Bankruptcy Code or under the CCAA, as applicable), (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on Collateral having a fair market value in excess of $500,000.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgage</u>" means a mortgage, deed of trust or deed to secure debt, in form and substance reasonably satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding 6 years, but, for greater certainty, does not include any Canadian Benefit Plans or Canadian Pension Plans.

"<u>NERP</u>" means, as of any date of determination, the difference between (a) ERP as of such date of determination, and (b) the sum of the estimated (i) servicing fees reasonably satisfactory to the Collateral Agent and (ii) reasonable court costs, in each case, as of such date of determination, with respect to (or allocated to) such existing Eligible Asset Pools, which estimated expenses and costs shall be calculated in a manner consistent with past practice and consistent with Borrowers' proprietary models, using assumptions and methods of calculations reasonably satisfactory to the Collateral Agent.

"<u>Net Cash Proceeds</u>" means, with respect to, any issuance or incurrence of any Indebtedness, any Equity Issuance, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable fees, commissions and expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid or reasonably expected to be paid to any taxing authorities by such Person or such Subsidiary in connection therewith, (d) net income taxes or repatriation taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof, and (e) appropriate amounts to be provided by the Person or a Subsidiary as a reserve in accordance

with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Person or a Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"New Lending Office" has the meaning specified therefor in Section 2.09(e).

"New Preferred Stock" shall mean a new class of participating convertible Equity Interests of the Parent with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(e).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees (including the fees provided for in the Fee Letter), premiums, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its reasonable discretion) may elect to pay or advance on behalf of such Person.

"OFAC Sanctions Programs" means (a) the Requirements of Law and Executive Orders administered by OFAC, including, without limitation, Executive Order No. 13224, and (b) the list of Specially Designated Nationals and Blocked Persons administered by OFAC, in each case, as renewed, extended, amended, or replaced.

"Other Cash Expenses" means expenses in an aggregate amount during any trailing twelve (12) month period not to exceed $2,500,000 consisting of (a) recruiting expenses that are incurred by the Parent or any of its Subsidiaries during such period, (b) for the 2016 Fiscal Year, lease breakage costs associated with any Loan Party's relocation to a new office, (c) severance and related expenses that are incurred by the Parent or any of its Subsidiaries during such period, (d) reserves on franchise notes receivable, (e) transaction expenses associated with any Permitted Disposition, and (f) to the extent acceptable to the Collateral Agent, other non-recurring expenses.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received

or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant Register" has the meaning specified therefor in Section 12.07(i).

"Payment Office" means the Administrative Agent's office located at 875 Third Avenue, New York, New York 10022, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Administrative Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Perfection Certificate" means a certificate in form and substance reasonably satisfactory to the Collateral Agent providing information with respect to the property of each Loan Party.

"Period" means the Interim Period or the Final Period, as the context requires.

"Permitted Business" shall mean the business of purchasing, managing, collecting and selling of charged-off, delinquent or distressed receivables, loans and other obligations.

"Permitted Discretion" means, as to any Agent or Lender, as the case may be, a determination made in good faith and in the exercise of commercially reasonable (from the perspective of a secured asset based lender) business judgment exercised in accordance with generally applicable practices of such Agent or Lender for transactions of this type.

"Permitted Disposition" means:

(a)     licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business consistent with past practice;

(b)     leasing or subleasing assets in the ordinary course of business;

(c)     (i) the lapse of Registered Intellectual Property of the Parent and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(d)     any involuntary loss, damage or destruction of property;

(e)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(f)     so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets (i) from the Parent or any of its Subsidiaries (other than the Borrowers) to a Loan Party (other than the Parent), and (ii) from any Subsidiary of the Parent that is not a Loan Party to any other Subsidiary of the Parent;

(g)     Dispositions of obsolete or worn-out equipment in the ordinary course of business consistent with past practice;

(h)     Dispositions of individual Asset Pools in the ordinary course of business, consistent with past practice for cash; <u>provided</u> that (i) the Net Cash Proceeds of all such Dispositions do not exceed $1,000,000 during the term of this Agreement, and (ii) the aggregate amount of ERP sold pursuant to this clause (h) during the term of this Agreement does not exceed $2,000,000;

(i)     [intentionally omitted];

(j)     sales or dispositions of Cash Equivalents for not less than fair market value thereof and in return for cash or Cash Equivalent; and

(k)     any Permitted Lien or any Permitted Investment;

<u>provided</u> that the Net Cash Proceeds of such Dispositions are paid to the Administrative Agent for the benefit of the Agents and the Lenders pursuant to the terms of Section 2.05(c)(i).

"<u>Permitted Indebtedness</u>" means:

(a)     any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)     Indebtedness existing on the Filing Date (other than any Pre-Petition Obligations);

(c)     Permitted Purchase Money Indebtedness;

(d)     Permitted Intercompany Investments;

(e)     Indebtedness incurred in the ordinary course of business under performance, surety, statutory and appeal bonds and similar obligations in an aggregate amount since the Filing Date not to exceed $250,000;

(f)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

(g)     [intentionally omitted];

(h)     Indebtedness in respect of letters of credit required in the ordinary course of business, consistent with past practice, having an aggregate face amount not exceeding $250,000 in the aggregate since the Filing Date;

(i)     [intentionally omitted];

(j)     Indebtedness arising under Hedging Agreements so long as the purpose of any such agreement is a bona fide hedging activity (and is not for speculative purposes) and the terms of such Hedging Agreement are approved by the Collateral Agent; and

(k)     Indebtedness in respect of the Pre-Petition Obligations.

"Permitted Intercompany Investments" means Investments made by (a) a Loan Party to or in another Loan Party, (b) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party, and (c) a Subsidiary that is not a Loan Party to or in a Loan Party, so long as, in the case of a loan or advance, the parties thereto are party to the Intercompany Subordination Agreement.  Upon the request of the Administrative Agent at any time, such Investment if made in the form of Indebtedness shall be evidenced by promissory notes having terms reasonably satisfactory to the Collateral Agent, the sole originally executed counterparts of which shall be pledged and delivered to the Collateral Agent, for the benefit of the Agents and Lenders, as security for the Obligations

"Permitted Investments" means:

(a)     Investments in cash and Cash Equivalents, provided that such cash and Cash Equivalents are subject to Control Agreements in favor of the Collateral Agent and not subject to set-off rights;

(b)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)     advances made in connection with purchases of goods or services in the ordinary course of business;

(d)     Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e)     Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof;

(f)     Permitted Intercompany Investments;

(g)     (i) loans and advances to employees of the Parent and its Subsidiaries for moving, entertainment, travel and other similar expenses in the ordinary course of business following the Filing Date not to exceed $250,000 in the aggregate at any time outstanding, and (ii) non-cash loans to employees of the Parent or its Subsidiaries or Franchisees which are used solely by such Person to simultaneously purchase the Equity Interests of the Parent;

(h)     advances and loans to Franchisees in the ordinary course of business and consistent with past practices, provided that (i) the aggregate amount of any such loans and advances to a Franchisee following the Filing Date does not exceed $2,300,000 and (ii) no Default or Event of Default has occurred and is continuing at the time of, or would result after giving effect to, any such advance or loan;

(i)     Loan Parties may make capital or asset contributions to the Excluded Canadian Subsidiary, solely to permit the Excluded Canadian Subsidiary to pay certain professional fees and expenses in accordance with the Initial Budget; provided, that any such amounts set forth in the Initial Budget may be contributed to the Excluded Canadian Subsidiary no more than 3 Business Days prior to such fees and expenses are due and payable; and

(j)     Investments pursuant to Hedging Agreements, to the extent constituting Permitted Indebtedness.

"Permitted Liens" means:

(a)     Liens securing the Obligations;

(b)     Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(c)(ii);

(c)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)     Liens described on Schedule 7.02(a), provided that any such Lien shall only secure the Indebtedness that it secures on the Interim Facility Effective Date and any Permitted Refinancing Indebtedness in respect thereof;

(e)     purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only (i) attaches to such property and (ii) secures the Indebtedness that was incurred to acquire such property or any Permitted Refinancing Indebtedness in respect thereof;

(f)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of

money) and statutory obligations, (iii) obligations incurred in reliance on clause (e) of the definition of "Permitted Indebtedness"; (iv) Liens securing the financing of insurance premiums; or (v) credit card merchant services; provided, that in the case of this clause (v), such deposits and pledges made after the Filing Date shall not exceed $250,000 in the aggregate;

(g)     with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)     Liens of landlords and mortgagees of landlords (i) arising by statute or under any lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)     the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)     non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k)     judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(l)     rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m)     Liens securing the 1.25 Lien Obligations, the 1.5 Lien Obligations and the Second Lien Obligations to the extent such Liens are subject to the terms and conditions of each applicable Intercreditor Agreement;

(n)     Liens on cash securing Indebtedness in respect of letter of credit permitted pursuant to clause (h) of the definition of "Permitted Indebtedness" in an aggregate amount not to exceed 105% of the lower of the face amount and the available amount of such letters of credit;

(o)     Liens on Receivables deemed to exist pursuant to agreements whereby the Asset Pool Seller of such Receivables retains the right to repurchase such Receivables so long as the price for such repurchase is at least equal to the purchase price paid to such Asset Pool Seller for such Receivable;

(p)     Liens arising from the sale of Accounts, Payment Intangibles or Promissory Notes to the extent (i) such sale is permitted pursuant to Section 7.02(c) and (ii) such

Liens relate only to the assets that were the subject of such sale and are no longer owned by any Loan Party;

(q) deposits and pledges of cash held in the Collateral Reserve Accounts not to exceed $1,500,000; and

(r) Liens securing the Pre-Petition Obligations.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided that (a) such Indebtedness is incurred within 20 days after such acquisition, (b) such Indebtedness when incurred shall not exceed the purchase price of the asset financed and (c) the aggregate principal amount of all such Indebtedness incurred after the Filing Date shall not exceed $125,000 at any time outstanding.

"Permitted Refinancing Indebtedness" means the extension of maturity, refinancing or modification of the terms of Indebtedness so long as:

(a) after giving effect to such extension, refinancing or modification, the amount of such Indebtedness is not greater than the amount of Indebtedness outstanding immediately prior to such extension, refinancing or modification;

(b) such extension, refinancing or modification does not result in a shortening of the average weighted maturity (measured as of the extension, refinancing or modification) of the Indebtedness so extended, refinanced or modified;

(c) such extension, refinancing or modification is pursuant to terms that are not less favorable to the Loan Parties and the Lenders than the terms of the Indebtedness (including, without limitation, terms relating to the collateral (if any), economics and subordination (if any)) being extended, refinanced or modified; and

(d) the Indebtedness that is extended, refinanced or modified is not recourse to any Loan Party or any of its Subsidiaries that is liable on account of the obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a) direct or indirect Subsidiaries of the Parent may make Restricted Payments to the Parent or to any Loan Party;

(b) the Parent to pay dividends in the form of common Equity Interests or additional New Preferred Stock (including payments of dividends and distributions in kind with respect to the New Preferred Stock), provided such New Preferred Stock constitutes Qualified Equity Interests; and

(c)     payment of director's fees not to exceed $500,000 in the aggregate for any Fiscal Year of the Borrower.

"Permitted Specified Liens" means Permitted Liens described in clauses (a), (b) and (c) of the definition of Permitted Liens, and, solely in the case of Section 7.01(b)(i), including clauses (f), (h) and (i) of the definition of Permitted Liens.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Plan" means any Employee Plan or Multiemployer Plan.

"Plan of Reorganization" means the plan of reorganization agreed upon pursuant to the Plan Support Agreement and otherwise in form and substance satisfactory to the Agents and the Required Lenders.

"Plan Support Agreement" means that certain Restructuring Support Agreement, dated as of March 3, 2017, entered into by and among the Loan Parties, the Agents, the Lenders, the Pre-Petition Lenders, the Lenders, the 1.25 Lien Agent, the 1.25 Lien Lenders, the 1.5 Lien Agent and certain of the 1.5 Lien Lenders.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.0%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.0%.

"Pre-Petition Administrative Agent" has the meaning specified in the recitals hereto.

"Pre-Petition Collateral Agent" has the meaning specified in the recitals hereto.

"Pre-Petition Collateral Agreements" has the meaning given to the collective terms "Security Agreement" in the Pre-Petition Financing Agreement.

"Pre-Petition Lenders" has the meaning specified in the recitals hereto.

"Pre-Petition Loans" means, collectively, the Pre-Petition Term Loans and the Pre-Petition Revolving Loans.

"Pre-Petition Financing Agreement" has the meaning specified in the recitals hereto.

"Pre-Petition Obligations" means all indebtedness, obligations and liabilities of the Company and the Guarantors to the Pre-Petition Agents and the Pre-Petition Lenders incurred prior to the Filing Date arising from or related to the Pre-Petition Financing Agreement and the other agreements, instruments and other documents related thereto plus fees, expenses, yield maintenance and prepayment premiums, indemnities and reimbursement obligations due

thereunder and interest thereon accruing both before and after the Filing Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Pre-Petition Revolving Loans" means any revolving loans outstanding under the Pre-Petition Financing Agreement.

"Pre-Petition Revolving Loan Balance" has the meaning specified in the recitals hereto.

"Pre-Petition Term Loans" means any term loans outstanding under the Pre-Petition Financing Agreement.

"Priority Professional Expenses" means those Carve-Out Expenses entitled to a priority as set forth in sub-clause (ii) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Pro Rata Share" means, the percentage obtained by dividing (A) such Lender's Revolving Credit Commitment, by (B) the Total Revolving Credit Commitment, provided that, if the Total Revolving Credit Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving Loans (including Collateral Agent Advances) and the denominator shall be the aggregate unpaid principal amount of all Revolving Loans (including Collateral Agent Advances).

"Process Agent" has the meaning specified therefor in Section 12.10(b).

"Professional Expense Cap" has the meaning specified in subclause (ii) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Purchase Agreement" means the Plan Funding Agreement, dated as of March 3, 2017, among the Parent, Collect America of Canada, LLC and Resurgent Holdings LLC.

"Qualified Equity Interests" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"Receivable(s)" shall mean a purchased Account or Accounts in the name of an Account Debtor, as set forth and described in a purchase agreement between any Loan Party and any Asset Pool Seller for the purchase of an Asset Pool, and all unpaid balances due from such Account Debtor, together with (to the extent available) all documents evidencing such Account Debtor's agreement to make payment of such unpaid balances, including, without limitation, each credit card application or agreement, and each promissory note, receivable, obligation, chattel paper, payment agreement, contract, installment sale agreement or other obligation or promise to pay of an Account Debtor, all as described and referred to in such purchase agreement.

"Recipient" means any Agent and any Lender, as applicable.

"<u>Reference Rate</u>" means, for any period, the greatest of (a) 3.0% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of 1 month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"<u>Reference Rate Loan</u>" means each portion of a Loan that bears interest at a rate determined by reference to the Reference Rate.

"<u>Register</u>" has the meaning specified therefor in Section 12.07(f).

"<u>Registered Intellectual Property</u>" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"<u>Registered Loans</u>" has the meaning specified therefor in Section 12.07(f).

"<u>Regulation T</u>", "<u>Regulation U</u>" and "<u>Regulation X</u>" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"<u>Related Fund</u>" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"<u>Rent Reserve</u>" means, at all times that there is no landlord's agreement in effect with respect to the Parent's chief executive office and the Canadian Loan Parties' Newmarket, Ontario location, an amount equal to three (3) months' rent under the lease with respect to such location.

"<u>Remedial Action</u>" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Replacement Lender" has the meaning specified therefor in Section 12.02(b).

"Reportable Event" means an event described in Section 4043 of ERISA (other than the commencement of the Bankruptcy Cases, and any event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means Lenders whose Pro Rata Shares aggregate more than 50%.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Reserves" means, as of any date of determination, such amounts as the Collateral Agent may from time to time establish in its good faith exercise of its Permitted Discretion (a) to reflect events, conditions, contingencies or risks arising which adversely affect (i) any Collateral or any Agent's access thereto, (ii) the priority, perfection or enforceability of any of the security interests of any Agent or any Lender in any Collateral, or (iii) the Agents' and the Lenders' ability to receive repayment of the Obligations in full, or (b) in respect of any state of facts which the Collateral Agent reasonably determines in its good faith reasonable discretion to constitute a Default or an Event of Default. Reserves shall include, without limitation, the Franchisee Program Reserve, the Canadian Priority Reserve, the Judgment Reserve, the Rent Reserve, permanent Reserves imposed pursuant to Section 2.05(d) and a reserve in an amount equal to the Professional Expense Cap.

"Restricted Payment" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity

Interests, warrants, rights, options, obligations or securities thereto as such, (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party, other than payment of compensation in the ordinary course of business and consistent with past practices to equityholders who are employees of such Loan Party and other than payments to Franchisees under the Franchising Contracts in the ordinary course of business and consistent with past practices, or (f) payments to any Subsidiary or any Affiliate that is not a debtor-in-possession in any of the Bankruptcy Cases.

"Revolving Credit Commitment" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrowers in the amount set forth opposite such Lender's name in Schedule 1.01(A) hereto or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving Loan" means a loan made by a Revolving Loan Lender to the Borrowers pursuant to Section 2.01(a).

"Revolving Loan Lender" means a Lender with a Revolving Credit Commitment or a Revolving Loan.

"Sale and Leaseback Transaction" means, with respect to the Parent or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Parent or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Second Lien Intercreditor Agreement" shall mean the Second Lien Intercreditor Agreement, dated as of May 24, 2016, by and among the Second Lien Notes Indenture Trustee, the 1.50 Lien Agent, the 1.25 Lien Agent and the Pre-Petition Collateral Agent and acknowledged by the Borrowers and Guarantors, as amended, amended and restated, supplemented, modified or replaced from time to time.

"Second Lien Note Documents" means the Second Lien Indenture, the Second Lien Notes and any security agreement and any other document, instrument or agreement executed and delivered by a Loan Party for the benefit of the Second Lien Noteholders in connection therewith, in each case, as amended, amended and restated, supplemented, modified, refinanced or replaced from time to time in accordance with this Agreement and the Second Lien Intercreditor Agreement.

"Second Lien Noteholders" means, the purchasers of Second Lien Notes under the Second Lien Indenture from time to time.

"Second Lien Notes" shall mean the Borrower's 11.625% Senior Second Lien Notes due 2017 issued pursuant to the Second Lien Notes Indenture.

"Second Lien Notes Indenture" means, the Indenture, dated as of April 7, 2010, with respect to the 11.625% Senior Second Lien Notes due 2017, between the Parent, as issuer, and U.S. Bank National Association, as the Second Lien Notes Indenture Trustee, as the same may be amended, modified, supplemented, replaced, renewed or refinanced from time to time in accordance with the terms of this Agreement and the Second Lien Intercreditor Agreement.

"Second Lien Notes Indenture Trustee" shall mean the trustee under the Second Lien Notes Indenture.

"Second Lien Obligations" means the obligations of the Parent and its Subsidiaries owing to the Second Lien Notes Indenture Trustee and the Second Lien Noteholders under the Second Lien Note Documents.

"Secured Party" means any Agent, and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreement" means the Canadian Security Agreement or any other security agreement securing the Obligations, as amended, amended and restated, supplemented, modified, or replaced from time to time.

"Specified Eligible Asset Pool" has the meaning specified therefor in the definition of "ERP".

"SquareTwo Canada" means SquareTwo Financial Canada Corporation, a Nova Scotia, Canada company.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subordinated Indebtedness" means any Indebtedness of any Loan Party the terms of which (including, without limitation, payment terms, interest rates, covenants, remedies, defaults and other material terms) are reasonably satisfactory to the Collateral Agent and which has been expressly subordinated in right of payment to all Indebtedness of such Loan Party under the Loan Documents (i) by the execution and delivery of a subordination agreement, in form and substance reasonably satisfactory to the Collateral Agent, or (ii) otherwise on terms and conditions reasonably satisfactory to the Collateral Agent.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person. References to a Subsidiary shall mean a Subsidiary of the Parent unless the context expressly provides otherwise.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the first date on which all of the Obligations are paid in full in cash, other than Contingent Indemnity Obligations, and the Commitments of the Lenders are terminated.

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Loan Party or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan; provided, however, no Termination Event shall be deemed to have occurred as a result of the commencement of the Bankruptcy Cases.

"Total Revolving Credit Commitment" means the sum of the amounts of the Lenders' Revolving Credit Commitments.

"Transactions" has the meaning specified therefor in the Pre-Petition Financing Agreement.

"Transferee" has the meaning specified therefor in Section 2.09(a).

"UCC Filing Authorization Letter" means a letter duly executed by each Loan Party authorizing the Collateral Agent to file appropriate financing statements on Form UCC-1 without the signature of such Loan Party in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement and each Mortgage.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04.

"Unused Line Fee" has the meaning specified therefor in Section 2.06.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Guarantor" means any Guarantor organized or incorporated under the laws of a jurisdiction in the United States.

"U.S. Loan Party" means any Loan Party organized or incorporated under the laws of a jurisdiction in the United States of America.

"U.S. Subsidiary" shall mean any Subsidiary organized or incorporated under the laws of a jurisdiction in the United States of America.

"Voting Stock" of any Person as of any date means the Equity Interests of such Person that are at the time entitled to vote in the election of the Board of Directors of such Person.

"Walker" means Christopher Walker, an individual.

"WARN" has the meaning specified therefor in Section 6.01(p).

"Withholding Agent" means any Loan Party and the Administrative Agent.

Section 1.02   Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".   Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same

meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03   Certain Matters of Construction.  References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04   Accounting and Other Terms.

(a)      Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.01, Section 7.02 and Section 7.03, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the

aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time). Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 840 on the definitions and covenants herein, GAAP as in effect on the Interim Facility Effective Date shall be applied and (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)     All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code" or the "UCC") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine, and when used to define a category or categories of the Canadian Collateral owned or hereafter acquired by such Person, such terms shall include the equivalent category or categories of property set forth in the Canadian PPSL. Notwithstanding the foregoing, and where the context so requires, (i) any term defined in this Agreement by reference to the "Code", the "UCC" or the "*Uniform Commercial Code*" shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the *Personal Property Security Act* of each applicable province of Canada, the *Bills of Exchange Act* (Canada) and the *Depository Bills and Notes Act* (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Collateral, (ii) all references in this Agreement to "Article 8" shall be deemed to refer also to applicable Canadian securities transfer laws (including, without limitation, the *Securities Transfer Act* (Ontario) and the *Securities Transfer Act* (Nova Scotia) (collectively, the "STA")), (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, including, without limitation, where applicable, financing change statements, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, and (v) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal and provincial securities laws in Canada.

Section 1.05    Time References; Notices.    Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day. For purposes of the computation of a period of time from

a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.  Except as otherwise expressly provided in this Agreement, any notice or report specified to be due hereunder on a date that is not a Business Day shall be due on the next Business Day following such due date.

Section 1.06   Obligation to Make Payments in Dollars.  All payments to be made by any Loan Party of principal, interest, fees and other Obligations under any Loan Document shall be made in Dollars in same day funds, and no obligation of any Loan Party to make any such payment shall be discharged or satisfied by any payment other than payments made in Dollars in same day funds.

## ARTICLE II

## THE LOANS

Section 2.01   Commitments.  (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Revolving Loan Lender severally agrees to make Revolving Loans to the Borrowers at any time and from time to time during the term of this Agreement, in an aggregate principal amount of Revolving Loans at any time outstanding not to exceed the amount of such Lender's Revolving Credit Commitment.

(b)   Notwithstanding the foregoing, the aggregate principal amount of Revolving Loans outstanding at any time to the Borrowers shall not exceed the least of (A) the Total Revolving Credit Commitment, (B) the then current Borrowing Base and (C) the maximum principal amount of Revolving Loans permitted by the Bankruptcy Court Orders.  The Revolving Credit Commitment of each Lender shall automatically and permanently be reduced to zero on the Final Maturity Date.  Within the foregoing limits, the Borrowers may borrow, repay and reborrow, the Revolving Loans on or after the Interim Facility Effective Date and prior to the Final Maturity Date, subject to the terms, provisions and limitations set forth herein.

Section 2.02   Making the Loans.  (a)  The Administrative Borrower shall give the Administrative Agent prior notice, in substantially the form of Exhibit C hereto (a "Notice of Borrowing"), not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the date of the proposed Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time, but in no event later than 12:00 noon (New York City time) on the borrowing date of the proposed Loan).  Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan, (ii) whether the Loan is requested to be a Reference Rate Loan or a LIBOR Rate Loan and, in the case of a LIBOR Rate Loan, the initial Interest Period with respect thereto, (iii) the use of the proceeds of such proposed Loan, and (iv) the proposed borrowing date, which must be a Business Day.  The Administrative Agent and the Lenders may act without liability upon the basis of notice believed by the Administrative Agent in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Administrative Agent).  The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the

Borrowers until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)     Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith. Each Revolving Loan shall be made in a minimum amount of $500,000 and shall be in an integral multiple of $200,000.

(c)     All Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Total Revolving Credit Commitment, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

Section 2.03   Repayment of Loans; Evidence of Debt.   (a) The outstanding principal of all Revolving Loans shall be due and payable on the earlier to occur of (i) the Final Maturity Date and (ii) the date on which they are declared due and payable pursuant to the terms of this Agreement.

(b)     [Intentionally omitted].

(c)     [Intentionally omitted].

(d)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(e)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(f)     The entries made in the accounts maintained pursuant to Section 2.03(d) or Section 2.03(e) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.03(d) and the accounts maintained pursuant to Section 2.03(e), the accounts maintained pursuant to Section 2.03(e) shall govern and control.

(g)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in a form furnished by the Collateral Agent and reasonably acceptable to the Administrative Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the payee named therein.

Section 2.04    Interest.

(a)     Revolving Loans.  Subject to the terms of this Agreement, at the option of the Administrative Borrower, each Revolving Loan shall be either a Reference Rate Loan or a LIBOR Rate Loan.  Each Revolving Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin.  Each Revolving Loan that is a LIBOR Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the LIBOR Rate for the Interest Period in effect for such Loan plus the Applicable Margin.

(b)     [Intentionally omitted].

(c)     Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of any Event of Default, at the election of the Collateral Agent or the Required Lenders (which election may be made retroactive to the date of the occurrence of the applicable Event of Default), in each case, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(d)     Interest Payment.  Interest on each Loan shall be payable (i) monthly, in arrears, on the last day of each month, commencing on the last day of the month in which such Loan is made and (ii) at maturity (whether upon demand, by acceleration or otherwise.  Interest at the Post-Default Rate shall be payable on demand.  Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, but shall not be required to, charge the Loan Account of the Borrowers pursuant to Section 4.01, with the amount of any interest payment due hereunder.

(e)     General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

(f)     Interest Act (Canada); Criminal Rate of Interest; Nominal Rate of Interest.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document:

(i)     For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to

be calculated on the basis of a 360-day year (or any period less than the actual number of days in the calendar year for which such calculation is made), the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used <u>multiplied by</u> the actual number of days in the calendar year in which the same is to be ascertained and <u>divided by</u> 360 (or such other period of calculation). The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(ii)     Any provision of this Agreement that would oblige a Canadian Loan Party to pay any fine, penalty or rate of interest on any arrears of principal or interest secured by a mortgage on real property or hypothec on immovables that has the effect of increasing the charge on arrears beyond the rate of interest payable on principal money not in arrears shall not apply to such Canadian Loan Party, which shall be required to pay interest on money in arrears at the same rate of interest payable on principal money not in arrears.

(iii)     If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to the Agents in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by such Agent of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by such Agent of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(A)     first, by reducing the amount or rate of interest calculated under this Section; and

(B)     thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if the Lenders shall have received an amount in excess of the maximum permitted by that section of the *Criminal Code* (Canada), the Loan Parties shall be entitled, by notice in writing to the Administrative Agent, to obtain reimbursement from the Lenders in an amount equal to such excess and, pending such reimbursement, such amount shall be deemed to be an amount payable by the Lenders to the Borrower. Any amount or rate of interest referred to in this Section shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the applicable Loan remains outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period from the Interim Facility Effective Date to the Final Maturity Date and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

Section 2.05    Reduction of Commitment; Prepayment of Loans.

(a)    Reduction of Revolving Credit Commitments. The Total Revolving Credit Commitment shall terminate on the Final Maturity Date.

(b)    Optional Prepayment.

(i)    Revolving Loans.  The Borrowers may, at any time and from time to time, prepay the principal of any Revolving Loan, in whole or in part.

(ii)    [Intentionally omitted].

(iii)    Termination of Agreement.  The Borrowers may, upon at least 10 days (or such shorter period as the Administrative Agent may agree) prior written notice to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations, other than Contingent Indemnity Obligations, in full.  If the Administrative Borrower has sent a notice of termination pursuant to this Section 2.05(b)(iii), then the Lenders' obligations to extend credit hereunder shall terminate and the Borrowers shall be obligated to repay the Obligations, in full; provided that such notice of termination may be rescinded (and/or updated to provide a new payoff date) by the Administrative Borrower if any transaction involving the refinancing or repayment of the Obligations fails to close.

(c)    Mandatory Prepayment.

(i)    Not later than five (5) Business Days following any Disposition (excluding Dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (e) and (f) of the definition of Permitted Disposition) by any Loan Party or its Subsidiaries (x) in excess of $500,000 for any single Disposition or series of related Dispositions, or (y) notwithstanding anything to the contrary contained in clause (x), in excess of $1,000,000 for all such Dispositions made during such Fiscal Year, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition.  Nothing contained in this Section 2.05(c)(i) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c)(ii).

(ii)    Not later than five (5) Business Days following the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.  The provisions of this Section 2.05(c)(ii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iii)    Not later than five (5) Business Days following the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, such that the aggregate amount of Extraordinary Receipts received during such Fiscal Year exceeds $1,500,000, the Borrowers shall prepay the outstanding principal of the Loans in accordance with Section 2.05(d)

in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.

(iv)     Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the Loans in whole or in part, the Borrowers shall prepay the Loans in full on the date which is thirty-five (35) days following the Filing Date in the event that that Final Bankruptcy Court Order shall not have been entered on or before such date.

(v)     The Borrowers will immediately prepay the Revolving Loans at any time when the aggregate principal amount of all Revolving Loans exceeds the Borrowing Base, to the full extent of any such excess.  On each day that any Revolving Loans are outstanding, the Borrowers shall hereby be deemed to represent and warrant to the Agents and the Lenders that the Borrowing Base equals or exceeds the aggregate principal amount of all Revolving Loans outstanding on such day.

(vi)     <u>Avoided Payments</u>.  In the event that the Lenders are required to repay or disgorge to the Borrowers, or any representatives of the Borrowers' estate, and have repaid, all or any portion of the Pre-Petition Obligations authorized and directed to be repaid pursuant to any Bankruptcy Order, as the case may be, or any payment on account of the Pre-Petition Obligations made to any Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of the Bankruptcy Code or any applicable state law, or any other similar provisions under any other state or federal statutory or common law (all such amounts being hereafter referred to as the "<u>Avoided Payments</u>"), then, in such event, the Borrowers shall prepay the Loans hereunder in amount equal to 100% of such Avoided Payments (with a corresponding permanent reduction in the Revolving Credit Commitments) immediately upon receipt of the Avoided Payments by the Borrowers or any representative of the Borrowers' estate.

(d)     <u>Application of Payments</u>.  Each prepayment pursuant to subsections (c)(i), (c)(ii) and (c)(iii) above (other than prepayments made with the proceeds of assets included in the Borrowing Base immediately prior to such prepayment) shall be applied to the Revolving Loans (with a corresponding permanent reduction in the Revolving Credit Commitments), until paid in full.  Each prepayment pursuant to subsections (c)(i), (c)(ii) and (c)(iii) above made with the proceeds of assets included in the Borrowing Base immediately prior to such prepayment shall be applied to the Revolving Loans (without a corresponding permanent reduction in the Revolving Credit Commitments), until paid in full.   All such prepayments (other than prepayments made with the proceeds of assets included in the Borrowing Base immediately prior to such prepayment) shall be accompanied by a permanent Reserve against the Borrowing Base in an amount equal to the amount of such prepayment.  Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, if the Administrative Agent has elected, or has been directed by the Collateral Agent or the Required Lenders, to apply payments in respect of any Obligations in accordance with Section 4.03(b), prepayments required under Section 2.05(c) shall be applied in the manner set forth in Section 4.03(b).

(e)     Interest and Fees.  Any prepayment made pursuant to this Section 2.05 (other than prepayments made pursuant to subsection (c)(v) of this Section 2.05) shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment, (ii) any Funding Losses payable pursuant to Section 2.08 and (iii) if such prepayment would reduce the amount of the outstanding Loans to zero at a time when the Total Revolving Credit Commitment has been terminated, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)     Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06   Fees.

(a)     Unused Line Fee.  From and after the Interim Facility Effective Date and until the Termination Date, the Borrowers shall pay to the Administrative Agent for the account of the Revolving Loan Lenders, in accordance with their Pro Rata Shares, except as otherwise agreed in a written agreement among the Agents and the Lenders, monthly in arrears on the last day of each month commencing March 31, 2017, an unused line fee (the "Unused Line Fee"), which shall accrue at the rate per annum of 0.5% on the excess, if any, of the Total Revolving Credit Commitment over the sum of the average principal amount of all Revolving Loans outstanding from time to time during the preceding month.

(b)     [Intentionally omitted].

(c)     Audit and Collateral Monitoring Fees.  (i) The Borrowers acknowledge that pursuant to Section 7.01(f), representatives of the Agents (which may include the Lenders) may visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, regulatory reviews and/or examinations of any or all of the Loan Parties at any time and from time to time.  The Borrowers agree to pay (i) $1,500 per day per examiner plus the examiner's reasonable and documented out-of-pocket costs and expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, regulatory reviews and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, regulatory reviews conducted by a third party on behalf of the Agents and the Lenders.

(ii)     Without limiting the foregoing, the Borrowers acknowledge that the Agents shall have the right to have the Borrowing Base Certificate and ERP Report of the Borrowers reviewed by an third party firm reasonably satisfactory to the Agents, and agree to pay all fees and expenses of such third party firm incurred in connection with such review.  So long as no Event of Default has occurred and is continuing, the Borrowers shall not be required to pay for the cost of more than one review during each quarter.

(d)     Fee Letter.  As and when due and payable under the terms of the Fee Letter, the Borrowers shall pay the fees set forth in the Fee Letter.

Section 2.07    LIBOR Option.

(a)    The Borrowers may, at any time and from time to time, so long as no Default or Event of Default has occurred and is continuing, elect to have interest on all or a portion of the Loans be charged at a rate of interest based upon the LIBOR Rate (the "LIBOR Option") by notifying the Administrative Agent prior to 11:00 a.m. (New York City time) at least 3 Business Days prior to (i) the proposed borrowing date of a Loan (as provided in Section 2.02), (ii) in the case of the conversion of a Reference Rate Loan to a LIBOR Rate Loan, the commencement of the proposed Interest Period or (iii) in the case of the continuation of a LIBOR Rate Loan as a LIBOR Rate Loan, the last day of the then current Interest Period (the "LIBOR Deadline").  Notice of the Borrowers' election of the LIBOR Option for a permitted portion of the Loans and an Interest Period pursuant to this Section 2.07(a) shall be made by delivery to the Administrative Agent of (A) a Notice of Borrowing (in the case of the initial making of a Loan) in accordance with Section 2.02 or (B) a LIBOR Notice prior to the LIBOR Deadline (or by telephonic notice received by the Administrative Agent before the LIBOR Deadline (to be confirmed by delivery to the Administrative Agent of a LIBOR Notice received by the Administrative Agent prior to 5:00 p.m. (New York City time) on the same day)).  Promptly upon its receipt of each such LIBOR Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders.  Each LIBOR Notice shall be irrevocable and binding on the Borrowers.

(b)    Interest on LIBOR Rate Loans shall be payable in accordance with Section 2.04(d).  On the last day of each applicable Interest Period, unless the Borrowers properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loans automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder.  At any time that a Default or an Event of Default has occurred and is continuing, the Borrowers no longer shall have the option to request that any portion of the Loans bear interest at the LIBOR Rate and the Administrative Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder on the last day of the then current Interest Period.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Borrowers (i) shall have not more than 5 LIBOR Rate Loans in effect at any given time, and (ii) only may exercise the LIBOR Option for LIBOR Rate Loans of at least $500,000 and integral multiples of $100,000 in excess thereof.

(d)    The Borrowers may prepay LIBOR Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.05(c) or any application of payments or proceeds of Collateral in accordance with Section 4.03 or Section 4.04 or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrowers shall indemnify, defend, and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.08.

(e)     Anything to the contrary contained herein notwithstanding, neither any Agent nor any Lender, nor any of their participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.  The provisions of this Article II shall apply as if each Lender or its participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

Section 2.08    Funding Losses.  In connection with each LIBOR Rate Loan, the Borrowers shall indemnify, defend, and hold the Agents and the Lenders harmless against any loss, cost, or expense incurred by any Agent or any Lender as a result of (a) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of a Default or an Event of Default or any mandatory prepayment required pursuant to Section 2.05(c)), (b) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default), or (c) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any Notice of Borrowing or LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses").  Funding Losses shall, with respect to any Agent or any Lender, be deemed to equal the amount reasonably determined by such Agent or such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market.  A certificate of an Agent or a Lender delivered to the Administrative Borrower setting forth a calculation in reasonable detail of any amount or amounts that such Agent or such Lender is entitled to receive pursuant to this Section 2.08 shall be conclusive absent manifest error.

Section 2.09    Taxes.  (a) Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law.  If any Withholding Agent shall be required under applicable law (as determined in the good faith discretion of the applicable Withholding Agent) to deduct or withhold any Taxes from or in respect of any sum payable hereunder to any Secured Party (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")), (i) the applicable Withholding Agent shall make such deductions or withholdings and (ii) the applicable Withholding Agent shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions or withholdings (including deductions or withholdings applicable to additions sums payable under this Section 2.09) such Secured Party (or such Transferee) receives the amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)     In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes.  Each Loan Party shall deliver to each Secured Party official receipts or copies thereof in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes (including, without limitation, Indemnified Taxes imposed on any amounts payable under this Section 2.09) paid by such Person, whether or not such Indemnified Taxes were correctly or legally asserted.   Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes.

(d)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Agents and the Loan Parties, at the time or times reasonably requested by an Agent or a Loan Party, such properly completed and executed documentation reasonably requested by an Agent or a Loan Party as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by an Agent or a Loan Party, shall deliver such other documentation prescribed by applicable law or reasonably requested by an Agent or a Loan Party as will enable the Agents or the Loan Parties to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e), (f) or (i) below, shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(e)     Each Lender (or Transferee) that is not a U.S. Person (a "Non-U.S. Lender") agrees that it shall, no later than the Interim Facility Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 12.07 hereof after the Interim Facility Effective Date, on or prior to the date upon which such Lender becomes a party hereto), and from time to time thereafter upon the reasonable request of an Agent or a Loan Party, deliver to the Agents and the Loan Parties properly completed and duly executed copies of U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY, W-9, other certification documents from each beneficial owner or any subsequent versions thereof or successors thereto, as applicable, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments of interest hereunder.  In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents to the Agents and the Borrowers that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate.  In addition, each Non-U.S. Lender shall deliver to the Agents and the Loan

Parties (in such number of copies as shall be requested by the recipient) on or prior to the Interim Facility Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 12.07 hereof after the Interim Facility Effective Date, on or prior to the date upon which such Lender becomes a party hereto) and from time to time thereafter upon the reasonable request of an Agent or a Loan Party, executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Agents and the Loan Parties to determine the withholding or deduction required to be made. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "<u>New Lending Office</u>"). In addition, such Lender (or Transferee) or Agent shall deliver such forms within 20 days after receipt of a written request therefor from any Agent, the assigning Lender or the Lender granting a participation, as applicable. Notwithstanding any other provision of this Section 2.09, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.09(e) that such Non-U.S. Lender is not legally able to deliver.

(f) Any Lender that is a U.S. Person shall deliver to the Agents and the Loan Parties on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of an Agent or a Loan Party), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.

(g) Any Secured Party (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.09 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Administrative Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such Secured Party (or Transferee) to disclose any information such Secured Party (or Transferee) deems confidential and would not, in the sole determination of such Secured Party (or Transferee), be otherwise disadvantageous to such Secured Party (or Transferee).

(h) If any Secured Party (or a Transferee) shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Taxes or Other Taxes with respect to which any Loan Party has made an indemnity payment or paid additional amounts, pursuant to this Section 2.09, it shall promptly notify the Administrative Borrower of the availability of such refund claim and shall, within 30 days after receipt of a request by the Administrative Borrower, make a claim to such Governmental Authority for such refund at the Loan Parties' expense. If any Secured Party (or a Transferee) receives a refund (including pursuant to a claim for refund made pursuant to the preceding sentence) in respect of any Taxes or Other Taxes with respect to which any Loan Party has made an Indemnity payment or paid additional amounts pursuant to this Section 2.09, it shall within 30 days from the date of such

receipt pay over such refund to the Administrative Borrower, net of all out-of-pocket expenses of such Secured Party (or Transferee).

(i)     If a payment made to a Lender (or Transferee) or any Agent under any Loan Document would be subject to U.S. Federal withholding tax imposed by FATCA if such Lender (or Transferee) or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender (or Transferee) or Agent shall deliver to the Administrative Borrower and the Agents at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Agents such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Administrative Borrower or the Agents as may be necessary for the Administrative Borrower and the Agents to comply with their obligations under FATCA and to determine that such Lender (or Transferee) or Agent has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (i), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Any forms, certifications or other documentation under this clause (i) shall be delivered by each Lender (or Transferee) and each Agent.

(j)     The obligations of the Loan Parties under this Section 2.09 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.10   <u>Increased Costs and Reduced Return</u>.  (a) If any Secured Party shall have determined that any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan or agreeing to make any Loan or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b)     If any Secured Party shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of

any Loans made or maintained, or any agreement to make Loans, or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party from time to time such additional amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c)     All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate.  A certificate of such Secured Party claiming compensation under this Section 2.10, specifying the event herein above described and the nature of such event shall be submitted by such Secured Party to the Administrative Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d)     The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.11    Changes in Law; Impracticability or Illegality.

(a)     The LIBOR Rate may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate.  In any such event, the affected Lender shall give the Administrative Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Administrative Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Administrative Borrower a statement setting forth in reasonable detail the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (ii) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under Section 2.09).

(b)     In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to the Administrative Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each

other Lender and (i) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder, and (ii) the Borrowers shall not be entitled to elect the LIBOR Option (including in any borrowing, conversion or continuation then being requested) until such Lender determines that it would no longer be unlawful or impractical to do so.

(c)     The obligations of the Loan Parties under this Section 2.11 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## ARTICLE III

## SECURITY AND ADMINISTRATIVE PRIORITY

Section 3.01    Pre-Petition Obligations.    Each Borrower and Guarantor hereby acknowledges, confirms and agrees that the Borrowers under the Pre-Petition Financing Agreement are indebted to the Agents and the Lenders for the Pre-Petition Obligations, as of March 22, 2017 in respect of (i) Pre-Petition Term Loans in the aggregate principal amount of $105,000,000 and (ii) Pre-Petition Revolving Loans in the aggregate principal amount of $41,000,000, together with all interest, costs, expenses, fees (including attorneys' fees), indemnities and other charges now or hereafter owed by the Borrowers to the Agents and the Lenders, all of which are unconditionally owing by the Borrowers to the Agents and the Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

Section 3.02    Acknowledgment of Security Interests.    As of the Filing Date, each of the Loan Parties hereby acknowledges, confirms and agrees that the Pre-Petition Agents and the Pre-Petition Lenders have valid, enforceable and perfected first priority and senior liens (subject only to Permitted Specified Liens (as defined in the Pre-Petition Financing Agreement) to the extent set forth in the Pre-Petition Financing Agreement) upon and security interests in all of the Collateral (as defined in the Pre-Petition Financing Agreement) pursuant to the Pre-Petition Financing Agreement, the Pre-Petition Collateral Agreements and the other Loan Documents (as defined in the Pre-Petition Financing Agreement) as in effect on the Filing Date to secure all of the Pre-Petition Obligations.

Section 3.03    Binding Effect of Documents.    Each of the Loan Parties hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Financing Agreement and the other Loan Documents (as defined in the Pre-Petition Financing Agreement) to which it is a party is in full force and effect as of the date hereof, (b) the agreements and obligations of each of the Loan Parties contained in the Pre-Petition Financing Agreement and the other Loan Documents (as defined in the Pre-Petition Financing Agreement) constitute the legal, valid and binding obligations of each of the Loan Parties enforceable against it in accordance with their respective terms and the Loan Parties have no valid defense, offset or counterclaim to the enforcement of such obligations and (c) the Pre-Petition Agents and the Pre-Petition Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Pre-Petition Financing Agreement and the other Loan Documents (as defined in the Pre-Petition Financing Agreement), except as clauses (b) and

(c) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

Section 3.04    Collateral; Grant of Lien and Security Interest.As security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby, as of the Interim Bankruptcy Court Order Entry Date, subject to the terms set forth in the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order and the CCAA Order, as applicable, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Agents and the Lenders, a security interest in and to, and Liens on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all accounts, inventory, goods, contract rights, instruments, documents, documents of title, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, intangibles, payment intangibles, letters of credit, letter-of-credit rights, securities, money, securities accounts, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Equity Interests of each Subsidiary of such Loan Party, all of the Equity Interests of all other Persons directly owned by such Loan Party, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this Section 3.04(a) being hereafter collectively referred to as the "Collateral").

(b)    Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order and CCAA Order, as the case may be, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.04(a) shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral. Such Liens and security interests and their priority shall remain in effect until the Total Revolving Credit Commitment shall have been terminated and all Obligations shall have been repaid in cash in full.

(c)    Notwithstanding anything herein to the contrary (i) all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in Section 3.04(a) and in each other Loan Document and by the Bankruptcy Court Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", and (ii) no Person entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

Section 3.05    Administrative Priority.  Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Bankruptcy Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the

Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

Section 3.06    <u>Grants, Rights and Remedies</u>.  The Liens and security interests granted pursuant to Section 3.04 hereof and pursuant to the Pre-Petition Collateral Agreements and the administrative priority granted pursuant to Section 3.05 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agents and the Lenders hereunder and thereunder are cumulative.

Section 3.07    <u>No Filings Required</u>.  The Liens and security interests referred to herein and in the Pre-Petition Collateral Agreements shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order and the CCAA Order, as the case may be.  The Collateral Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order or the CCAA Order, as the case may be, or any other Loan Document; <u>provided</u>, that the Collateral Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

Section 3.08    <u>Survival</u>.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Pre-Petition Collateral Agreements, the Bankruptcy Court Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Loan Party (pursuant to Section 364 of the Bankruptcy Code, the CCAA or otherwise), or by any dismissal or conversion of any of the Bankruptcy Cases, or by any other act or omission whatsoever.    Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" as set forth in Section 4.02, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against any Loan Party in respect of any Obligation;

(b)    the Liens in favor of the Agents and the Lenders set forth in Section 3.04 hereof and in the Pre-Petition Collateral Agreements shall constitute valid and perfected first priority Liens and security interests to which other Liens and security interests may be subordinate and junior, and which Liens and security interests shall be prior to all other Liens

and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the Liens in favor of the Agents and the Lenders set forth herein, in the Pre-Petition Collateral Agreements and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Collateral Agent file financing statements, mortgages, certificates of title or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 3.09     <u>Further Assurances</u>.  The Loan Parties shall take any other actions reasonably requested by the Agents and the Lenders from time to time to cause the attachment, perfection and first priority of, and the ability of the Agents and the Lenders to enforce, the security interest of the Agents and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Collateral Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, (d) except as satisfied or rendered unnecessary by the Bankruptcy Court Orders, complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, and (e) except as satisfied or rendered unnecessary by the Bankruptcy Court Orders, obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

## ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS; JOINT AND SEVERAL LIABILITY OF BORROWERS

Section 4.01     <u>Payments; Computations and Statements</u>.  (a)  The Borrowers will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day.  All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan

Account of the applicable Borrowers with any amount due and payable by the Borrowers under any Loan Document. Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right, but not the obligation, to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Section 5.03 have been satisfied. Any amount charged to the Loan Account shall be deemed a Revolving Loan hereunder made by the Revolving Loan Lenders to the Borrowers, funded by the Administrative Agent on behalf of the Revolving Loan Lenders and subject to Section 2.02 of this Agreement. The Lenders and the Borrowers confirm that any charges which the Administrative Agent may so make to the Loan Account of the applicable Borrowers as herein provided will be made as an accommodation to the Borrowers and solely at the Administrative Agent's discretion; provided that, in the absence of a continuing Event of Default, any such charge in respect of out-of-pocket fees, costs and expenses of the Agents and Lenders payable by the Borrowers shall occur no sooner than 10 days after the Administrative Borrower's receipt of a reasonably detailed invoice therefor. Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days (including the first day, but excluding the last day). Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)     The Administrative Agent shall provide the Administrative Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrowers during such month, the amounts and dates of all Loans made to the Borrowers during such month, the amounts and dates of all payments on account of the Loans to the Borrowers during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrowers during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations. All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.02   Sharing of Payments.   If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to

(i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply). The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.03 <u>Apportionment of Payments</u>. Subject to any written agreement among the Agents and/or the Lenders:

(a) All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b) After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, subject to the provisions of this Agreement, (i) <u>first</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) <u>second</u>, to pay interest then due and payable in respect of the Collateral Agent Advances until paid in full; (iii) <u>third</u>, to pay principal of the Collateral Agent Advances until paid in full; (iv) <u>fourth</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Lenders until paid in full; (v) <u>fifth</u>, ratably to pay interest then due and payable in respect of the Loans until paid in full; (vi) <u>sixth</u>, ratably to pay principal of the Loans until paid in full; and (vii) <u>seventh</u>, to the ratable payment of all other Obligations then due and payable.

(c) For purposes of Section 4.03(b), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part.

(d) In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.03 shall control and govern.

Section 4.04  Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02.

(b)  The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by any Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Administrative Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrowers as if such Defaulting Lender had made such Loans to the Borrowers.  Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.  No Defaulting Lender shall be entitled to receive any Unused Line Fee for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fees that otherwise would have been required to have been paid to that Defaulting Lender).

(c)  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Collateral Agent and/or the Borrowers to replace the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 12.07.

(d)  The operation of this Section shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(e)  This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrowers

shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 4.05    Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)    Each Borrower hereby irrevocably appoints the Parent as the borrowing agent and attorney-in-fact for the Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Agents and receive from the Agents all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

(b)    Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.05), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.05 constitute the absolute and unconditional, full recourse

Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(c)     The provisions of this Section 4.05 are made for the benefit of the Agents, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 4.05 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(d)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

Section 4.06   Mitigation Obligations.   If any Lender requires the Borrowers to pay any additional amounts under Section 2.09, requests any increase in the LIBOR Rate under Section 2.11(a),  exercises its rights with respect to Section 2.11(b), or requests compensation under Section 2.10, then such Lender shall (at the request of the Administrative Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to such Section in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

## ARTICLE V

## CONDITIONS TO LOANS

Section 5.01   Conditions Precedent to Effectiveness.   This Agreement shall become effective as of the Business Day (the "Interim Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner reasonably satisfactory to the Agents:

(a)     Interim Bankruptcy Court Order.   The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court on or before March 22, 2017, and the Collateral Agent shall have received a true and complete copy of such order, and such order shall be in full

force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent prior written consent of the Agents, the Required Lenders and the Borrowers. The Interim Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, during the Interim Period, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.04 hereof shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral.

(b)     CCAA Order.  The CCAA Order shall have been entered by the Canadian Bankruptcy Court on or before March 22, 2017, and the Collateral Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, absent prior written consent of the Agents, the Required Lenders and the Borrowers.

(c)     Payment of Fees, Etc.  The Borrowers shall have paid on or before the Interim Facility Effective Date (i) all fees then payable pursuant to Section 2.06 and (ii) to the extent invoiced prior to the Interim Facility Effective Date, all costs, expenses and taxes then payable pursuant to Section 12.04.

(d)     Representations and Warranties; No Event of Default.  The following statements shall be true and correct:  (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Interim Facility Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Interim Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Interim Facility Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(e)     Legality.  The making of the initial Loans shall not contravene any law, rule or regulation applicable to any Secured Party.

(f)     Delivery of Documents.  The Collateral Agent shall have received on or before the Interim Facility Effective Date the following, each in form and substance reasonably satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Interim Facility Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)     the Canadian Security Agreement;

(ii)    the results of searches for any effective UCC financing statements, Canadian PPSL financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens);

(iii)    a Perfection Certificate;

(iv)    the Disbursement Letter;

(v)    the Fee Letter;

(vi)    the Intercompany Subordination Agreement;

(vii)    a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Interim Facility Effective Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, Notices of Borrowing, LIBOR Notices, and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers and (D) as to the matters set forth in Section 5.01(d);

(viii)    a certificate of the chief financial officer of the Parent (A) attaching a copy of the Borrowing Base Certificate, calculated as of March 22, 2017, (B) attaching a copy of the Financial Statements described in Section 6.01(g) hereof and certifying as to the compliance with the representations and warranties set forth in Section 6.01(g) and (C) certifying that after giving effect to all of the transactions contemplated to (or required to) occur on the Interim Facility Effective Date, the Availability (without giving effect to the $10,000,000 limitation on Revolving Loans during the Interim Period pursuant to subclause (a)(iii) of the definition of Availability) is not less than $15,000,000;

(ix)    a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each Loan Party certifying as of a recent date not more than 30 days prior to the Interim Facility

Effective Date as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such jurisdictions;

(x) opinions of (A) Willkie Farr & Gallagher LLP, counsel to the Loan Parties, (B) Stewart McKelvey LLP, Nova Scotia counsel to the Loan Parties, and (C) Wildeboer Dellelce LLP, Ontario counsel to the Loan Parties, in each case, as to such matters as the Collateral Agent may reasonably request;

(xi) Acord insurance certificates evidencing the insurance coverage of the Loan Parties required by Section 7.01;

(xii) a copy of the Initial Budget, together with a certificate of an Authorized Officer of the Administrative Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Initial Budget shall be in form and substance satisfactory to the Agents (it being acknowledged and agreed that the form and substance of the Initial Budget provided to the Administrative Agent on March 16, 2017 is satisfactory); and

(xiii) evidence satisfactory to the Agents that a Process Agent has been properly appointed by each Foreign Loan Party in accordance with Section 12.10(b).

(g) <u>Security Interests</u>. The Loan Documents together with the Bankruptcy Court Orders shall create in favor of the Collateral Agent, for the benefit of the Agents and the Lenders, a legal, valid and enforceable first priority security interest in the Collateral secured thereby (subject only to Permitted Liens).

(h) <u>Material Adverse Effect</u>. The Collateral Agent shall have determined, in its reasonable business judgment, that, except for the commencement of the Bankruptcy Cases, no event or development shall have occurred since December 31, 2016, which could reasonably be expected to have a Material Adverse Effect.

(i) <u>Approvals; Litigation</u>. All consents, licenses, permits, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with this Agreement, the other Loan Documents, any of the Transactions or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect. There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or Governmental Authority which relates to this Agreement or the other Loan Documents or any of the Transactions, or which, in the opinion of the Agents, has any reasonable likelihood of having a Material Adverse Effect.

(j) <u>Consent Orders; Settlement Agreements</u>. No Loan Party shall have entered into, or agreed to enter into, a consent order or settlement with any federal or state regulatory agency prior to the Interim Facility Effective Date that was not fully disclosed to the Agents prior to March 22, 2017.

(k)     Filing Date.  The Filing Date shall have occurred not later than March 22, 2017.

(l)     Adverse Orders.  No order shall have been entered or, with respect to the Chapter 11 Cases, requested by any Person (i) for appointment of a trustee, a receiver or an examiner with enlarged powers with respect to any U.S. Loan Party or the operation of any U.S. Loan Party's business, properties or assets beyond those set forth in subsections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code, (ii) for the appointment of a trustee, receiver or interim receiver for the assets, property or undertakings of any Canadian Loan Party, or (iii) to convert the Chapter 11 Cases to a Chapter 7 case or to dismiss the Chapter 11 Cases or the CCAA Cases.

(m)     First Day Motions and Orders.  (i) the Agents shall have received on or before the Filing Date, copies of the first day motions to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases and with the Canadian Bankruptcy Court in the CCAA Cases, each of which shall be in form and substance satisfactory to the Agents and (ii) orders of the Bankruptcy Court and the Canadian Bankruptcy Court approving or recognizing such motions, as applicable, shall have been entered by the Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, on or before the date that is five (5) Business Days after the Filing Date.

(n)     Pre-Petition Financing Agreement.  The Pre-Petition Lenders shall have received adequate protection in respect of the Liens securing the Pre-Petition Obligations in the form of (i) replacement Liens on the Collateral, subject only to the Liens securing the Obligations, (ii) priority administrative expense claim status with respect to the Pre-Petition Obligations, subject only to the super-priority administrative expense claim status of the Obligations to the extent of any diminution in value of the collateral securing the Pre-Petition Obligations caused by the Liens granted hereunder and under the other Loan Documents, and (iii) payment of interest in respect of the Pre-Petition Obligations.

(o)     Plan of Reorganization, Plan Support Agreement and Purchase Agreement.  The Plan of Reorganization shall have been filed with the Bankruptcy Court.  The Plan Support Agreement shall have been entered into by the parties thereto and filed with the Bankruptcy Court.  The Purchase Agreement shall have been entered into by the parties thereto and filed with the Bankruptcy Court.

Section 5.02   Conditions Precedent to Final Facility Effectiveness.   The obligation of any Agent or any Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents:

(a)     Final Bankruptcy Court Order, Etc.  The Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court on a date that is within thirty-five (35) days following the Filing Date, and the Agents shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Agents, the Required Lenders and the Borrowers.  The Final Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents

and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.01 shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral.

(b)      Final Bankruptcy Court Order; Payment of Pre-Petition Obligations.  With respect to Loans to be made subsequent to the date that is thirty-five (35) days following the Filing Date, the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court and such order shall provide, among other things, that all (or such portion as the Lenders shall elect) of the Pre-Petition Revolving Loans shall be repaid in full (with the proceeds of the Loans made hereunder) upon the entry of such order, and the Agents shall have received a certified copy of such order and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended absent prior written consent of the Agents.

(c)      Payment of Fees, Etc.  The Borrower shall have paid on or before such date all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04.

(d)      Representations and Warranties; No Event of Default.   The following statements shall be true and correct:   (i) the representations and warranties contained in ARTICLE VII and in each other Loan Document, certificate or other writing delivered to the Agents or the Lenders pursuant hereto or thereto on or prior to the Final Facility Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Final Facility Effective Date or would result from the making of Loans on such date.

(e)      Liens; Priority.   The Collateral Agent shall be satisfied that it has been granted, and still continues to hold, as the case may be, for the benefit of the Agents and the Lenders, a perfected, first priority Lien on and security interest in all of the Collateral.

(f)      Budget.   The Agents shall have received an updated Budget in accordance with Section 7.01(a)(vii), together with a certificate of an Authorized Officer of the Administrative Borrower dated as of the Final Facility Effective Date stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be prepared in form and detail consistent with the Initial Budget.

(g)    Material Adverse Effect.  The Agents shall have determined, in their reasonable judgment, that no change having a Material Adverse Effect shall have occurred and be continuing since the Interim Facility Effective Date.

(h)    Litigation.  There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Agents, has any reasonable likelihood of having a Material Adverse Effect.

Section 5.03    Conditions Precedent to All Loans.  The obligation of any Agent or any Lender to make any Loan after the Interim Facility Effective Date is subject to the fulfillment, in a manner reasonably satisfactory to the Administrative Agent, of each of the following conditions precedent:Representations and Warranties; No Event of Default.  The following statements shall be true and correct, and the submission by the Administrative Borrower to the Administrative Agent of a Notice of Borrowing with respect to each such Loan, and the Borrowers' acceptance of the proceeds of such Loan, shall each be deemed to be a representation and warranty by each Loan Party on the date of such Loan that:  (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the date of such Loan are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date), (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made, on such date and (iii) the conditions set forth in this Section 5.03 have been satisfied as of the date of such request.

(b)    Legality.  The making of such Loan shall not contravene any law, rule or regulation applicable to any Secured Party.

(c)    Notices.  The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.02 hereof.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01    Representations and Warranties.  Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a)     Organization, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership or other foreign business entity duly organized, validly existing and, where applicable, in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the Bankruptcy Court Orders, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrowers, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business, and, where applicable, is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing could reasonably not be expected to have a Material Adverse Effect.

(b)     Authorization, Etc.   The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable material Requirement of Law or (C) any material Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval material to its operations or any of its properties, not stayed by the Bankruptcy Court Orders.

(c)     Governmental Approvals.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with: (i) the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party; (ii) the grant by any Loan Party of the Liens granted hereby; (iii) the perfection, to the extent required by the applicable Loan Document, of the Liens granted pursuant to any Loan Documents; or (iv) the exercise by any Agent of its rights and remedies hereunder and under the Loan Documents (except for (x) filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation and (y) non-material actions by or consents of Governmental Authorities with respect to Collateral that does not constitute Assets, Asset Pools, Asset Pool Proceeds or Collateral necessary for the collection thereof), and except for the Bankruptcy Court Orders.

(d)     Enforceability of Loan Documents.  From and after the Interim Bankruptcy Court Order Date (with respect to the Interim Period), and, as applicable, the Final Bankruptcy Court Order (with respect to the period after the entry of the Final Bankruptcy Court Order), and subject to the Bankruptcy Court Orders, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)     Capitalization.  On the Interim Facility Effective Date, after giving effect to the transactions contemplated hereby to occur on the Interim Facility Effective Date, the authorized Equity Interests of the Parent and each of its Subsidiaries and the issued and outstanding Equity Interests of the Parent and each of its Subsidiaries are as set forth on Schedule 6.01(e).  All of the issued and outstanding shares of Equity Interests of the Parent and each of its Subsidiaries have been validly issued and are fully paid and nonassessable (as applicable), and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All Equity Interests of such Subsidiaries of the Parent are owned by the Parent or one of its Subsidiaries free and clear of all Liens (other than Permitted Specified Liens).  Except as described on Schedule 6.01(e), there are (i) no outstanding debt or equity securities and (ii) no outstanding obligations of the Parent or any of its Subsidiaries, in each case, that are convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from any Subsidiaries of the Parent, or other obligations of any Subsidiaries of the Parent to issue, directly or indirectly, any shares of Equity Interests of any Subsidiaries of the Parent.

(f)     Litigation.  Other than the Chapter 11 Cases and the CCAA Cases, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) is not subject to the automatic stay, (ii) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (iii) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(g)     Financial Statements.  The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present in all material respects the consolidated financial condition of the Parent and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the Parent and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP, subject to, in the case of unaudited Financial Statements, the absence of footnotes and normal year-end adjustments.  All Indebtedness and other Liabilities (including, without limitation, Indebtedness, liabilities for taxes, long-term leases and other unusual forward or long-term commitments), direct or contingent, of the Parent and its Subsidiaries are set forth in the Financial Statements, other than as reflected on the most recent financial statements delivered to the Agents and Lenders hereunder or as incurred in the ordinary course of business following the date thereof.  Except as disclosed in writing to the Agents, since the Filing Date, no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect (other than the commencement of the Bankruptcy Cases).

(h)     Compliance with Law, Etc.  No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any material Requirement of Law (including all Consumer Laws) or (iii) any material term of any material Contractual Obligation binding on or otherwise affecting it or any of its properties, if, in the case of this clause (iii), such violation could reasonably be expected to result in a Material Adverse Effect.

(i)     ERISA.  Except as set forth on Schedule 6.01(i), (i) each Employee Plan is in substantial compliance with ERISA and the Internal Revenue Code, (ii) no Termination Event has occurred nor is reasonably expected to occur with respect to any Employee Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Employee Plan, including any

required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and (if requested) delivered to the Agents, is complete and correct in all material respects and fairly presents in all material respects the funding status of such Employee Plan, and since the date of such report there has been no material adverse change in such funding status, (iv) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Agents, (v) no Employee Plan had an accumulated or waived funding deficiency or permitted decrease which would create a deficiency in its funding standard account or has applied for an extension of any amortization period within the meaning of Section 412 of the Internal Revenue Code at any time during the previous 60 months, (vi) no Lien imposed under the Internal Revenue Code or ERISA exists or is likely to arise on account of any Employee Plan within the meaning of Section 412 of the Internal Revenue Code, and (vii) no Loan Party or any of its ERISA Affiliates has incurred any withdrawal liability under ERISA with respect to any Multiemployer Plan, or is aware of any facts indicating that it or any of its ERISA Affiliates may in the future incur any such withdrawal liability. No Loan Party or any of its ERISA Affiliates has (i) engaged in a nonexempt prohibited transaction described in Sections 406 of ERISA or 4975 of the Internal Revenue Code, (ii) failed to pay any required installment or other payment required under Section 412 of the Internal Revenue Code on or before the due date for such required installment or payment, (iii) engaged in a transaction within the meaning of Section 4069 of ERISA or (iv) incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid. There are no pending or, to the best knowledge of any Loan Party, threatened material claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (i) any Employee Plan or its assets, (ii) any fiduciary with respect to any Employee Plan, or (iii) any Loan Party with respect to any Employee Plan. Except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or coverage after a participant's termination of employment.

(j)     Taxes, Etc.  (i) All foreign, Federal and material provincial, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been filed and are complete and accurate in all material respects, or extensions have been obtained, and (ii) all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party in an aggregate amount for all such taxes, assessments and other governmental charges exceeding $250,000 and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP. As of the Interim Facility Effective Date, none of the income tax returns of Loan Parties or any of their Subsidiaries are under audit or other proceeding by any Governmental Authority. No tax Liens have been filed against any Loan Party. The charges, accruals and reserves on the books of Loan Parties and each of their Subsidiaries in respect of any taxes or other governmental charges are in accordance with GAAP. Each U.S. Loan Party has executed IRS Form 8821 designating the Collateral Agent as such Loan Party's appointee to receive directly from the IRS, on an on-going

basis, certain tax information, notices and other written communication and each U.S. Loan Party authorizes the Collateral Agent to file such Form 8821 with the IRS. The federal tax identification number of each U.S. Loan Party and its subsidiaries are set forth on the Perfection Certificate. No Loan Party has been notified that the IRS, the Canada Revenue Agency or any other Governmental Authority, has raised or intends to raise, any adjustments with respect to Tax liabilities of such Loan Party in an amount in excess of $250,000.

(k)     Regulations T, U and X.   No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)     Nature of Business. No Loan Party is engaged in any business other than the Permitted Business.

(m)     Adverse Agreements, Etc.   No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)     Permits, Etc.   Each Loan Party has, and is in compliance with, all material permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, including, without limitation, as required under any Consumer Laws. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect.

(o)     Properties.   Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens. All such properties and assets are in good working order and condition, ordinary wear and tear and casualty events excepted.

(p)     Employee and Labor Matters.   There is (i) no unfair labor practice complaint pending or, to the best knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Loan Party or (iii) to the best knowledge of each Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan

Party, which could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements. All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party.

(q)    Environmental Matters. Except as set forth on Schedule 6.01(q), (i) the operations of each Loan Party are in material compliance with all Environmental Laws, except for such noncompliance that could not reasonably be expected to result in Environmental Liabilities of each Loan Party or its Subsidiaries in excess of $250,000 in the aggregate; (ii) there has been no Release at any of the properties owned or operated by any Loan Party or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Loan Party or any predecessor in interest nor does any Loan Party have knowledge or notice of any threatened or pending Environmental Action against any Loan Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Loan Party or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (v) no property now or, to the knowledge of the Loan Parties as of the Interim Facility Effective Date, formerly owned or operated by a Loan Party has been used as a treatment or disposal site for any Hazardous Material; (vi) no Loan Party has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (vii) each Loan Party holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Loan Party's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; and (viii) no Loan Party has received any written notification pursuant to any Environmental Laws that (A) any work, repairs, construction or capital expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

(r)    Insurance. Each Loan Party maintains the insurance and required services and financial assurance as required by law and as required by Section 7.01(h). Schedule 6.01(r) sets forth a list of all insurance maintained by each Loan Party on the Interim Facility Effective Date.

(s)    Use of Proceeds. The proceeds of the Loans shall be used in accordance with the terms of the Initial Budget as then in effect (without resulting in any Material Adverse Deviation), (i) (A) to pay for the fees, costs and expenses incurred in connection with the

transactions contemplated hereby and in connection with the Bankruptcy Cases and (B) to fund working capital of the Loan Parties (including, without limitation, payments of fees and expenses to professionals under Sections 328, 330 and 331 of the Bankruptcy Code and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Loan Parties or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under this Agreement), subject to the priorities set forth in the definition of "Agreed Administrative Expense Priorities" herein) and (ii) in the case of certain Loans made on the Final Facility Effective Date, to repay the outstanding revolving loans under the Pre-Petition Financing Agreement. Without limiting the foregoing, none of the proceeds of the Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Pre-Petition Agents, Pre-Petition Lenders, Agents or Lenders, including in connection with the validity of the liens granted to the Pre-Petition Agents, Pre-Petition Lenders, Agents or Lenders (whether under the Pre-Petition Financing Agreement (or any of the loan documents related thereto), the Loan Documents, or otherwise). No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

(t)     [Intentionally omitted].

(u)     Intellectual Property. Except as set forth on Schedule 6.01(u), each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Set forth on Schedule 6.01(u) is a complete and accurate list as of the Interim Facility Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party, (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property and (iii) each material Intellectual Property Contract to which each Loan Party is bound. No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)     [Intentionally omitted].

(w)     Investment Company Act. None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its

ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)     Canadian Employee Benefit Plans.  As of the Interim Facility Effective Date, the Canadian Pension Plans are duly registered under the ITA and all other Requirements of Law which require registration and no event has occurred which is reasonably likely to cause the loss of such registered status.  As of the Interim Facility Effective Date, the Canadian Pension Plans and Canadian Benefit Plans have been administered and invested in compliance with their terms and Requirements of Law and there have been no improper withdrawals or applications of the assets of the Canadian Pension Plans or the Canadian Benefit Plans.  As of the Interim Facility Effective Date, none of the Canadian Pension Plans are Canadian DB Plans.  As of the Interim Facility Effective Date, all payments, contributions (which in the case of such Canadian Pension Plan shall be limited to those contributions determined by the plan actuary and identified in the most recently completed and filed actuarial valuation report) or premiums required to be made by any Loan Party to or in respect of any Canadian Benefit Plan or Canadian Pension Plan have been made on a timely basis in accordance with the current terms of such plans and all Requirements of Law.  As of the Interim Facility Effective Date, no promises of benefit improvements under the Canadian Pension Plans or the Canadian Benefit Plans have been made and there are no taxes, penalties or interest owing in respect of any Canadian Pension Plan.  As of the Interim Facility Effective Date, there has been no partial termination of any Canadian Pension Plan and no facts or circumstances have occurred or existed that could result, or be reasonably expected to result, in the declaration of a partial termination of any Canadian Pension Plan under Requirements of Law.  Schedule 6.01(x) lists all Canadian Benefit Plans and Canadian Pension Plans.

(y)     Broker's Fees.  No broker's or finder's fee or commission will be payable with respect to the Transactions (other than any fees payable pursuant to the Fee Letter) other than any broker's or finder's fees or commissions set forth in Schedule 6.01(y).

(z)     [Intentionally omitted].

(aa)     Event of Default.  No Default or Event of Default has occurred and is continuing.

(bb)     Anti-Money Laundering and Anti-Terrorism Laws.

(i)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, has violated or is in violation of any of the Anti-Money Laundering and Anti-Terrorism Laws or has engaged in or conspired to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)     None of the Loan Parties, nor any Affiliate of any of the Loan Parties, nor any officer, director or principal shareholder or owner of any of the Loan Parties, nor any of the Loan Parties' respective agents acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, is a Blocked Person.

(iii)　　None of the Loan Parties, nor any of their agents acting in any capacity in connection with the Loans or other transactions hereunder, (A) conducts any business with or for the benefit of any Blocked Person in violation of OFAC Sanctions Programs or engages in making or receiving any contribution of funds, goods or services to, from or for the benefit of any Blocked Person in violation of OFAC Sanctions Programs, or (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to any OFAC Sanctions Programs in violation of OFAC Sanctions Programs.

(cc)　　<u>Anti-Bribery and Anti-Corruption Laws</u>.

(i)　　The Loan Parties are in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>") and the anti-bribery and anti-corruption laws of those jurisdictions in which they do business (collectively, the "<u>Anti-Corruption Laws</u>").

(ii)　　None of the Loan Parties has at any time:

(A)　　offered, promised, paid, given, or authorized the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any employee, official, representative, or other person acting on behalf of any foreign (i.e., non-U.S.) Governmental Authority thereof, or of any public international organization, or any foreign political party or official thereof, or candidate for foreign political office (collectively, "<u>Foreign Official</u>"), for the purpose of: (1) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (2) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official, or (3) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(B)　　acted or attempted to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

(iii)　　There are, and have been, no allegations, investigations or inquiries with regard to a potential violation of any Anti-Corruption Law by any of the Loan Parties or any of their respective current or former directors, officers, employees, stockholders or agents, or other persons acting or purporting to act on their behalf.

(iv)　　The Loan Parties have adopted, implemented and maintain anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(dd)　　<u>Proper Legal Form</u>.  The Loan Documents are in proper legal form under the laws of Canada to be valid, legal, effective, enforceable or admissible into evidence in the courts of Canada except for any other procedural steps that have been taken or that can be taken at any time without significant expense or delay and without prejudice to any rights or remedies the Secured Parties may have under the Loan Documents.

(ee)　　<u>No Recordation</u>.  It is not necessary that any Loan Document or any other document be filed, registered or recorded with, or executed or notarized before, any court, public office or other authority in Canada or that any registration charge or stamp or similar tax be paid

on or in respect of any Loan Document or any other document in order to ensure the legality, validity, effectiveness, enforceability, priority or admissibility in evidence of such Loan Document.

(ff)    Proceedings to Enforce Agreement.  In any proceeding in Canada to enforce any Loan Document governed by New York law, the choice of New York law as the governing law of such Loan Document will be recognized and applied, the irrevocable submission of it to the jurisdiction of the courts of the State of New York or of the United States of America for the Southern District of New York will be valid, legal, binding and enforceable, and any judgment obtained in such a court will be recognized and enforceable in Canada without reconsideration as to the merits of such judgment.

(gg)    Pari Passu.  The obligations of each Loan Party under this Agreement and the other Loan Documents to which it is a party rank and will rank at least *pari passu* in priority of payment and in all other respects with all its other present and future unsecured and unsubordinated Indebtedness of such Loan Party.

(hh)    Exchange Controls.  Each Loan Party has the ability to lawfully pay solely and exclusively in Dollars the total amount which is, or may become, payable by it to the Lender under the Loan Documents.

(ii)    Full Disclosure.

(i)    Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state, when taken together with all other information furnished, any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not materially misleading.

(ii)    [Intentionally omitted].

(jj)    Administrative Priority; Lien Priority.

(i)    After the Interim Bankruptcy Court Order Entry Date or the Final Bankruptcy Court Order Entry Date, as the case may be, the Obligations of the Loan Parties will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in the Agreed Administrative Expense Priorities.

(ii)     Upon entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, the Liens and security interests of the Collateral Agent on the Collateral referred to in Section 3.04 hereof shall be valid and perfected first priority Liens.

(iii)     On or after the Interim Bankruptcy Court Order Entry Date and prior to the Final Bankruptcy Court Order Entry Date, the Interim Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal, absent the written consent of the Collateral Agent, the Administrative Agent, the Required Lenders and the Borrowers, and after the Final Bankruptcy Court Order Entry Date, the Final Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Agents, the Required Lenders and the Borrowers.

(iv)     <u>Appointment of Trustee or Examiner; Liquidation</u>.  No order has been entered in any Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES

Section 7.01   <u>Affirmative Covenants</u>.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)     <u>Reporting Requirements</u>.  Furnish to each Agent and each Lender:

(i)     as soon as available, and in any event within 30 days after the end of each fiscal month of the Parent and its Subsidiaries commencing with the first fiscal month of the Parent and its Subsidiaries ending after the Interim Facility Effective Date, internally prepared consolidated balance sheets, statements of income and cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Parent and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(ii)     as soon as available and in any event within 45 days after the end of each fiscal quarter of the Parent and its Subsidiaries commencing with the first fiscal quarter of the Parent and its Subsidiaries ending after the Interim Facility Effective Date, consolidated and consolidating balance sheets, statements of operations and retained earnings and statements of cash flows of the Parent and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Parent and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Parent and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(iii)     [intentionally omitted];

(iv)     simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), a certificate of an Authorized Officer of the Parent (a "Compliance Certificate"):

(A)     stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Parent and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Parent and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto,

(B)     in the case of the delivery of the financial statements of the Parent and its Subsidiaries required by clause (i) of this Section 7.01, attaching, in each case, with respect to such month, (1) a discussion and analysis of the financial condition and results of operations of the Parent and its Subsidiaries for the portion of the Fiscal Year then elapsed; (2) a schedule of the outstanding Indebtedness for borrowed money of the Parent and its Subsidiaries, describing in reasonable detail each such debt issue or loan outstanding and the principal amount and amount of accrued and unpaid interest with respect to each such debt issue or loan; (3) a schedule of all jurisdictions in which a Loan Party became qualified to transact business; (4) copies of any amendments made to the Governing Documents of the Parent or any of its Subsidiaries; and (5) copies of any tax audit notices received; and (6) a Borrowing Base Certificate containing a calculation of the amount specified in clause (a)(i)(C) of the definition of the term "Borrowing Base", current as of the close of business on the last Business Day of the immediately preceding month;

(v)     within 10 Business Days following the end of each month, an ERP Report with respect to such month;

(vi)     as soon as available and in any event within 10 Business Days after the end of each month commencing with the first month ending after the Interim Facility Effective Date, a Borrowing Base Certificate, current as of the close of business on the last Business Day of the immediately preceding month (the "Subject Month") (other than in the case of the calculation of the amount specified in clause (a)(i)(C) of the definition of the term "Borrowing Base", which shall be current as of the close of business on the last Business Day of the month immediately preceding the Subject Month), supported by schedules showing the derivation thereof and containing such detail and other information as any Agent may reasonably request from time to time; provided that (A) the Borrowing Base set forth in the Borrowing Base Certificate shall be effective from and including the date such Borrowing Base Certificate is duly received by the Agents but not including the date on which a subsequent Borrowing Base Certificate is received by the Agents, unless any Agent reasonably disputes the eligibility of any property included in the calculation of the Borrowing Base or the valuation thereof by notice of such dispute to the Administrative Borrower and (B) in the event of any dispute about the eligibility of any property included in the calculation of the Borrowing Base or the valuation thereof, such Agent's good faith judgment shall control;

(vii)     on or about the twentieth day (20th) of each month (or, if an Event of Default has occurred and is continuing, more frequently should the Agents so elect), a Budget for (A) the next succeeding 13-week period and (B) for the months from the Interim Facility Effective Date through the Final Maturity Date, in each case, prepared in form and detail consistent with the Initial Budget (or in such other form and detail approved by the Agents and the Required Lenders), and shall be (1) believed by the Loan Parties at the time furnished to be reasonable, (2) prepared on a reasonable basis and in good faith, and (3) based on assumptions believed by the Loan Parties to be reasonable at the time made and upon the best information then reasonably available to the Loan Parties, and shall be accompanied by a certificate of an Authorized Officer of the Administrative Borrower certifying as to the matters set forth in subclauses (1), (2) and (3) above;

(viii)     as soon as available and in any event within three (3) Business Days after (i) the first two full weeks following the Interim Facility Effective Date, the end of such two-week period following the Interim Facility Effective Date, (ii) the first four full weeks following the Interim Facility Effective Date, the end of such four-week period following the Interim Facility Effective Date, and (iii) thereafter, each week for a rolling four-week period, in each case, a reconciliation, in form and detail reasonably acceptable to the Agents and the Required Lenders, of the actual cash receipts and cash disbursements of the Loan Parties for such week to the budgeted line item amounts set forth in the Initial Budget for such Budget Period;

(ix)     [intentionally omitted];

(x)     as soon as possible and in any event within 3 days prior to any submission to any Governmental Authority, all material documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority;

(xi)     as soon as possible, and in any event within 3 days after any senior officer of any Loan Party becomes aware of the occurrence of an Event of Default or Default or the occurrence of any event or development that such senior officer has determined could reasonably be expected to have a Material Adverse Effect (including, without limitation and for the avoidance of doubt, (i) any notice that any Person has given to the Parent or any of its Subsidiaries or any other action taken with respect to a claimed default or event or condition of the type referred to in Section 9.01(e) and (ii) the occurrence of any default, breach, termination or amendment of any consent, license or permit issued by any Governmental Authority to any Loan Party which default, breach, termination or amendment would, in each case, be reasonably likely to have a Material Adverse Effect), the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(xii)     (A) as soon as possible and in any event within 10 days after any Loan Party or any ERISA Affiliate thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to an Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Administrative Borrower setting forth the details of such occurrence and the action, if any, which such Loan Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within 3 days after receipt thereof by any Loan Party or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Loan Party or any ERISA Affiliate thereof of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C) promptly and in any event within 10 days after the filing thereof with the Internal Revenue Service if requested by any Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within 10 days after any Loan Party or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within 3 days after receipt thereof by any Loan Party or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within 10 days after any Loan Party thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party;

(xiii)     (A) as soon as possible after receipt thereof any notice of any governmental investigation or any litigation or proceeding commenced or threatened against any Loan Party that is asserted or instituted against any Canadian Benefit Plan, Canadian Pension Plan, its fiduciaries or its assets; (B) promptly after filing same, copies of each annual and other return, report or valuation with respect to each Canadian Pension Plan as filed with any applicable Governmental Authority; (C) promptly after receipt thereof, a copy of any direction,

order, notice, ruling or opinion that any Loan Party or any Subsidiary of any Loan Party may receive from any applicable Governmental Authority with respect to any Canadian Pension Plan; (D) notification within 30 days of any increases having a cost to one or more of the Loan Parties and their Subsidiaries in excess of $250,000 per annum in the aggregate, in the benefits of any existing Canadian Pension Plan or Canadian Benefit Plan, or the establishment of any new Canadian Pension Plan or Canadian Benefit Plan, or the commencement of contributions to any such plan to which any Loan Party was not previously contributing; and (E) notification within 30 days of any voluntary or involuntary termination of, or participation in, a Canadian Pension Plan or a Canadian Benefit Plan;

(xiv) promptly after the commencement thereof but in any event not later than 5 days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(xv) [intentionally omitted];

(xvi) as soon as possible and in any event within 5 days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xvii) [reserved];

(xviii) promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xix) promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof, to the extent not already provided hereunder;

(xx) promptly upon request, any certification or other evidence reasonably requested from time to time by any Lender in its sole discretion, confirming the Borrowers' compliance with Section 7.02(s);

(xxi) within three (3) Business Days following the date of such execution, filing or agreement, (A) the execution or filing with the IRS, the Canada Revenue Agency or any other Governmental Authority of any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes or other Charges by any Loan Party or any of its Subsidiaries and (B) any agreement by any Loan Party or any Loan Party's Subsidiaries or request directed to any Loan Party or any Loan Party's Subsidiaries to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise;

(xxii) within three (3) Business Days after any Loan Party elects to change insurance carriers, policies or coverage amounts, notice of such change, along with Acord insurance certificates evidencing the same, and all endorsements thereof;

(xxiii) within three (3) Business Days following the request of the Collateral Agent, information regarding the face value of all Assets, the ownership of such Assets, and each such Loan Party, Franchisee or other Person which will attempt to collect such Assets, the locations of its books, records and other documents relating to such Assets, and such other reports in connection with the Assets as the Collateral Agent may reasonably request, all in such form and detail as the Collateral Agent may request, including, without limitation (1) a schedule of Asset Pools purchased, including Asset Pool Seller, purchase price, face amount, ERP and NERP, and (2) a schedule reflecting proceeds collected on owned Asset Pools;

(xxiv) simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(r), the consolidated financial statements of the Parent and its Subsidiaries delivered pursuant to clauses (i), (ii) and (iii) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance reasonably satisfactory to the Agents;

(xxv) promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time may reasonably request (including, without limitation, any information regarding the formula for the calculation of ERP);

(xxvi) promptly after the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Loan Parties in the Bankruptcy Cases, which papers and documents shall also be given or served on Agent's counsel; and

(xxvii) promptly after the sending thereof, copies of all written reports given by the Loan Parties to any official or unofficial creditors' committee in the Bankruptcy Cases, other than any such reports subject to privilege, provided that such Person may redact any confidential information contained in any such report if it provides a summary of the nature of the information redacted to the Agents.

(b)     Additional Borrowers and Collateral Security.  Cause:

(i)     each Subsidiary of any Loan Party not a party to any Bankruptcy Cases on the Interim Facility Effective Date, but which later becomes a party to the Chapter 11 Cases or the CCAA Cases, to, at the request of the Collateral Agent, execute and deliver to the Collateral Agent promptly and in any event within 5 Business Days after the delivery to the Administrative Agent of the relevant forms of agreement (or such later date as may be permitted

by the Collateral Agent), (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the applicable Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the applicable Security Agreement, (2) undated stock powers for such Equity Interests executed in blank with signature guaranteed, and (3) such opinions of counsel as the Collateral Agent may reasonably request, (C) to the extent required under the terms of this Agreement, within thirty (30) days of such request, or such later date as may be permitted by the Collateral Agent, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to Permitted Specified Liens) on such real property and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)     each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 5 Business Days after the formation or acquisition of such Subsidiary (or such later date as may be permitted by the Collateral Agent) a Pledge Amendment (as defined in the applicable Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the applicable Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank with signature guaranteed, (C) such opinions of counsel as the Collateral Agent may reasonably request and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent.

(c)     Compliance with Laws; Payment of Taxes.

(i)     Comply, and cause each of its Subsidiaries to comply, in all material respects, with all Requirements of Law (including, without limitation, all Consumer Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing).

(ii)     Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all taxes, assessments and other governmental charges imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries, except to the extent subject to a stay imposed as a result of the Chapter 11 Cases or contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(iii)     Comply with and perform in all material respects all of its obligations under and in respect of such Canadian Pension Plan or Canadian Benefit Plan, including under any funding agreements and all applicable laws (including any fiduciary,

funding, investment and administration obligations), and pay or remit in a timely fashion in accordance with the terms of any funding agreements and all applicable laws all employer or employee payments, contributions or premiums required to be remitted, paid to or in respect of each Canadian Pension Plan or Canadian Benefit Plan, except to the extent subject to a stay imposed as a result of the CCAA Cases.

(d)     Preservation of Existence, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence (except to the extent otherwise permitted to merge, dissolve or liquidate pursuant to this Agreement), rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)     Keeping of Records and Books of Account.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)     Inspection Rights.  Upon three (3) Business Days' prior written notice to the Borrowers, permit, and cause each of its Subsidiaries to permit, the agents and representatives (including legal counsel) of the Collateral Agent (which may include any Lender) at any time and from time to time during normal business hours to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, regulatory reviews or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives, during normal business hours and as often as may be reasonably requested; provided that, upon the occurrence and continuance of a Default or an Event of Default, the Collateral Agent shall not be required to provide any notice to the Borrowers prior to the performance of an inspection; provided further that, so long as no Default or Event of Default has occurred and is continuing, the Borrowers shall only be obligated to reimburse the Collateral Agent for the fees and expenses with respect to four such examinations during any calendar year (in addition to the third party examinations of the ERP Reports and Borrowing Base Certificates provided for in Section 2.06(c)(ii)).  In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the Collateral Agent (which may include any Lender) in accordance with this Section 7.01(f). Without limiting the foregoing, the Borrowers acknowledge that the Agents shall have the right to have the Borrowing Base Certificate and ERP Report of the Borrowers reviewed by an third party firm satisfactory to the Agents, and agree to promptly cooperate with all reasonable requests made by such third party firm in connection with such review.

(g)     Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the

provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except (i) to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect or (ii) for any non-compliance resulting in a default, the enforcement of which is stayed by the Chapter 11 Cases or the CCAA Cases.

(h)     <u>Maintenance of Insurance</u>.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent, worker's compensation and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent.  The Collateral Agent confirms that the insurance in effect on the Interim Facility Effective Date (as described in the documents delivered to the Collateral Agent) is acceptable to the Collateral Agent as of the Interim Facility Effective Date.  All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation.  If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)     <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all material permits, licenses, authorizations, approvals, entitlements and accreditations and regulatory approvals and consents that are necessary in the proper conduct of its business, including under all Consumer Laws.

(j)     <u>Environmental</u>.  Except as could not reasonably be expected to have a Material Adverse Effect, (i) keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its Subsidiaries to comply, with all Environmental Laws and provide to the Collateral Agent any documentation of

such compliance which the Collateral Agent may reasonably request; (iii) provide the Agents written notice within 5 days of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide the Agents with written notice within 10 days of the receipt of any of the following:  (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries; and (C) notice of a violation, citation or other administrative order which could reasonably be expected to have a Material Adverse Effect.

(k)     Fiscal Year.  Cause the Fiscal Year of the Parent and its Subsidiaries to end on December 31 of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)     [Intentionally omitted].

(m)     [Intentionally omitted].

(n)     Anti-Bribery and Anti-Corruption Laws.  Maintain, and cause each of its Subsidiaries to maintain, anti-bribery and anti-corruption policies and procedures that are reasonably designed to ensure compliance with the Anti-Corruption Laws.

(o)     [Intentionally omitted].

(p)     Lender Meetings.  Upon the request of any Agent or the Required Lenders (which request, so long as no Event of Default shall have occurred and be continuing shall not be made with respect to an in-person meeting more than once per Fiscal Year, and with respect to a telephonic meeting more than once per month), participate in a meeting with the Agents and the Lenders at such time as may be mutually agreed to by the Administrative Agent and the Collateral Agent and the Borrowers.

(q)     Further Assurances.  Subject to the terms of the Bankruptcy Court Orders, take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries (other than the Excluded Canadian Subsidiary), (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document (including, without limitation, with respect to obtaining "control" (as such term is defined in the UCC, the STA or any other Canadian PPSL) of any Collateral, as a result of any amendment to the UCC, the STA or any analogous legislation or amendment to any other Canadian PPSL.  In addition to and without limiting the foregoing, upon the initial acquisition by any Loan Party of

any owned real or personal property in Quebec with an aggregate value in excess of $250,000, such Loan Party shall provide prompt written notice of such acquisition and, if requested by the Collateral Agent, the Collateral Agent and the applicable Loan Party shall take such steps as are reasonably necessary from time to time to perfect a security interest in such Loan Party's property in Quebec, and such Loan Party shall, upon the Collateral Agent's request, deliver to the Collateral Agent within thirty (30) days of such request, or such later date as permitted by the Collateral Agent, such fully executed security documents, including without limitation a moveable hypothec and deed of trust, and certificates as shall be reasonably required by the Collateral Agent in order to perfect such security interest. For the avoidance of doubt, the residence of any Account Debtor in Quebec who is obligated on the Receivables in any Asset Pool shall not be considered to constitute the ownership of personal property in Quebec by any Loan Party. In furtherance of the foregoing, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court Orders, each Loan Party (i) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(r)    [Intentionally omitted].

(s)    <u>Use of Proceeds</u>. Use the proceeds of the Loans in accordance with the cash disbursements contemplated in the Initial Budget so as not to cause a Material Adverse Deviation and subject to the terms, conditions and limitations of this Financing Agreement and the Bankruptcy Court Orders.

Section 7.02    <u>Negative Covenants</u>. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)    <u>Liens, Etc.</u> Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof) other than, as to all of the above, Permitted Liens; <u>provided</u> that no Liens shall be permitted on any assets included in the Borrowing Base other than the Liens of the Collateral Agent for the benefit of the Agents and the Lenders, Permitted Liens in favor of the 1.25 Lien Agent, the 1.5 Lien Agent and the Second Lien Notes Indenture Trustee, and inchoate Permitted Liens.

(b)    <u>Indebtedness</u>. Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create,

incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)    Fundamental Changes; Dispositions.

(i)    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or permit any of its Subsidiaries to do (or agree to do) any of the foregoing; provided, however, that any wholly-owned Subsidiary of any Loan Party (other than a Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate or amalgamate with another wholly-owned Subsidiary of such Loan Party, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the Agents at least 10 Business Days' prior written notice (or such shorter notice as the Agents may agree) of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including, without limitation, the certificate or certificates of merger or amalgamation to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lenders' rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation and (E) in the case of any merger involving a Loan Party, the surviving Subsidiary, if any, if not already a Loan Party, is joined as a Loan Party hereunder pursuant to a Joinder Agreement and is a party to a Security Agreement and the Equity Interests of such Subsidiary is the subject of a Security Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation; and

(ii)    Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions; provided, further, that notwithstanding anything to the contrary contained herein, for the avoidance of doubt, any Disposition of the Eagle Software shall not be deemed to be a Permitted Disposition.

(d)    Change in Nature of Business.  Make, or permit any of its Subsidiaries to engage in any business other than the Permitted Business.

(e)    Loans, Advances, Investments, Etc.  Make or commit or agree to make, or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)    Sale and Leaseback Transactions.  Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction.

(g)    [Intentionally omitted].

(h)     Restricted Payments.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)     Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)     Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) transactions consummated in the ordinary course of business in a manner necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and that are fully disclosed to the Agents prior to the consummation thereof, if they involve one or more payments by the Parent or any of its Subsidiaries in excess of $100,000 for any single transaction or series of related transactions, (ii) transactions with another Loan Party, (iii) transactions permitted by Section 7.02(e) and Section 7.02(h), (iv) [intentionally omitted], (v) reasonable and customary director and officer compensation (including bonuses and stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary, (vi) [intentionally omitted], (vii) [intentionally omitted], (viii) [intentionally omitted], and (ix) any other affiliate transactions listed on Schedule 7.02(j).

(k)     Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 7.02(k) shall prohibit or restrict compliance with:

(A)     this Agreement, the other Loan Documents, the 1.25 Lien Loan Documents, the 1.5 Lien Loan Documents and the Second Lien Note Documents;

(B)     any agreement in effect on the date of this Agreement and described on Schedule 7.02(k), or any extension, replacement or continuation of any such agreement; provided, that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued;

(C)　　any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

(D)　　in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing Permitted Purchase Money Indebtedness from restricting on customary terms the transfer of any property or assets subject thereto;

(E)　　customary restrictions on dispositions of real property interests in reciprocal easement agreements;

(F)　　customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or

(G)　　customary restrictions in contracts that prohibit the assignment of such contract.

(l)　　<u>Limitations on Negative Pledges</u>.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (i) this Agreement, the other Loan Documents, the 1.25 Lien Loan Documents, the 1.5 Lien Loan Documents and the Second Lien Note Documents, (ii) restrictions or conditions imposed by any agreement relating to Permitted Purchase Money Indebtedness if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; <u>provided</u> that such sale or other disposition is permitted hereunder and that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, (iv) customary provisions in leases restricting the assignment or sublet thereof and (v) customary non-assignment provisions or other restrictions on Liens arising under leases, subleases, licenses, joint venture agreements and other contracts entered into in the ordinary course of business.

(m)　　<u>Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.</u>

(i)　　[intentionally omitted];

(ii)　　[intentionally omitted];

(iii)    amend, waive, modify or otherwise change the Purchase Agreement, the Plan of Reorganization or the Plan Support Agreement if the result would have an adverse effect on the right or remedies of any Loan Party or any Secured Party;

(iv)    amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iv) that either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect;

(v)    [intentionally omitted];

(vi)    agree to any amendment to any Assets Available For Purchase Agreement without the prior written consent of (i) the Collateral Agent in all events (other than an amendment solely to decrease the aggregate dollar value of the participation interests available to all Franchisee with respect to any applicable level of quarterly assets purchased during any period below the amounts determined in accordance with Section 3 of such agreements or decrease the amounts payable to a Franchisee pursuant to Sections 6, 7, or 8 of such agreements, and (ii) the Required Lenders (each of whom may grant or withhold consent in its own sole discretion) with respect to any amendment or modification that increases the aggregate dollar value of the participation interests available to all Franchisees with respect to any applicable level of quarterly assets purchased during any period in excess of the amounts determined in accordance with Section 3 of such agreements or increases the amounts payable to a Franchisee pursuant to Sections 6, 7, or 8 of such agreements; provided, however, that nothing contained in this Section 7.02(m)(vi) or otherwise in this Agreement shall prohibit any Loan Party from rejecting any Assets Available For Purchase Agreement in connection with the Bankruptcy Cases; or

(vii)    modify in any respect all or any portion of the formula for the calculation of ERP without the prior written consent of the Collateral Agent.

(n)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)    <u>ERISA</u>.  (i) Engage, or permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as

required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(p)    Canadian Pension Plans.  Contribute to or assume an obligation to contribute to or have any liability under any Canadian DB Plan or acquire an interest in any Person that sponsors, maintains or contributes to or at any time in the five-year period preceding such acquisition has sponsored, maintained, or contributed to a Canadian DB Plan, without the prior written consent of the Administrative Agent.

(q)    Environmental.  Except as could not reasonably be expected to result in a Material Adverse Effect, permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance with Environmental Laws.

(r)    Accounting Methods.  Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(s)    Anti-Money Laundering and Anti-Terrorism Laws.

(i)    Do, or permit any of their Affiliates or agents to do any of the following:

(A)    conduct any business or engage in any transaction or dealing with or for the benefit of any Blocked Person in violation of the OFAC Sanctions Program, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Blocked Person in violation of the OFAC Sanctions Program;

(B)    deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to the OFAC Sanctions Programs;

(C)    use any of the proceeds of the transactions contemplated by this Agreement to finance, promote or otherwise support in any manner any illegal activity, including, without limitation, any violation of the Anti-Money Laundering and Anti-Terrorism Laws or any specified unlawful activity as that term is defined in the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956 and 1957; or

(D)    violate, attempt to violate, or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the Anti-Money Laundering and Anti-Terrorism Laws.

(ii)    Become or permit any Affiliate, officer, director or principal shareholder or owner of any of the Loan Parties, or any of the Loan Parties' respective agents

acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, to become a Blocked Person.

(t)     Anti-Bribery and Anti-Corruption Laws.

(i)     Offer, promise, pay, give, or authorize the payment or giving of any money, gift or other thing of value, directly or indirectly, to or for the benefit of any Foreign Official for the purpose of: (1) influencing any act or decision of such Foreign Official in his, her, or its official capacity; or (2) inducing such Foreign Official to do, or omit to do, an act in violation of the lawful duty of such Foreign Official, or (3) securing any improper advantage, in order to obtain or retain business for, or with, or to direct business to, any Person; or

(ii)     Act or attempt to act in any manner which would subject any of the Loan Parties to liability under any Anti-Corruption Law.

(u)     Foreign Exchange Availability.  Fail to maintain in full force and effect and comply in all material respects with the terms of all Requirements of Law required to enable it to pay solely and exclusively in Dollars all amounts which a Loan Party is or may be required to pay under the Loan Documents.

(v)     Pari Passu.  Fail to take all actions necessary to cause all Obligations to rank at all times at least pari passu in priority in right of payment and in all other respects with all other of unsecured and unsubordinated Indebtedness of any Loan Party.

(w)     No Excess Cash.  Maintain, or permit any of its Subsidiaries to maintain, an average monthly balance of cash and Cash Equivalents in all of the checking, savings and other accounts of the Loan Parties (other than the Collateral Reserve Accounts) in excess of $10,000,000 in the aggregate at the close of business on the last Business Day of any month.

(x)     Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims.

(i)     at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders, except for modifications and amendments agreed to by the Agents and the Required Lenders;

(ii)     at any time, suffer to exist a priority for any administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except as provided in Section 3.05 and for the Carve-Out Expenses having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities";

(iii)     at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders in respect of the Collateral; and

(iv)     prior to the date on which the Obligations have been paid in full in cash, the Loan Parties shall not pay any administrative expense claims except (A) Priority Professional Expenses and other payments pursuant to sub-clause (i) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (B) principal of an interest on the Pre-Petition Revolving Loans and the Obligations due and payable hereunder, and (C) other administrative expense and professional claims incurred in the ordinary course of the business of the Loan Parties or their respective Bankruptcy Cases, in each case, to the extent and having the order of priority set forth in the definition of the term "Agreed Administrative Expense Priorities".

(y)     Limitation on Prepayments of Prepetition Obligations.  Notwithstanding anything to the contrary contained herein or in any other Loan Documents, no Loan Party shall (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with any trustee with respect thereto money or securities before due for the purpose of paying when due) of any Indebtedness or other obligations (other than the Pre-Petition Obligations) of any Loan Party, in each case, incurred prior to the Filing Date other than payments provided for in the Initial Budget and approved by an order of the Bankruptcy Court entered within 5 Business Days from the Filing Date or, if thereafter, either to carry out the Loan Parties' obligations under the Plan Support Agreement or otherwise as are reasonably acceptable to the Required Lenders, (ii) pay any interest on any Indebtedness or other obligations (other than Pre-Petition Obligations) of any Loan Party, including, without limitation, the 1.25 Lien Obligations, the 1.5 Lien Obligations and the Second Lien Obligations (whether in cash, in kind securities or otherwise), or (iii)   except as permitted or provided under the Bankruptcy Orders, make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code or pursuant to any other provision of the Bankruptcy Code, the CCAA or the BIA authorizing adequate protection, or apply to the Bankruptcy Court or the Canadian Bankruptcy Court for the authority to do any of the foregoing.

Section 7.03   Financial Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)     Minimum Availability.  Permit Availability to be less $2,500,000 at any time.

# ARTICLE VIII

# CASH MANAGEMENT ARRANGEMENTS
# AND OTHER COLLATERAL MATTERS

Section 8.01   Cash Management Arrangements.   (a) The Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more of the banks set forth on Schedule 8.01 (each a "Cash Management Bank") and (ii) except as otherwise provided under Section 8.01(b), deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature

susceptible to a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party and remittances on credit card sales) into a Cash Management Account.

(b)     The Loan Parties shall not maintain, and shall not permit any of their Subsidiaries to maintain, cash, Cash Equivalents or other amounts in any deposit account or securities account, unless the Collateral Agent shall have received a perfected, first priority Lien in respect of each such Cash Management Account (other than Excluded Accounts).

(c)     Upon the terms and subject to the conditions set forth in a Control Agreement (including any Control Agreement existing as of the Interim Facility Effective Date in favor of the Prepetition Collateral Agent) with respect to a Cash Management Account, all amounts received in a Cash Management Account (other than the Collateral Reserve Accounts) shall be wired each Business Day into the Administrative Agent's Account; provided that, so long as no Event of Default has occurred and is continuing, the Loan Parties may retain up to $10,000,000 in Cash Management Accounts in which all amounts on deposit therein are not wired to the Administrative Agent's Account on a daily basis, so long as such Cash Management Accounts are subject to a "springing" Control Agreement in favor of the Collateral Agent (including any Control Agreement existing as of the Interim Facility Effective Date in favor of the Prepetition Collateral Agent).

(d)     So long as no Default or Event of Default has occurred and is continuing, the Borrowers may amend Schedule 8.01 to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered to the Collateral Agent a Control Agreement. Each Loan Party shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from the Collateral Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such Cash Management Bank with respect to Cash Management Accounts or the Collateral Agent's liability under any Control Agreement with such Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01   Events of Default.  Each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)     any Borrower shall fail to pay (i) all or any portion of the principal of any Loan or any interest on any Loan, any fee or any Collateral Agent Advance when due (whether

by scheduled maturity, required prepayment, acceleration, demand or otherwise), or (ii) any indemnity or other amount payable under this Agreement (other than any amount set forth in clause (i) above), when due, and in the case of this clause (ii), such failure continues for five (5) or more Business Days;

(b)     any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)     any Loan Party shall fail to perform or comply with any covenant or agreement contained in Section 7.01(a), Section 7.01(c), Section 7.01(d), Section 7.01(f), Section 7.01(h), Section 7.01(i), Section 7.01(k), Section 7.01(n), Section 7.01(p), Section 7.01(q), Section 7.02 or Section 7.03 or Article VIII, or any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party;

(d)     any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 15 days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by any Agent to such Loan Party;

(e)     any Loan Party or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Indebtedness (excluding Indebtedness evidenced by this Agreement) having an individual principal amount in excess of $2,500,000 or having an aggregate amount outstanding in excess of $5,000,000, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)     [intentionally omitted];

(g)     [intentionally omitted];

(h)     any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or

enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     the Bankruptcy Court Orders, any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby, in each case, for any reason other than the failure of any Agent to take any action that is solely within its control, after such Agent has received all information and documents necessary to take such action;

(j)     (i) one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $3,000,000 in any individual case and $5,000,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and (x) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (y) there shall be a period of 10 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal; or (ii) any fine is assessed against any Loan Party, or any Loan Party enters into any consent decree agreeing to the payment of any fine, damages or other penalty in an aggregate amount (1) in excess of $5,000,000 cash or (2) that reduces (or could reasonably be expected to reduce) ERP by $15,000,000 or more;

(k)     any Loan Party or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than 15 days;

(l)     the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party or any of its Subsidiaries, or failure to obtain any license or permit required by applicable Requirements of Law, if such loss, suspension, revocation or failure to renew or obtain could reasonably be expected to have a Material Adverse Effect;

(m)     the indictment of any Loan Party or any of its Subsidiaries or any senior officer thereof under any criminal statute, or commencement of criminal or civil proceedings (including, without limitation, under any federal or state racketeering statute (including, without limitation, the Racketeer Influenced and Corrupt Organization Act of 1970)), against any Loan Party or any of its Subsidiaries or any senior officer thereof, pursuant to which statute or proceedings the penalties or remedies sought or available include confiscation or forfeiture to any Governmental Authority of any material portion of the property of any Loan Party;

(n)     any Loan Party or any of its ERISA Affiliates shall have made a complete or partial withdrawal from a Multiemployer Plan, and, as a result of such complete or partial withdrawal, any Loan Party or any of its ERISA Affiliates incurs a withdrawal liability in an annual amount exceeding $1,000,000; or a Multiemployer Plan enters reorganization status under Section 4241 of ERISA, and, as a result thereof any Loan Party's or any of its ERISA Affiliates' annual contribution requirements with respect to such Multiemployer Plan increases in an annual amount exceeding $1,000,000;

(o)     any Termination Event with respect to any Employee Plan shall have occurred, and, 30 days after notice thereof shall have been given to any Loan Party by any Agent, (i) such Termination Event (if correctable) shall not have been corrected, and (ii) the then current value of such Employee Plan's vested benefits exceeds the then current value of assets allocable to such benefits in such Employee Plan by more than $1,000,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, the liability is in excess of such amount);

(p)     (i) any holder of Subordinated Indebtedness shall fail to perform or comply with any of the subordination provisions of the documents evidencing or governing such Subordinated Indebtedness, (ii) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness, (iii) any party to any Intercreditor Agreement shall fail to perform or comply with any of the terms thereof, or (iv) any Intercreditor Agreement shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any party to such Intercreditor Agreement;

(q)     a Change of Control shall have occurred;

(r)     any event or development occurs with regard to, under, or in respect of, any Consumer Law or financial regulation (including changes or proposed changes in regulatory requirements, or allegations by regulatory authorities of regulatory violations by the Loan Parties or their Subsidiaries), in each case, that could reasonably be expected to (i) decrease aggregate ERP by 10% or more or (ii) otherwise have a material and adverse effect on the Loan Parties' ability to conduct their business and operations as conducted on the Interim Facility Effective Date;

(s)     the entry by any Loan Party into a consent order or other settlement with any federal or state regulatory agency that could reasonably be expected to (i) decrease aggregate ERP by 10% or more or (ii) otherwise have a material and adverse impact on the Loan Parties' ability to conduct their business and operations as conducted on the Interim Facility Effective Date;

(t)     any Governmental Authority shall have initiated any action, enforcement proceeding or litigation against any Loan Party before or by any court, governmental, regulatory or administrative agency or instrumentality in any way relating to the Transactions;

(u)     any Bankruptcy Court Order shall have been stayed, amended, modified, reversed, vacated or subject to appeal;

(v)     the Final Bankruptcy Court Order shall not have been entered by the Bankruptcy Court within thirty-five (35) days from the Filing Date;

(w)     an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, appointing, or any Loan Party shall file an application for an order with respect to any Bankruptcy Case, as applicable, seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code or under the BIA, as applicable, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or under any other Debtor Relief Law;

(x)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(y)     an order shall be entered by the Bankruptcy Court or the Canadian Bankruptcy Court confirming a plan of reorganization in any of the Bankruptcy Cases which does not (i) contain a provision for termination of the Total Revolving Credit Commitment and payment in full in cash of all Pre-Petition Obligations and all Obligations of the Loan Parties hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Agents and the Lenders and priorities until such plan effective date;

(z)     an order shall be entered by the Bankruptcy Court or the Canadian Bankruptcy Court dismissing any of the Bankruptcy Cases which does not contain a provision for termination of the Total Revolving Credit Commitment and the payment in full in cash of all Pre-Petition Obligations and all Obligations of the Loan Parties hereunder and under the other Loan Documents upon entry thereof;

(aa)     an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, without the express prior written consent of the Agents and the Required Lenders, (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(bb)     an application for any of the orders described in clauses (u) through (aa) above shall be made by any Loan Party or any other Person to the extent such application is not

contested by the Loan Parties in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(cc)    an order shall be entered by the Bankruptcy Court or the Canadian Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay or court-ordered stay, as applicable, to any creditor of any Loan Party with respect to any claim in an amount equal to or exceeding $250,000 in the aggregate;

(dd)    (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent and/or the Lenders', claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement or the Bankruptcy Court Orders shall, for any reason, cease to be valid or (iii) any action is commenced by any Loan Party which contests the validity, perfection or enforceability of any of the Liens and security interests of any Agent and/or the Lenders created by any of the Bankruptcy Court Orders, this Agreement, any mortgage, any security agreement, any pledge agreement or any other security agreement;

(ee)    the determination of any Loan Party, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Bankruptcy Cases, seeking authority to do any of the foregoing;

(ff)    a Material Adverse Deviation shall have occurred;

(gg)    the Purchase Agreement or the Plan Support Agreement shall have terminated for any reason; or

(hh)    the Plan of Reorganization is withdrawn in the Bankruptcy Court or any Loan Party files a plan of reorganization other than the Plan of Reorganization (or disclosure statement describing such plan) unless such plan of reorganization provides for the repayment in full in cash of the Obligations and the Pre-Petition Obligations or is otherwise consented to by the Agents and the Required Lenders;

then, and in any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Administrative Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without further order of, or application to, the Bankruptcy Court and without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents.

Section 9.02    [Intentionally omitted].

# ARTICLE X

## AGENTS

Section 10.01    Appointment.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including:  (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of

any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 10.02  Nature of Duties; Delegation.  (a) The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender.  Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)  Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Lender).  Any such Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03  Rights, Exculpation, Etc.  The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty

to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

Section 10.04    Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05    Indemnification.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse such Agent for and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted

from such Agent's gross negligence or willful misconduct. The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.06    Agents Individually.  With respect to its Pro Rata Share of the Total Revolving Credit Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07    Successor Agent.  (a) Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Administrative Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Administrative Borrower, to appoint a successor Agent.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08    Collateral Matters.

(a)    The Collateral Agent may from time to time make such disbursements and advances ("Collateral Agent Advances") which the Collateral Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the

Borrowers of the Loans and other Obligations or to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 12.04. The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to Revolving Loans that are Reference Rate Loans. The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.01. The Collateral Agent shall notify each Lender and the Administrative Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance. Without limitation to its obligations pursuant to Section 10.05, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance. If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Revolving Credit Commitment and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnification Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(b).

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(b). Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary or reasonably requested by any Loan Party (other than a UCC-3 or Canadian PPSL financing statement amendments) to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)     Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(e)     The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

(f)     Each of the parties hereto (including each Lender, acting for itself and on behalf of each of its Affiliates that are or become Secured Parties from time to time) confirms the appointment and designation of the Collateral Agent as the hypothecary representative for the present and future Secured Parties (in such capacity, the "Representative"), as contemplated by Article 2692 of the Civil Code of Québec, for the purposes of holding any security including any hypothecs ("Hypothecs") granted by the Loan Parties or any one of them pursuant to the laws of the Province of Quebec. The execution by the Representative prior to the date hereof of any document creating or evidencing any such security for the benefit of any of the Secured Parties is hereby ratified and confirmed. Each future Secured Party, whether a Lender or a holder of any Obligation, shall be deemed to have ratified and confirmed (for itself and on behalf of each of its Affiliates that are or become Secured Parties from time to time) the appointment of the Collateral Agent as the Representative. The Representative shall (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted hereunder, all rights and

remedies given to the Representative pursuant to any hypothec, pledge, applicable law or otherwise, (b) benefit from and be subject to all provisions hereof with respect to the Administrative Agent, mutatis mutandis, including all such provisions with respect to the liability or responsibility to an indemnification by the Secured Parties, and (c) be entitled to delegate from time to time any of its powers or duties under any hypothec or pledge on such terms and conditions as it may determine from time to time. The substitution or replacement of the Collateral Agent pursuant to the provisions hereof shall also constitute the substitution or replacement of the Representative. The new Representative, without further act, shall then be vested and have all the rights, powers and authorities granted to the Representative hereunder and shall be subject in all respects to the terms, conditions and provisions hereof, to the same extent as if originally acting as Representative hereunder.

(g) Notwithstanding the provisions of Section 32 of An Act Respecting the Special Powers of Legal Persons (Québec), the Administrative Agent and the Collateral Agent may purchase, acquire and be the holder of any bond issued by any Loan Party. Each of the Loan Parties hereby acknowledges that any such bond shall constitute a title of indebtedness, as such term is used in Article 2692 of the Civil Code of Québec.

Section 10.09    Agency for Perfection.    Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10    No Reliance on any Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby:    (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act or any other

Anti-Terrorism Laws. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations or any other Anti-Terrorism Laws.

Section 10.11    No Third Party Beneficiaries. The provisions of this Article are solely for the benefit of the Secured Parties, and, except as provided in Section 10.07 (with respect to the Administrative Borrower's consent rights in respect of the appointment of a successor Agent), no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12    No Fiduciary Relationship. It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13    Reports; Confidentiality; Disclaimers. By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Parent or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)    expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrowers, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorneys' fees and

costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14    Collateral Custodian.    Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests.  Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral.  All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrowers and charged to the Loan Account.

Section 10.15    Intercreditor Agreement.    Each Lender hereby grants to the Collateral Agent all requisite authority to enter into or otherwise become bound by, and to perform its obligations and exercise its rights and remedies under and in accordance with the terms of, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement and to bind the Lenders thereto by the Collateral Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any Lender is or will be required in connection with the performance by the Collateral Agent of the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement.

Section 10.16    Collateral Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and

its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

## ARTICLE XI

## GUARANTY

Section 11.01    <u>Guaranty</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due and payable, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest, fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article XI.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02    <u>Guaranty Absolute</u>.    Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto.  Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral.  The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03    Waiver.    Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04    Continuing Guaranty; Assignments.    This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation,

all or any portion of its Commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05    Subrogation.    No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.    If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.    If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06    Contribution.    All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for

purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor. "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06) minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor. The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01    Notices, Etc.

(a)    Notices Generally.   All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or telecopier. In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

> SquareTwo Financial Corporation
> 4340 S. Monaco Street, 2nd Floor
> Denver, CO 80237
> Attention:  Chief Financial Officer
> Telephone:  303-713-2160
> Telecopier:  303-713-2509

> with a copy to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York  10019
> Attention:  Leonard Klingbaum
> Telephone:  212-728-8290
> Telecopier:  212-728-9290

> if to the Administrative Agent, to it at the following address:

Cerberus Business Finance, LLC
875 Third Avenue
New York, NY 10022
Attention: Eric Miller
Telephone:  212-891-1549
Telecopier:  212-891-1541

with a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022
Attention:  Frederic L. Ragucci
Telephone:  212-756-2000
Telecopier:  212-593-5955

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

      (b)    Electronic Communications.

      (i)    Each Agent and the Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

      (ii)    Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the

recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 12.02 <u>Amendments, Etc.</u> (a) No amendment or waiver of any provision of this Agreement or any other Loan Document (excluding the Fee Letter), and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Agents and the Lenders or extending an existing Lien over additional property, by the Agents and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), (y) in the case of any other waiver or consent, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, waiver or consent shall:

(i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case, without the written consent of such Lender;

(ii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iii) amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender;

(iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by Section 7.02(c)(ii)), in each case, without the written consent of each Lender;

(v) amend, modify or waive Section 4.02, Section 4.03 or this Section 12.02 of this Agreement without the written consent of each Lender; or

(vi) amend the definition of "Borrowing Base," "Eligible Asset Pool," "ERP," "NERP" or "Specified Asset Pool," in each case, without the written consent of each Lender.

Notwithstanding the foregoing, (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents and (B) the consent of the Borrowers shall not be required to change any order of priority set forth in Section 2.05(d)

and Section 4.03.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents and any Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender).

(b)     If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Collateral Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07.  Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

Section 12.03     No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04     Expenses; Taxes; Attorneys' Fees.  The Borrowers will pay within 10 days after receipt of written notice from any Agent, including a reasonably detailed invoice thereof, all reasonable and documented out-of-pocket costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (n) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable and documented out-of-pocket fees, costs, client charges and expenses of counsel for each Agent (and, in the case of clauses (b) through (n) below, each Lender, provided that the obligation to reimburse expenses of counsel shall be limited to one law firm for each Agent and one law firm for all of the Lenders (taken as a whole) and if necessary no more than one counsel for each of the Agents and all of the Lenders (taken as a whole) in each jurisdiction

where Collateral is located and solely in the event of an actual or potential conflict of interests, an additional counsel for each group of similarly-situated affected Lenders), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any Facility of any Loan Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien, (m) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization, or (n) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing; provided, however, the foregoing to the contrary notwithstanding, that no Loan Party shall have any obligation to any Agent or Lender, as the case may be, under this Section 12.04 with respect to any Environmental Liabilities and Costs (x) that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith, or willful misconduct of such Agent or Lender or (y) which arises from a material breach of the Loan Documents by the Agent or Lenders.  Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrowers agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by any Agent or any Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrowers agree to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, (y) the Borrowers agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan

Documents and (z) if the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers. The obligations of the Borrowers under this Section 12.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents. Nothing contained herein shall limit the obligations of the Borrowers under the Commitment Letter, dated as of April 20, 2016, between the Parent and CBF, with respect to expenses incurred prior to the Interim Facility Effective Date by CBF, the Agents or the Lenders, even if such expenses are invoiced after the Interim Facility Effective Date.

Section 12.05 <u>Right of Set-off</u>. Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07 <u>Assignments and Participations</u>.

(a)     This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code, pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code or pursuant to the CCAA); <u>provided</u>, <u>however</u>, that none of the Loan Parties may assign or transfer any of its rights

hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)     Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to:

(i)     [intentionally omitted], and

(ii)     all or a portion of its Revolving Credit Commitment and the Revolving Loans made by it with (A) the written consent of each Agent and (B) the written consent of the Administrative Borrower (not to be unreasonably withheld, conditioned or delayed);

provided, however, that (1) no written consent of the Collateral Agent or the Administrative Agent shall be required (A) in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender and (2) no written consent of the Administrative Borrower shall be required (I) if, at the time of such assignment, any Event of Default shall have occurred and be continuing, (II) in connection with an assignment by a Lender to an Affiliate of such Lender or a Related Fund of such Lender or (III) if the Administrative Borrower fails to respond to a request for consent for five (5) Business Days following the receipt of such request.

(c)     Assignments shall be subject to the following additional conditions:

(i)     Each such assignment shall be in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof);

(ii)     the parties to each such assignment shall execute and deliver to the Collateral Agent (and the Administrative Agent, if applicable), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Collateral Agent, for the benefit of the Collateral Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender) and

(iii)     no such assignment shall be made to (A) any Loan Party, any Person that owns any Equity Interest or Indebtedness of any Loan Party (other than Loans hereunder or the Pre-Petition Loans) or any of their respective Affiliates or (B) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons.

(d)     Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Collateral Agent (or such shorter period as shall be agreed to by the Collateral Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f)     The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Administrative

Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)     Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent or the Collateral Agent pursuant to Section 12.07(b) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)     [Reserved].

(i)     In the event that any Lender sells participations in a Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Loans held by it and the principal amount (and stated interest thereon) of the portion of the Loan that is the subject of the participation (the "Participant Register").  A Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.   The Participant Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(e).

(k)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document).  The Loan Parties agree that each

participant shall be entitled to the benefits of Section 2.09 and Section 2.10 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender.

(l)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. The Loan Parties shall cooperate with such Lender and its Affiliates to effect the Securitization including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Loans or the Securitization.

Section 12.08     Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09     GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE.

Section 12.10     CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.

(a)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO

SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS..

(b)     Each Foreign Loan Party hereby irrevocably appoints the Parent (the "Process Agent"), with an office at the address set forth in Section 12.02, as its agent to receive on behalf of each Foreign Loan Party service of the summons and complaint and any other process which may be served in any action or proceeding described above. Such service may be made by mailing or delivering a copy of such process to each Foreign Loan Party, in care of the Process Agent at the address specified above for such Process Agent, and such Foreign Loan Party hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. Each Foreign Loan Party covenants and agrees that, for so long as it shall be bound under this Agreement or any other Loan Document, it shall maintain a duly appointed agent for the service of summons and other legal process in New York, New York, United States of America, for the purposes of any legal action, suit or proceeding brought by any party in respect of this Agreement or such other Loan Document and shall keep the Agents advised of the identity and location of such agent. If for any reason there is no authorized agent for service of process in New York, each Foreign Loan Party irrevocably consents to the service of process out of the said courts by mailing copies thereof by registered United States air mail postage prepaid to it at its address specified in Section 12.01. Nothing in this Section 12.10 shall affect the right of any Secured Party to (i) commence legal proceedings or otherwise sue any Foreign Loan Party in the country in which it is domiciled or in any other court having jurisdiction over such Foreign Loan Party or (ii) serve process upon any Foreign Loan Party in any manner authorized by the laws of any such jurisdiction.

Section 12.11     WAIVER OF JURY TRIAL, ETC.   EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO

OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12 <u>Consent by the Agents and Lenders</u>. Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13 <u>No Party Deemed Drafter</u>. Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14 <u>Reinstatement; Certain Payments</u>. If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Administrative Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15 <u>Indemnification; Limitation of Liability for Certain Damages</u>.

(a)  In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees, costs and expenses of one law firm for each Agent and one law firm for all of the Lenders (taken as a whole) and, if necessary, no more than one counsel for each of the Agents and all of the Lenders (taken as a whole) in each jurisdiction where Collateral is located and solely in the event of an actual or potential conflict of interests, an additional counsel for

each group of similarly-situated affected Lenders) incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrowers' use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Administrative Borrower or the handling of the Loan Account and Collateral of the Borrowers as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)	The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)	No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)	The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16	Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17    Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrower pursuant to Chapter 11 of the Bankruptcy Code, pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code or pursuant to the CCAA), except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18    Highest Lawful Rate.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrowers).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender

would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19    Confidentiality.  Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates and to its and its Affiliates' respective equityholders (including, without limitation, partners), directors, officers, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Loan Parties; (vi) in connection with any litigation to which any Agent or any Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Administrative Borrower.

Section 12.20    Public Disclosure.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using

the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure). Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrowers, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.21    Integration.    This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22    USA PATRIOT Act.    Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

Section 12.23    CAML Legislation.

(a)    The Loan Parties acknowledge that, pursuant to CAML, the Lenders and the Administrative Agent may be required to obtain, verify and record information regarding the Loan Parties, their directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Loan Parties, and the transactions contemplated hereby. The Loan Parties shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Administrative Agent, or any prospective assignee or participant of a Lender or the Administrative Agent, in order to comply with any applicable CAML, whether now or hereafter in existence.

(b)    Each of the Lenders agrees that the Administrative Agent has no obligation to ascertain the identity of the Loan Parties or any authorized signatories of the Loan Parties on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Loan Parties or any such authorized signatory in doing so.

Section 12.24    Judgment Currency.    This is an international financial transaction in which the specification of a currency and payment in New York is of the essence. Dollars

shall be the currency of account in the case of all payments pursuant to or arising under this Agreement or under any other Loan Document, and all such payments shall be made to the Administrative Agent's Account in New York in immediately available funds. To the fullest extent permitted by applicable law, the obligations of each Loan Party to the Secured Parties under this Agreement and under the other Loan Documents shall not be discharged by any amount paid in any other currency or in a place other than to the Administrative Agent's Account in New York to the extent that the amount so paid after conversion under this Agreement and transfer to New York does not yield the amount of Dollars in New York due under this Agreement and under the other Loan Documents. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "Other Currency"), to the fullest extent permitted by applicable law, the rate of exchange used shall be that at which the Administrative Agent could, in accordance with normal procedures, purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given. The obligation of each Loan Party in respect of any such sum due from it to the Secured Parties hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that, on the Business Day immediately following the date on which the Administrative Agent receives any sum adjudged to be so due in the Other Currency, the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with the Other Currency. If the Dollars so purchased are less than the sum originally due to the Secured Parties in Dollars, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Secured Parties against such loss, and if the Dollars so purchased exceed the sum originally due to the Secured Parties in Dollars, the Secured Parties agrees to remit to the Loan Parties such excess.

Section 12.25    Waiver of Immunity. To the extent that any Loan Party has or hereafter may acquire (or may be attributed, whether or not claimed) any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service of process or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such Loan Party hereby irrevocably waives and agrees not to plead or claim, to the fullest extent permitted by law, such immunity in respect of (a) its obligations under the Loan Documents, (b) any legal proceedings to enforce such obligations and (c) any legal proceedings to enforce any judgment rendered in any proceedings to enforce such obligations. Each Loan Party hereby agrees that the waivers set forth in this Section 12.25 shall be to the fullest extent permitted under the Foreign Sovereign Immunities Act and are intended to be irrevocable for purposes of the Foreign Sovereign Immunities Act.

Section 12.26    English Language. This Agreement and each other Loan Document have been negotiated and executed in English. All certificates, reports, notices and other documents and communications given or delivered by any party hereto pursuant to this Agreement or any other Loan Document shall be in English or, if not in English, accompanied by a certified English translation thereof. The English version of any such document shall control the meaning of the matters set forth herein.

Section 12.27    Parties Including Trustees; Bankruptcy Court Proceedings    This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and

any trustee or successor in interest of any Loan Party in any Bankruptcy Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, the CCAA or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case, any CCAA Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or any CCAA Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

<u>BORROWERS</u>:

SQUARETWO FINANCIAL CORPORATION

By: _____
      Name:
      Title:

SQUARETWO FINANCIAL SERVICES CORPORATION

By: _____
      Name:
      Title:

CACH, LLC

By: _____
      Name:
      Title:

<u>U.S. GUARANTORS</u>:

ASTRUM FINANCIAL LLC

By: _____
       Name:
       Title:


CACV OF COLORADO, LLC

By: _____
       Name:
       Title:


CACV OF NEW JERSEY, LLC

By: _____
       Name:
       Title:


HEALTHCARE FUNDING SOLUTIONS, LLC

By: _____
       Name:
       Title:


ORSA, LLC

By: _____
       Name:
       Title:

CANDEO, LLC

By: _____
    Name:
    Title:


AUTUS, LLC

By: _____
    Name:
    Title:


CA INTERNET MARKETING, LLC

By: _____
    Name:
    Title:


COLLECT AIR, LLC

By: _____
    Name:
    Title:


REFINANCE AMERICA, LTD.

By: _____
    Name:
    Title:


COLLECT AMERICA OF CANADA, LLC

By: _____
    Name:
    Title:

<u>CANADIAN GUARANTORS</u>:

SQUARETWO FINANCIAL CANADA
CORPORATION


By: _____
      Name:
      Title:


METROPOLITAN LEGAL ADMINISTRATION
SERVICES INC.


By: _____
      Name:
      Title:


CCL FINANCIAL, INC.


By: _____
      Name:
      Title:


PREFERRED CREDIT RESOURCES LIMITED


By: _____
      Name:
      Title:

<u>COLLATERAL AGENT AND</u>
<u>ADMINISTRATIVE AGENT</u>:

CERBERUS BUSINESS FINANCE, LLC

By: _____
      Name:
      Title:

<u>LENDERS</u>:

CERBERUS ASRS HOLDINGS LLC, as a Lender


By: _____
        Name:
        Title:


CERBERUS AUS LEVERED HOLDINGS LP, as a Lender


By:   CAL I GP Holdings LLC
      Its:  General Partner

By: _____
        Name:
        Title:


CERBERUS ICQ LEVERED LOAN OPPORTUNITIES FUND, L.P., as a Lender


By:   Cerberus ICQ Levered Opportunities GP, LLC
      Its:  General Partner

By: _____
        Name:
        Title:

CERBERUS ICQ OFFSHORE LOAN OPPORTUNITIES MASTER FUND, L.P., as a Lender

By: Cerberus ICQ Offshore Levered GP, LLC
Its: General Partner

By: _____
Name:
Title:


CERBERUS KRS LEVERED LOAN OPPORTUNITIES FUND, L.P., as a Lender

By: Cerberus KRS Levered Opportunities GP, LLC
Its: General Partner

By: _____
Name:
Title:


CERBERUS PSERS LEVERED LOAN OPPORTUNITIES FUND, L.P., as a Lender

By: Cerberus PSERS Levered Opportunities GP, LLC
Its: General Partner

By: _____
Name:
Title:

CERBERUS NJ CREDIT OPPORTUNITIES FUND, L.P., as a Lender

By:    Cerberus NJ Credit Opportunities GP, LLC
       Its:  General Partner

By:    _____
       Name:
       Title:


CERBERUS OFFSHORE LEVERED LOAN OPPORTUNITIES MASTER FUND III, L.P., as a Lender

By:    Cerberus Offshore Levered Opportunities III GP, LLC
       Its:  General Partner

By:    _____
       Name:
       Title:


CERBERUS LEVERED LOAN OPPORTUNITIES FUND III, L.P., as a Lender

By:    Cerberus Levered Opportunities III GP, LLC
       Its:  General Partner

By:    _____
       Name:
       Title:

CERBERUS SWC LEVERED LOAN OPPORTUNITIES MASTER FUND, L.P., as a Lender

By: Cerberus SWC Levered Opportunities GP, LLC
Its: General Partner

By: _____
Name:
Title:

DRAWBRIDGE SPECIAL OPPORTUNITIES
FUND LP, as a Lender

By:     Drawbridge Special Opportunities GP LLC
        Its:  General Partner

By:     _____
        Name:
        Title:

**Schedule 1.01(A)**

**Lenders and Lender's Commitments**

| **Lenders** | **Revolving Credit Commitment** |
|---|---|
| Cerberus ASRS Holdings LLC | $7,067,764.86 |
| Cerberus AUS Levered Holdings LP | $1,001,958.52 |
| Cerberus ICQ Levered Loan Opportunities Fund, L.P. | $3,790,951.34 |
| Cerberus ICQ Offshore Loan Opportunities Master Fund, L.P. | $563,156.35 |
| Cerberus KRS Levered Loan Opportunities Fund, L.P. | $861,163.16 |
| Cerberus PSERS Levered Loan Opportunities Fund, L.P. | $3,450,883.28 |
| Cerberus NJ Credit Opportunities Fund, L.P. | $1,834,560.23 |
| Cerberus Offshore Levered Loan Opportunities Master Fund III, L.P. | $6,397,194.47 |
| Cerberus Levered Loan Opportunities Fund III, L.P. | $9,608,394.46 |
| Cerberus SWC Levered Loan Opportunities Master Fund, L.P. | $878,518.77 |
| Drawbridge Special Opportunities Fund LP | $23,045,454.55 |
| **TOTAL:** | **$58,500,000.00** |